## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

Civil Case No.: _____

JOHN DOE,

      Plaintiff,

                 v.

GEORGE MASON UNIVERSITY, THE RECTOR
AND BOARD OF VISITORS OF GEORGE MASON
UNIVERSITY, JENNIFER RENEE HAMMAT, in her
official and individual capacities, JULIAN ROBERT
WILLIAMS, in his official and individual capacities,
KEITH DAVID RENSHAW, in his official and individual
capacities, ANN LOUISE ARDIS, in her official and
individual capacities, and SZUYUNG DAVID DWU, also
known as S. David Wu, in his official
and individual capacities.

                Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff"), by his attorneys Farmer Legal,

PLLC and Nesenoff & Miltenberg, LLP, as and for his complaint against Defendants George

Mason University, The Rector and Board of Visitors of George Mason University (collectively

"GMU or the University"), Jennifer Renee Hammat, Julian Robert Williams, Keith David

Renshaw, Ann Louise Ardis and Szuyung David Dwu, also known as S. David Wu (collectively

the "Defendants") respectfully alleges as follows:

## THE NATURE OF THE ACTION

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

1.      This action arises out of GMU's flawed and gender-biased Title IX proceedings against Plaintiff and the resulting violations of Plaintiff's Fourteenth and First Amendment rights and violations of state law.

2.      Plaintiff, who has taught courses and conducted research concerning human sexuality, abnormal behavior and cultural norms at the University for over 15 years, has long been held in the highest esteem by students and colleagues alike, having achieved the highest levels of success in his field and received numerous awards and accolades over the course of his career.

3.      Plaintiff held his tenured position without incident until December, 2018 when he was notified of years-old, false allegations of sexual harassment reported against him by a graduate student whom he had recently fired from his lab, and her three friends, two of whom had already graduated from GMU at the time their reports were made.

4.      The complaints—some of which dated back to 2013—primarily concerned topics Plaintiff discussed in his classes, comments made by Plaintiff in the course of class discussion or, on occasion, outside of the classroom but pertaining to topics he taught and scientifically researched at the University. The remaining allegations were disproven by witness statements that supported Plaintiff's account of various events, or evidence submitted by Plaintiff which contradicted the allegations, including that the complainants had suffered harm, or been denied access to their education in any way.

5.      On the contrary, at each complainant's request, Plaintiff provided assistance with writing and consulting opportunities, provided recommendations for job opportunities and grants and, in one case, Plaintiff sat on the complainant's dissertation committee. Understandably, Plaintiff was surprised to learn that the same women who had given him unsolicited praise for his teaching and research, and sought him out for assistance with academics and their careers, now

alleged that he had created a "hostile environment." The Defendants did not question that these women were all friends (Complainants 3 and 4 were roommates) or that they had waited years to complain. None of the Defendants questioned the motives of the graduate student who had been fired for poor performance.

6.      Instead, Defendants pursued a baseless investigation of allegations that were timed out under the applicable GMU policies and procedures, ignored that the majority of the allegations concerned protected academic discourse, and deprived Plaintiff of even the most minimal due process protections including notice, cross-examination and the right to review the evidence against him, even though he faced termination as a potential sanction. No hearing was held. No faculty were involved. The Title IX Coordinator, who had a conflict of interest, solely determined the outcome of the case. Her supervisor, alone, decided Plaintiff's appeal. That decision was final.

7.      During the time in which Plaintiff's case was investigated and decided, GMU was already facing intense public pressure due to two civil rights investigations concerning its failure to adequately respond to the complaints of female students, an exposé in The Washington Post and The Atlantic about a professor who made sexual advances toward a number of his students over a span of years, and student outcry over the University's decision to hire "controversial" Supreme Court Associate Justice Brett Kavanaugh.

8.      The Title IX staff assigned to Plaintiff's case were biased against Plaintiff. Their backgrounds are in advocacy for women's rights, and they have made public statements indicating bias against male respondents. Certain statements made by Defendants Hammat and Williams in correspondence to Plaintiff suggested that they employed stereotypical views of males and females in their decision-making process when evaluating Plaintiff's case.

9.     The Title IX investigator assigned to Plaintiff's case, Megan Simmons ("Ms. Simmons"), was removed from the case due to bias. This occurred after the investigator conducted the complainant interviews and, upon information and belief, interviewed the majority of witnesses in the case. Neither Defendant Hammat nor Defendant Williams considered that the evidence gathered by Ms. Simmons could be tainted due to her bias against Plaintiff.

10.     Defendant Hammat erroneously found Plaintiff responsible for sexual and gender-based harassment, adding new allegations and charges to the letters conveying her findings to Plaintiff, to which Plaintiff had no opportunity to respond during the investigation. Further, the evidence did not support the findings.

11.     Defendant Williams denied Plaintiff's appeal, in part finding that Plaintiff had provided no new evidence in support of his appeal. In fact, Plaintiff provided new evidence that utterly refuted a number of the complainants' allegations. He also pointed to a number of procedural errors—including a lack of due process in the proceedings and bias on the part of Defendant Hammat and Ms. Simmons—that warranted reversal of the findings.

12.     As a result of the finding, Defendant Renshaw imposed severe restrictions on Plaintiff's contact with graduate students, including teaching and research positions for an indefinite period of time because the lifting of said restrictions is left to Dr. Renshaw's discretion.

13.     Defendants publicly released information about Plaintiff's case to faculty members in Plaintiff's program, even before any outcome had been determined, causing rumors to spread and harming his reputation. Defendants also released confidential Title IX documents to the faculty in Plaintiff's program without his knowledge, resulting in the sharing of this information to graduate students, who were then discouraged from working with Plaintiff. The faculty then filed a grievance against Plaintiff which resulted in Plaintiff's disaffiliation from his program.

14.     Plaintiff was heavily pressured to discuss the case at a faculty meeting even though he had made clear to his supervisor, Defendant Renshaw, that he had no intention of discussing the case. The meeting was with the same individuals who filed the grievance against him. While he did not provide the details of the case that were repeatedly demanded by the faculty (the majority of whom were female) at that meeting, he did sit through an attack on his character, speculation and surmise about what had happened, and statements to the effect that his colleagues had little concern about what harm may occur to his reputation.

15.     As a result of Defendants' misconduct in violating the University's own policies and failing to provide Plaintiff with a fundamentally fair process, Plaintiff has, among other things, suffered irreparable harm to his career and reputation. Several faculty explicitly mentioned in the meeting that the Plaintiff's reputation has already been ruined.

16.     As fully set forth below, Plaintiff alleges claims against Defendants for: violations of Title IX of the Education Amendments of 1972; violation of Plaintiff's right to procedural due process under the Fourteenth Amendment of the United States Constitution; violation of the due process clause of the Constitution of the Commonwealth of Virginia; and violation of Plaintiff's right to free speech under the First Amendment of the United States Constitution.

## THE PARTIES

17.     Plaintiff is a natural person and a resident of the Commonwealth of Virginia.

18.     Defendant George Mason University ("GMU" or the "University") is a public university with its principal place of business located in the Commonwealth of Virginia.

19.     Defendant The Rector and Board of Visitors of George Mason University (the "Board of Visitors") is a corporation operating under the laws of the Commonwealth of Virginia. It is the policy-making and oversight authority for the University.

20.     Defendant Jennifer Renee Hammat ("Dr. Hammat") is a natural person and, upon information and belief, a resident of Indiana. Defendant Hammat was the Title IX Coordinator at GMU during all relevant times herein.

21.     Defendant Julian Robert Williams ("Mr. Williams") is a natural person and a resident of the Commonwealth of Virginia. Mr. Williams was the Vice President for Compliance. Diversity and Ethics ("CDE") at GMU during all relevant times herein.

22.     Defendant Keith David Renshaw ("Dr. Renshaw") is a natural person and a resident of the Commonwealth of Virginia. Dr. Renshaw, a GMU professor, was Plaintiff's supervisor during all relevant times herein.

23.     Ann Louise Ardis ("Dean Ardis") is a natural person and a resident of the Commonwealth of Virginia. Dean Ardis became the Dean of Plaintiff's College in or around February 2019.

24.     Szuyung David Dwu, also known as S. David Wu ("Provost Wu") is a natural person and a resident of the Commonwealth of Virginia and at all relevant times was GMU's Provost.

## JURISDICTION AND VENUE

25.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1367 because: (i) the claims arise under statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

26.     This Court has personal jurisdiction over Defendants Williams, Renshaw, Ardis and Dwu, because they are residents of the Commonwealth of Virginia. These Defendants are also employed by GMU in Virginia and committed acts injurious to Plaintiff in the Commonwealth of

Virginia. This Court has personal jurisdiction over Defendant Hammat because she committed acts injurious to Plaintiff in the Commonwealth of Virginia while employed by GMU.

27.     Venue properly lies in this Court under 28 U.S.C. §1391. The Defendant is a public school created under Virginia Code Title 23.1, Subtitle IV, Chapter 15, incorporated in and with its principal place of business in the Commonwealth of Virginia, and is considered to reside in this judicial district. In addition, the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## FACTS RELEVANT TO ALL CLAIMS

### I.     Plaintiff's Background

28.     Plaintiff received his Ph.D. in 2004. He obtained tenure at GMU in 2008, and became a Full Professor in 2014. Plaintiff has worked at GMU for over fifteen (15) years. During that time, and until December 2018, Plaintiff was subject to no disciplinary action and had a stellar track record with his students, including student course evaluations and peer evaluations.

29.     Plaintiff has published over 185 articles in peer-reviewed journals and is the author of two books, which have been published in over 15 languages. He has also received a number of awards and accolades, and research grants over the course of his career. Plaintiff's groundbreaking research has been featured in hundreds of newspaper and magazines.

30.     Much of Plaintiff's research focuses on sex, human sexuality and cultural norms.

31.     Plaintiff has received continuing support from former and current students and colleagues, men and women alike, who have had positive experiences with Plaintiff. Despite these positive working relationships and the spotless record Plaintiff amassed in his over 15 years at GMU, GMU caved in to pressure surrounding the social and political climate at GMU and

conducted a unilateral and biased investigation, resulting in severe and unwarranted sanctions against Plaintiff which have significantly impacted his research and his career.

## II.   The United States Department of Education's Various Guidance Documents and Proposed Regulations

### A. The United States Department of Education's 2001 Guidance Concerning Sexual Harassment Complaints Against Faculty

32.   In January 2001, the United States Department of Education's Office for Civil Rights ("OCR") issued a Title IX Guidance addressing "Harassment of Students By School Employees, Other Students or Third Parties" (the "2001 Guidance"). The Guidance remains in effect today and is applicable in cases in which faculty members are accused of sexually harassing students. *Id.* at iv.

33.   The 2001 Guidance stressed "[i]t is important that schools not overreact to behavior that does not give rise to the level of sexual harassment." *Id.* at iii.

34.   Per the 2001 Guidance, gender-based harassment is not covered by Title IX unless it is "*sufficiently serious* to deny or limit a student's ability to participate in or benefit from" an educational program." *Id.* at v. The 2001 Guidance defines gender-based harassment as harassing a student on the basis of that student's failure to conform to stereotyped notions of masculinity and femininity." *Id.* The 2001 Guidance further defines gender-based harassment as "acts of verbal, non-verbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping but not involving conduct of a sexual nature." *Id.* at 3.

35.   The 2001 Guidance defines sexual harassment as:

> [U]welcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature…. Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal…will not be considered sexual harassment.

8

36.     In the case of "hostile environment harassment" an assessment is required of "whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program." *Id.* at 5. "Conduct that is not severe will not create a hostile environment." *Id.* at 16.

37.     If a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally will not support a conclusion that the conduct was unwelcome." *Id.* at 8.

38.     According to the 2001 Guidance, Title IX applies to harassment that (i) is carried out in the context of an employee's performance of his or her responsibilities in relation to students, including teaching, supervising and advising students and (ii) denies or limits a student's ability to participate in or benefit from a school program on the basis of sex.

39.     As further noted, "a school should be aware of the confidentiality concerns of an accused employee or student. Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused." *Id.* at 18.

40.     "OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the procedures provide for…[a]dequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence." *Id.* at 20.

41.     As mandated in the 2001 Guidance, "OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees." *Id.* at 17. "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed

due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

42.     The 2001 Guidance *did not* set forth a burden of proof, such as the preponderance of the evidence standard, to be used by colleges and universities in Title IX proceedings—whether against faculty or students.

43.     As mandated in the 2001 Guidance, "the protections of the First Amendment must be considered if issues of speech or expression are involved. Free speech rights apply in the classroom (e.g. classroom lectures and discussions) and in all other education programs and activities of public schools…. In addition, First Amendment rights apply to the speech of students and teachers." *Id.* at 22.

44.     "Title IX is intended to protect students from sex discrimination, not to regulate the content of speech." *Id.* OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, *is not a legally sufficient basis to establish a sexually hostile environment under Title IX*." *Id.* (emphasis added).

45.     The 2001 Guidance contains the following example of protected speech:

Example 1: In a college level creative writing class, a professor's required reading list includes excerpts from literary classics that contain descriptions of explicit sexual conduct, including scenes that depict women in submissive and demeaning roles. The professor also assigns students to write their own materials, which are read in class. Some of the student essays contain sexually derogatory themes about women. Several female students complain to the Dean of Students that the materials and related classroom discussion have created a sexually hostile environment for women in the class. What must the school do to respond?

Answer: Academic discourse in this example is protected by the First Amendment even if it offensive to individuals. Thus, Title IX would not require the school to discipline the professor or to censor the reading list or related class discussion.

46.     On July 28, 2003, the OCR issued a "Dear Colleague Letter" to confirm its position "regarding a subject which is of central importance to our government, our heritage of freedom,

and our way of life: the First Amendment to the U.S Constitution." *Id.* at 1. The Letter reiterated

the OCR's position in the 2001 Guidance that "[i]n order to establish a hostile environment,

harassment must be sufficiently serious (i.e., severe, persistent or pervasive) as to limit or deny a

student's ability to participate in or benefit from an educational program." It continued:

> Some colleges and universities have interpreted OCR's prohibitions of
> 'harassment' as encompassing all offensive speech regarding sex, disability, race
> or other classifications. Harassment, however, to be prohibited by the statutes
> within OCR's jurisdiction must include something beyond the mere expression of
> views, words, symbols or thoughts that some person finds offensive. Under OCR's
> standard, the conduct must also be considered sufficiently serious to deny or limit
> a student's ability to participate in or benefit from the educational program. Thus,
> OCR's standards require that the conduct be evaluated from the perspective of a
> reasonable person in the alleged victim's position, considering all the
> circumstances, including the alleged victim's age.[2]

47.    GMU did not apply the standards set forth in the 2001 Guidance, or 2003 Dear

Colleague Letter to Plaintiff's case. Nor do GMU's grievance procedures for addressing sexual

harassment complaints against faculty comport with the 2001 Guidance.

**B.  The United States Department of Education's 2011 Title IX Guidance
      Concerning Sexual Harassment Complaints Against Students**

48.    On April 4, 2011, the OCR sent a "Dear Colleague Letter" to colleges and

universities (hereinafter referred to as the "2011 Dear Colleague Letter"). As stated in the 2011

Dear Colleague Letter:

> This letter focuses on peer sexual harassment and violence. Schools' obligations
> and the appropriate response to sexual harassment and violence committed by
> employees may be different from those described in this letter. Recipients should
> refer to the 2001 Guidance for further information about employee harassment of
> students. *Id.* at p. 2, n. 8.

49.    GMU willfully ignored this distinction, electing to apply the requirements set forth

in the 2011 Dear Colleague Letter to student respondents and faculty respondents alike, and

---

[2] The complainants in this case were all graduate students in their mid- to late twenties.

adopting a uniform sexual harassment policy and grievance procedures that afforded less rights to tenured faculty respondents than to students.

50.     Indeed, GMU students are permitted to review the evidence gathered in a given case and are provided with a hearing. In contrast, faculty have no such rights—the evidence gathered is withheld from them and the Title IX Coordinator determines whether a policy violation has occurred. There is no hearing.

51.     The 2011 Dear Colleague Letter advised recipients that sexual violence, such as sexual assault, constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." 2011 Dear Colleague Letter at p. 4. This combined approach to sexual harassment and acts of sexual violence, which was adopted by GMU in response to the April 2011 Dear Colleague Letter, blurred any distinction between speech that could be potentially harmful and the most aggressive acts of sexual violence, eliminating any spectrum upon which such acts should be measured.

52.     The 2011 Dear Colleague Letter relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." 2011 Dear Colleague Letter, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault.[3]

53.     Relying on these faulty numbers, the 2011 Dear Colleague Letter minimized due process protections for the accused by, among other things, eschewing any presumption of

---

[3] http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

innocence, mandating a preponderance of the evidence standard,[4] limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

54.     The April 2011 Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

55.     The 2011 Dear Colleague Letter stated that schools should "minimize the burden on the complainant," and suggested that schools focus more on victim advocacy. It required schools to give both parties the right to appeal a decision, which amounted to double jeopardy.

56.     The Obama Administration, through the OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

57.     In February 2014, Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education, told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

58.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the

---

[4] Recent District Court decisions in Title IX cases involving student respondents have held that the preponderance of the evidence standard is not the proper standard for university sexual misconduct proceedings given the significant consequences. *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3 ("the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion"). *See Doe v. DiStefano*, 2018 WL 2096347, at *6 (May 7, 2018) ("'[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion.'").

procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

59.     In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

60.     The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual misconduct.

61.     In June 2014, Lhamon testified at a Senate hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools,

my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee that if OCR cannot secure voluntary compliance from a recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the Department of Justice.

62.    In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."[5]

63.    As a result of the issuance of the 2011 Dear Colleague Letter, hundreds of colleges and universities, public and private alike, have been investigated by the OCR for violations of Title IX.

64.    On September 12, 2016, OCR launched a Title IX investigation into GMU's alleged mishandling of a female student's sexual assault complaint. Upon information and belief, this investigation is pending.

65.    On March 29, 2018, OCR launched a second Title IX investigation into GMU's alleged mishandling of a sexual harassment complaint which was, upon information and belief, made by a female student. Upon information and belief, this investigation is pending.

---

[5] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

C.      **The U.S. Department of Education Rescinds the 2011 Dear Colleague Letter**

66.     On September 7, 2017 the United States Secretary of Education, Betsy DeVos ("DeVos") gave a Title IX speech at GMU's Antonin Scalia Law School. The speech received national attention and was also featured in GMU's student newspaper. In her speech, DeVos personally thanked GMU's President, Angel Cabrera ("President Cabrera"), for his leadership.

67.     In her speech, DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos stated that "one person denied due process is one too many."[6]

68.     The failure of educational institutions to provide fair and impartial policies and procedures led DeVos to declare that "the current approach isn't working. Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be judge and jury?"  Moreover, DeVos stated, "It's no wonder so many call these proceedings 'kangaroo courts.' Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

69.     Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over."  The "April 2011 Dear Colleague Letter" has failed students and their institutions. "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

70.     One week after DeVos' speech, President Cabrera publicly launched a new Title IX website and informed the GMU community that the university would be closely monitoring any forthcoming changes in the Title IX regulations.

---

[6] https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

71.     On September 22, 2017, the OCR rescinded the 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

72.     The OCR noted that the 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added).[7]

73.     The OCR noted that it would continue to rely on the 2001 Guidance, referenced *supra*.

74.     On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "2017 Guidance").[8] The 2017 Guidance suggested that it may apply in circumstances other than cases involving student, peer-on-peer sexual misconduct noting "the Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning sexual misconduct, *including* peer-on-peer sexual harassment." *Id.* at 1 (emphasis added).

75.     The 2017 Guidance requires colleges and universities to respond to sexual misconduct that is "so severe, persistent or pervasive as to *deny or limit a student's ability to participate in or benefit from* the school's programs or activities." *Id.* (emphasis added).

76.     The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

77.     The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or

---

[7] *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf
[8] *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; and (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation. The 2017 Guidance also permits schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

78.     The 2017 Guidance remains in effect. GMU's grievance procedures for faculty, including in Plaintiff's case, do not align with this Guidance.

**D.     The United States Department of Education's Proposed Title IX Regulations**

79.     In or around November 2018, the United States Department of Education issued proposed, amended Title IX regulations for public comment. Introductory statements to the proposed regulations noted that DeVos:

> identified problems with the current state of Title IX's application in schools and colleges, including overly broad definitions of sexual harassment, lack of notice to the parties, lack of consistency regarding both parties' right to know the evidence relied on by the school investigator and right to cross-examine parties and witnesses, and adjudications reached by school administrators operating under a federal mandate to apply the lowest possible standard of evidence.[9] *Id.* at p. 12.

80.     The introductory statements also noted other criticisms of the previous guidance, including that "those guidance documents pressured schools and colleges to forego robust due process protections; captured too wide a range of misconduct, resulting in infringement on academic freedom and free speech and government regulation of consensual, noncriminal sexual activity; and removed reasonable options for how schools should structure their grievance

---

[9] https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf

processes to accommodate each school's unique pedagogical mission, resources, and educational community." *Id.*

81.     The proposed amendments to the Title IX regulations are intended to apply to sexual harassment by students, employees and third parties. The Department of Education presented the following directed question to commenters:

> The Department seeks the public's perspective on whether there are any parts of the proposed rule that will prove unworkable in the context of sexual harassment by employees, and whether there are any unique circumstances that apply to processes involving employees that the Department should consider. *Id.* at 3.

82.     With respect to grievance procedures, proposed regulation 34 CFR 106.45(a)-(b)(1) requires: i) a presumption of innocence for the respondent; ii) the objective evaluation of all evidence; iii) no conflicts of interest or bias on the part of Title IX Coordinators, investigators or decision-makers; and iv) no discipline without due process protections. *See* Background & Summary of the Education Department's Proposed Title IX Regulations, at 5.[10]

83.     Proposed regulation 34 CFR 106.45(b)(2)-(b)(3) mandates that schools provide "equal access to review all the evidence that the school investigator has collected, including the investigation report, giving each party equal opportunity to respond to that evidence before a determination is made." *Id.* For colleges and universities, a final determination must be made at a live hearing, and cross-examination must be allowed. *Id.*

84.     Pursuant to proposed regulation 34 CFR 106.45(b)(4), the determination of responsibility must be made by a decision-maker who *is not* the same person as the Title IX Coordinator or investigator. *Id.* Schools may also apply either the preponderance of the evidence standard or the clear and convincing evidence standard. *Id.* at 6.

---

[10] https://www2.ed.gov/about/offices/list/ocr/docs/background-summary-proposed-ttle-ix-regulation.pdf

85.     Proposed regulation 34 CFR 106.6 expressly states that nothing in the regulations requires any school to restrict rights that are protected under the First Amendment or the Due Process Clauses. *Id.* at 6.

86.     The proposed regulations have not yet been implemented but serve to highlight the glaring flaws in GMU's grievance procedures governing sexual harassment complaints against faculty, which are discussed in more detail below.

### III.    The American Association of University Professors' Position On Sexual Harassment Complaints Against Faculty

87.     The American Association of University Professors ("AAUP"), founded in 1915, is a non-profit organization of over 40,000 faculty, librarians, graduate students, and academic professionals, a significant number of whom are public sector employees.

88.     The mission of the AAUP is to advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and all those engaged in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good.[11]

89.     The AAUP's policies have been recognized by the United States Supreme Court and are widely respected and followed in American colleges and universities. *See, e.g., Bd. of Regents v. Roth*, 408 U.S. 564, 579 n. 17 (1972); *Tilton v. Richardson*, 403 U.S. 672, 681-682 (1971).

90.     In its 2016 report *The History, Uses and Abuses of Title IX*, the AAUP warned that "[o]verly broad interpretations of what constitutes a 'hostile environment' are increasingly

---

[11] *See* https://www.aaup.org/about-aaup.

undermining academic freedom."[12] In a discussion about trigger warnings, the AAUP noted that "'the presumption that students need to be protected rather than challenged in a classroom is at once infantilizing and anti-intellectual.'"[13] The AAUP further noted that this can be particularly troubling for professors who teach about topics involving sex and sexuality, causing self-censorship by faculty members in order to avoid accusations of sexual harassment and unreasonable investigations of same.[14] Harvard Law Professor Jeannie Suk Gersen has written extensively about the challenges faced by professors teaching sensitive subject matter in today's classrooms, noting in regard to classes teaching rape law, "a dozen new teachers of criminal law at multiple institutions have told me that they are not including rape law in their courses, arguing it's not worth the risk of complaints of discomfort by students....Both men and women teachers seem frightened of discussion, because they are afraid of injuring others or being injured themselves."[15]

91. The AAUP has written extensively about the obligation of universities to protect the due process rights of faculty members when investigating, and determining the outcome of, sexual harassment complaints. For example, the AAUP has urged OCR to do away with the "preponderance of the evidence standard" in Title IX cases involving faculty members, noting that a "clear and convincing standard" is more suitable in cases where the administration needs to show cause for imposing a severe sanction and the accusations—whether true or false—have the potential to ruin a faculty member's career.[16]

---

[12] *The History, Uses and Abuses of Title IX*, at p. 75, *available at* https://www.aaup.org/file/TitleIXreport.pdf.
[13] *Id.* at p. 83.
[14] *Id.* at pp. 83-84.
[15] https://www.newyorker.com/news/news-desk/trouble-teaching-rape-law
[16] Bradley, G., *Sexual Harassment Guidelines*, Academe, November/December 2011, *available at* https://www.aaup.org/article/sexual-harassment-guidelines#.XIauFChKg2w.

92.     In *Sexual Harassment: Suggested Policy and Procedures for Handling Complaints*, the AAUP noted that "it is incumbent upon a university or college to provide due process for those accused of harassment."[17] In order to accomplish this, the AAUP recommends that universities first attempt to informally resolve sexual harassment complaints and, if unsuccessful, that complaints be reviewed by a *faculty committee*, through a hearing at which the complainant and respondent may confront any adverse witnesses.[18] "In dealing with cases in which sexual harassment is alleged, as in dealing with all other cases in which a faculty member's fitness is under question, the protections of academic due process are necessary for the individual, for the institution, and for the principles of academic freedom and tenure."[19]

93.     In *The History, Uses and Abuses of Title IX* the AAUP once again called for due process protections for faculty members through the adoption of university Title IX procedures that require faculty committee review, including a hearing.[20] Referencing a case in which Bard College investigated and sanctioned a professor, without disclosing the investigation report and related evidence, the AAUP questioned the propriety of educational institutions circumventing existing grievance procedures to "conduct secret Title IX investigations, and impose sanctions based on a star-chamber-like process."[21] The AAUP also again called for the application of a clear and convincing evidence standard in the handling of Title IX complaints against faculty.[22]

94.     In the same report, the AAUP pointed to a number of problems with the current application of Title IX to cases involving faculty:

---

[17] https://www.aaup.org/report/sexual-harassment-suggested-policy-and-procedures-handling-complaints.
[18] *Id.*
[19] *Due Process in Sexual-Harassment Complaints*, *available at* https://www.aaup.org/report/due-process-sexual-harassment-complaints
[20] https://www.aaup.org/report/history-uses-and-abuses-title-ix. *See* Part IV.
[21] *Id.* at p. 87.
[22] *Id.*, Part IV.

- The failure to make meaningful distinctions between conduct and speech or otherwise to distinguish between "hostile-environment" sexual harassment and sexual assault.
- The use of overly broad definitions of hostile environment to take punitive employment measures against faculty members for protected speech in teaching, research, and extramural contexts.
- The tendency to treat academic discussion of sex and sexuality as contributing to a hostile environment.
- The adoption of lower evidentiary standards in sexual-harassment hearings (the "preponderance of evidence" instead of the "clear and convincing" standard).
- The increasing corporatization of the university, which has framed and influenced the implementation of Title IX by colleges and universities.
- The failure to address gender inequality in relationship to race, class, sexuality, disability, and other dimensions of social inequality.

The contemporary interpretation, implementation, and enforcement of Title IX threatens academic freedom and shared governance in ways that frustrate the statute's stated goals. This occurs in part because the current interpretative scope of Title IX has narrowed to focus primarily on sexual harassment and assault on campus. This narrow focus is inconsistent with the original intent of the legislation, which Congress envisioned as protecting a range of educational opportunities for women, including access to higher education, athletics, career training and education, education for pregnant and parenting students, employment, the learning environment, math and science education, standardized testing, and technology.

Critically, the current focus of Title IX on sexual violations has also been accompanied by regulation that conflates sexual misconduct (including sexual assault) with sexual harassment based on speech. This has resulted in violations of academic freedom through the punishment of protected speech by faculty members. Recent interpretations of Title IX are characterized by an overly expansive definition of what amounts and kinds of speech create a "hostile environment" in violation of Title IX.

95.    In January 2019, AAUP submitted comments to the Department of Education which addressed the impact of the proposed, amended Title IX regulations on faculty. Per the AAUP, the proposed regulations did not go far enough to protect free speech or the due process rights of the accused.

96.    Accordingly, AAUP recommended: 1) applying sexual harassment policies in ways that "distinguish between speech protected by academic freedom and conduct that consists of unwelcome actions or unprotected speech;" 2) requiring that Title IX Coordinators have

knowledge and training concerning First Amendment issues and the knowledge and experiences

of the faculty; 3) using a "clear and convincing evidence" standard to cases involving faculty to

protect their due process rights; and 4) endorsing the role of shared governance in the development

and implementation of Title IX policies.[23]

97.     As detailed below, the policies and procedures adopted by GMU to address sexual

harassment complaints against faculty failed to consider, or protect, the First Amendment and due

process rights of the accused, including Plaintiff. In fact, over time, with the input of Dr. Hammat,

GMU revised its policies and procedures in a manner that deliberately eroded these rights.

## IV.     GMU's Campus Climate

98.     A university's campus climate—including pressure from negative publicity,

campus activism and federal investigations—can provide evidence of gender bias supporting a

claim for sex discrimination under Title IX.

99.     Evidence that a college has been placed under federal investigation, severely

criticized for its failure to protect female sexual assault victims and is under pressure to correct its

perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias.

*Doe v. Baum*, 903 F.3d 575, 586-587 (6th Cir. 2018) (external pressure combined with hearing

board's credibility determinations in favor of females on a cold record raised plausible inference

of gender bias). *See also Doe v. Miami U.*, 882 F.3d 579, 592-93 (6th Cir. 2017) (plausible

inference of gender bias where *inter alia* university faced pressure to zealously "prosecute" male

respondents after facing lawsuit by female student); *Doe v. Columbia U.*, 831 F.3d 46, 57 (2d Cir.

2016) (gender bias inferred where university was motivated to accept female accusation of sexual

assault and reject male's claim of consent to avoid further public criticism that it did not protect

---

[23] https://www.aaup.org/sites/default/files/AAUP%20title%20IX%20exec%20summary_0.pdf

female students); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 584 (E.D. Va. Mar. 14, 2018) (influence of Dear Colleague Letter and political pressure acknowledged by senior official one factor in plausibly alleging gender bias); *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university was under federal pressure to convict male respondents regardless of guilt or innocence, combined with flawed proceedings and statements of university officials supported plausible inference of gender bias).

100.    In the recent decision of *Menaker v. Hofstra University*, 2019 WL 3819631, at *5 (2d Cir. Aug. 15, 2019), which involved a university employee, the United States Court of Appeals for the Second Circuit explained the correlation between press coverage, public pressure and gender bias:

> We agree that '[p]ress coverage of sexual assault at a university does not automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination.' But this does not mean that the press coverage or public pressure must reach a particular level of severity. On the contrary, when combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination. *Id.*

101.    In the years leading up to, and during, the time period in which the allegations against Plaintiff were investigated, and an outcome decided, GMU was under pressure from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from sexual misconduct at the expense of the rights of the male accused.

102.    On August 21, 2014, the Governor of Virginia created a Task Force on Combating Campus Sexual Violence, of which GMU's President Cabrera was a member. Media reports described the Governor as ordering a "top-to-bottom" review of college sexual assault policies after a number of state schools were subject to OCR investigations, and demonstrating his

commitment to "aggressively combating sexual violence on college campuses."[24] President Cabrera created a corresponding task force at GMU.

103.    On May 28, 2015 the Governor's Task Force issued a lengthy report of final recommendations. One recommendation, which was adopted by GMU, was to employ a trauma-informed approach to Title IX investigations.

104.    Upon information and belief, GMU trained its sole investigator, Megan Simmons ("Ms. Simmons") and Title IX Coordinator, Dr. Hammat, to use the trauma-informed approach in Title IX investigations, including Plaintiff's.

105.    A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event.

106.    Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual misconduct as opposed to an indicator that the complainant's story may lack credibility. Such training has recently come under fire from scientists and courts alike.[25]

---

[24] https://www.huffpost.com/entry/virginia-campus-sexual-assault-mcauliffe_n_5697683. *See also* https://www.washingtonpost.com/local/education/gov-mcauliffe-forms-task-force-to-combat-sexual-violence-at-virginia-colleges/2014/08/20/947c6c64-2874-11e4-86ca-6f03cbd15c1a_story.html
[25] *See* "The Bad Science Behind Campus Response to Sexual Assault" *at* https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/. *See also Norris v. U. of Colorado, Boulder*, 2019 WL 764568 at * 9 (D. Colo. 2019) (among other things, trauma-informed training supported plausible allegations of gender bias in Title IX proceedings); *Doe v. The Regents of the University of California*, Case No. RG16843940, Order Awarding Petitioner's Attorneys' Fees, at pp. 2-3, *available at* https://kcjohnson.files.wordpress.com/2018/04/uscb-attorney-fees.pdf (unacceptable risk that Title IX investigator was "not unbiased" where his evaluation of credibility was based on trauma-informed approach).

107.    The Association of Title IX Administrators ("ATIXA") recently issued a position statement to colleges and universities warning that a complainant's perceived trauma must not be used as evidence that the alleged sexual misconduct has occurred. ATIXA further warned that the improper use of trauma-informed methods, such as to interpret evidence is junk science and must be avoided.[26]

108.    On October 24, 2016, GMU's student newspaper, Fourth Estate, published an article about the OCR investigation commenced at GMU in September 2016, noting "[s]tudents received an email Sept. 16 alerting the community to the launch of an investigation surrounding a sexual assault case filed by a female student on campus."[27] Per the article, the OCR complainant, a female student, alleged that GMU failed to respond promptly and equitably to her complaint of sexual assault, creating a "sexually hostile environment."

109.    Mr. Williams was interviewed for the article and stated that the OCR would be interested in seeing GMU's training materials and "who is in some of the roles to respond to these issues." Williams noted that GMU had to comply with Title IX because it is a recipient of federal funding. *Id.* Mr. Williams also said "[t]he biggest sort of power [OCR] would yield would be one of the egregious cases where they could limit a university's ability to accept financial aid funding."

110.    On December 5, 2016, GMU's Women and Gender Studies Department released a list of sexual assault prevention demands to GMU's administration, which was published in the student newspaper.[28] One of the individuals responsible for creating the list of demands met with Dr. Hammat at around the same time. Dr. Hammat had recently been hired by GMU. Dr. Hammat confirmed that the list of demands was being addressed. The list of demands included the

---

[26] https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIXA-Trauma-Position-Statement-Final-Version.pdf
[27] http://gmufourthestate.com/2016/10/24/sexual-assault-investigation/
[28] http://gmufourthestate.com/2016/12/05/students-release-sexual-assault-demands/

implementation of a trauma-informed approach in victim reporting, investigation and adjudication procedures employed by the University in Title IX cases. *Id.*

111.    On April 26, 2017, former Vice President Joe Biden gave a speech on campus as part of the "It's On Us campaign."[29] The visit was reported in The Washington Post[30] and The Huffington Post.[31] In his speech Biden urged the men on campus to take responsibility in doing their part to change the culture of sexual violence against women on college campuses. *Id.*

112.    In September 2017, Inside Higher Education interviewed Dr. Hammat about Secretary DeVos' remarks concerning the 2011 Dear Colleague Letter and proposed regulations. Dr. Hammat was referred to in the resulting September 8, 2017 article as noting that some sexual assault survivors "do not understand DeVos's remarks, and may interpret them as her devaluing them, or wanting to roll back their protections."[32] She added that "some students will react quickly to a sense that DeVos is making it more difficult to file complaints. "I think you might have some of those secondary types of issues, where there's panic." *Id.*

113.    In mid-October 2017, the #MeToo movement re-emerged nationwide as a women's movement against sexual harassment and sexual violence, the primary purpose of which was not only to vocalize women's experiences but to publicly identify alleged male perpetrators to be dealt with in the court of public opinion. The #MeToo movement caused the public downfall of a number of men in high profile jobs and positions of power—sometimes without due process or a process of any kind. The public outcry of the movement does not always include any sense of

---

[29] https://www.itsonus.org/. *See* http://gmufourthestate.com/2017/05/05/stopping-sexual-assault/
[30] https://www.washingtonpost.com/news/grade-point/wp/2017/04/26/biden-calls-on-students-to-change-the-culture-to-fight-college-sexual-assault/?noredirect=on
[31] https://www.huffpost.com/entry/joe-biden-rape-and-sexual-assault-are-not-about-sex-theyre-about-power_n_5900c2d3e4b0af6d718abe2d
[32] https://www.insidehighered.com/news/2017/09/08/campus-administrators-reassure-students-protections-after-title-ix-announcement

proportionality to the punishments called for against alleged male perpetrators, making no distinction between acts considered offensive or improper versus violent assaults.[33]

114.    On November 13, 2017, the Chronicle of Higher Education published an article about the impact of the #MeToo movement on higher education:

> The galvanizing momentum of the #metoo campaign has forced many industries to confront widespread sexual harassment and assault in their midsts. Academe is no exception. Propelled by admiration for those who have spoken out, fear that what happened to them could happen to others, and anger at how long abusers have gone unpunished, women have come forward in droves to report instances of sexual assault….Campus officials have struggled to determine how to punish abusive employees….But the new wave of revelations and accusations has raised the stakes, and the fury of the #metoo movement has tapped into could have a longstanding impact on higher education.[34]

115.    On December 1, 2017, a former professor turned blogger published an open source spreadsheet "Sexual Harassment in the Academy," upon which anonymous posters could list instances of alleged sexual harassment at universities. This was described by the media as "a viral #MeToo list." The list garnered national attention, and was reported on in The Washington Post[35] and The Wall Street Journal.[36] A women's blog, Jezebel.com, referred to the list as "Academia's Shitty Men List."[37] A number of entries on the list concerned GMU professors.[38]

---

[33] *See, e.g.*, Stephens, B., *When #MeToo Goes Too Far*, *at* https://www.nytimes.com/2017/12/20/opinion/metoo-damon-too-far.html. *See also* Merkin, D., *Publicly We Say MeToo, Privately We Have Misgivings*, *at* https://www.nytimes.com/2018/01/05/opinion/golden-globes-metoo.html. One year after the emergence of #MeToo, *The New York Times* reported "at least 200 prominent men have lost their jobs after public allegations of sexual harassment. A few… face criminal charges…. And nearly half of the men who have been replaced were succeeded by women." Carlsen, A. et al., *#MeToo Brought Down Nearly 201 Powerful Men. Nearly Half of Their Replacements are Women*, *at* https://www.nytimes.com/interactive/2018/10/23/us/metoo-replacements.html?nl=top-stories&nlid=72995439ries&ref=cta

[34] *See* Gluckman N., Read, B., Mangan, K., and Quilantan, B., *Sexual Assault in Higher Ed*, at https://www.chronicle.com/article/Sexual-HarassmentAssault/241757.

[35] https://www.washingtonpost.com/local/education/academias-metoo-moment-women-accuse-professors-of-sexual-misconduct/2018/05/10/474102de-2631-11e8-874b-d517e912f125_story.html

[36] https://www.wsj.com/articles/allegations-of-groping-lewd-comments-and-rape-academias-metoo-moment-1515672001

[37] https://jezebel.com/academias-shitty-men-list-has-around-2-000-entries-deta-1821991028

[38] https://docs.google.com/spreadsheets/d/1S9KShDLvU7C-KkgEevYTHXr3F6InTenrBsS9yk-8C5M/edit#gid=1530077352

116.    On January 1, 2018, the OCR published an updated list of colleges and universities that were under investigation. The September 2016 complaint against GMU was on the list. The list was later updated to include a second OCR investigation, opened in March 2018, involving a complaint concerning sexual harassment.[39]

117.    On April 30, 2018, the Fourth Estate published an article "How a Title IX report in Student Government dragged on for over a year."[40] The article, which used a pseudonym for the complainant, but named the male student, outlined sexual harassment allegations against the male student, who had run for student body president one year earlier. Certain allegations dated back to the time period before both students attended GMU. According to the article, GMU failed to respond to the female student's report about the sexual harassment, her grievance with the student government election committee, or to investigate her Title IX complaint for over one year. The male student in question was elected student body president and completed his term in March 2018. *Id.*

118.    One criticism in the article was that the Title IX office only had two employees assigned to handle investigations for 35,000 students and three campuses—Dr. Hammat and Ms. Simmons. Dr. Hammat was interviewed and quoted: "If we're working on 14 cases at once, that could elongate all of those processes…I'd love to tell you that I have ten hours a week to write nothing but investigation reports, but I am lucky if I get even a few hours a week to write those reports." The article also referenced the 2016 OCR investigation, pending at the time, which attributed GMU's lack of response to creating a sexually hostile environment for a female student. *Id.*

---

[39] Plaintiff was unable to find any public information about the basis of the complaint. It appears that GMU did not announce the second investigation.
[40] http://gmufourthestate.com/2018/04/29/how-a-title-ix-report-in-student-government-dragged-on-for-over-a-year/

119.    On May 3, 2018, Mr. Williams and Rose Pascarell, the Vice President of University Life, demanded that Fourth Estate correct the article because it contained "several incorrect statements of fact and inconsistencies, starting with the headline."[41] Mr. Williams and Ms. Pascarell stated that "Mason has been and remains thoroughly committed to eradicating sexual violence in all forms. As a result of the Sexual Assault and Interpersonal Violence Task Force that President Cabrera commissioned in 2015, 18 recommendations have been implemented on campus…We would never want a message conveyed to our community that suggests a student would not be listened to or receive a timely response."

120.    On May 10, 2018, Mr. Williams sent a follow-up to the Fourth Estate which outlined the manner in which GMU responded to the female student's allegations. Mr. Williams noted that the "article as written is replete with inaccuracies and reflects a lack of understanding of the Title IX reporting process. It sends a message to the campus community that is factually incorrect." *Id.* This correspondence was published in Fourth Estate on May 16, 2018. *Id.*

121.    On August 18, 2018, The Washington Post published an article, "George Mason professor retires amid sexual harassment allegations," which detailed termination proceedings against a communications professor—who was the director of GMU's nationally acclaimed forensics team—amid accusations that he had sexually harassed a student, which "prompted others to come forward and say they had been harassed."[42]

122.    Per the article, a male student alleged that the professor made sexual advances when the two were alone in a hotel room after a night of heavy drinking. The article noted that "[t]he allegations against the George Mason professor come amid a larger national conversation about

---

[41] http://gmufourthestate.com/2018/05/16/corrections-request-title-ix-article-published-on-430/
[42] https://www.washingtonpost.com/local/education/george-mason-professor-retires-amid-sexual-harassment-allegations/2018/08/18/683e60d8-9055-11e8-bcd5-9d911c784c38_story.html

sexual harassment and misconduct that has reverberated across the academy." Per the article, GMU included allegations in the Title IX investigation that concerned students who had already graduated and incidents that allegedly occurred after they were no longer students.

123.    GMU confirmed to The Washington Post that the Title IX records turned over to the newspaper were authentic. The professor in question acknowledged having an inappropriate conversation with the student but denied the remaining allegations. He retired after GMU started termination proceedings. A GMU official told The Washington Post that the Title IX documents provided to the newspaper show that GMU took "swift, decisive action on this matter."

124.    On August 21, 2018, The Washington Post reported that the same professor turned himself into the GMU police department in regard to charges of embezzlement, which "came to light during the investigation into the harassment claims."[43] The charges were later dropped.

125.    On October 15, 2018, President Cabrera was interviewed by Fourth Estate and discussed Title IX issues and Brett Kavanaugh's confirmation to the United States Supreme Court on October 6th. President Cabrera noted "many victims of sexual violence have had a hard time through this whole period. We are registering many more reports of sexual violence over the last two weeks….. It is very, very important that we continue to send a message…. If you are a victim of sexual violence we are here to help."[44]

126.    On October 28, 2018, GMU held a "Chapter Next: Ending Sexual Violence" event. The student newspaper reported that female members of the forensics team were present at the event, noting that the team's director was accused of sexual harassment. At the end of the event,

---

[43] https://www.washingtonpost.com/news/grade-point/wp/2018/08/21/former-george-mason-professor-accused-of-sexual-harassment-is-now-facing-embezzlement-charges/
[44] http://gmufourthestate.com/2018/10/15/a-one-on-one-with-president-cabrera/

Dr. Hammat read GMU's Pledge to End Sexual Violence, which was recited by audience members including President Cabrera.

127.    On March 26, 2019, The Atlantic published an exposé about the GMU professor and forensics team director, discussed *supra*, who was accused of sexual harassment, "A #MeToo Nightmare in the World of Competitive College Speech."[45]

128.    In late March 2019, it was announced that GMU had hired Supreme Court Justice Brett Kavanaugh to teach a course at a GMU campus of the Antonin Scalia Law School in the United Kingdom. This sparked protests from thousands of GMU students.[46] Despite the protests, Justice Kavanaugh was not terminated from the position.

129.    GMU's students held a town hall and presented more than 10,000 signatures petitioning school administrators to fire Kavanaugh over the sexual assault allegations leveled against him in 2018 by Dr. Christine Blasey Ford. *Id.* The decision to hire Justice Kavanaugh sparked media attention nationwide. The media coverage largely focused on student reactions to GMU's decision-making. One student was quoted saying "In hiring Kavanaugh, to what extent did you consider the mental health of the survivors on campus and how that might affect them and their education?" *Id.* Another protestor said the university is disregarding sexual assault survivors. "A blatantly obvious response by GMU (would be one) that states that first they do not believe Dr. Blasey Ford's testimony and second do not care about the safety of their students." *Id.*

130.    The University's decision to hire Kavanaugh was so divisive that a petition was started by a group called "Mason 4 Survivors" which to date has over 15,000 signatures.[47] The

---

[45] https://www.theatlantic.com/education/archive/2019/03/students-accuse-gmu-forensics-coach-sexual-harassment/585211/
[46]    https://www1.cbn.com/cbnnews/us/2019/april/gmu-will-allow-brett-kavanaugh-to-teach-despite-backlash-from-student-protesters
[47] https://www.washingtonpost.com/nation/2019/04/09/kick-kavanaugh-off-campus-students-decry-george-masons-decision-hire-supreme-court-justice/

petition asked University administrators to remove Kavanaugh and issue a formal apology to victims of sexual assault. It also called for the public release of documents related to the judge's hire, including "emails, donor agreements, and contracts." *Id.* The petition also yielded separate forms for parents and alumni to pledge that they will not donate to the university so long as Kavanaugh is teaching. *Id.*

131.    On April 8, 2019, The College Fix reported that GMU's Faculty Senate, of which Dr. Renshaw was a member, called for an investigation of Kavanaugh, noting there was mounting pressure to fire the Supreme Court Justice. President Cabrera rejected the idea of investigating Kavanaugh, stating that the University had done its due diligence.[48]

132.    On April 19, 2019, local press reported that GMU approved funding to double the number of it Title IX staff by hiring two new Title IX coordinators before the 2019 Fall semester.[49] The decision was made in "the wake of an outcry from students who opposed the university's hiring of U.S. Supreme Court Justice Brett Kavanaugh." The article noted that the Mason 4 Survivors' petition prompted the decision.

133.    On June 25, 2019, The Huffington Post published an article about President Cabrera, "GMU Students Rip Departing President Over Brett Kavanaugh's Hire."[50] In the article, Mason 4 Survivors accused President Cabrera of having "a lack of compassion for survivors of sexual assault" and "disdain…for the well-being of Mason students." The article further speculated that GMU had no choice but to hold its ground on the Kavanaugh hiring decision because it had

---

[48] https://www.thecollegefix.com/gmu-faculty-want-new-probe-of-kavanaugh-there-has-not-been-a-full-investigation/. *See also* https://www.washingtonpost.com/nation/2019/04/09/kick-kavanaugh-off-campus-students-decry-george-masons-decision-hire-supreme-court-justice/.

[49] http://www.fairfaxtimes.com/articles/gmu-approves-funding-for-two-added-title-ix-coordinators/article_dbc3a0be-62db-11e9-a5a5-172f8820e14f.html

[50] https://www.huffpost.com/entry/george-mason-university-brett-kavanaugh-angel-cabrera-sexual-assault_n_5d12309de4b0aa375f53c67c

received assistance from the Federalist Society with respect to an anonymous $20 million gift made to the University in 2016.

134.    On August 22, 2019, GMU's Title IX Coordinator gave a presentation on the Title IX process at student orientation, which included faculty and students from Plaintiff's Department. During her presentation, the Title IX Coordinator very clearly stated that GMU *suspends due process* during Title IX proceedings.

135.    On August 26, 2019, an article was published in the Fourth Estate in which a sexual assault survivor criticized GMU as being "more negligent in Title IX reform compared to other public universities in Virginia due to the office being understaffed and a standing history of lack of coordination among necessary resources."[51]

V.    **Overview of the Biased and Procedurally Deficient Process GMU Employed in Plaintiff's Case**

136.    On December 4, 2018, Plaintiff received four (4) emails from Dr. Hammat, the Title IX Coordinator at the time, notifying him that four current and former graduate students, "Complainant 1," "Complainant 2," "Complainant 3," and "Complainant 4,"[52] had filed Title IX complaints against him for sexual harassment.

137.    As discussed in extensive detail *infra* Point VII, Complainants 1-4, all graduate students (two of whom had already graduated), alleged that Plaintiff created a hostile environment through: statements he made on two occasions during one class that he taught in 2013 and one class in 2014; in conversations he had with his lab students about human sexuality; comments made during social interactions with his lab students; by inviting Complainant 3 to view a widely received presentation at a professional conference; by referring to the same presentation during

---

[51] http://gmufourthestate.com/2019/08/26/new-title-ix-coordinator-who-this/
[52] Plaintiff is using pseudonyms in place of the students' names to protect their privacy.

one class; by electing to attend an outing organized by Complainant 4 at a famous dive bar when he and some of his graduate lab students attended a professional conference; and when briefly hugging Complainant 4 in a passing social interaction in a public place. Almost all of the allegations occurred years prior to when they were reported.

138.    Dr. Hammat's emails to Plaintiff concerning the four complaints contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Nor was Plaintiff notified as to whether the investigation would be conducted under GMU's 2018 grievance procedures for sexual misconduct cases or those in effect at the time in which the alleged events occurred.

139.    Dr. Hammat appears to have improperly applied the policies and procedures in place in December 2018, even though Dr. Hammat appended numerous copies of older policies and procedures to each email sent to Plaintiff, making it virtually impossible for him to discern which policies and procedures applied to his case.

140.    Complainants 1-4 were close friends; Complainant 3 and 4 were roommates. Plaintiff was not informed of the origin of the complaints but believes that Complainant 4 solicited her friends into reporting Plaintiff to Title IX under a false theory of sexual harassment because Plaintiff fired Complainant 4 from his laboratory, for poor performance, a few months prior to Plaintiff receiving notice of the Title IX complaints.

141.    GMU investigated the four complaints together, even though the allegations of Complainants 3 and 4 were factually distinct from each other and from the allegations of Complainants 1 and 2.

142.    The allegations of Complainants 1 and 2 dated back over **five years**. These complaints were timed out under the applicable procedures and should not have been investigated.

Moreover, Complainants 1 and 2 had already graduated from GMU and there was no policy or procedure which permitted the *post hoc* investigation of complaints alleged by former students. Regardless, as discussed below, the allegations made by Complainants 1 and 2 were flatly contradicted by evidence Plaintiff submitted to Dr. Hammat during the Title IX investigation, the statements of other students, and new evidence submitted as part of Plaintiff's appeal.

143.    The allegations made by Complainant 3 concerned events that occurred **at least two years** prior and were, thus, timed out under the applicable sexual misconduct procedures. As discussed below, these allegations were also contradicted by evidence that Plaintiff submitted during the investigation and on appeal.

144.    The majority of Complainant 4's allegations were also timed out under the applicable procedures. As discussed below, these allegations were also flatly contradicted by evidence that Plaintiff submitted during the investigation and on appeal.

145.    For purposes of GMU's investigation into the allegations, Plaintiff was interviewed on three occasions.

146.    The first interview was conducted on January 15, 2018 by GMU's Title IX investigator at the time,[53] Ms. Simmons. Ms. Simmons operated under a presumption that Plaintiff was guilty, which was apparent from her demeanor when interviewing Plaintiff. She was hostile and menacing towards Plaintiff, and seemed disinterested in ensuring that she gathered all relevant information from Plaintiff in response to the sexual harassment allegations against him.

147.    Ms. Simmons has a lengthy background of advocacy on behalf of female victims of sexual violence, as well as adversarial investigations of men accused of sex crimes. Her background includes working as a federal agent. She also represented law enforcement on various

---

[53] Ms. Simmons left GMU shortly after being removed from Plaintiff's investigation due to bias.

committees tasked with finding holistic approaches to ending violence against women in the Navy. Ms. Simmons left GMU during the investigation into allegations against Plaintiff to work for a non-profit that advocates for the prevention of violence against women. While at GMU, Ms. Simmons gave guest lectures for the Women and Gender Studies Department. She continues to do so.

148.    Dr. Hammat, the Title IX Coordinator at the time, removed Ms. Simmons from Plaintiff's case after Plaintiff complained that Ms. Simmons was biased. However, upon information and belief, Ms. Simmons had already conducted the witness interviews that were later relied upon in reaching a determination in Plaintiff's case in a biased manner, thereby tainting the process. Ms. Simmons further compromised the reliability of the evidence gathered in Plaintiff's case by failing to name the complainants when interviewing witnesses about the allegations against Plaintiff.

149.    Dr. Hammat replaced Simmons and conducted the second and third interviews with Plaintiff, which took place on January 22, 2019 and January 24, 2019. Dr. Hammat had a conflict of interest because she was the Title IX Coordinator and was also responsible for determining the outcome of Plaintiff's case. Dr. Hammat was also demonstrably biased against Plaintiff. During the interviews, Dr. Hammat alluded to false, unrelated allegations against Plaintiff and suggested that he was involved in a consensual, romantic relationship with an unnamed student. The Plaintiff denied this never before mentioned allegation and asked for the evidence for such a serious claim. Dr. Hammat stated that Complainant 3 never saw anything but heard a rumor from another unnamed student. The allegation was untrue.[54]

---

[54] Shortly after deciding Plaintiff's case Dr. Hammat left GMU.

150.    Dr. Hammat, the sole individual tasked with deciding the outcome of the allegations against Plaintiff, has in recent years been publicly vocal about the fact that she is a survivor of a sexual assault that happened on a college campus.[55] This occurred when she was a student, and a member of a sorority. In an interview for a women's advocacy group's newsletter Dr, Hammat recounted that in college she started a "pledge patrol group" which "wouldn't leave a party until we had gone into every room, kicked down doors, got all our girls out." *Id.* Dr. Hammat also referenced speaking at fraternity houses where she told fraternity members to "be this angry and protective of every female that walks in this house." Dr. Hammat's statements suggest that Dr. Hammat holds stereotypical views of men and women and that her views potentially influenced her decision-making in sexual misconduct cases against male respondents at GMU, including in Plaintiff's case.

151.    Dr. Hammat has been publicly criticized for statements that she made while acting as Title IX Coordinator for the University of Texas, prior to joining GMU.[56] In an interview with the Daily Texan, published in November 2013, Dr. Hammat stated that, according to national statistics concerning sexual assault, "For a campus population of 50,000 [students], that means we should be seeing 12,500 cases a year. And we're not."[57] This quote garnered criticism that Dr. Hammat was "such an ideologue that she's incapable of interpreting statistical data that contradicts her preconceived worldview" and that she has "redefined (and broadened) the meaning of rape and sexual assault to such an extent that it bears no relationship to how these commonly referenced terms are defined…under most states' criminal law."[58]

---

[55] http://www.ncdsv.org/images/IDVSA_Voice-v08-i01_2013.pdf. *See* pages 7-8.
[56] https://www.mindingthecampus.org/2013/11/06/myths_realities_and_common_sen/
[57] https://www.dailytexanonline.com/news/2013/11/03/sexual-assault-remains-under-reported-on-campus-despite-growing-awareness
[58] https://www.mindingthecampus.org/2013/11/06/myths_realities_and_common_sen/

152.    In April 2016, while employed at GMU as Title IX Coordinator, Dr. Hammat participated in an event that the Clearinghouse on Women's Issues listed as a "DC Area Feminist Event," "How Equity Advocates Can Support High Expectations for Title IX and Title IX Coordinators."[59] As part of the event, Hammat was to provide her "wish list" of how women's advocates could assist her with Title IX enforcement. This is yet another example of Dr. Hammat publicly taking a biased position on the side of women's rights when she was required to make *impartial* determinations of responsibility in GMU's sexual misconduct cases.

153.    As part of the investigation, Plaintiff provided a list of witnesses to Dr. Hammat but, upon information and belief, Dr. Hammat and/or Ms. Simmons declined to interview a number of those witnesses. Dr. Hammat did not inform Plaintiff of the identities of the witnesses interviewed in his case.

154.    Plaintiff provided Dr. Hammat with over 150 pages of email communications and text messages with the complainants, course evaluations, social media postings and photographs which contradicted the allegations.

155.    During the investigation, Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigator; and f) summaries of the interviews in which he participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

---

[59] https://womensclearinghouse.org/files/8814/6117/5463/CWI_April_2016__News4-19-16.pdf

156.    No hearing was held. Plaintiff had no opportunity to cross-examine his accusers, or any other witnesses. The determinations made by Dr. Hammat required her to make credibility assessments making this deprivation even more significant.

157.    Plaintiff recently learned that his colleague, a co-mentor of Complainant 4, was interviewed by Dr. Hammat and raised questions about Complainant 4's credibility and motives, and the veracity of the harassment allegations against Plaintiff. Upon information and belief, Dr. Hammat ignored this testimony, simply accepting Complainant 4's allegations as true. Plaintiff also learned after the proceedings that at least one female student was interviewed who adamantly refuted the allegations made by Complainant 4. Again, this contradictory evidence was ignored by Dr. Hammat.

158.    Dr. Hammat was solely responsible for determining whether Plaintiff violated any applicable sexual misconduct policies.

159.    Prior to any decision being made in Plaintiff's case, Dr. Hammat directed Dr. Renshaw to prohibit Plaintiff from taking on graduate research assistants for the Fall 2019 semester. There was no policy in place which gave Dr. Hammat, or any other representative from CDE the authority to take such actions during ongoing Title IX investigations. As a result, Plaintiff was directed to reject six student applicants whom he had already interviewed for positions in his lab.

160.    On February 22, 2019, Plaintiff received four (4) emails from Dr. Hammat notifying him of the determinations that she made with respect to each complainant (the "Letters of Determination"). In each case, Plaintiff was found responsible for "Sexual or Gender-Based Harassment," but the Letters of Determination did not define the conduct, state which version of

University Policy 1202 was applied, or how the allegations supported a violation of any given version of the Policy.

161.   The Letters of Determination did not state whether the preponderance of the evidence standard was relied upon by Dr. Hammat. Rather, in each case Dr. Hammat simply stated "CDE did find enough factual information" to find a policy violation, suggesting that she did not apply the preponderance of the evidence standard.

162.   The Letters of Determination stated that Plaintiff had a right to appeal the determinations to Mr. Williams, the Vice President of CDE, who was solely responsible for deciding the appeal. The Letters of Determination further stated that Mr. Williams' determination was final and "Deans, Directors or Department Chairs [could] not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in any of the GMU Grievance Procedures provided to Plaintiff. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process" the failure to provide for a level of faculty review, including a hearing, when Plaintiff faced termination as a potential outcome, served to reinforce the bias that existed in the investigative process.

163.   Neither the Letters of Determination nor the various iterations of the Grievance Procedures provided to Plaintiff identified the specific process through which sanctions would be determined. The Letters of Determination did not set forth any sanctions.

164.   Each Letter of Determination contained new allegations—which Dr. Hammat erroneously found supported violations of University policy—that had not been disclosed to Plaintiff. He had no opportunity to respond to these allegations, which were vague and unsubstantiated, at any time before Dr. Hammat found he violated the University policy with respect to each complainant.

42

165.    On March 28, 2019, Plaintiff submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits—including new evidence—with contradicted the allegations against him.[60]

166.    Mr. Williams has made public statements to the effect that campus administrators have a moral obligation to protect and care for female students, and to make them feel safe, by, in part, investigating and responding to issues of sexual assault and sexual harassment.[61] Williams also publicly discussed the challenges of Title IX, stating "[r]egardless of the results of the hearing, we still hear you, we still care about you. Just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying." *Id.*

167.    On April 11, 2019, Mr. Williams denied Plaintiff's appeal and upheld Dr. Hammat's Letters of Determination in their entirety.

168.    On April 25, 2019, Plaintiff notified Mr. Williams that the confidentiality of the Title IX proceedings had been violated when a university administrator disclosed to GMU students—who then approached Plaintiff—that Plaintiff had been prohibited from taking on graduate students in Fall 2019. In response, Plaintiff was advised that GMU could not impose "gag orders" on parties to prevent them from sharing information. Mr. Williams did not address the leaking of confidential information by GMU administrators.

169.    On May 31, 2019, Dr. Renshaw imposed sanctions on Plaintiff which barred him from conducting the majority of his responsibilities as a Professor and researcher for at least two years. The time period for lifting the sanctions was left indefinite because Plaintiff could only be

---

[60] Plaintiff had been granted an extension of time in which to submit his appeal due to a medical issue.
[61] http://info.vassar.edu/news/features/2014-2015/150401-julian-williams.html

reinstated to his full teaching and research responsibilities after further evaluation at the discretion of his Department Chair.

170.    In the May 31, 2019 sanction letter, Plaintiff was also notified for the first time that GMU's Human Resources Department was conducting a covert investigation of Plaintiff to determine whether he violated other university policies. To date, Plaintiff has not been provided any further information about the Human Resource investigation, including the specific allegations against him and whether they are identical to those alleged in the Title IX investigation.

171.    On June 10, 2019, Plaintiff filed a grievance with the relevant Faculty Grievance Committee against Dr. Renshaw, Mr. Williams and GMU.

172.    On June 19, 2019, the Committee reviewed the grievance with respect to Dr. Renshaw and upheld the sanctions imposed against Plaintiff. Plaintiff was not afforded a hearing before the Faculty Grievance Committee nor would the Committee consider the various due process concerns repeatedly raised by Plaintiff throughout the Title IX proceedings and thereafter.

173.    On August 8, 2019, Plaintiff received notice of a grievance that had been filed against him by several professors, seeking to force Plaintiff to disaffiliate from his program. It is unclear why or how the professors came to learn of the confidential Title IX proceedings and outcome against Plaintiff but these professors were not within the scope of GMU administrators to whom such information could be disclosed.

174.    On August 13, 2019, Plaintiff submitted a response, objecting to the grievance and declining the demand that he disaffiliate from his program.

175.    On August 23, 2019, the Grievance Committee asked Plaintiff to answer a series of questions concerning whether he should be held to the ethical standards of conduct of a professional organization related to his profession—the very basis of the grievance against him. It

was clear that the Grievance Committee was seeking admissions from Plaintiff that could cause further damage to his career.

176.    Plaintiff called the professional organization directly and asked whether GMU could lose its accreditation because of the Title IX findings against Plaintiff, or whether there was any duty to report the findings. Plaintiff learned that GMU's accreditation was not in jeopardy because of the Title IX findings and that there was no duty to report. Accordingly, the professors— motivated by bias against him—created a sham basis for attempting to force him to disaffiliate from his program.

177.    On September 10, 2019, the Grievance Committee issued a decision recommending that Plaintiff disaffiliate from the program, or that Dr. Renshaw require his disaffiliation.

178.    On September 10, 2019, the Grievance Committee sent the decision to the Dean of Plaintiff's Department, Ann L. Ardis ("Dean Ardis").

179.    On September 16, 2019, Dean Ardis "concurred" with the decision and recommended disaffiliation even though she was not authorized to do so by the Faculty Handbook.

180.    On September 17, 2019, Dr. Renshaw disaffiliated Plaintiff from his program "at least until" all students currently enrolled as of the 2019-2020 academic year are no longer enrolled in the program.

## VI.    The Policies and Procedures At Issue in Plaintiff's Title IX Proceedings

181.    Attached to each of the four emails that Dr. Hammat sent to Plaintiff concerning the allegations made by Complainants 1-4, were a number of different sexual misconduct policies and grievance procedures—she did not specify which policies and procedures would apply/were applied to determine the outcome in Plaintiff's case. Plaintiff was left to try to make sense of what

definitions and procedures were applied by Dr. Hammat from the time the complaints were received, through the time in which Dr. Hammat determined that Plaintiff violated "Policy 1202."

### A.     The Various Iterations of GMU's Sexual Misconduct Policy

#### 1.     Policy 2006-14

182.     With respect to Complainants 1 and 2, Dr. Hammat provided Plaintiff with what she referred to as "University Policy Number 1202: Sexual Harassment Policy 2006-14." ("Policy 2006-14"). This version of GMU's Sexual Harassment Policy was effective as of April 20, 2006 and defined sexual harassment as follows:

> Sexual harassment is defined by law as unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or other form of communication of a sexual nature, when submission to or rejection of such conduct is used as a basis for employment or academic decisions, or such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or sexually offensive work or academic environment. Examples of behavior that may be considered sexual harassment include, but are not limited to, the following:
>
> 1. Sexual Assault
>
> 2. Explicitly or implicitly requiring submission to sexual advances as a condition or term of education or employment…
>
> 3. Repetitive sexual comments, questions, jokes, gestures or other forms of sexually explicit expression.
>
> *Note: Sexual harassment does not include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason's educational mission.

#### 2.     The 2014-2015 and 2015-2016 Sexual Misconduct Policies

183.     With respect to Complainant 3, Dr. Hammat provided Plaintiff with two versions of University Policy 1202: (i) University Policy 1202: Sexual Harassment and Misconduct 2014-

15 (the "2014-2015 Sexual Misconduct Policy"); (ii) University Policy 1202: Sexual Harassment and Misconduct 2015-16[62] (the "2015-2016 Sexual Misconduct Policy").

184.    A cover memo to the 2014-2015 Sexual Misconduct Policy stated that "the policy now describes Sexual Misconduct more fully as a form of Sexual Harassment under Title IX…and sets out the process of investigation in cases of Sexual Misconduct."

185.    The definition of Sexual Harassment in the 2014-2015 Sexual Misconduct Policy is identical to that set forth in Policy 2006-14, set forth *supra*.

186.    The 2014-2015 Sexual Misconduct Policy defined Sexual Misconduct more broadly to include sexual harassment and beyond the requirements of the OCR's 2001 Guidance applicable to faculty and employees as:

> A range of behaviors, including but not limited to sexual harassment, sexual assault, domestic violence, dating violence and sexual exploitation, It includes unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature that (a) is sufficiently severe, persistent, or pervasive as to limit a student or employee's ability to participate in or benefit from an education program; or (b) explicitly or implicitly affects an individual's employment or academic environment, unreasonably interferes with an individual's academic or work performance, or creates an intimidating, hostile, or offensive academic or work environment. *Id.* at IV.

Under GMU's expanded definition, which far exceeded the 2001 Guidance, any conduct could constitute sexual misconduct.

187.    Per the 2014-2015 Sexual Misconduct Policy:

a.      "[m]embers of the University community *accused* of sexual misconduct *will be* subject to disciplinary action." *Id.* at III.A (emphasis added).

b.      "Employees who violate this policy will be subject to discipline, up to and including termination of employment." *Id.* at III.C.

c.      With regard to Title IX proceedings, "only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent." *Id.* at III.B.

---

[62] Though Dr. Hammat referenced this document as the 2015-2016 Policy, the copy provided to Plaintiff was revised as of August 15, 2014.

188. The 2015-2016 Sexual Misconduct Policy defined Sexual Harassment identically to Policy 2006-14 and the 2014-2015 Sexual Misconduct Policy. *Id.* at II.

189. The 2015-2016 Sexual Misconduct Policy defined Sexual Misconduct identically to the 2014-2015 Sexual Misconduct Policy. *Id.* at V.

190. Per the 2015-2016 Sexual Misconduct Policy:

a. "[m]embers of the University community *accused* of sexual misconduct *will be* subject to disciplinary action." *Id.* at III (emphasis added).

b. "Employees who violate this policy will be subject to discipline, up to and including termination of employment." *Id.* at IV.B.

c. With regard to Title IX proceedings, "only people who need to know will be told and information will be shared only as necessary with investigators, hearing board members, administrators, witnesses and the respondent. *Id.* at IV.A.

### 3. The 2016-2017 and 2017-2018 Sexual Misconduct Policies

191. With respect to Complainant 4, Dr. Hammat provided Plaintiff with two copies of University Policy 1202: (i) University Policy 1202: Sexual Harassment and Misconduct 2016-2017 (the "2016-2017 Sexual Misconduct Policy"); and (ii) University Policy 1202: Sexual and Gender-Based Harassment and Other Interpersonal Violence 2017-2018 (the "2017-2018 Sexual Misconduct Policy").

192. The cover memo for the 2016-2017 Sexual Misconduct Policy indicated that Dr. Hammat participated in the policy revision process.

193. Per the 2016-2017 Sexual Misconduct Policy, "the University does not discriminate on the basis of sex or gender in any of its education or employment programs and activities." *Id.* at II.

194. Per the 2016-2017 Sexual Misconduct Policy, "each set of procedures" is "guided by the same principles of fairness and respect for Complainants and Respondents," provides for "prompt and equitable response to reports of Prohibited Conduct" and "thorough and impartial

investigations that afford *all parties* notice and an opportunity to present witnesses and evidence and *to view the information that will be used in determining whether a policy violation has occurred*." *Id.* at III (emphasis added). Plaintiff was denied these rights.

195.    The 2016-2017 Sexual Misconduct Policy requires the application of the "Preponderance of the Evidence" standard, which "means that it is more likely than not that a policy violation has occurred." *Id.*

196.    Per the 2016-2017 Sexual Misconduct Policy, an "[e]mployee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. *Id.*

197.    Per the 2016-2017 Sexual Misconduct Policy, the Title IX Coordinator—who is responsible for determining the outcome of Title IX complaints against faculty—is "charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects." *Id.* at IV.

198.    Per the 2016-2017 Sexual Misconduct Policy, "[t]here is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University." *Id.* at V.D.

199.    The 2016-2017 Sexual Misconduct Policy significantly expanded the definition of Sexual Harassment and included a category of Prohibited Conduct referred to as Gender-Based Harassment. *Id.* at VI.E.

200. The 2016-2017 Sexual Misconduct Policy defines Sexual Harassment and Gender-Based Harassment are defined as follows:

> **Sexual Harassment** is any unwelcome sexual advance, request for sexual favors, or other unwanted conduct of a sexual nature, whether verbal, non-verbal, graphic, physical or otherwise, when the conditions outlined in (1) and/or (2), below, are present.
>
> **Gender-Based Harassment** includes harassment based on gender, sexual orientation, gender identity, or gender expression, which may include acts of aggression, intimidation, or hostility, whether verbal or non-verbal, graphic, physical or otherwise, even if the acts do not involve conduct of a sexual nature, when the conditions outlined in (1) and/or (2), below, are present.
>
> (1) Submission to or rejection of such conduct is made, either explicitly or implicitly, a term or condition of a person's employment, academic standing, or participation in any University programs and/or activities or is used as the basis for University decisions affecting the individual (often referred to as "quid pro quo" harassment); or
>
> (2) Such conduct creates a hostile environment: A 'hostile environment' exists when the conduct is *sufficiently severe, persistent or pervasive that it unreasonably interferes with, limits or deprives an individual from participating in or benefiting from the University's education or employment programs and/or activities.* Conduct must be deemed severe, persistent, or pervasive from both a subjective *and an objective perspective*. In evaluating whether a hostile environment exists, the University will consider the totality of the known circumstances, including but not limited to:
>
> - The frequency, nature and severity of the conduct;
> - Whether the conduct was physically threatening;
> - The effect of the conduct on the Complainant's mental or emotional state;
> - Whether the conduct was directed at more than one person;
> - Whether the conduct arose in the context of other discriminatory conduct;
> - *Whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or University programs or activities*; and
> - *Whether the conduct implicates concerns related to academic freedom or protected speech.*

> A hostile environment can be created by persistent or pervasive conduct or by a single, isolated incident, if sufficiently severe. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment. *In contrast, the perceived offensiveness of a single verbal or written expression, standing alone, is typically not sufficient to constitute a hostile environment. Id.* at VI.E. (emphasis added).

201.     The 2016-2017 Sexual Misconduct Policy placed an obligation on all parties to

provide truthful information:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct and subject to disciplinary sanctions under the University's Code of Conduct and disciplinary action under the appropriate disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are no later substantiated. *Id.* at X.

202.     The 2017-2018 Misconduct Policy was released on August 21, 2017. The cover

memo provided to Plaintiff noted that Dr. Hammat initiated revisions to the policy to "broaden the

policy's application beyond only intimate partner violence to violence between cohabitants and

family members" and to "clarif[y] the definition of sexual and gender-based harassment."

203.     Per the 2017-2018 Sexual Misconduct Policy, "the University does not discriminate

on the basis of sex or gender in any of its education or employment programs and activities." *Id.*

at II.

204.     Per the 2017-2018 Sexual Misconduct Policy, "each set of procedures" is "guided

by the same principles of fairness and respect for Complainants and Respondents," provides for

"prompt and equitable response to reports of Prohibited Conduct" and "thorough and impartial

investigations that afford *all parties* notice and an opportunity to present witnesses and evidence

and *to view the information that will be used in determining whether a policy violation has occurred*." *Id.* at III (emphasis added). Plaintiff was denied these rights.

205.    The 2017-2018 Sexual Misconduct Policy requires the application of the "Preponderance of the Evidence" standard, which "means that it is more likely than not that a policy violation has occurred." *Id.*

206.    Per the 2017-2018 Sexual Misconduct Policy, an "[e]mployee determined by the University to have committed an act of Prohibited Conduct is subject to disciplinary action, up to and including separation from the University. *Id.*

207.    Per the 2017-2018 Sexual Misconduct Policy, the Title IX Coordinator—who is responsible for determining the outcome of Title IX complaints against faculty—is "charged with monitoring the University's compliance with Title IX; ensuring appropriate education and training; coordinating the University's investigation, response, and resolution of all reports under this policy; and ensuring appropriate actions to eliminate Prohibited Conduct, prevent its recurrence, and remedy its effects." *Id.* at IV.

208.    Per the 2017-2018 Sexual Misconduct Policy, "[t]here is no time limit for reporting Prohibited Conduct to the University under this policy; however, the University's ability to respond may diminish over time, as evidence may erode, memories may fade, and Respondents may no longer be affiliated with the University." *Id.* at V.

209.    The 2017-2018 Sexual Misconduct Policy once again expanded the definition of sexual harassment and collapsed the definition of gender-based harassment into the same definition as follows:

E. SEXUAL OR GENDER-BASED HARASSMENT

Sexual or Gender-Based Harassment includes:

52

1. Unwelcome sexual advances, requests for sexual favors, and other verbal, physical, or electronic conduct of a sexual nature that creates a hostile, intimidating or abusive environment;
2. Verbal, physical, or electronic conduct based on Sex, Gender, Sexual Orientation, or sex-stereotyping that creates a hostile, intimidating, or abusive environment, even if those acts do not involve conduct of a sexual nature, or
3. Harassment for exhibiting what is perceived as a stereotypical characteristic for one's Sex or for failing to conform to stereotypical notions of masculinity and femininity, regardless of the actual or perceived Sex, Gender, Sexual Orientation, Gender Identity, or Gender Expression of the individuals involved.

a) **Harassment** is a type of discrimination that occurs when verbal, physical, electronic, or other conduct based on an individual's Protected Status…interferes with that individual's (a) educational environment (e.g. admission, academic standing, grades, assignment); (b) work environment (e.g., hiring, advancement, assignment); (c) participation in a University program (e.g. campus housing); or (d) receipt of legitimately requested services (e.g. disability or religious accommodations), thereby creating Hostile Environment Harassment or Quid Pro Quo Harassment, as defined below.

i. **Hostile Environment Harassment**
Unwelcome conduct based on Protected Status that is so severe, persistent, or pervasive that it alters the conditions of education, employment, or participation in a University program or activity, thereby creating an environment that a reasonable person in similar circumstances and with similar identities would find hostile, intimidating, or abusive. An isolated incident, unless sufficiently severe, does not amount to Hostile Environment Harassment.

ii. **Quid Pro Quo Harassment**
Unwelcome conduct based on Protected Status where submission to or rejection of such conduct is used, explicitly or implicitly, as the basis for decisions affecting an individual's education, employment, or participation in a University program or activity.

b) **Additional Guidance about Discrimination and Harassment**
Consistent with the definitions provided above, conduct that constitutes Discrimination and Harassment:

- May be blatant and involve an overt action, threat or reprisal; or may be subtle and indirect, with a coercive aspect that is unstated but implied.
- May or may not include intent to harm.
- May not always be directed at a specific target.
- May be committed by anyone, regardless of Protected Status, position, or authority. While there may be a power differential between the Complainant and the Respondent—perhaps due to differences in age or educational,

employment, or social status—Discrimination and Harassment can occur in any context.

- May be committed by a stranger, an acquaintance, or someone with whom the Complainant has a current or previous relationship, including a romantic or sexual relationship.
- May be committed by or against an individual or against an organization or group.
- May occur in the classroom, the workplace, in residential settings, or in any other setting.
- May be a pattern of behavior or, if sufficiently severe, a one-time event.
- May be committed in the presence of others, when the Complainant and Respondent are alone, or through remote communications, including email, text messages, or social media.
- May take the form of threats, assault, property damage, economic abuse, and violence or threats of violence.
- May include harassing or retaliatory behavior directed to a sexual or romantic partner, family member, friend, or pet of the Complainant.

*Id.* at VI.E.

210.    The 2017-2018 Sexual Misconduct Policy excluded prior protections for academic discourse and free speech including the requirement that allegations be viewed objectively, and based on the totality of circumstances. *Compare* 2016-2017 Sexual Misconduct Policy at VI.E.

211.    The 2017-2018 Sexual Misconduct Policy placed an obligation on all parties to provide truthful information:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct and subject to disciplinary sanctions under the University's Code of Conduct and disciplinary action under the appropriate disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are no later substantiated. *Id.* at X.

### B.    The Various Iterations of the Grievance Procedures in Cases Against Faculty

212.    Dr. Hammat provided Plaintiff with six (6) different versions of GMU's Equal Opportunity/Affirmative Action procedures, none of which sufficiently protected the due process

rights of faculty. It was never specified what procedures applied/were applied in Plaintiff's Title IX proceedings.

1.   **Equal Opportunity/Affirmative Action Grievance Procedure 2006-14**

213.   With respect to Complainants 1 and 2, Dr. Hammat provided Plaintiff with what she referred to as Equal Opportunity/Affirmative Action Grievance Procedures 2006-14 (the "2006-14 Grievance Procedures").

214.   Pursuant to the 2006-14 Grievance Procedures a written complaint was required to be filed within 180 days of the most recent incident. *Id.* at III.

215.   Pursuant to the 2006-14 Grievance Procedures, "a full investigation is conducted by [CDE] complete with written findings." If a violation is found, CDE would recommend "corrective actions." The determination is final.

216.   The 2006-14 Grievance Procedures did not require a hearing, a right of cross-examination or similar right of confrontation, did not provide for the respondent's review of evidence related to the investigation, and provided no right of appeal.

217.   Per the 2006-14 Grievance Procedures, [CDE] was "committed to protecting the integrity of the investigation process including confidentiality and the due process rights of all individuals." With respect to all parties, the Procedures stated "all parties are cautioned not to publicize or divulge the nature of the proceedings, or the identity of those involved." *Id.* at IV.

2.   **The 2015 and 2016 Grievance Procedure**

218.   With respect to Complainant 3, Dr. Hammat provided Plaintiff with GMU's January 2015 Equal Opportunity/Affirmative Action Grievance Procedure (the "2015 Grievance Procedure") and the February 2016 Equal Opportunity/Affirmative Action Grievance Procedure

(the "2016 Grievance Procedure").[63] Dr. Hammat also attached a copy of the 2016 Grievance Procedure to the email concerning Complainant 4.

219.    Per the 2015 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

220.    The 2015 Grievance Procedure required that a written complaint be filed within 180 days. Requests to extend the period would be considered "where the complainant can show he or she needed additional time due to circumstances beyond his or her control. *Id.* at III.

221.    The 2015 Grievance Procedure required the respondent to be notified of the complaint "within 10 working days after it is filed." *Id.*

222.    The 2015 Grievance Procedure did not require a hearing, a right of cross-examination or similar right of confrontation, and did not provide for the respondent's review of evidence related to the investigation. *Id.*

223.    Per the 2015 Grievance Procedure, "[a] full investigation is conducted by CDE with written findings. If a violation is found, the Office will recommend corrective actions." *Id.*

224.    The 2015 Grievance Procedure allowed either party to appeal a finding. *Id.* "A party may appeal a decision based on the discovery of new evidence previously unavailable or a significant irregularity in the procedural process which could affect the outcome of the finding…general dissatisfaction with the decision will not be sufficient." *Id.* The appeal determination was final. *Id.*

---

[63] Dr. Hammat also purported to send the 2013 Grievance Procedure to Plaintiff but it was not attached to the email concerning Complainant 3.

225.     The 2015 Grievance Procedure warned all parties against disclosure of the nature of the proceedings, or the identity of those involved, outside the scope of the investigation. *Id.* at IV.

226.     Per the 2016 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

227.     The 2016 Grievance Procedure permitted a written or verbal complaint, and required a complaint to be filed within 180 calendar days of the most recent incident unless the reporting party could "show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior." *Id.* at III. The Procedure did not define what constituted a pattern.

228.     Per the 2016 Grievance Procedure "[a]ll complaints of discrimination and harassment will be treated in the strictest confidence possible under the particular circumstances." *Id.*

229.     The 2016 Grievance Procedure provided for "a full investigation" consisting of interviews of the reporting party, responding party and any material witnesses identified, as well as a review of any relevant documentation. *Id.* at III. The reporting party and responding party will also be "given the opportunity to provide any additional relevant information to the investigator." *Id.*

230.     The 2016 Grievance Procedure did not provide for a hearing, cross-examination or other right of confrontation, or permit the respondent to review and/or respond to the evidence gathered during the investigation. This conflicted with the 2016-2017 Sexual Misconduct Policy

which permitted the respondent to review all of the evidence. *See supra* Paragraph 194. Plaintiff

was not permitted to review any evidence in the case against him.

231.    The 2016 Grievance Procedure required CDE to issue a final written determination

at the conclusion of its investigation. *Id.* at III. The determination was to state whether there was

a violation of "this policy" and was to be provided to the "appropriate supervisor" "Human

Resources" and "other pertinent university officials as necessary to ensure proper resolution and

follow-up." *Id.* "CDE's involvement in the matter concludes when the final written determination

is issued." *Id.*

232.    The 2016 Grievance Procedure defined the "preponderance of the evidence"

standard used in investigations as follows:

> Under this standard, individuals are not presumed to have engaged in the alleged
> conduct unless a 'preponderance of the evidence' supports a finding that the
> conduct occurred. This 'preponderance of the evidence' standard *requires that the
> evidence supporting each finding be more convincing than the evidence offered in
> opposition to it*." *Id.* (emphasis added).

233.    Sanctions that could be imposed on a faculty member for violations of University

policy included dismissal. *Id.* Sanctions were required to be "commensurate with the severity

and/or frequency of the conduct. And shall be adequate and sufficient to prevent such conduct in

the future." *Id.*

234.    The 2016 Grievance Procedure also permitted appeals based on new evidence or a

significant irregularity in the procedural process which could affect the outcome." *Id.* The

determination on appeal, made by the Vice President of CDE, was final.

235.    The 2016 Grievance Procedure cautioned all parties not to publicize or divulge the

nature of the proceedings, or the identity of those involved. *Id.* at IV.

### 3. **The 2017 Grievance Procedure**

236.    With respect to Complainant 4, Dr. Hammat provided Plaintiff with the 2016 Grievance Procedure discussed *supra* as well as the December 2017 Equal Opportunity/Affirmative Action Grievance Procedure (the "2017 Grievance Procedure").

237.    Per the 2017 Grievance Procedure, GMU "reserve[d] the right to investigate any allegation of harassment or discrimination upon receipt of sufficient evidence to sustain such claims." *Id.* at II.

238.    The 2017 Grievance Procedure permitted a written or verbal complaint, and required a complaint to be filed within 180 calendar days of the most recent incident unless the reporting party could "show he or she needed additional time due to circumstances beyond his or her control, or a pattern of ongoing discriminatory behavior." *Id.* at III. The Procedure did not define what constituted a pattern.

239.    The 2017 Grievance Procedure contained the following new language:

> The Reporting Party will meet with a member from CDE to discuss their concerns. *Assuming the complete veracity of the allegation(s)*, CDE will make a threshold determination as to whether the allegation(s) contained in the complaint *constitute* a violation of university policy….If the threshold determination indicates that an investigation is required, CDE will determine the appropriate investigation process, and an investigator from CDE assigned to the complaint will notify the Reporting Party…and Responding Party…that said investigation is under way. *Id.* at III. (emphasis added).

240.    The 2017 Grievance Procedure provided for "[a]n investigation" consisting of interviews of the reporting party, responding party and any material witnesses identified, as well as a review of any relevant documentation. *Id.* at III. The reporting party and responding party will also be "given the opportunity to provide any additional relevant information to the investigator." *Id.*

241.    The 2017 Grievance Procedure did not provide for a hearing, cross-examination or other right of confrontation, or permit the respondent to review and/or respond to the evidence gathered during the investigation. This conflicted with the 2017-2018 Sexual Misconduct Policy which permitted the respondent to review all of the evidence. *See supra* Paragraph 204. Plaintiff was not permitted to review any evidence in the case against him.

242.    Per the 2017 Grievance Procedure CDE "may" issue a final written determination at the conclusion of its investigation. *Id.* at III. The determination was to state whether there was a violation of "this policy" and was to be provided to the "appropriate supervisor" "Human Resources" and "other pertinent university officials as necessary to ensure proper resolution and follow-up." *Id.* "CDE's involvement in the matter concludes when a final determination is made."

243.    The 2017 Grievance Procedure defined the "preponderance of the evidence" standard used in investigations as follows:

> Under this standard, individuals are presumed not to have engaged in the alleged conduct unless a 'preponderance of the evidence' supports a finding that the conduct occurred. This 'preponderance of the evidence' standard *requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it*." *Id.* (emphasis added).

244.    Sanctions that could be imposed on a faculty member for violations of University policy included dismissal. *Id.* Sanctions were required to be "commensurate with the severity and/or frequency of the conduct. And shall be adequate and sufficient to prevent such conduct in the future." *Id.*

245.    The 2017 Grievance Procedure also permitted appeals based on new evidence or a significant irregularity in the procedural process which could affect the outcome." *Id.* The determination on appeal, made by the Vice President of CDE, was final.

246.     The 2017 Grievance Procedure cautioned all parties not to publicize or divulge the nature of the proceedings, or the identity of those involved. *Id.* at IV.

## VII.     The Allegations Against Plaintiff

### A.   Complainant 1

#### 1.   The Allegations and Lack of Supporting Evidence

247.     Complainant 1 graduated from a GMU doctoral program prior to making a report against Plaintiff. Complainant 1's allegations stemmed from one graduate school course taught by Plaintiff in Spring 2013 ("Course A") and a second graduate school course taught by Plaintiff in Spring 2014 ("Course B"). Certain classes taught by Plaintiff in each class involved discussions concerning human sexuality, abnormal behavior, and cultural norms.

248.     Under the applicable Grievance Procedure 2006-14—which required complaints to be filed within 180 days—these allegations should not have been pursued by CDE. The allegations, which concerned class discussions that occurred over five (5) years prior, should have been questioned for that reason—they were not.

249.     Per Dr. Hammat's email to Plaintiff on December 4, 2018, Complainant 1's allegations concerned "potential violations" of Policy 2006-14. Complainant 1 alleged—without specifying whether a particular incident occurred in Course A or Course B—that:

- During class, Plaintiff provided a detailed description with the students of a sexual encounter wherein he performed oral sex upon a woman at a party where others were "packed around" and able to see him perform oral sex;

- During class, Plaintiff discussed a then recent event that occurred while traveling to the middle east and described having an erotic and adventurous experience in the middle of the desert while he watched a woman with notability and a connection to power "skinny dipping" while he relaxed and watched her. You told the students how erotic the experience was without actually having sex with the woman;

- During class, also emphasized to the students in the class (a cohort) that they "needed to get naked together to really get to know each other." To that end, Plaintiff repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other.

- During class, Plaintiff asked the students who they thought would end up "sleeping with who" in the cohort. Plaintiff also indicated, "Grad students typically end up being incestuous with each other."

- During class, Plaintiff bragged about presenting his new findings at a conference in a presentation that used the term "fuck."

- During class, if a student expressed that they were offended, uncomfortable, or frustrated by the topic of discussion, Plaintiff would dismiss those concerns as being "emotional," "irrational," or "weak."

- During class, Plaintiff stated, on Baumeister Day "if you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women are equal."

- Graduate students in the program often warned new students to "not get on [Plaintiff's] bad side, because if [Plaintiff] liked you, you would get ample opportunities for publications, collaborations, and very reasonable feedback as a committee member. If [Plaintiff] did not like you, interactions were very uncomfortable."

- Through favoritism, Plaintiff made it clear to his students that opportunities and teaching was dependent on liking them and having sexually stimulating conversations with them.

250.    Complainant 1 did not allege that she was harmed as a result of the incidents alleged or that she was denied access to her education or any other benefits. Indeed, Complainant 1 had already graduated from a GMU graduate program at the time her complaint was made. None of the above-cited policies, *supra* Point VI, permitted GMU to pursue such *post hoc* complaints.

251.    During the Title IX investigation, Plaintiff was not permitted to review the written complaint or any evidence collected in regard to Complainant 1's allegations. Without specifics, Plaintiff conducted an exhaustive search of his course syllabi, teaching evaluations and communications with Complainant 1 and others about the courses and topics in question. As a

result of this search, he provided Dr. Hammat with substantial evidence that contradicted Complainant 1's allegations.

252.    With respect to Complainant 1's allegation that Plaintiff discussed a personal story about performing oral sex on a woman at a party, Plaintiff did not deny sharing this story in class but provided Ms. Simmons and Dr. Hammat with context demonstrating the relevance of the story and how it fit into Plaintiff's pedagogical approach of utilizing examples, stories, case studies, and interesting scientific research so that students better understand and remember what they are being taught.

253.    As explained during his interview concerning these allegations, the example that Plaintiff gave was part of a single class that he taught that semester on sexuality and sexual disorders. One set of disorders that the class discussed was paraphilias. As Plaintiff explained, a person is diagnosed with a paraphilia when his or her sexual arousal is dependent on objects, situations or nonconsenting individuals as opposed to consensual sexual activity. When discussing exhibitionism, which is sexual gratification from the exposure of one's genitals to non-consenting others, and voyeurism, which is sexual gratification from observing unsuspecting others, Plaintiff offered concrete examples. Plaintiff offered case studies, discussed scientific research and stories from clinical experiences, news stories, and personal experiences.

254.    One such example was a woman Plaintiff met at a party who could only get sexual gratification when orally pleasured in public. No sexual details were provided in Plaintiff's discussion about this woman other than that Plaintiff performed oral sex on her. It was a concrete example of exhibitionism because she invited others to watch. This example was directly relevant to the topic being taught—sexual disorders.

255.    When viewed in context, Plaintiff's recounting of the story was an appropriate pedagogical tool and constituted protected academic discourse under the First Amendment of the U.S. Constitution and the 2001 Guidance. Moreover, the policy in place in Spring 2013, Policy 2006-14, expressly stated:

> Sexual harassment *does not* include verbal expression or written material that is relevant to course subject matter or curriculum and this policy shall not abridge academic freedom or George Mason University's educational mission. (emphasis added).

Thus, under the University's sexual harassment policy in place at the time, the story complained of by Complainant 1 did not constitute sexual harassment.

256.    There is, further, no evidence that Plaintiff's story contributed in any way to a hostile environment. On the contrary, Plaintiff's student evaluations for Course A demonstrated that students were pleased with the class and his teaching. 100% of the students rated his teaching as a 5 out of 5. For Item #5 on the evaluation, "The instructor showed respect for students" every student but one rated Plaintiff a 5 out of 5. That student rated Plaintiff a 4 out of 5. Those ratings were higher than the means for Plaintiff's department, college and the University. Three students provided positive, optional feedback including a request that Plaintiff teach Course B. In fact, Plaintiff ended up teaching Course B—which Plaintiff had never taught before— because every student in the class—including Complainant 1 and Complainant 2—asked Plaintiff to teach the course so they could have him as an instructor for the second time.

257.    When preparing his appeal, Plaintiff came across a peer evaluation of the exact class which was the subject of Complainant 1's allegations, written by a professor who observed the class. Plaintiff included this evaluation with his appeal. The evaluation noted "[g]iven the sensitive nature of the materials and some strong opinions in the class, [Plaintiff] worked very well to keep an atmosphere of mutual respect and fact based discussion throughout the class." The

evaluator further noted "[o]verall, the discussion was very lively and interesting. Plaintiff's teaching style was positive and encouraging, and allowed the students to voice a range of thoughts and opinions in a highly supportive environment." The professor who observed the class did not even mention the story raised by the Complainant 1 and Complainant 2. Each statement about the Plaintiff's teaching and interactions with students in the objective, written peer evaluation was positive.

258.    After Plaintiff taught Course A, Complainant 1 raised no complaints about the class discussion or example about oral sex, to Plaintiff, other students, or the administration. On the contrary, shortly after Plaintiff taught the course, in July 2013, Complainant 1 solicited Plaintiff's participation in her second-year project. During the investigation, Plaintiff submitted an email communication concerning this topic to Dr. Hammat.

259.    Complainant 1 subsequently took Course B and she and Plaintiff continued to have positive interactions, including her praise of Plaintiff's teaching, request for Plaintiff to be on her dissertation committee and request for Plaintiff to provide a reference letter for her internships. In her request for a reference letter, Complainant 1 pointed to Plaintiff's position as her instructor in Course A as one of their "primary interactions." Complainant 1 and Plaintiff also collaborated on a number of research articles, which she pointed out in her request. As for Complainant 1's request for Plaintiff to be on her dissertation committee, there are many faculty members in Plaintiff's Department who could, and likely would have, served on her dissertation committee. In fact, other Department faculty members were more qualified than Plaintiff because they studied topics relevant to her dissertation topic. Complainant 1's request that Plaintiff serve on her dissertation committee was evidence of her positive relationship with him and her preference for Plaintiff over other qualified faculty members. This evidence was ignored by Dr. Hammat and Mr. Williams.

260.    Complainant 1's next allegation, that during class Plaintiff discussed a trip to the Middle East in which Plaintiff either watched a woman "skinny dipping" or went "skinny dipping" with her was contradicted by Plaintiff and other student-witness' statements (as Plaintiff learned in Dr. Hammat's Notice of Determination). According to Complainant 1's Notice of Determination, discussed in more detail *infra*, student witnesses interviewed during the investigation confirmed that Plaintiff *did not* reference skinny dipping in class, raising questions about Complainant 1's credibility, and motives, in making this unfounded, stale allegation against Plaintiff.

261.    Plaintiff further informed Dr. Hammat during the investigation that one of the important themes in Course B was cultural differences (*e.g*., an example of different systems that influence emotions, thoughts, and behavior). Plaintiff taught two classes related to this issue. The purpose of these classes was to teach students how people are influenced by situations, culture, or contexts. To illustrate this point, Plaintiff discussed science along with concrete examples and stories.

262.    One such story was from Plaintiff's travels to the Middle East to speak at a conference. Plaintiff's female acquaintance invited Plaintiff to her house and had a female member of her staff serve as Plaintiff's tour guide throughout his trip. The tour guide answered all of Plaintiff's questions about cultural differences compared to the United States. Women are not allowed to wear swimsuits in the country in question. The tour guide took Plaintiff to a beach where she could swim in a bathing suit. She also showed Plaintiff an area of the country that was populated by illegal mistresses living in chateaus. To conclude the tour, the tour guide and Plaintiff went to a particular road known as "love street". Young people are not allowed to date because arranged marriages are still the norm. But they come to the street, park, and if they see someone

they like, they throw a burner phone into their car and hope they call back to arrange a date. Plaintiff told the class this story to initiate a conversation about dominant culture and counter cultures, and how people respond, with an emphasis on dissent. Plaintiff never discussed skinny dipping or any other sexual activity with his guide because there was no sexual activity.

263.   Apart from the lack of factual foundation to support the "skinny dipping" allegation, the Middle East story was yet another example of protected academic discourse that cannot be construed as sexual harassment under either the 2001 Guidance, or Policy 2006-14.

264.   During the Spring 2014 Semester, Complainant 1 praised Course B in an email to Plaintiff which copied Complainant 2, stating "[t]his semester has rocked. Our awesomeness has now ruined you for all following cohorts. Conversely, the rest of our classes will now be terrible in comparison."

265.   Like Course A, Plaintiff received outstanding student evaluations for Course B. On Question #5 "The instructor showed respect for students," 4 out of 5 students rated Plaintiff a 5 out of 5, with one student rating Plaintiff a 3 out of 5. Once again, the facts did not support a hostile environment claim and were explained during Plaintiff's interviews and in his appeal.

266.   Complainant 1's allegation "during class, [Plaintiff] bragged about presenting his new findings at a conference in a presentation which included the word "fuck" in the title also failed to substantiate a claim for sexual harassment. Notably the use of the word "bragged" demonstrates bias against Plaintiff, and it is unknown whether the word was used by Complainant 1 or by the investigator, as there was only a vague recitation of allegations included in Dr. Hammat's email to Plaintiff.

267.   As Plaintiff explained during the investigation, it was Plaintiff's recollection that during the sexuality class he taught for Course A, Plaintiff used a PowerPoint presentation which

referenced data from professional presentations Plaintiff gave concerning human sexuality. The students learned about Plaintiff's scientific research in this area. The names of the articles Plaintiff relied on for the PowerPoint presentation, which have been presented at conferences and published in peer-reviewed journals, were provided to Dr. Hammat and Mr. Williams. The presentation has utilized "fuck" in the title, when presented to hundreds of people—including at GMU, without complaint.

268.    These allegations, again, did not support a violation of Policy 2006-14 because they concerned protected academic discourse under the Policy and 2001 Guidance.

269.    Complainant 1 next alleged that on Baumeister Day Plaintiff said "If you want to argue that men and women are equal, it is up to you to provide empirical evidence that men and women are equal." Plaintiff explained to Dr. Hammat that he never said this.

270.    Plaintiff referred to one class as Baumeister Day because the two readings had Roy Baumeister as the lead author. The topic of the class was not the equality of men and women. That has not been discussed in any of Plaintiff's classes over the course of Plaintiff's 15-plus years of teaching at the University. The Baumeister articles put forth a theory that women's sexual attitudes and behavior are more responsive to sociocultural influences than men. The two articles present a wide range of data to support this position. This is what was discussed in class.

271.    In class, Plaintiff mentioned that if anyone wanted to argue that men and women show the same level of reactivity to cultural influences, they must provide evidence to challenge the data presented in the readings. Plaintiff's class was about critical thinking, which trained students how to think and argue. Students could not just say they disagree with the readings; they had to provide a rationale.

272.   In preparing his appeal, Plaintiff came across email correspondence between him and his graduate students which discussed the Baumeister readings ahead of class. The correspondence demonstrated Plaintiff's approach to the readings and the students' reaction to them, refuting Complainant 1's allegations. Plaintiff submitted this correspondence with his appeal.

273.   This evidence raised questions about Complainant 1's credibility as there were no readings and no discussions about the "equality" of men and women. The use of quotes in Complainant 1's allegations as to what was said during class also raised credibility concerns because it was unlikely that Complainant 1 could recite, verbatim, what was discussed approximately five years earlier. This was one of several false statements made by Complainant 1, disproven by Plaintiff's evidence, that raised questions about both her credibility and motives.

274.   Complainant 1 also alleged, in quotes, that Plaintiff stated in class that graduate students "needed to get naked together to really get to know each other" and repeatedly mentioned Spa World (a spa where people are often naked in the common areas) and encouraged the cohort to go together to really get to know each other." These allegations were false. Plaintiff never recommended that his students "get naked together." Moreover, there is nothing sexual about Spa World. As Plaintiff stated during his appeal, Spa World does not allow nudity in its common areas. There is one private bathing pool for women which permits nudity and one private bathing pool for men. This is not the case for any other part of the facility. As he told Dr. Hammat during the investigation, Plaintiff frequently recommended restaurants, activities and venues to his students, in part to alleviate the stress of graduate school. To the extent that he may have recommended Spa World to any of his students, it would have been as a place to relax.

275.    Complainant 1 also alleged that Plaintiff called students "emotional, irrational, or weak." Plaintiff learned from Dr. Hammat's Letter of Determination, discussed *infra*, that a witness stated that Plaintiff called one student's *arguments* emotional—not the student. Plaintiff's email communications concerning Baumeister Day demonstrated Plaintiff's approach to students engaged in passionate discussion about challenging topics, and contradicted Complainant 1's allegations. There was no mention of this in the "objective" peer evaluation conducted during the class about which Complainant 1 complained, nor was it borne out in student evaluations.

276.    The statement that a student is basing his or her arguments on emotion also has no relationship to sex or gender and, as such, did not support a finding of sexual, or gender-based, harassment. Any student, regardless of gender or gender identity, can base their arguments on what emotions are being felt when taking a position on a topic of discourse.

277.    Complainant 1 also made the false allegation that, during class, Plaintiff asked the students who they thought would end up "sleeping with who" in the cohort and Plaintiff also indicated, "Grad students typically end up being incestuous with each other." Plaintiff denied these allegations and no evidence was uncovered during the investigation to support these statements. To the extent that Plaintiff made any reference to students dating each other, a number of graduate students that had classes with Plaintiff were dating each other. References to students dating did not support an allegation of sexual harassment, or even gender-based harassment, because general statements concerning relationships between students of all gender identities and sexual orientations to students of all identities and orientations do not constitute sex discrimination.

### 2. **Dr. Hammat's Erroneous Finding**

278.    On February 22, 2019, Dr. Hammat emailed Plaintiff a "Letter of Determination" with respect to Complainant 1. Whereas Dr. Hammat's December 4, 2018 email to Plaintiff

referenced "potential violations" of **Policy 2006-14**, her Letter of Determination found Plaintiff "engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason's University's **Policy 1202**: *Sexual or Gender-Based Harassment and Other Interpersonal Violence*." Dr. Hammat did not specify which version of the policy was applied in Plaintiff's case and failed to provide the precise definitions applicable to the findings.

279.   As discussed *supra* Point VI, GMU's policies and procedures were revised a number of times—including by Dr. Hammat—and eroded the rights of the faculty and expanded the definition of sexual harassment to include nearly any form of conduct that a person found offensive, without regard to principles of academic freedom or the 2001 Guidance. Even so, Complainant 1's allegations did not fit within any definition of sexual or gender-based harassment and, even if they could, were contradicted by witnesses and evidence.

280.   Dr. Hammat failed to apply the preponderance of the evidence standard even though Plaintiff was purportedly found responsible under Policy 1202. Under Policy 1202, and the 2016-2017 Grievance Procedures the 'preponderance of the evidence' standard "requires that the evidence supporting each finding be more convincing than the evidence offered in opposition to it." *See supra* Paragraphs 232, 243. Dr. Hammat merely found "enough factual information to sustain the allegation that" Plaintiff engaged in "conduct that qualifies as Sexual or Gender-based Harassment."

281.   Dr. Hammat's finding was based on: i) Plaintiff's discussion of voyeurism and paraphilias in Course A (which received a positive peer evaluation); ii) Plaintiff's recommendations about Spa World; iii) Plaintiff "jesting" about graduate students dating each other; and iv) Plaintiff calling one student "emotional." As discussed *supra* these allegations were unsupported and did not support the finding.

71

282.    Dr. Hammat added new allegations to the Letter of Determination that *did not* appear in her December 4, 2018 email to Plaintiff: i) that "Complainant 1 indicated that the interactions with [Plaintiff] included regular and gratuitous stories detailing sexual encounters, disparaging comments and actions regarding stereotypical female traits (e.g. being emotional); and ii) that Plaintiff cautioned students about sharing the stories told in class outside of class. Plaintiff did not have the opportunity to refute these allegations during the investigation.

283.    The Letter of Determination did not provide any information about sanctions, or who would determine the same.

284.    Dr. Hammat's letter was vague as to the reasoning for the determination. Although alluding to conversations and interviews with others, or documents gathered through the investigative process, Plaintiff was not privy to any such information or "evidence," making it extremely difficult to fully appeal the finding. Names of witnesses were not divulged. Plaintiff was told he could appeal the determination in writing to Mr. Williams.

B.      **Complainant 2**

1.      **The Allegations and Lack of Supporting Evidence**

285.    Complainant 2 graduated from a GMU graduate program prior to making a complaint against Plaintiff. Complainant 2 was good friends with Complainant 1 (as well as Complainants 3 and 4). Complainant 2's allegations also concerned graduate Course A, which Plaintiff taught in Spring 2013, and graduate Course B, which Plaintiff taught in Spring 2014.

286.    Under the applicable Grievance Procedure 2006-14—which required complaints to be filed within 180 days—these allegations should not have been pursued by CDE. The allegations, which concerned class discussions that occurred over five (5) years prior, should have been questioned for that reason—they were not.

287.    As with Complainant 1, Dr. Hammat's email to Plaintiff dated December 4, 2018, stated that Complainant 2's allegations concerned "potential violations" of Policy 2006-14. Complainant 2 alleged:

> a.    that Plaintiff provided a "detailed description with the students of a sexual encounter wherein [Plaintiff] performed oral sex upon a woman at a party;"
>
> b.    During class Plaintiff "shared with students the number of sexual partners he had;"
>
> c.    During class Plaintiff "discussed 'skinny dipping' with a woman who was not your wife with the students in the class;"
>
> d.    During class Plaintiff "recounted [his] visits to a Spa World, a Korean Spa in Centreville, VA, allegedly known for human trafficking and public nudity, and encouraged the students of the class to go together."

288.    As discussed *supra* Paragraph 252, Plaintiff's discussion about oral sex within the context of exhibitionism and paraphilias was protected academic discourse, was not detailed, and was observed by another professor conducting a peer evaluation who gave Plaintiff a positive review of his teaching and interactions with students.

289.    The reference to Plaintiff's wife as part of the "skinny dipping" allegation evidences bias, and potential gender bias, on the part of either Complainant 2 or Dr. Hammat depending on the origin of the precise wording. The allegation suggests that Plaintiff was expected to comport with traditional notions of marriage, fidelity and monogamy or else be branded a sexual harasser. As discussed with respect to Complainant 1's nearly identical allegation, this allegation was disproven by witnesses that confirmed that Plaintiff did not discuss skinny dipping. Plaintiff also provided Dr. Hammat with stellar student evaluations for Course B.

290.    The Spa World allegation, which referred to "human trafficking" also evidences bias against Plaintiff, implying that he had knowledge of, or participated in, human trafficking.

One need only conduct a Google search of Spa World to see that it is a legitimate business. While conducting a Google search in preparation for his appeal, Plaintiff found that there were allegations against the spa for human trafficking that came to light *after* Complainants 1 and 2 took Plaintiff's classes.[64] When recommending Spa World to students Plaintiff had no knowledge of these alleged activities. As discussed *supra* Paragraph 274, Plaintiff recommended a variety of activities and business to students, including with respect to managing the stresses of graduate school.

291.    After Complainant 2 took Course A and Course B, she and Plaintiff maintained a cordial, professional relationship. In July 2014, Complainant 2 emailed Plaintiff "quick favor? I owe you a beer" in which she asked Plaintiff to resubmit a letter of recommendation for a funding application for her research. Upon being asked by Complainant 2, Plaintiff had also written a recommendation letter for her first submission. This email was provided to Dr. Hammat.

292.    Omitted from Complainant 2's allegation that Plaintiff shared the number of sexual partners he had was any context, including that *Complainant 2* asked Plaintiff to disclose that information during class. This conversation took place on the last day of Course A. On the first day of class, Plaintiff told students that as a return favor for them sharing personal information throughout the semester, through discussions and thought papers, on the last day of class they could ask Plaintiff anything they wanted. In response to Complainant 2's question, Plaintiff responded with nothing more than a number.

293.    Complainant 2 provided no evidence of harm, or that her access to her education or GMU activities were impacted by the alleged incidents. At most, Complainant 2 expressed to Dr. Hammat discomfort with the subject matter discussed in class. As noted in a 2003 Dear Colleague

---

[64] https://wjla.com/news/crime/court-documents-report-mistreatment-at-spa-world-in-virginia-104749.

Letter issued by the OCR, sexual harassment "must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive."[65]

### 2.   **Dr. Hammat's Erroneous Finding**

294.    On February 22, 2019, Dr. Hammat emailed Plaintiff a "Letter of Determination" with respect to Complainant 2's allegations. As with Complainant 1, on December 4, 2018 Dr. Hammat informed Plaintiff of potential violations of Policy 2006-14 but found that Plaintiff violated "University Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence."

295.    As with Complainant 1, Dr. Hammat failed to apply the preponderance of the evidence standard, merely stating "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-Based Harassment."

296.    Dr. Hammat's finding was based on: i) Plaintiff's discussion of exhibitionism and paraphilias in Course A (which received a positive peer evaluation); ii) Plaintiff's recommendations about Spa World; iii) Plaintiff's discussion of cultural differences in the Middle East and going to a beach with his female tour guide, which Dr. Hammat described as an "intimate encounter" even though "student witnesses...did not recall 'the skinny-dipping' element of the story;" and iv) the conversation, prompted by Complainant 2, about the number of Plaintiff's sexual partners.

297.    As with Complainant 1, Dr. Hammat added allegations to the Letter of Determination including Complainant 2's statement that "[Plaintiff's] behavior is an issue of the [Department] and it contributed to a toxic environment where learning is more difficult. While [Plaintiff] is not responsible for anyone's behavior but his own, the fact that he is unaware of what

---

[65] *See* https://www2.ed.gov/about/offices/list/ocr/firstamend.html

transpires in his lab or if aware does not take meaningful steps to intervene, is grossly negligent as an educator." Plaintiff had no opportunity to respond to these allegations during the course of the investigation. Complainant 2 only took Courses A and B with Plaintiff and, apart from their few interactions during that time, Complainant 2 and Plaintiff had no individual contact. Complainant 2 spent *no time* in Plaintiff's lab. This was never questioned.

298.    The Letter of Determination provided no information about sanctions, including about who would determine same.

299.    Dr. Hammat's letter was vague as to the reasoning for the determination. Although alluding to conversations and interviews with others, or documents gathered through the investigative process, Plaintiff was not privy to any such information or "evidence," making it extremely difficult to fully appeal the finding. Names of witnesses were not divulged. Plaintiff was told he could appeal the determination in writing to Mr. Williams.

**C.    Complainant 3**

**1.    The Allegations and Lack of Supporting Evidence**

300.    On December 4, 2018 Dr. Hammat emailed Plaintiff concerning Complainant 3's allegations, addressing the email to "Complainant 3" as opposed to Plaintiff.

301.    The email noted "potential violations" of the 2014-2015 and 2015-2016 Sexual Misconduct Policies. The allegations dated as far back as November 2014.

302.    The 2015 and 2016 Grievance Procedure required complaints to be filed within 180 days absent a showing of extenuating circumstances. Thus, Complainant 3's allegations—reported in 2018—were timed out and should not have been investigated. The delay in reporting was never questioned by Dr. Hammat or Mr. Williams.

303.    Complainant 3 alleged as follows:

- At a professional conference on November 21-23, 2014, Plaintiff gave the presentation that Complainant 1 had complained about, *which was about human sexuality*, at which Plaintiff discussed working at a pornography store, and made "explicit reference to sexual acts" and utilized slides containing "images of naked women." Plaintiff "invited [Complainant 3] to attend this talk, knowing she was a first year graduate student and had been an undergraduate in his classes previously."[66]

- At the same conference, Plaintiff pulled Complainant 3's boyfriend aside (who was also Plaintiff's graduate student) and made a derogatory remark to the boyfriend about whether he was having sex with Complainant 3. Plaintiff then high-fived Complainant 3's boyfriend when learning the two were in a committed relationship.

- At a happy hour soon after the conference, Plaintiff approached Complainant 3, said he knew about her relationship with her fellow graduate student, hugged her and congratulated her. Plaintiff then told Complainant 3 he "knew how to keep secrets" and bought her a drink on his tab.

- In mid-February 2015, Plaintiff hosted a party at his home for graduate students in his lab and commented on the penis size of Complainant 3's boyfriend.

- In Spring 2016, while attending a professional conference, Plaintiff hugged Complainant 3 and told her he overheard a conversation with her companion. Plaintiff told Complainant 3 "she didn't have to worry because he knew how to keep secrets" and would not tell her boyfriend what he overheard.

- In Spring 2016, when Complainant 3 broke up with her boyfriend and fellow graduate student, Plaintiff stopped her in the hallway, hugged her and said "I'm not mad and I still think highly of you." Plaintiff indicated that he wanted to work with her in the future and commented that she was intelligent, attractive and creative and expressed that he hoped they could work together on projects, despite the breakup.

304.   With respect to Complainant 3's first allegation about the November 2014 conference, there was a factual error because Complainant 3 was never an undergraduate student in any of Plaintiff's courses. The allegation also demonstrates biased thinking—that it would somehow be inappropriate for a male professor to invite an adult, female graduate student to attend a public presentation about human sexuality that is grounded in peer-reviewed research. Plaintiff

---

[66] Notably, first-year graduate students are typically over 21 years of age.

stated during the investigation that he had no recollection of specifically inviting Complainant 3 to the presentation, but even if he had this would not be a ground for a claim of sexual harassment.

305.    Plaintiff's presentation was not aimed at a particular audience, nor was it directed at Complainant 3. Plaintiff made the presentation to hundreds of people at multiple organizations (including at a large conference at GMU) without a negative comment or complaint. The slides in the presentation did not focus on "naked women" but couples involved in intimate moments. The images were no more revealing than one would see in fashion advertisements or advertisements for perfume or cologne.

306.    Regarding Complainant 3's allegation that Plaintiff made derogatory comments about her to her boyfriend while at the conference, Plaintiff explained to Dr. Hammat, and in his appeal, that he did not recall making the derogatory comments. Nor did Plaintiff recall high fiving Complainant 3's boyfriend. Plaintiff also did not recall having a conversation of this nature in Complainant 3's presence. Plaintiff and Complainant 3's boyfriend often engaged in banter of a personal nature about their relationships and other topics. Plaintiff still has a close working relationship with him, and he did not mention that he was offended or disturbed by any conversations Plaintiff had with him while he was dating Complainant 3. Had Plaintiff known that any offense was taken by anything Plaintiff said, Plaintiff would have remedied the situation. If such a conversation took place in front of Complainant 3, and had Plaintiff known she was offended by it, Plaintiff also would have taken steps to remedy the situation, including by apologizing.

307.    With respect to Complainant 3's allegation about the subsequent happy hour, no evidence was uncovered during the course of the investigation to support this allegation, which

Plaintiff did not recall this ever happening. Dr. Hammat confirmed in her Letter of Determination, discussed *infra* that there was no corroborating evidence to support this allegation.

308.    With respect to Complainant 3's allegation that at a party in mid-February 2015 Plaintiff commented on her boyfriend's penis size, neither Plaintiff nor Complainant 3's boyfriend recalled such a conversation occurring (as per the Letter of Determination).

309.    Plaintiff presented evidence to Dr. Hammat that, on the Monday after the party, Complainant 3 reached out to Plaintiff and said:

> You're [sic] research has even invaded the yuppie/hippie filled aisles of Whole Foods! Spread the word. Thanks again for having us to your house on Friday! Lovely house and adorable children. See you soon.

The tenor of this email contradicts that anything occurred at the party that made Complainant 3 uncomfortable. Notably, in February 2015, she was not a student of Plaintiff's and there was no need for her to send this email.

310.    With respect to Complainant 3's allegations concerning the Spring 2015 conference, Plaintiff told Dr. Hammat that Plaintiff's recollection was that he was at a restaurant with multiple colleagues from around the United States. One table away, sitting on the same side facing Plaintiff were Complainant 3 and another person. Complainant 3 asked Plaintiff to come over and meet her friend. Plaintiff did not hear what she was talking about because there was a row of people between them. Plaintiff did not say anything about what she said to her friend or say anything about Complainant 3's boyfriend.

311.    Even if the uncorroborated allegation about what Plaintiff said to Complainant 3 at the Spring 2016 conference were true, it would not support a finding of sexual or gender-based harassment. While Complainant 3, who was not a student of Plaintiff's at the time, claimed to be "very uncomfortable" from the alleged conversation, she subsequently asked Plaintiff whether she

could be part of one of Plaintiff's lab's research projects and asked Plaintiff for letters of reference for a grant, which she obtained. Complainant 3's actions once again contradicted her claims. Accordingly, her conduct should have discredited any allegation of sexual harassment.

312.    With respect to Complainant 3's allegation concerning Plaintiff's conversation about her breakup in Spring 2016, Plaintiff did not recall any conversation with Complainant 3 in which Plaintiff referenced her appearance or called her "attractive." As Plaintiff told Dr. Hammat, and noted in his appeal, Plaintiff did not recall any conversations in his 15 years at the University in which he told any graduate student that he or she was attractive. Plaintiff said it was possible that he hugged Complainant 3 briefly, as had happened as a quick greeting with some students in the past. For example, when Plaintiff's graduate students came over to his house, it was customary for them to hug each other hello or goodbye. Complainant 3 regularly hugged Plaintiff, Plaintiff's wife, and numerous other people when visiting Plaintiff's house. Plaintiff served on the dissertation committees of 18 doctoral students, including Complainant 1. Plaintiff briefly hugged male and female students when congratulating them on the completion of their dissertations. Many of the faculty on these committees did the same.

## 2.    Dr. Hammat's Erroneous Finding

313.    As in the cases of Complainants 1 and 2, Dr. Hammat's Letter of Determination with respect to Complainant 3 changed the policy under which Plaintiff was found responsible. Dr. Hammat's December 4, 2018 email referenced the 2014-2015 and 2015-2016 Sexual Misconduct Policies, while the Letter of Determination stated that it was alleged that Plaintiff "engaged in Sexual or Gender-Based Harassment, in violation of George Mason University's Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence."

314.     Dr. Hammat again failed to apply the preponderance of the evidence standard, stating "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment," without specifying the definitions that were applied, or which version of Policy 1202 was relied upon.

315.     The Letter of Determination included references to *uncorroborated* evidence to *support* the finding such as:

   i.     witnesses provided "differing details" as to whether Plaintiff made a derogatory comment to Complainant 3's boyfriend at the November 2014 conference;

   ii.    "[d]ue to [a] lack of corroborating witnesses, the investigator was unable to confirm" whether Plaintiff "hugged [Complainant 3] at a bar and offered to buy her a beer on your tab;" and

   iii.   The graduate student who was dating Complainant 3 did not recall a conversation at a party in February 2015 where Plaintiff referenced his penis size, though he recalled the details of other conversations that occurred.

316.     The Letter of Determination also altered the original allegations against Plaintiff, stating that Complainant 3 had alleged that, in Spring 2016, when Plaintiff allegedly stopped Complainant 3 in the hallway to discuss the breakup with her boyfriend, he "hugged her tightly and for too long."

317.     The Letter of Determination also stated that "[a] non-student witness confirmed that [Complainant 3] told her about this interaction in real time, corroborating this interaction." It is unclear what the "non-student witness" corroborated. Plaintiff did not have an opportunity to address that witness's statement because the University withheld this evidence from him.

318.     The Letter of Determination also changed the  allegations concerning the discussion that Plaintiff had with Complainant 3 and her friend at the conference in Spring 2016:

> Complainant 3 alleged that…after enjoying a dinner with her colleague and venting about her relationship she realized you were sitting behind her. When she introduced you to her colleague, she said you hugged her and whispered that you

heard what she said about [Complainant 3's boyfriend] but that, her secret was
safe with you and that you knew how to keep secrets. Complainant 3 said this was
the first time you made it seem like secrets between the two of you were a good
thing. She said that made her very uncomfortable. During the investigation, you
said you were facing [Complainant 3] and she saw you the whole time. A non-
student witness provided photo evidence of you sitting behind [Complainant 3].

319.    During the investigation, Plaintiff was not provided a copy of the photograph
referred to in the Letter of Determination or given an opportunity to respond to the new
allegations. Plaintiff expressed concern to Mr. Williams that an anonymous "non student witness"
was taking photographs of Plaintiff at the conference which were then provided to the University
*over two years later* as some form of evidence of alleged wrongdoing. Upon information and
belief, GMU's Title IX investigators did not question this disturbing fact. Regardless, even if there
were a discrepancy in Plaintiff's testimony about where he was sitting at a dinner over two years
earlier, this fact was irrelevant to what was allegedly discussed. Complainant 3's allegations did
not support a claim of sexual or gender-based harassment.

320.    The Letter of Determination contained the following new allegation of which
Plaintiff was not previously notified:

[Complainant 3] felt that when you included her 'attractiveness' in the 'reasons'
provided for wanting to work with her, she felt like that was a grooming
behavior.

321.    In his appeal, Plaintiff' response to this allegation was that the language used,
here, suggested that Complainant 3 was coached by a third party when preparing her statement to
CDE. As previously noted, to Plaintiff's recollection he did not reference Complainant 3's
appearance or "attractiveness" at any point in time. Assuming that Plaintiff had referenced her
attractiveness, the phrase "grooming behavior" is defined as psychological and emotional
manipulation utilized by an abuser against a vulnerable victim, most frequently a child, with the

aim of carrying out a sexual relationship in private. None of the complainants, including Complainant 3, alleged that Plaintiff made any sexual advances towards them because Plaintiff did not. Moreover, Complainant 3's allegations—that Plaintiff allegedly noted her attractiveness, hugged her on two occasions, 2 years apart in public places, and made offensive comments to her boyfriend—do not fit within the definition of grooming behavior.

322.    The Letter of Determination also added the following new allegations of which Plaintiff was not previously notified:

> She recalls deliberately removing herself from future research opportunities with you based on these concerning behaviors. She stressed it was hard to describe the number of times when she felt offended, objectified and demeaned as a result of chronic sexual harassment from you. [Complainant 3] stated, '[t]he impact [Plaintiff] had on my productivity and curriculum are disturbing. I turned down a grant opportunity, that same grant for which he wrote a letter of recommendation, because I could not spend another year in this program. The abusive tactics [Plaintiff] used only exacerbated the helplessness I felt across all of the situations described above here.

This appears to be from a written statement, which Plaintiff was not permitted to review during the course of the investigation.

323.    As part of his appeal, Plaintiff submitted evidence demonstrating that this allegation of harm was wholly inaccurate:

> a.    There were no research opportunities on which Plaintiff and Complainant 3 had planned to work together. Complainant took one class with Plaintiff for one semester in Fall 2014.

> b.    From November 2015 to December 31, 2015, Complainant 3 was 1 of approximately 9 students Plaintiff funded for a project that involved writing short literature reviews (10,000 words each). Complainant 3 worked with Complainant 4 on one literature review. Plaintiff's contact with Complainant 3 took place by email or in a group setting. There were no one-on-one meetings.

> c.    In December 2015, post-dating a number of the events alleged by Complainant 3, she emailed Plaintiff about the project "[i]t was a great experience, especially learning to write for a different audience. I really appreciated your feedback along the way and am grateful that I got to be involved with such a good

group of people!" In this email, Complainant 3 asked to be paid more because she believed she took more of a lead role over Complainant 4 when drafting a particular chapter. Complainant 3 was the only student who made such a request.

d.      In 2016, a graduate student "JD," who joined Plaintiff's graduate program the same year as Complainant 3 in the fall of 2014, switched labs so that Plaintiff could be his mentor. For the first two years of the program, JD and Complainant 3 worked together in another professor's lab. When JD switched labs, he continued a project with Complainant 3 and his previous mentor. They asked Plaintiff to come on board to avoid it being awkward for JD to continue the research with the advisor he left. Plaintiff was copied on some emails and read a few documents, such as an internal George Mason grant submission for graduate students. Plaintiff only met with JD, who was now working in Plaintiff's lab and meeting with Plaintiff weekly about research. Plaintiff did not meet with Complainant 3. Plaintiff does not know what happened to the project. As part of his appeal, Plaintiff provided Mr. Williams with the last email Plaintiff received about the project in July 2017. Plaintiff did not respond because he was not actively involved or interested in the project.

e.      In November 2016, Complainant 3 contacted Plaintiff and asked Plaintiff if she could be part of his research team for a particular study. Complainant 3 heard about the research through her boyfriend, who suggested to Plaintiff that they bring Complainant 3 on board because she was interested in the area of research. At the time, they had enough people working on the project and Plaintiff told Complainant 3 as much. Complainant 3 was not asked to be on any of Plaintiff's lab teams, nor did she ever work in Plaintiff's lab. Accordingly, she could not have decided to turn down or "remove herself" from future research opportunities with Plaintiff.

f.      In July 2017 Complainant 3 asked Plaintiff to write her a letter of recommendation for a second submission for a predoctoral grant. Plaintiff had also written a recommendation letter for her first submission. Plaintiff was not part of the planned project. Complainant 3 intended to conduct research with her mentor. It was Plaintiff's understanding that Complainant 3 was seeking the grant to pursue an area of study in which Plaintiff was not conducting research.

g.      Complainant 3's statement about turning down the grant because she could not "spend another year in the program" was also easily discredited by the fact that her mentor told the faculty that Complainant 3 was not interested in pursuing a research career. Along with the rest of the faculty, Plaintiff was informed by Complainant 3's mentor that she turned down the grant for this reason. That occurred at a faculty meeting that took place during the 2017-2018 academic year. Had Complainant 3 wished to pursue a research career, she could have used the grant money for the Fall 2018 and Spring 2019 semesters, as it did not stipulate that she would have had to stay an additional year in the program.

Complainant 3's allegations of harm were clearly contradicted by this evidence, which was explained at length in Plaintiff's appeal. Her statement should have been discredited. There was no evidence to support a sexual or gender-based harassment claim against Plaintiff with respect to Complainant 3.

### D.  Complainant 4

324.    Complainant 4 is a female graduate student who worked in Plaintiff's lab, co-authored a number of published papers with Plaintiff, and, with Plaintiff's assistance, secured a prominent internship that resulted in her full-time employment in the private sector after she graduated from a GMU doctoral program in May 2019.

325.    Complainant 4 volunteered herself as the lab's social director. She organized a number of events for the lab, including while she, Plaintiff and other students were away at professional conferences.

326.    As a researcher who studies sexuality, and as part of months of work with Complainant 4 on presentations and a publication related to a research study of pleasurable and intimate sexual intercourse, Plaintiff and Complainant 4, and students in his lab, talked about sexuality. Plaintiff talked about sexuality with students working with him on sexuality-related scientific research, including Complainant 4. Plaintiff and Complainant 4 had hundreds of hours of conversations, only a small portion of which concerned sexuality-related topics.

327.    In May 2016, Complainant 4 wrote a letter to a fellow graduate student recounting her experiences after one year in Plaintiff's lab. This letter was an exemplar of Complainant 4's communication style as a graduate student, with Plaintiff and others in the lab. The opening greeting to her colleague was "Dude/chief/yo bitch." The letter was also laden with expletives and

intimate associations that Complainant 4 subjectively attributed to working in the lab. Complainant 4 talked about sex from the time of her graduate interview onward.

328.    Complainant 4 touted the research she and Plaintiff conducted on sexuality on social media. She regularly praised the lab and its culture. She told Plaintiff that she was "unbelievably proud and grateful to be part of this lab family." In a self-evaluation in April 2018, Complainant 4 wrote that the lab provided her with the opportunity to "understand and be understood," skills that "will serve me in my career to change people's lives," "Friends with whom I can discuss anything" and "unforgettable memories." When interviewing for jobs in Spring 2018, Complainant 4 texted Plaintiff "thank you so much. I wouldn't even be interviewing at these places if it weren't for you and the badass experiences we get as grad students through you. And more yet to come."

329.    During the course of her studies, and at Complainant 4's request, Plaintiff met her parents. Complainant 4 asked the Plaintiff to meet her mother when she visited the campus, and her father when he visited the campus.

330.    While a member of Plaintiff's lab, Complainant 4 was often criticized by her colleagues for seeking more credit than she deserved and not always pulling her weight in the lab. Criticisms of Complainant 4's work came from other graduate students in the Plaintiff's lab, graduate students in other labs including Complainant 3, and Complainant 4's co-mentor, who met with her dozens of times.

331.    Plaintiff had a close, professional and positive relationship with Complainant 4 until September 2018, when Plaintiff removed Complainant 4 from his lab. As her interests waned from clinical research and moved towards working in the private sector, Complainant 4's lab contributions suffered and she encountered disagreement from her colleagues with respect to co-

authorship and participation. Complainant 4 failed to deliver work-related products for quite some time before and during this transition period and Plaintiff and Complainant 4's co-mentor thought it best that she no longer participate in lab activities. Complainant 4's potential removal was discussed at length with lab personnel and a decision was made by Plaintiff to remove Complainant 4 from the lab. Complainant 4 was asked to leave the lab because she had been focusing all of her attention on her new job and her work for the lab was suffering. Complainant 4 agreed with this assessment in person and in electronic communications. Plaintiff did not hear from Complainant 4 after that.

332.     A short time after she was terminated, Complainant 4 and her friends filed Title IX complaints against Plaintiff. This was not questioned by Dr. Hammat or Mr. Williams.

### 1.   The Allegations and Lack of Supporting Evidence

333.     The December 4, 2018 email from Dr. Hammat to Plaintiff stated that Complainant 4 alleged "potential violations" of the 2016-2017 and 2017-2018 Sexual Misconduct Policies. Dr. Hammat then incorrectly stated that Plaintiff "shared information during your instruction in [Course A during] the spring semester of 2013 in and during the instruction of [Course B] in the spring semester of 2014." Complainant 4's allegations did not concern these courses.

334.     With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable 2016 and 2017 Grievance Procedures, which require reports to be made within 180 days. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

335.     Complainant 4 alleged:

- On December 9, 2016, Plaintiff invited the students from his lab to his home for drinks and hot tubbing. Plaintiff shared stories about his experience at a brothel in Germany.

- On January 20, 2017, while attending a professional conference, Plaintiff and his graduate students went to dinner and then to the bar for drinks. Plaintiff left the bar with another woman attending the conference and then provided explicit sexual details about that encounter the next day to his graduate students;

- During the first week of class in the fall of 2017, Plaintiff gathered the graduate students from the lab for a gathering at Oh George! Tables & Taphouse with Complainant 4 and several other students. Plaintiff discussed an erotic massage he experienced in Thailand;

- During the spring of 2018, Plaintiff asked a student "Student 1[67]" what kind of pornography she liked/watched while at Oh George! Tables & Taphouse and asked her repeatedly to provide an answer when she tried to avoid the conversation;

- While attending a conference in March of 2018, after going to dinner with his graduate students, Plaintiff took his graduate students to a strip club called the Clermont Lounge. A fellow student bought a lap dance for Complainant 4, which Plaintiff took a photo of and made reference to future blackmail against her;

- On August 6, 2018, while attending an academic conference with graduate students (Complainant 4 and others), Plaintiff shared the details of a sexual experience he had in "Hanoi, Thailand" with a 24-year old woman while presenting a professional workshop. Plaintiff also told his students his wife had "given [him] a free pass" to have sex with whomever he wanted while in Hanoi.[68]

- While in the campus laboratory setting, Plaintiff engaged students in frequent conversations about sex and the pursuit of women as sexual vessels;

- Through favoritism, Plaintiff made it clear to his students that opportunities for research, supervision, and consulting was dependent on how Plaintiff viewed them and if they were willing to engage in sexual conversations with him.

---

[67] Plaintiff is using "Student 1" to protect this student's identity.

[68] As with other allegations discussed *supra*, the reference to Plaintiff's wife—either by Complainant 4 or Dr. Hammat—is evidence of bias against Plaintiff.

- Plaintiff created a toxic, verbally abusive environment, using profanity and demeaning language with his graduate students tasked with lab management. These occurred in person, over email, and through the Slack messaging system.

336.    Concerning the allegation that Plaintiff engaged students in frequent conversations about sex and the pursuit of women as sexual vessels, completely overlooked by Dr. Hammat in electing to investigate this allegation was the fact that such conversations about sex, and attitudes around sex, were part of the research conducted in the lab. Complainant 4 assisted Plaintiff in conducting research for a number of articles about human sexuality, including physically pleasurable sexual activity, including orgasms, and the influence of physical touch, intimate and non-intimate, on human emotions. Plaintiff provided references to the articles co-authored by Complainant 4 to Dr. Hammat and Mr. Williams.

337.    Regarding Complainant 4's allegation that Plaintiff "repeatedly" asked Student 1 about pornography during a conversation at a bar, Plaintiff did not specifically recall Student 1 having a negative reaction to the discussion. Notably, Student 1 did not file a complaint against Plaintiff.

338.    Plaintiff explained to Dr. Hammat, and in his appeal to Mr. Williams, that he and his students were having a group discussion about pornography because Plaintiff and his colleague were trying to obtain access to data from Pornhub.com for future research. They were discussing pornography as a useful methodological tool to capture people's true sexual interests, a method that they found to be far better than the questionnaires they used in the past, specifically the research that Plaintiff had recently conducted, and published, with Complainant 4. They were discussing ways to improve upon this work. They also discussed recent books that were published on the science of pornography. This was a typical conversation about the research conducted in Plaintiff's laboratory. In fact, one of the reasons Plaintiff and Complainant 4 attended the

professional conference on August 6, 2018 (of which Complainant 4 also complained) was to listen to talks by leading researchers on pornography. Complainant 4 specifically asked Plaintiff to get her one of three graduate student invitations Plaintiff was allowed. Most relevant, Plaintiff and Complainant 4 published an article on how physical intimacy leads to meaning the next day. Complainant 4 initiated interest in conducting another study from the same dataset on whether watching pornography on a given day influences the frequency and quality of real-world sexual activity. This led to a conversation on whether the existing assessment of pornography use was too rudimentary because it failed to measure what people watched. To illustrate this point, a discussion ensued about the sheer variety of porn people are interested in and whether content influences real-world sexual activity.

339.    Once again, CDE mischaracterized protected academic discourse about ongoing research as sexual harassment. There was no evidence that Student 1 alleged any harm from what was discussed, nor was there any evidence that Plaintiff did anything more than ask her a question within the context of their discussion about research. The conversation was not aimed at students of a particular gender, sexual orientation or gender expression, nor could asking Student 1 a question about pornography in the context in which it was asked constitute sufficiently severe and pervasive conduct to create a hostile environment that harmed *Complainant 4*.

340.    In June 2019, Student 1, a graduate student of Plaintiff's, approached Plaintiff and told him that she had been interviewed during the Title IX investigation and that she denied that anything Plaintiff had discussed with her was problematic. She told Plaintiff that, during her interview, she said that Complainant 4's allegation about Plaintiff repeatedly asking Student 1 about pornography was untrue. Student 1 further told Plaintiff that she did everything in her power to stop the "nonsense" and the false allegations against Plaintiff.

341.    Regarding the allegation that Plaintiff discussed his experience at a brothel while "hot tubbing," in December 2016 Plaintiff invited his graduate students to his home for dinner to celebrate the end of the semester. Plaintiff explained to Dr. Hammat and Mr. Williams that having people in a hot tub, in their swimsuits, is no different than being in a pool. There was never a point of time where anyone was alone in the hot tub with anyone else.

342.    Plaintiff acknowledged that he discussed his trip to Germany as part of a larger discussion with his lab students, who were involved in research concerning human sexuality at the time, about many different topics. Complainant 4 actively participated in the conversation. She made multiple comments about being glad to hang out with the lab in this manner. The three other students that participated in this conversation should have been able to corroborate Complainant 4's active participation in the conversation, as well as the dynamic that existed when the five of them were together discussing a multitude of topics while socializing. Plaintiff does not believe the investigators asked them questions about this. He had no way of knowing since he was denied access to evidence that could confirm this.

343.    Within days of attending the party, Complainant 4 sent Plaintiff an unsolicited email stating that she was "unbelievably proud and grateful to be part of this lab family. [H]aving you as a mentor has change the course of my entire life…thank you for being you. with love, [Complainant 4]." This directly contradicts Complainant 4's allegation, made nearly two years later, that her participation in this social gathering harmed her in any way or that she was uncomfortable with the conversation which covered a range of topics, not just the discussion about Plaintiff's trip to Germany.

344.    Regarding the conversations that took place at the conference in January 2017, Plaintiff informed Dr. Hammat that at the conference there was a mutual and voluntary group

discussion with his graduate students about sexual encounters that occurred on the trip. At the time, Plaintiff did not have the impression that anyone was uncomfortable discussing their sexual activities. Nor did Complainant 4, who regularly volunteered information about her sex life to the group, allege that she experienced any discomfort or harm as a result of participating in the conversation.

345.    Regarding Complainant 4's allegations that during a conference in March 2018 Plaintiff took his graduate students to a strip club called the Clermont Lounge. Plaintiff agreed that he went to the Clermont Lounge and received a lap dance. What Complainant 4 left out of her narrative is that she—not Plaintiff—organized the trip to the Clermont Lounge.

346.    The Clermont Lounge is a kitschy place that can be found in most mainstream travel books on the best of Atlanta. It has been operating for over fifty years and is an old establishment that is part bar, part karaoke bar, and is known as a relic. It is part of the tapestry of Atlanta and as such was featured on The Travel Channel when Anthony Bourdain explored Atlanta in Season 2, Episode 4 of The Layover.[69] It also appeared on CNN's best places to eat and drink in Atlanta.[70]

347.    While at the conference, Complainant 4—an Atlanta native—invited Plaintiff and three other graduate students in Plaintiff's lab to go out after dinner to what Complainant 4 described as a "seedy" Atlanta bar. Plaintiff provided evidence that Complainant 4 was the organizer of the trip. Complainant 4 selected the location because no one else was familiar with Atlanta. Complainant 4 went on her smartphone and looked up the Clermont Lounge, explained that the place is on lists of the best places to visit in Atlanta, and organized/ordered Uber rides. While at the bar, which had a strip club component, Complainant 4 purchased a lap dance for

[69] https://www.travelchannel.com/shows/the-layover/episodes/atlanta
[70] https://www.cnn.com/travel/amp/atlanta-neighborhoods/index.html

another graduate student. That graduate student refused the lap dance. When the woman said it was already paid for, Complainant 4 directed the lap dance to Plaintiff. Plaintiff took a photo of Complainant 4 getting a lap dance and the two did joke about Plaintiff using the photo for blackmail. There was no evidence that Plaintiff had, or ever would, use such a photo against Complainant 4 or that it was anything other than the two joking around.

348.    In a group chat the day after the trip, Complainant 4 stated "Thanks for dinner and everything last night…everything I could have hoped for in a first titty bar." In the same chat, one of the graduate students thanked Complainant 4 "for taking us out. Always a good time."

349.    In an email Complainant 4 sent to Plaintiff less than two months after the conference, Complainant 4 referred to "seedy Atlanta bars (and their bathrooms)" as "bonus" "unforgettable memories" from her time in the lab.

350.    Plaintiff received no explanation as to how his agreement to participate in a plan to go to the Clermont Lounge, organized by Complainant 4, and her purchase of a lap dance for him, accompanied by mutual joking around, constituted sexual harassment. As part of his appeal, Plaintiff acknowledged that once he realized that Complainant 4 had taken the group to the Clermont Lounge *because of* its strip club component that he should have bowed out and returned to his hotel. However, Plaintiff denied engaging in discriminatory behavior towards Complainant 4.

351.    Prior to submitting his appeal, Plaintiff learned from a graduate student that Complainant 4 often organized sex-related activities for her colleagues while they were at conferences. On a trip that Complainant 4 took to Tokyo and Japan with her colleagues, including graduate students in Plaintiff's lab, several of whom were witness names that Plaintiff provided to Dr. Hammat, Complainant 4 appointed herself the tour guide and took students to a sex shop.

While at the shop, she proceeded to violate rules about restricted access to certain areas of the shop.

352.    This was yet another example of Complainant 4's behavior within the context of the graduate program, demonstrating that she was comfortable with such activities, and undermining her credibility with respect to any alleged offense upon hearing the few stories Plaintiff shared with his lab students within the context of discussions related to sexuality. Like the trip to the Clermont Lounge, Complainant 4 listed Japan as an unforgettable memory in an email to Plaintiff in April 2018. Complainant 4's credibility was not questioned by Dr. Hammat or Mr. Williams.

353.    Regarding Plaintiff's conversation with graduate students about an experience he had in Hanoi, Vietnam, Plaintiff acknowledged that during the course of the August 2018 conference he and his graduate students engaged in several hours of discussion and that his experience in Hanoi arose as a topic of conversation. Complainant 4 expressed no discomfort with the subject matter. After the conference she sent out a group chat volunteering information about a romantic relationship she was in.

354.    Regarding Complainant 4's allegation that, during a Fall 2017 gathering at a local bar, Plaintiff discussed an erotic massage he received in Thailand, Plaintiff denied this allegation because he has never received an erotic massage in Thailand.

355.    The hundreds of pages of documents and communications, that Plaintiff provided to Dr. Hammat, and in support of his appeal—including Complainant 4's own words—flatly contradicted Complainant 4's allegations concerning favoritism, or that Plaintiff created a toxic environment in the lab.

## 2.   Dr. Hammat's Erroneous Finding

356.    On February 22, 2019, Dr. Hammat emailed Plaintiff a Letter of Determination with respect to Complainant 4's allegations. Like the other Letters, Dr. Hammat stated that it was "alleged that you engaged in Sexual or Gender-Based Harassment, in violation of George Mason's University *Policy 1202: Sexual or Gender-Based Harassment or Other Interpersonal Violence*."

357.    Dr. Hammat did not apply the requisite preponderance of the evidence standard as indicated by her statement that "CDE did find enough factual information to sustain the allegation that you engaged in conduct that qualifies as Sexual or Gender-based Harassment."

358.    The allegations in the Letter of Determination were expanded upon, and Plaintiff had no opportunity to respond during the investigation.

359.    Regarding the dinner party at Plaintiff's house in December 2016, Complainant 4 embellished her allegations:

> [Complainant 4] said she felt "stuck" and unable to leave the conversation discreetly. She said she felt extremely uncomfortable with the conversation, given the setting. During the investigation, you confirmed that you invited your graduate students (from the lab) to your home for an end-of-the-semester gathering for drinks and food. You also confirmed that you and your graduate students ended up in the hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany.  This was corroborated by several student witnesses.

Plaintiff submitted a wealth of evidence regarding Complainant 4's manner of communication with Plaintiff and the other graduate students which contradicted her allegations of discomfort, including Complainant 4's unsolicited email within days of the party stating "[H]aving you as a mentor has changed the course of my entire life…thank you for being you. with love, [Complainant 4]." This email was provided to Mr. Williams as part of Plaintiff's appeal.

360.    The Letter of Determination further embellished Complainant 4's allegations concerning the January 2017 conference, stating that Plaintiff solicited information from his graduate students about their sexual encounters at the conference:

95

[Complainant 4] alleged that while attending the…conference… you and several graduate students met up with other attendees from the conference and took them back to your respective hotel rooms. She said the next morning, you and the other students discussed in detail what happened the night before. You asked for explicit details about their sexual encounters. You confirmed that you met someone at the conference and that you and your graduate students discussed the prior evening's sexual activity the next morning at breakfast. Several student witnesses and one non-student witness corroborated this event.

361.   Plaintiff was not given access to the evidence, and was unable to respond to the statement of the "non-student" witness. Nor was it clear exactly what facts were corroborated. However, Plaintiff reiterated in his appeal that the conversation that took place was mutual, voluntary and only a small part of the conversations had during the conference. Complainant 4 routinely volunteered personal information about her sex life with the group and it is unclear how a mutual conversation of a sexual nature, amongst individuals researching human sexuality, constituted sexual harassment with respect to Complainant 4.

362.   Complainant 4's allegations concerning the fall 2017 happy hour were also amended. First, Complainant 4 alleged that Plaintiff said he had an erotic massage in Thailand. In the Letter of Determination, it was alleged that Plaintiff talked about a "happy ending" erotic massage that he received in Sri Lanka. In his appeal, Plaintiff stated that these allegations were untrue because he had never had an erotic massage in Thailand or Sri Lanka and would, accordingly, not have discussed this subject.

363.   The Letter of Determination stated that several students corroborated Plaintiff's account that he discussed "research trends, wellness, disfunction, and sex" with his graduate students. The Letter of Determination—ignoring that Plaintiff researched sex extensively with those graduate students—also stated that one student offered "[Plaintiff]likes to talk about sex. A lot."

364.   The Letter of Determination further stated for the first time:

[Complainant 4] said having time away from the lab and the opportunity to work in a professional environment that would never tolerate the conversation or circumstances she experienced while working for [Plaintiff]. Only now does she feel able to articulate how inappropriate the power imbalance of [Plaintiff's] mentorship was. She conveyed that the way [Plaintiff] viewed her (including her sexual behaviors) had an effect on his decisions for how he handled graduate assistantships, authorship on papers, and consulting opportunities.

365.    It does not appear that Complainant 4 referenced the fact that she was fired in the context of her sudden realization that harm had allegedly occurred as a result of working in Plaintiff's lab. Regardless, Plaintiff submitted a wealth of evidence in support of his appeal which directly contradicted Complainant 4's allegations that Plaintiff's alleged behavior had any impact on her academic and career opportunities, including:

a.      Over the course of the approximately two years that she worked in Plaintiff's lab, [Complainant 4] was given credit as a co-author on five published articles and three conference presentations. Complainant 4 never earned first authorship because she never completed any project that she led.

b.      During the time that she worked in Plaintiff's lab, [Complainant 4] also received funding from 2 consulting projects to conduct research. As her interests waned from clinical research and moved towards working in the private sector, her lab contributions suffered and she encountered disagreement from her colleagues with respect to co-authorship and participation.

c.      [Complainant 4] obtained an internship for Summer 2018 because of her work in Plaintiff's lab. Plaintiff wrote her primary reference for that job. Nearly her entire curriculum vitae was populated with accomplishments tied to her work with Plaintiff. This should have raised questions about whether [Complainant 4] had motive to tarnish Plaintiff's reputation with false allegations of harassment in order to prevent Plaintiff from discussing Complainant 4's poor performance with her current or future employers.

d.      In response to [Complainant 4's] new allegations of harm, Plaintiff submitted their relevant text and email communications from April 2018 through August 2018, when they attended the conference at which Plaintiff discussed Hanoi. The correspondence showed that after [Complainant 4] began working at her new job in May 2018, she continued to communicate with Plaintiff enthusiastically, including about attending the conference, as well as catching up in person about her new job. In August 2018, [Complainant 4] told Plaintiff that the company for which she interned offered her a job after graduation, making a six-figure salary. Around the same time, she and Plaintiff communicated about

removing [Complainant 4] from a paper they had been working on, to which she agreed, stating "I have a different perspective on priority right now and basically need to crank on all things that get me graduated, which the…paper is not." In September 2018, Plaintiff asked [Complainant 4] to leave the lab because she was not conducting the research required for the projects to which she was assigned. At that point, she told the lab team that her interests in the research had waned and she was interested only in doing what was required of her to graduate.

## VIII.  **The Complainants' Bad Faith Reporting**

366.     Section X of the 2018-2019 Sexual Misconduct Policy, and previous versions,

required that allegations of sexual harassment or sexual misconduct be made in good faith:

> All University community members are expected to provide truthful information in any report or proceeding under this policy. Submitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct is prohibited and subject to disciplinary sanctions under the University's Student Code of Conduct and disciplinary action under the appropriate Employee disciplinary policy. This provision does not apply to reports made or information provided in good faith, even if the facts alleged in the report are not later substantiated.

367.     In his appeal, dated March 28, 2019, Plaintiff outlined evidence showing that the

complainants acted in bad faith when filing Title IX complaints against Plaintiff:

- The student evaluations and peer-review evaluation demonstrate that Plaintiff engaged in no conduct that created a hostile environment while teaching Course A in Spring 2013.

- Student witnesses refuted the allegation that Plaintiff discussed "skinny-dipping" with a while teaching Course Bin Spring 2014.

- Student evaluations for Course B demonstrated that Plaintiff engaged in no conduct which created a hostile environment. As did Complainant 1's and Complainant 2's conduct in the months after class had ended.

- Complainant 1's allegations regarding "Baumeister Day" were proven to be completely unfounded.

- Complainant 4's allegations of harm were completely unfounded as evidenced by her consistent praise of the lab, its culture and the unforgettable memories she made while being a part of it. Her time line of when she allegedly discovered that she

experienced harm did not fit with the nature of text messages she sent to Plaintiff in August 2018.

- Complainant 4's communications with Plaintiff and members of the lab, including the social activities she organized for the group to strip clubs and sex shops, contradicted any allegation that she was uncomfortable with discussing topics of a sexual nature and that, instead, she actively pursued such discussions and activities. Without prompting, Complainant 4 expressed interest in leading a research study with existing lab data on whether pornography use influences the frequency and quality of real-world sexual activity.

- Complainant 4 was terminated from the lab group because she was not meeting expectations in fulfilling her obligations to the lab. Less than two months later she filed a report against Plaintiff for sexual harassment, seeming to change her allegations as the investigation progressed.

- Complainant 3's allegations of harm were utterly contradicted by her conduct in seeking letters of reference from Plaintiff and sending him unsolicited emails, including one praising the party at which she claimed he made her uncomfortable. Her mentor's statements to the faculty—made well before any report was made against Plaintiff—show that she turned down a research grant for reasons wholly unrelated to any alleged discomfort with remaining in the program.

- Complainant 3's unfounded allegation, introduced verbally, as a surprise, by Dr. Hammat in the second interview with Plaintiff, that Plaintiff had sexual relations with students. When Plaintiff asked about this, Dr. Hammat said Complainant 3 did not witness it, only heard it in gossip from another student, and did not want to reveal who the student was and had no behavioral evidence. There was no evidence to support this.

368.    In Plaintiff's appeal, he urged CDE to investigate whether any of the complainants acted in bad faith in making allegations against him that were readily disproven by the evidence. Upon information and belief, CDE failed to consider this.

369.    On April 1, 2019, Plaintiff filed a conduct complaint against Complainant 4, under the Student Conduct Code and the 2018-2019 Sexual Misconduct Policy, for "providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another in connection with an incident of Prohibited Conduct." Plaintiff's complaint outlined the various falsehoods, contradictions and inconsistencies in Complainant 4's allegations, as well as Plaintiff's

belief that Complainant 4—who was upset by being fired—solicited her friends to file complaints against Plaintiff. GMU took no action with respect to Plaintiff's complaint.

## IX. **Mr. Williams Denies Plaintiff's Appeal**

370.  On or about March 28, 2019, Plaintiff submitted a comprehensive appeal to Mr. Williams, outlining the significant procedural irregularities in the Title IX process. The procedural irregularities included: i) the Title IX process employed by the University denied Plaintiff of the due process protections Plaintiff should have been afforded as a tenured member of the faculty; ii) the Title IX investigators erroneously equated speech protected by the First Amendment with sexual harassment; iii) the investigators made numerous errors with respect to each report alleged; and iv) CDE made determinations against Plaintiff that were not supported by the evidence.

371.  As discussed *supra*, Plaintiff also questioned whether, based on the lack of credible evidence supporting the complainants' allegations, the University should have investigated whether certain complainants should be disciplined for violating Section X of University Policy 1202 for submitting false or misleading information about Plaintiff in bad faith or with a view toward personal gain.

372.  Plaintiff submitted new evidence on appeal that refuted the findings made in the Letters of Determination, a number of which were based on allegations of which Plaintiff had no notice as they appeared in the Letters of Determination for the first time.

373.  On April 11, 2019, Mr. Williams denied Plaintiff's appeal. His response letter failed to address the majority of Plaintiff's arguments, new evidence, and questions regarding the complainants' violations of the Policy.

374.    For the first time, Plaintiff learned that GMU had interviewed "12 individuals including [Plaintiff]." Mr. Williams did not disclose the identities of those individuals or state why their statements and other evidence had not been shared with Plaintiff during the investigation.

375.    Mr. Williams discounted the fact that "the reporting parties and others participated in the sexually-charged environment" because of the "objective" negative effects of "hyper-sexual conversations/interactions between a faculty member and graduate students under his supervision and instruction." Mr. Williams' analysis appeared to occur in a vacuum, failing to account for the explicit subject matter that Plaintiff and his students were discussing and researching. The categorization of the environment as "hyper-sexual" and disregard of the evidence showing that Complainant 4 in particular was an initiator and organizer of conversations and activities that centered around sex, also demonstrated bias against Plaintiff.

376.    Mr. Williams further stated that students "explained that they felt as if they had to participate [in sexual conversations] to remain in your favor." Yet, as outlined *supra*, certain of the complainants who reported this false allegation were not students in Plaintiff's lab, and/or had minimal contact with Plaintiff other than taking Course A and/or Course B. Thus, there would be no reason for them to be in Plaintiff's "favor." There was no allegation, or evidence, that Complainants 1-3 participated in sexual conversations. The evidence also showed that Plaintiff assisted Complainants 1-4 with their professional advancement, whether through recommendations, consulting projects, or co-authorship. All of the Complainant sent Plaintiff *unsolicited* emails—some when they were no longer his students—praising his work and mentorship.

377.    With respect to Complainant 4, any allegation that favoritism was based on sexual conversations with students was disproven by the evidence submitted by Plaintiff demonstrating a

number of opportunities that Complainant 4 received commensurate with the level of work she put into each project. Complainant 4 had issues with others in the lab which had to do with her lack of work ethic—not whether or not she participated in discussions about sex. Evidence submitted by Plaintiff during the investigation, and on appeal, showed that Complainant 4 was "hyper-sexual" with the entire lab team, organized sex tours in Japan and to a strip club (and then lied about Plaintiff organizing the trip), and communicated with colleagues using profanity and sexual language on a regular basis. That Dr. Hammat and Mr. Williams attributed the regular, overtly sexual behavior of an adult woman in her mid-twenties to Plaintiff—despite any evidence of a correlation—suggests that their assumptions were based on gender bias, including the idea that Complainant 4, as a female, was incapable of behaving in such a manner absent the coercion of a male authority figure.

378.    It is clear that Mr. Williams never questioned the complainants' motives.

379.    Included in Mr. Williams' reasons for upholding Dr. Hammat's findings were: i) "[n]umerous conversations between you, and graduate students under your supervision and instruction, about sex;" ii) "occasions where students under your supervision visited your home hot tub;" and iii) "you asking probing questions about pornography preferences and the dating/sex lives of students." Mr. Williams did not explain why having students swim in a hot tub constitutes sexual harassment or a hostile environment[71] and rejected Plaintiff's numerous assertions that much of the allegations concerned protected academic discourse. Mr. Williams' letter upholding Dr. Hammat's decision declared "occasions" where students visited Plaintiff's hot tub when in fact, there was only a single time.

---

[71] Indeed, members of the faculty, including a female professor, regularly invite students to their homes for pool parties.

380.     Mr. Williams' also mischaracterized Plaintiff's discussion of his sexual encounters as "frequent,"[72] when Plaintiff stated on more than one occasion that he spent hundreds of hours with the graduate students in his lab and only a small percentage of that time involved discussions about sex. Mr. Williams also found Plaintiff responsible for taking "a trip to a strip club with students during a professional conference"—ignoring that it was not Plaintiff who took the graduate students but Complainant 4—who omitted that detail from her account to the investigator. Plaintiff acknowledged that he should have left upon realizing that the outing involved the strip club component of the Clermont Lounge which Complainant 4 had described as a "seedy dive bar."

381.     The tone of Mr. Williams' response to Plaintiff's appeal insinuated that female graduate students in their mid-twenties are in need of parenting by professors, and that they should not be held accountable for participating in the activities in question. Yet the OCR's 2001 Guidance clearly states that when a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally *will not support a conclusion that the conduct was unwelcome*." *Id.* at p. 8 (emphasis added).

382.     On April 25, 2019, Plaintiff's counsel informed Mr. Williams that Plaintiff had been approached by students asking whether the University punished him for engaging in sexual

---

[72] At a mandatory workshop for faculty and students which took place in 2017, the University's facilitator discussed his personal sex life, including his BDSM practices, including being a submissive and the use of whips. Unlike the conversations that Plaintiff engaged in with his students, the information shared by the facilitator had no relevance to the topics being discussed. No one took issue with this presentation. In August 2019, GMU included a "Sexual Chocolate" event in its orientation programming for first year undergraduate students, run by the Student Support and Advocacy Center, which included a post-party with "complimentary chocolate cake, a tutorial on how to use dildos, and take away prizes of squeeze toys modeled as eggplant and peaches." https://www.thecollegefix.com/university-hosts-sexual-chocolate-sex-ed-event-as-part-of-freshman-orientation/. This type of "hyper-sexual" discourse with students, who were under the impression that attendance was mandatory, was University approved. A female facilitator ran the event.

misconduct. At that point, no sanctions had been issued. The students asked Plaintiff whether he had been prohibited from taking on new graduate students for the upcoming year. Plaintiff's counsel informed Mr. Williams that there was no basis in any University policy for informing the complainants or any faculty about the prohibition that Dr. Renshaw had imposed (albeit improperly).

383.    On April 26, 2019, Mr. Williams responded to Plaintiff's counsel stating "we cannot impose 'gag orders' on parties to prevent them from sharing information." Mr. Williams further "advised" that "Title IX regulations" recommend that "sanctions that are directly related to the complainants, be shared."

384.    The 2017 Guidance states that for "proceedings not covered by the Clery Act such as those arising from allegations of harassment…the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and any other steps that the school has taken to eliminate the hostile environment, if the school found one to exist." An example of a sanction that could be disclosed to a reporting party per the 2017 Guidance is a no-contact order. Thus, GMU's disclosure of Dr. Renshaw's prohibition against Plaintiff taking on graduate research assistants to any complainant would not have been in keeping with the 2017 Guidance, and violated Plaintiff's right to privacy as an employee of the University.

X.    **GMU Faculty Members Confirm Faculty Proceedings Lack Due Process**

385.    On May 15, 2019, multiple members of the GMU faculty, among them Dr. Renshaw, sent a letter to University President Angel Cabrera, Provost Wu, and Senior Vice President Carol Kissal. The faculty members sent the letter to express their "grave concerns

104

regarding the handling of cases of allegations made against faculty members and to request immediate actions." Although the letter's authors did not name the specific faculty members they were concerned about, stating that they would protect their confidentiality, they explained that they were sending the letter outlining their broader concerns, based on their review of cases of complaints about alleged faculty misconduct that were submitted to CDE via the Title IX office and to HR.

386.    Upon information and belief, the letter and recommendations were prompted by the mishandling of Plaintiff's Title IX proceedings, which afforded him no due process protections. The concerns raised in the letter confirmed that the Title IX proceedings to which Plaintiff was subjected violated his right to due process as a tenured faculty member.

387.    The letter's authors noted several ways in which faculty members have not been afforded procedural due process in the handling of these allegations, having reviewed extensive documentation provided by multiple faculty members.

388.    The letter's authors further pointed out that the violations of due process were inconsistent with Section 2.10.2 of the Faculty Handbook, which asserts that all parties involved in such allegations have a right to procedural due process, as well as principles of institutions such as the American Association of University Professors (https://www.aaup.org/issues/appointments-promotions-discipline/faculty-misconduct-and-discipline-2005) and the Foundation for Individual Rights in Education (https://www.thefire.org/research/fire-guides/fires-guide-to-due-process-and-campus-justice/fires-guide-to-due-process-and-fair-procedure-on-campus-full-text/).

389.    Additionally, the letter's authors pointed out, the violations "are reflective of a general lack of clearly specified processes and procedures for handling such allegations, such as those that exist in Faculty Handbook Sections 2.6.2, 2.9.3, 2.10.9, and 2.11.2, as well as those that

exist in the context of other University policies (e.g., https://diversity.gmu.edu/about/grievance-procedures).”

390.    The letter's authors listed ways in which due process appears to have been violated in the cases they reviewed, as well as specific requests they make. The list was as follows:

1. <u>Lack of appropriate notification of allegations brought to HR</u>. In cases involving allegations to HR, faculty members were not informed of the existence of allegations before a meeting – rather, they came to the meeting completely unprepared to have allegations verbally levied against them. We note that, in the case of allegations made to Title IX, faculty members have received general notification that allegations had been made when receiving a meeting request.

2. <u>Inadequate opportunity to respond to allegations</u>. First, *in several cases, faculty members received no written description of allegations upon notification or even prior to being interviewed about the allegations*. This is more variable in Title IX cases, with some faculty receiving formal, written descriptions and others receiving only an informal email summary of allegations, after requesting such a summary (and after having been interviewed). In HR cases, faculty members either never received a formal written summary of allegations or received a written summary only after a formal letter substantiating the allegations was inserted in their personnel file. Moreover, in at least one HR case, the faculty member was never formally interviewed with an opportunity to fully respond to the allegations.

3. <u>Presumption of guilt/Biased investigations</u>. In at least one HR case, a faculty member was removed from all contact with staff and students *during an investigation* (and without following procedures specified in Faculty Handbook Section 2.10.9). *In multiple HR cases, the faculty members provided evidence from other parties that contradicted the allegations, but we saw no indication that such exculpatory evidence was addressed in the ultimate findings.*

4. <u>Attempts to coerce confessions</u>. In HR cases, faculty members reported multiple instances during which supervisors or representatives of HR tried to "force" them to admit to the allegations, including statements that things would be "easier" if they did confess.

5. <u>Lack of timely communication</u>. In HR cases, email records indicate that faculty members frequently received no response to their requests for updates, or that such updates came only after inordinately long periods of time.

6. <u>Lack of clarity in presenting evidence that supports decisions</u>. The standard for making a decision in Title IX cases is stated as the "preponderance of evidence," *but evidence provided in letters of determination is minimal*. There is no established standard for making a decision in HR cases, nor is there clear evidence provided in supporting decisions.

7. <u>Inadequate appeal process</u>. In line with the fact that there are no clear published policies or procedures to guide investigation of allegations made to HR, there was no clear indication of an opportunity to appeal the findings of the HR investigations. *In the case of appeals of Title IX findings, the individual who reviews the appeal **is** the VP of CDE, who is the direct supervisor of the Title IX office. This would seem to present a lack of independent objectivity in reviewing appeals.*

8. <u>Lack of consistency in processes and sanctions</u>. The handling of potential removal from duties during an investigation is inconsistent across cases. Moreover, the severity of sanctions varies greatly across cases as well, with little relation to variation in the severity of allegations.

*Id.* (emphasis added).

391.    The letter's authors proposed following potential remedies:

1. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for handling allegations against faculty members that will protect the rights of both complainants and respondents. This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices. The guidelines and procedures should address all of the problems described above and any other identified issues, including but not limited to:

      a. The authorization under which Human Resources is charged with conducting an investigation of faculty behavior should be clearly described in writing.

      b. The completed set of guidelines and procedures under which the investigations are to be conducted should be published in writing.

      c. Respondents in cases should be notified in writing that they may have an advisor present during all meetings.

      d. A set of guidelines and procedures for appealing a determination should be published in writing. Appeals should be reviewed by an independent set of individuals who have not yet been involved in the case.

2. Representatives from HR, CDE, and other relevant administrative offices work with representatives of the Faculty Senate to establish a clear set of guidelines and procedures for issuing sanctions other than dismissal (which is already addressed in the Faculty Handbook). This work should utilize external consultants as needed, and draw on best practices at other universities and in other relevant offices.

3. For all investigations of alleged faculty misconduct that are ongoing or that have been concluded within the last two years, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether findings of investigations were impacted by any of the issues enumerated above, and if so, reopen those investigations if desired by the respondent for that case. This work should utilize external consultants as needed.

4. Upon completion of guidelines and procedures for issuing sanctions and renewals (see #2), for all cases in which sanctions of faculty members are currently in place, the administration work with faculty representatives (designated by the Faculty Senate) to evaluate whether those sanctions are consistent with the newly established guidelines and procedures. If not, that group should work to realign the sanctions with the newly established guidelines.

5. If the volume of work for #3 and #4 above is large enough to warrant it, faculty representatives involved in the work should be compensated for their time through either course releases or stipends that are commensurate with the workload.

392.     On May 21, 2019, Provost Wu and Executive Vice President Carol Kissal responded to the Faculty Senate Executive Committee that GMU was requesting the University Auditor to conduct a formal internal audit to determine if GMU's policies and procedures concerning faculty misconduct allegations are in alignment with "Commonwealth law, our bylaws, faculty and employee handbooks, and other requirements." The University Auditor would also compare GMU's policies and procedures to those at other universities. Dr. Renshaw was appointed to a "multi-constituent committee" tasked with assessing how to improve existing procedures.

## XI.     Dr. Renshaw Imposes Sanctions Tantamount to Dismissal

393.     On May 31, 2019, Plaintiff received a letter from Dr. Renshaw outlining the disciplinary sanctions to be imposed on Plaintiff (the "Sanctions"). The Sanctions included:

1. Plaintiff's participation in sexual harassment prevention training, to be identified by CDE.
2. From the date of the letter until **August 15, 2021**:
   a. Plaintiff will be restricted in his mentorship, supervision, and teaching of graduate students in the following ways:
      i.  Graduate students currently conducting research under Plaintiff's mentorship and supervision will be asked to meet with the Department Chair to discuss their experience working with Plaintiff and be given the opportunity to switch to a different mentor/supervisor, while Plaintiff is not permitted to discuss the meeting or the students' decision with those students at any time;
      ii. Plaintiff will be ineligible to recruit new graduate students to work under his mentorship or supervision; and
      iii. Plaintiff will be ineligible to teach graduate courses.

    b. Plaintiff will be restricted in his mentorship, supervision, and professional relationship with any graduate or undergraduate students who elect to remain under such mentorship/supervision in the following ways:

        i.      Plaintiff may only communicate with GMU students through GMU email and servers, with such communications subject to review at any time by the University;

        ii.     Plaintiff may only meet with students on campus in an open setting. If he engages in meetings with students at professional conferences or at another academic site, these must occur in an open setting, and must be reported in advance (or, if arranged on an impromptu basis, as soon as possible afterward). Any meetings that occur off-campus (except for those at professional conferences or other academic settings that are reported to the Chair) may result in additional disciplinary actions; and

        iii.    Plaintiff may only interact with students, if outside of meetings, at department and professional events where other faculty members are present. Any interaction outside of such events may result in additional disciplinary action.

3. Plaintiff will further be under regular review of his conduct with students throughout the probationary period and such reviews may include random assessment of his interactions with students and solicitation of feedback from students. By the end of the Fall 2020 semester, Plaintiff's Department Chair, in consultation with the Dean, will make a determination based on the reviews, about whether there has been sufficient behavioral change to allow Plaintiff to resume graduate teaching and/or mentorship or supervision of graduate students in Fall 2021. If a positive decision is made, the decision will be subject to change if any violations of the terms described above are subsequently revealed.

4. If Plaintiff is allowed to resume teaching, mentoring, and/or supervising graduate students at any point in the future, Plaintiff's Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions or conduction are necessary.

394.    A copy of the sanction letter was permanently placed in Plaintiff's personnel file. The sanctions imposed on Plaintiff were vague without definitive end-dates, burdens to meet, or prescribed guidelines for Plaintiff to follow. Essentially, Plaintiff was left to wonder if he will ever

be able to resume his teaching and research efforts in any meaningful way. The sanctions are tantamount to dismissal because they have effectively prevented Plaintiff from fulfilling his duties as a full professor and there are so many conditions in effect that Plaintiff could be prevented from ever teaching, or conducting research with graduate students, again.

395.    The sanctions required Dr. Renshaw to solicit commentary from Plaintiff's existing graduate students, during meetings at which he would ask whether they want to change advisors, compromising the confidentiality of the Title IX proceedings and raising questions that would not have otherwise been present in the minds of Plaintiff's students.

396.    The restrictions imposed on Plaintiff's teaching and research will have a long lasting, chilling effect on his work because he has been deemed ineligible to recruit new graduate students to work under his mentorship or supervision, or to teach graduate courses until at least Fall 2021.

397.    The sanctions also include vague monitoring and reporting requirements which have necessitated a number of conversations about the manner in which Plaintiff must comply with them, and in fact are solely in Dr. Renshaw's discretion. The monitoring and reporting requirements are excessive and involve every circumstance in which Plaintiff encounters, meets with, or even has a phone conversation with any GMU student. They are also vague enough that it will be easy for Dr. Renshaw to argue that a violation occurred, even if it was not clear from the language of the letter. Consequently, Plaintiff is in near constant communication with Dr. Renshaw regarding the minutiae of Plaintiff's daily work to ensure a violation will not occur.

398.    At the end of Dr. Renshaw's letter, he suggested that the disciplinary measures taken against Plaintiff could be indefinite: "If you are allowed to resume teaching, mentoring,

and/or supervision of graduate students in the future, your Department Chair, in consultation with the Dean, will make the determination if any continuing restrictions are necessary."

399.    Plaintiff's compensation has also been affected by the erroneous findings and resulting sanctions. He is ineligible for salary increases, as well as any merit-based pay raises, for an indefinite period of time.

## XII.    Plaintiff Files A Grievance Regarding Violations of His Constitutional Rights

400.    On June 7, 2019, Plaintiff filed a grievance with the applicable Faculty Grievance Committee against GMU, Mr. Williams, and Dr. Renshaw for violating Plaintiff's rights under the First Amendment and Fourteenth Amendment of the United States Constitution, as well as for imposing "severe and unwarranted restrictions and monitoring requirements" concerning Plaintiff's teaching and supervision of graduate students, which – as explained above – are tantamount to dismissal of his teaching position (hereinafter, "Plaintiff's Grievance"). Notably, the procedure for filing such a grievance, as well as the person to whom said grievance should be submitted were not posted on any GMU website and Plaintiff's counsel had to seek direction from GMU's counsel. The Faculty Grievance Procedures available online, and which are still in effect, date back to 2009. The Committee members listed on the University's website were also outdated.

401.    As explained in Plaintiff's Grievance, CDE and Mr. Williams ignored the issues of academic freedom raised by stale (in some cases over five years old) allegations, relying on the protected academic discourse to find Plaintiff responsible for violating University Policy concerning sexual and gender-based harassment. Instead, Mr. Williams simply dismissed the discourse as "non-pedagogical" despite Plaintiff's evidence to the contrary. As Plaintiff restated for the Grievance Committee, the CDE findings should have been reversed by Mr. Williams due

to the numerous procedural errors, clear bias, and lack of any credible evidence that Plaintiff violated the Policy.

402.    As Plaintiff explained in his Grievance, Mr. Williams mischaracterized the complained-of statements, as well as the context in which the statements were made, despite the high volume of contradictory behavioral evidence Plaintiff had submitted. Mr. Williams did so in order to fit into the narrative of a "hostile environment."

403.    Furthermore, as Plaintiff explained, Mr. Williams disregarded the fact that Plaintiff was given no time to review the evidence against him nor cross-examine his accusers, and he overlooked the fact that witness testimony contradicted the complainants' allegations with respect to what was discussed in Plaintiff's classroom.

404.    Plaintiff further reiterated the violations to his due process rights which he previously outlined in his appeal, including: (i) lack of faculty involvement in the Title IX proceedings against him; (ii) no recitation of specific charges against Plaintiff or notification of which policies and procedures applies and/or were being employed by CDE; (iii) adding allegations to the Notices of Determination that were not the basis of the original complaints while failing to provide Plaintiff any opportunity to respond to them; (iv) investigating allegations that went well beyond the 180-day limit set forth in the applicable policies and involved students who no longer attended GMU; (v) investigating under a presumption of guilt; (vi) withholding from Plaintiff all of the evidence collected during the investigation, and (vii) failing to inform Plaintiff of the manner in which sanctions would be determined.

405.    Plaintiff also explained the ways in which Dr. Renshaw violated Plaintiff's due process rights, as well as the conditions of Plaintiff's employment, by banning Plaintiff from taking on graduate student research assistants for the Fall 2019 semester *before* the Letters of

Determination had been issued or Plaintiff's appeal had been decided. Furthermore, Dr. Renshaw directed Plaintiff to reject the students he had already interviewed for a previously approved position to work in Plaintiff's lab in Fall 2019, which subsequently raised questions and concerns and compromised the confidentiality of the Title IX process.

406.    Additionally, Plaintiff explained in his Grievance that Dr. Renshaw violated Plaintiff's conditions of employment through the restrictions he imposed on Plaintiff. Plaintiff discovered that Dr. Renshaw was the individual designated by the University to impose disciplinary action on Plaintiff as a result of CDE's determination. However, there was no transparency in the process and no information was provided to Plaintiff by the University as to how sanctions or other "corrective measures" would be decided or imposed. Upon information and belief, Dr. Renshaw was unable to review the evidence against Plaintiff, reverse the findings, or request Faculty Committee involvement in the proceedings or sanctioning decision.

407.    On June 19, 2019, Plaintiff received a response from the Grievance Committee, which read that the committee found that no prima facie case existed with respect to Plaintiff's allegations against Dr. Renshaw because his decision to prohibit Plaintiff from taking on graduate students in Fall 2019—before any decision was made in Plaintiff's case—fell "within the period of investigation and its aftermath."

408.    The Grievance Committee then relied on the CDE Grievance Procedures implemented in March 2019, to find that Dr. Renshaw was the appropriate party to formulate "corrective actions."

409.    The Grievance Committee also relied on the March 2019 Grievance Procedures— which post-dated the allegations and CDE's investigation and findings—to note "the University

may also take corrective action even if no discrimination and/or unlawful harassment is found, but the Responding Party is found to have engaged in inappropriate workplace behavior."

410.    The Grievance Committee then found that Plaintiff was not entitled to confidentiality concerning the sanctions or the Title IX proceedings during Dr. Renshaw's meetings with students because Dr. Renshaw's actions were not "governed by CDE investigation procedures." The Grievance Committee then stated, without specifying the policies, that Dr. Renshaw's actions were in keeping with "CDE publicly available policy."

411.    In deciding Plaintiff's Grievance, the Grievance Committee ignored that the due process and First Amendment issues raised by Plaintiff were also raised several weeks earlier by the Faculty Senate.

## XIII.    **Plaintiff's Colleagues File Grievance Against Plaintiff**

412.    In June 2019, during a meeting with Student 1, also discussed *supra* Paragraphs 340, Plaintiff was informed by Student 1 that faculty in the Department were telling their students about the Title IX proceedings and sanctions against Plaintiff. Student 1 reported this to Dr. Renshaw who denied that this was occurring, even though Student 1 provided Dr. Renshaw with the name of a male student who told Student 1 that he had learned about the allegations against Plaintiff from a faculty member. Student 1 told Plaintiff that "several" faculty members were spreading rumors about what had occurred.

413.    On July 23, 2019, a female professor in charge of one of the programs within Plaintiff's Department ("Professor 1")[73] asked for a meeting with Plaintiff and Dr. Renshaw to discuss "pressing business."

---

[73] Plaintiff is referring to this professor by pseudonym so that his identity is not disclosed by association with this individual.

414.    The three met the next day, on July 24, 2019. At the meeting, Professor 1 told Plaintiff that, because of the Title IX finding, he would need to disaffiliate from the program, otherwise the program would lose its accreditation. Professor 1 minimized the impact that disaffiliation would have on Plaintiff's career.

415.    Professor 1 told Plaintiff that she had spoken anonymously with the organization providing the accreditation and confirmed that Plaintiff's disaffiliation was recommended. Professor 1 stated that Plaintiff would not be able to re-affiliate with the program until after the last currently enrolled student left for internship (approximately 5-6 years).

416.    As explained in more detail *infra*, Plaintiff subsequently spoke anonymously with the Director of the Office of Program Consultation and Accreditation at the organization providing the accreditation where the director stated "there is not an accreditation requirement that an individual come forward" and there are "no mandatory reporting requirements." Thus, the Plaintiff learned that the statements about the organization made by Professor 1 were not true.

417.    Apart from her dishonesty, Professor 1 had no authority to unilaterally amend the sanctions already imposed on Plaintiff by Dr. Renshaw under any University policy, or otherwise.

418.    On July 29, 2019 Plaintiff informed Professor 1 by email that he was not disaffiliating from the program, noting, among other things, that this was not part of the sanction issued by Dr. Renshaw, and the fact that all three of his existing graduate students (two females, one male) expressed interest in continuing their research with Plaintiff.

419.    In response, led by Professor 1, On August 8, 2019, a group of Plaintiff's colleagues (7 female professors and 1 male professor) filed a grievance against Plaintiff and Dr. Renshaw (the "Program Grievance") with the same Faculty Grievance Committee that declined to proceed with Plaintiff's Grievance. Notably, the Faculty Handbook states in Section 2.11.2.1.a., "Grievance

Procedures," that "No grievance may be heard on behalf of a third party or group." Notably, a number of the female professors named in the grievance had strongly protested against GMU's hiring of Brett Kavanaugh.

420.   In a letter to Plaintiff, the Grievance Committee summarized the grievance as follows:

1.   Whether sufficient disciplinary action was taken by Dr. Renshaw in response to the findings that [Plaintiff] violated University Policy, 1202 "sexual and gender-based harassment and other interpersonal violence."  More specifically, whether Dr. Renshaw has, in his authority per the Office of Compliance, Diversity and Ethics, acted appropriately to protect the…Program …including its faculty, students, and ethical responsibilities.

2.   Whether your (Plaintiff's) unprofessionalism (established by findings of violations of University Policy 1202 "sexual and gender-based harassment and other interpersonal violence") potentially places the …Program… including its faculty, students, and ethical responsibilities, at risk.

421.   First and foremost, it was wholly inappropriate and a violation of GMU's Policy that confidential proceedings were divulged to Plaintiff's colleagues. Plaintiff was not aware that his colleagues had been informed about the Title IX investigation and outcome, which were communicated to Plaintiff to be confidential proceedings.

422.   The Program Grievance requested new, additional sanctions to be added to existing sanctions following the Title IX office's investigation of the allegations. Per the Grievance Committee's statement in response to Plaintiff's Grievance, which cited the March 2019 Grievance Procedures, only Plaintiff's supervisor was responsible for determining "corrective actions." On this ground, alone, the Grievance Committee should have declined to review the Program Grievance.

423.   The Program Grievance requested that Plaintiff disaffiliate from the program. The new request went far beyond what was asked of Plaintiff following receipt of the Title IX office

sanctions. A request to disaffiliate was the opposite of reintegration, which was the aim of the sanctions imposed by Dr. Renshaw. Disaffiliation could be viewed as a form of banishment from a program that Plaintiff heavily contributed to and helped establish. Disaffiliation was a particularly harsh punishment in light of the due process violations detailed in Plaintiff's appeal and Plaintiff's Grievance, and reiterated to his colleagues in his August 13, 2019 response to the Program Grievance.

424.    Plaintiff also learned that the foundation of the Program Grievance—the program's accreditation with a national organization—was untrue. Plaintiff called the organization anonymously, as had Professor 1, and learned that the organization expected universities to rely upon internal disciplinary regulations and procedures to handle allegations of "unethical" behavior or misconduct. Plaintiff spoke to two representatives at the organization, one is the current Director of the Office of Program Consultation and Accreditation, who told him that the Title IX finding and resulting sanctions did not put the University's accreditation at risk. The organization looked at whether a program had policies and procedures in place, including whether those policies and procedures ensured due process for faculty and students alike—the Program Grievance ignored the lack of due process in Plaintiff's case, instead electing to rely on the erroneous findings of Dr. Hammat. The Program Grievance also mischaracterized the allegations, and evidence, at issue in the Title IX proceedings.

425.    The Program Grievance failed to address the three graduate students who wished to continue their work with Plaintiff. These students met with Dr. Renshaw as part of the sanction and were asked if they wanted to switch mentors—they said no. Notably, each of the three graduate students overlapped with Complainant 4 and her allegations of a hostile environment. All three graduate students contradicted this allegation of a hostile environment and chose to continue

working with Plaintiff. Upon information and belief, two of these students were interviewed as witnesses in the Title IX investigation and their testimony, which refuted any allegation of a hostile environment, was ignored.

426.     The only graduate students who had shown interest in Plaintiff's research at GMU are in the program led by Professor 1. The primary reason for Plaintiff's productivity and success has been his graduate students. The Program Grievance filed against Plaintiff to disaffiliate was a disastrous proposition for Plaintiff's research program at GMU and the graduate students who are devoted to his research.

427.     On August 12, 2019, Plaintiff met with Dr. Renshaw to plan for his attendance at upcoming faculty meetings, including with the professors who had filed the Program Grievance. At that meeting, Plaintiff learned from Dr. Renshaw that Professor 1 was able to obtain copies of the Title IX findings—and potentially more documentation—from CDE without Plaintiff's knowledge or consent. Upon information and belief, Professor 1 also shared those documents with the professors who filed the Program Grievance. Despite this conversation with Plaintiff, Dr. Renshaw continued to insist that faculty learned information about Plaintiff's case through the complainants.

428.     At the meeting, Plaintiff and Dr. Renshaw discussed ways in which *Plaintiff* might quell the hostile environment that had been created by the faculty against him in response to the one-sided misinformation being spread around the Department. In a subsequent email to Human Resources, Dr. Renshaw acknowledged the "difficult working environment" that Plaintiff was being subjected to and asked for a Human Resources representative to assist Plaintiff with any plans to address the faculty with respect to the Title IX findings.

429.     The faculty meeting with Professor 1 and colleagues was scheduled to take place on August 29, 2019. A Human Resources representative emailed Plaintiff after work hours on the evening of August 28. By that point Plaintiff had decided that he was not interested in having a discussion with the faculty about what had happened, and that he had no obligation to explain anything to his colleagues during the pendency of a grievance against him. He expressed this to Dr. Renshaw, who said he would speak to Professor 1, because they needed a "plan in place" for the meeting.

430.     At the last minute, Professor 1 "cancelled" the planned faculty meeting and then held a meeting without Plaintiff. Upon information and belief, the Title IX findings and sanctions were discussed at this meeting.

431.     A second program faculty meeting was organized by Professor 1 and held on September 4, 2019. Shortly prior to the meeting, Professor 1 informed Plaintiff that she requested that an HR representative attend the meeting. Professor 1 made clear that the faculty was not interested in questioning him about the investigation which she asserted was "conducted by qualified investigators who heard both sides and a decision was rendered."

432.     On September 4, 2019, Plaintiff attended the meeting with Professor 1, Dr. Renshaw, and the other faculty members behind the Program Grievance. At the meeting, Plaintiff gave a brief statement that he disagreed with the findings and that he had provided a wealth of evidence to CDE which contradicted the allegations. Plaintiff did not go into details about the case.

433.     During his statement, Plaintiff was interrupted by a female professor who had previously attempted to interfere with Plaintiff's promotion to full professor (and had mentored Complainant 1 prior to her graduation). This professor threatened to resign from the program if

Plaintiff was not disaffiliated and attacked Plaintiff's character and reputation, saying that he should not be allowed near students. Plaintiff did not respond to the rage-filled tirade.

434.    A male professor told Plaintiff that some students were disinterested in working with Plaintiff because they had heard rumors.

435.    Later in the meeting, a second female professor said he should not be allowed near students and also said she could not work in the program if Plaintiff remained affiliated. She told Plaintiff he was selfish for not agreeing to disaffiliate from the program, his reputation was already shattered and staying in the program would only make it worse. This professor also referenced a Facebook post on Plaintiff's personal page from Fall 2018 (shortly before the Title IX complaints were filed) that had "offended faculty and students" because it referred to a published article using a sexual metaphor. During the Title IX investigation, Plaintiff had posited to Dr. Hammat, and to Mr. Williams on appeal, that the Facebook post caused faculty who disagreed with Plaintiff's political ideology, and even the subject matter of his research and teachings, to solicit complaints from female students to create a false narrative of sexual harassment.

436.    Several professors at the meeting mentioned that they were afraid of litigation and saying or doing the wrong thing. Others said that Plaintiff must be planning a legal action or else he would be trying to show them that he was innocent.

437.    On September 10, 2019, the Faculty Grievance Committee found against Plaintiff with respect to the Program Grievance. In doing so, the Grievance Committee relied on Section 2.10.2 of the Faculty Handbook as follows "Faculty members must also adhere to the ethical standards of their respective professional associations and to university policies related to professional ethics." The portion of Section 2.10.2 that the Grievance Committee overlooked states "*In all cases*, all parties have a right to due process." (emphasis added).

438.    With respect to the Program Grievance, no hearing was held, and Plaintiff had no

right to question Professor 1 or any other witnesses concerning the purported risk to the program

if Plaintiff remained affiliated. Moreover, the Grievance Committee improperly took jurisdiction

over a grievance brought by a group, and issued a final decision about an issue that would further

damage Plaintiff's career and jeopardize his tenure.

439.    The Grievance Committee found:

> a.  If determination(s) of violation(s) of University Policy 1202 by a faculty
>     member affiliated with the…program occurred, then the faculty
>     member [Plaintiff] should act in accordance with the Faculty Handbook
>     Section 2.10.2 and disaffiliate from the …Program to prevent harm to
>     the program and to prevent violations of Section 2.10.2 for himself and
>     other faculty;
>
> b.  If determination(s) of violation(s) of University Policy 1202 by a faculty
>     member affiliated with the…program occurred, and that faculty
>     member does not voluntarily disaffiliate, the onus to take corrective
>     actions lie with the supervisor [Dr. Renshaw] per *Compliance, Diversity
>     and Ethics Grievance Procedure Corrective Actions*. Corrective actions
>     should require, if they do not already, the disaffiliation of that faculty
>     member from the …Program."
>
> c.  Then disaffiliation should occur after all appeals applicable to
>     violation(s) of University Policy 1202 have been exhausted within the
>     University (including direct appeals of determination made by…CDE
>     and any review of CDE investigative procedures by the Provost's
>     Office.")

440.    Upon review of the Committee's correspondence, Plaintiff was surprised to see the

reference to the "review of CDE investigative procedures by the Provost's Office" as an avenue

for appeal. The documentation received from Mr. Williams denying his appeal, and the Grievance

Procedures provided to him that referenced a right of appeal stated that CDE's decision on appeal

was final.

441.    Plaintiff's counsel conferred with GMU's counsel in regard to this matter, who

confirmed that Plaintiff had exhausted all avenues of appeal for CDE's determination. GMU's

counsel further stated "Please note that the Committee is an internal faculty body and does not speak or act for the University."

442.    On September 16, 2019, Plaintiff met with Dr. Renshaw and informed him that he was not going to voluntarily disaffiliate from his program. Dr. Renshaw informed Plaintiff that Dean Ardis would be making a final decision with respect to the Faculty Grievance Committee's recommendation. At the meeting, Plaintiff and Dr. Renshaw discussed Plaintiff's continuing objection to Dr. Hammat's erroneous determinations against him.

443.    Dr. Renshaw informed Plaintiff that even though the complainants gave Plaintiff positive course evaluations, praised him in emails and maintained positive relationships with him, "you never know what a student is thinking."

444.    Dr. Renshaw acknowledged that the #metoo movement may have impacted Plaintiff's case, and that the complainants likely looked back and "reframed" Plaintiff's conduct as sexual harassment.

445.    Dr. Renshaw also told Plaintiff that Complainants 1-4 had been informed of the sanctions imposed on him and were upset that they were too light.

446.    Dr. Renshaw acknowledged that the Department had no clear guidelines for spending time with graduate students and that many faculty continued to drink with their graduate students and invite them to their homes. GMU's faculty committees were working on guidelines for socializing with graduate students.

447.    On September 16, 2019, the head of the Faculty Grievance Committee emailed Plaintiff and cited Section 11 of their 2009 operating procedures as the basis for having forwarded the Committee's recommendation to the Dean of Plaintiff's Department. This email forwarded the Dean's email to the Committee which stated that the Dean concurred with the Grievance

Committee's recommendation that Dr. Renshaw take action to disaffiliate Plaintiff from his program.

448.    For the first time Plaintiff learned from the Dean's email that, on July 30, 2019, Provost Wu sent a letter to the Faculty Senate Executive Committee, of which Dr. Renshaw is a member, stating that the Provost would not be conducting a re-evaluation of CDE's substantive findings in Plaintiff's case. Plaintiff was not given notice of any request to the Provost's Office regarding his case or any request from the Faculty Senate Executive Committee for the Provost to conduct such a review.

449.    By letter dated September 17, 2019, Dr. Renshaw disaffiliated Plaintiff from his program, acknowledging that the basis for disaffiliation was the sham reasoning set forth in the Program Grievance concerning the program's accreditation:

> On August 1, 2019, multiple faculty members in the clinical psychology program filed a grievance with the College…Grievance Committee against me in my role as Department Chair, for failing to take what they saw as necessary steps to protect the accreditation of that program. Specifically, they suggested that, in four separate cases, you were found to have violated University Policy 1202, which is the university's policy prohibiting sexual or gender-based harassment. They then described ways in which they believed that having a core faculty member of the program with substantiated claims of sexual harassment would put the program in violation of the …standards of accreditation for graduate programs in health service psychology (which includes clinical psychology). They concluded by requesting that, if you did not voluntarily "disaffiliate" from the clinical program, I compel your disaffiliation from the program.

450.    Dr. Renshaw's letter justified Dean Ardis' decision pursuant to Section 2.11.2.2.2b of the Faculty Handbook, which "indicates that, when a grievance is filed against an academic administrator below the level of the a [sic] Dean, the college-level grievance committee makes a recommendation to the Dean, whose decision on the matter is considered final."

451.    However, the Faculty Handbook did not authorize the Dean to take action on the Faculty Grievance Committee's decision. Per Section 2.11.2.2.2a of the program, "[i]f the grievance is against a fellow faculty member, the committee is charged to investigate the facts of the case and determine an appropriate resolution. The grievance committee's decision is final."

452.    Because, as pointed out by GMU's counsel, the Faculty Grievance Committee did "not speak for the University," and could only make recommendations about the Program Grievance (which was made by a group and should not have been heard). Neither Plaintiff nor Dr. Renshaw were required to follow those recommendations.

453.    Accordingly, the Committee, the Dean and Dr. Renshaw improperly stretched the meaning well beyond the written word of the Faculty Handbook to come up with a mechanism through which to more severely punish Plaintiff in the wake of the complainants' (and female faculty members') outcry that he received too lenient a punishment.

454.    Dr. Renshaw's letter also referenced the Provost's July 30th letter to the Faculty Senate Executive Committee, and informed Plaintiff that he received additional information from Senior Vice President Kissal regarding the "status of the Provost's Office review of investigative procedures in an email from Senior Vice President Carol Kissal on September 16, 2019." Dr. Renshaw did not share this email with Plaintiff. This portion of the letter suggests that the Faculty Senate Executive Committee had raised the lack of due process in Plaintiff's case with the Provost's Office and that the Provost Wu elected not to protect Plaintiff's clearly established right to due process as a tenured faculty member.

455.    Dr. Renshaw elected to disaffiliate Plaintiff from his program for the period recommended by Professor 1—*5-6 years*—even though the duration of his original sanctions, which remained in place, permitted re-evaluation of Plaintiff and reinstatement of his teaching and

mentoring of graduate students in 2021. Per Dr. Renshaw "the following actions [would] accompany this change:

1. Your name and information will be removed from listings of core faculty members in … program materials (e.g., brochure, handbook) and on the website

2. You should no longer attend … program faculty meetings or participate in … program decision making

3. You should not participate in … program related student training, which includes:
    a. Teaching courses or seminars ….
    b. Participating in … program brown bags
    c. Conducting program-related research …with doctoral students in the …program
    d. Serving on … student committees (e.g., comps, second year projects, dissertation)
    e. Serving as a … mentor for doctoral students in the … program

4. You should not participate in other work related to the clinical program (e.g., serving on committees related to the program's functioning).

To facilitate these actions, I will send a letter to [Professor 1], instructing her that you are no longer to be considered a core faculty member in the … program. In that letter, I will request that she remove your information from program materials. I will also ask her to identify all program-related student committees and faculty committees on which you are currently a member, so that we can identify replacements. In addition, based on the preferences you expressed during our meeting on September 16, 2019, I will contact the three doctoral students in … whom you are currently mentoring … to set up meetings with each of them individually. I will conduct these meetings with [Professor 1]. Together, we will inform the students that you can no longer act as their primary research mentor, and work with them to identify new advisors in line with their research interests. We will make it clear that this decision was not made by you, but we will not disclose the specific nature of the reasons for this change….

456. Thus, even though 3 students (2 female, 1 male)—who had contradicted the allegations that Plaintiff created a hostile environment—wanted to continue working with Plaintiff they were forced to separate from his mentorship.

457. Dr. Renshaw's new, more severe penalty of disaffiliation, was the final blow to Plaintiff's research and professorship, preventing from working within the program he created for "at least" 5-6 years. On this basis, the new, severe sanctions imposed on Plaintiff rendered his position untenable, and were the equivalent of termination without a hearing.

458.     On September 18, 2019, Dr. Renshaw led a meeting of the full faculty in Plaintiff's Department at which Plaintiff's Title IX case was discussed in detail. Dr. Renshaw had previously represented to Plaintiff that he would make no mention of the case to the full faculty. At the meeting, the faculty also discussed changes to the Faculty Handbook and Department bylaws to address violations of professional ethics and notification to the faculty about their colleagues' violations.

459.     At no stage of the process—Title IX, appeal, sanctioning, or before the Faculty Grievance Committee, was Plaintiff provided with evidence, a hearing, a right of cross-examination or to question witnesses. At all times, including with respect to Professor 1, was the female complainant or grievant deemed more credible, even in the face of contradictory evidence—including that Plaintiff's program would *not* lose its accreditation as a result of the findings and sanctions. Upon information and belief, Complainants 1-4, dissatisfied with the outcome, sought more severe sanctions through their mentors in the program, who filed the Program Grievance.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972
### Erroneous Outcome/Selective Enforcement
### (Against George Mason University and Board of Visitors of George Mason University)

460.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

461.     Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

462.    Title IX applies to all public and private educational institutions that receive federal funding, which includes a public university such as GMU.

463.    Title IX prohibits sex discrimination against employees of universities that receive federal funding—its protections are not limited to students. Employees, as well as students, have a private right of action under Title IX. *See Doe v. Mercy Catholic Medical Center*, 850 F.3d 545, 562 (3d Cir. 2017); *Kadiki v. Virginia Commonwealth U.*, 892 F. Supp. 746, 749 (E.D. Va. 1995).

464.    The 2001 Guidance stressed "[i]t is important that schools not overreact to behavior that does not give rise to the level of sexual harassment." *Id.* at iii.

465.    Per the 2001 Guidance, gender-based harassment is not covered by Title IX unless it is "*sufficiently serious* to deny or limit a student's ability to participate in or benefit from" an educational program." *Id.* at v. The 2001 Guidance defines gender-based harassment as harassing a student on the basis of that student's failure to conform to stereotyped notions of masculinity and femininity." *Id.* The 2001 Guidance further defines gender-based harassment as "acts of verbal, non-verbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping but not involving conduct of a sexual nature." *Id.* at 3.

466.    The 2001 Guidance defines sexual harassment as:

> [U]welcome conduct of a sexual nature. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature…. Title IX's prohibition against sexual harassment does not extend to legitimate nonsexual touching or other nonsexual conduct. For example, a high school athletic coach hugging a student who made a goal…will not be considered sexual harassment.

467.    In the case of "hostile environment harassment" an assessment is required of "whether or not the conduct is sufficiently serious to deny or limit a student's ability to participate in or benefit from the school's program." *Id.* at 5. "Conduct that is not severe will not create a hostile environment." *Id.* at 16.

468. If a student "actively participates in sexual banter and discussions and gives no indication that he or she objects"—and later lodges a complaint—"the evidence generally will not support a conclusion that the conduct was unwelcome." *Id.* at 8.

469. As mandated in the 2001 Guidance, "OCR enforces Title IX consistent with the federally protected due process rights of public school students and employees." *Id.* at 17. "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

470. The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." 2001 Guidance, at 20.

471. As mandated in the 2001 Guidance, "the protections of the First Amendment must be considered if issues of speech or expression are involved. Free speech rights apply in the classroom (e.g. classroom lectures and discussions) and in all other education programs and activities of public schools…. In addition, First Amendment rights apply to the speech of students and teachers." *Id.* at 22.

472. "Title IX is intended to protect students from sex discrimination, not to regulate the content of speech." *Id.* OCR recognizes that the offensiveness of a particular expression as

perceived by some students, standing alone, *is not a legally sufficient basis to establish a sexually hostile environment under Title IX*." *Id.* (emphasis added).

473.   Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." 2011 DCL at 7; August 2015 Dear Colleague Letter at 2-3.

474.   The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

475.   The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; and (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation. The 2017 Guidance also permits schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

476.   Title IX may be violated by a school's imposition of university discipline where gender is a motivating factor in the decision to discipline. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

477.   To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the

flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 583 (Ed. Va. 2018).

478.    Articulable doubt in the accuracy of the outcome of a disciplinary proceeding can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Marymount U.*, 297 F. Supp. 3d at 584. *See Yusuf*, 35 F. 3d at 715.

479.    Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf*, 35 F. 3d at 715. For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d at 57.

480.    Outdated and discriminatory views of sexuality and gender on the part of a key decisionmaker in a Title IX proceeding will also show that the proceeding was infected with gender bias. *Marymount U.*, 297 F. Supp. 3d at 586. *See also Doe v. Grinnell College*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 22-28. A university's denial of the opportunity for cross-examination in a case where credibility is at stake is also a fact sufficient to cast articulable doubt on the accuracy of the outcome. *Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018).

481.    Evidence that a college has been placed under federal investigation, severely criticized for its failure to protect female sexual assault victims and is under pressure to correct its perceived tolerance of the sexual assault of female students provides a "backdrop" for gender bias. *See, e.g. Marymount U.*, 297 F. Supp. 3d at 584 (influence of Dear Colleague Letter and political

pressure acknowledged by senior official one factor in plausibly alleging gender bias); *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (allegations that university was under federal pressure to convict male respondents regardless of guilt or innocence, combined with flawed proceedings and biased statements of university officials supported plausible inference of gender bias). "[W]hen combined with clear procedural irregularities in a university's response to allegations of sexual misconduct, even *minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination." *Menaker*, 2019 WL 3819631, at *5.

482.    An erroneous outcome occurred in this case because Plaintiff was subjected to a blatantly flawed proceeding, erroneously found responsible for violating University Policy 1202: GMU's Sexual and Gender-Based Harassment Policy, and gender was a motivating factor behind this erroneous outcome.

483.    Plaintiff was deprived of due process in all respects, including a fair and impartial process with regard to the sexual harassment complaints alleged against him, because without limitation:

a.    GMU's 2017 Grievance Procedures required Ms. Simmons and Dr. Hammat to assume the "complete veracity" of the complainants' allegations prior to investigating them. *Id.* at III.

b.    Dr. Hammat's December 2018 notification emails to Plaintiff contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Plaintiff was not notified whether the investigator employed the Grievance Procedures relevant to each time period, or those in effect at the time that the reports were made.

c.    Complainant 1 and Complainant 2's allegations concerned events that took place in Spring 2013 and Spring 2014 – over five years prior to when they reported them. These allegations were reported well beyond the 180-day time limit set forth in the applicable Grievance Procedures. These allegations should not have been investigated. Upon information and belief, the significant delay in reporting was not questioned by the Title IX Office nor the investigators.

d.      Not only were Complainant 1's and Complainant 2's allegations timed out, both complainants had already left the University, their degrees having been conferred months prior to the making of their reports. There is no University policy provision which permits such *post-hoc* complaints.

e.      Complainant 3's allegations were also timed out under the 2015 and 2016 Grievance Procedures, which required reports to be made within 180 days, because they involved events that took place at least two years prior to when they were reported. There was no evidence of circumstances beyond Complainant 3's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

f.      With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable Grievance Procedures, which require reports to be made within 180 days. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

g.      Dr. Hammat's December 2018 emails to Plaintiff used quoted statements that Plaintiff purportedly made years ago, calling those allegations into question, as it is unlikely direct quotes would be remembered accurately years later.

h.      There was no information provided to Plaintiff concerning the motivation behind the four complainants coming forward at the same time, nor does it appear that this was questioned by the Title IX Office or the investigators.

i.      Upon information and belief, the four complaints were investigated together, which tainted the information gathering process. The first investigator, Ms. Simmons, also conducted the investigation under the presumption that Plaintiff was guilty of the allegations. This was apparent to Plaintiff from the rude and hostile manner in which she acted towards Plaintiff during the investigation. Upon information and belief, Defendant Simmons' presumption of guilt influenced the manner in which she questioned the complainants and witnesses, and tainted the information gathering process. To the extent that Ms. Simmons' replacement, Dr. Hammat, relied upon the evidence gathered and conclusions drawn by Ms. Simmons, the investigation was irreparably tainted.

j.      Dr. Hammat, who took over the investigation for Ms. Simmons after Plaintiff complained that she was biased, was also demonstrably biased. Throughout the interview, Dr. Hammat alluded to allegations that were not part of the case and suggested incorrectly that Plaintiff was involved in a consensual relationship with

an unnamed student. It was clear that she also presumed that Plaintiff was guilty, and that her decision making was impacted by false and unsubstantiated rumors.

k.      As the Title IX Coordinator, Dr. Hammat also had a conflict of interest, and should not have been tasked with determining responsibility.

l.      Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigators; and f) summaries of the interviews in which Plaintiff participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

m.      There was no hearing.

n.      Plaintiff had no opportunity to cross-examine the complainants, nor to ask questions of any of the witnesses. Many of the allegations required Dr. Hammat to make credibility determinations and, thus, this deprivation was even more significant.

o.      Upon information and belief, the names of the complainants were withheld from the witnesses interviewed as part of the investigation, prejudicing the process because the witnesses could not accurately answer questions posed to them.

p.      The allegations stated in the Letters of Determination differed from the allegations set forth in Dr. Hammat's December 2018 emails to Plaintiff, as did the cited sexual misconduct policy in each case.

q.      The Letters of Determination added charges of gender-based harassment to the original charges of sexual harassment. Plaintiff had no awareness of, or opportunity to respond to these charges during the Title IX investigation.

r.       The Letters of Determination contained allegations that had not been disclosed to Plaintiff during the interview process and, therefore, Plaintiff had no opportunity to defend himself against them.

s.      The Letters of Determination did not state the specific policy provisions applied by Dr. Hammat to find that Plaintiff engaged in sexual or gender-based harassment.

t.      The evidence gathered, to the extent it was cited in each Letter of Determination, did not support a policy violation. In determining that a policy violation occurred in each case, Dr. Hammat found against the weight of the evidence, suggesting bias in the process.

u.      Dr. Hammat's statement in the Letters of Determination that "CDE did find enough factual information" to find a policy violation differs from the preponderance of the evidence standard. There was also a startling lack of factual evidence to support the findings against Plaintiff as opposed to the subjective thoughts or reactions of the complainants posed as "facts."

v.      The Letters of Determination failed to provide any and all relevant definitions of Sexual or Gender Based Harassment and an explanation of how the evidence supported a finding of misconduct against Plaintiff under those definitions. The Determination Letters did not specify which policy definitions were at issue for each complaint, which alleged conduct and events during differing time periods, and instead cited only to "Policy 1202."

w.      The Letters of Determination stated that the determination of the appeal was final and "Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in the Grievance Procedures. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process," the failure to provide for a level of faculty review, including a hearing, potentially reinforced any bias in the investigative process, which was instead left to a single investigator.

x.      Neither the Grievance Procedures nor the Letters of Determination referred to the specific process through which sanctions are determined for tenured faculty members found responsible for violations of the University's Sexual Misconduct Policies.

y.      Prior to the issuance of the Letters of Determination, and before Plaintiff was notified of the outcome of the investigation, CDE directed the Chair of Plaintiff's Department to prohibit Plaintiff from taking on graduate research assistants. There is no policy provision which gives CDE authorization to take such actions. Before Plaintiff's appeal was taken, and any sanctions imposed, Plaintiff was directed to reject the six students Plaintiff interviewed for a previously approved position to work in his lab in Fall 2019.

z.      Plaintiff's appeal was decided by Mr. Williams, Assistant Vice President of CDE, who had a conflict of interest due to his administrative responsibility to enforce GMU's policies.

484.    Apart from GMU's violations of Plaintiff's due process rights, resulting in a flawed proceeding, the pressure that GMU was under, combined with these violations suggest that gender bias was a motivating factor in the findings against Plaintiff. In the years leading up to, and during the time period in which the allegations against Plaintiff were investigated, and an outcome

decided, GMU was under pressure from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from sexual misconduct at the expense of the rights of the male accused:

    a.  Beginning in 2014, GMU's President Cabrera belonged to the Governor's task force to aggressively combat sexual assault. A corresponding task force was created at GMU;

    b.  At the recommendation of the task force, GMU implemented trauma-informed training for Title IX investigations. The use of the trauma-informed approach in assessing the evidence in a case can lead to the belief that a female complainant is always telling the truth, and that any discrepancies or credibility issues can be explained away by her trauma. Upon information and belief, Ms. Simmons and Dr. Hammat were trained to use the trauma-informed approach in Title IX investigations. GMU's 2017 Grievance Procedures reflected this approach, requiring Title IX administrators to assume "the complete veracity" of sexual misconduct allegations in deciding whether to conduct an investigation;

    c.  In 2016, Dr. Hammat met with members of the Women and Gender Studies Department and agreed to implement their demands into GMU's Title IX process, including the use of a trauma-informed approach;

    d.  During the time period in which Plaintiff's investigation occurred the OCR was conducting two separate investigations at GMU, one involved a female student's complaint that GMU mishandled her sexual misconduct complaint and created a "sexually hostile environment" for her;

    e.  In discussing the 2016 OCR investigation, Mr. Williams—who decided Plaintiff's appeal—noted that GMU's funding could be limited by OCR as a result of an investigation;

    f.  Shortly after Betsy DeVos spoke at GMU in September 2017, President Cabrera announced a new Title IX initiative;

    g.  Dr. Hammat, publicly stated that sexual assault survivors could panic as they believed Secretary DeVos was "devaluing them" and "rolling back" protections;

    h.  On December 1, 2017, a former professor turned blogger published an open source spreadsheet "Sexual Harassment in the Academy," upon which anonymous posters could list instances of alleged sexual harassment at universities. This was described by the media as "a viral #MeToo list." The list garnered national attention, and was reported on in The Washington Post

and The Wall Street Journal. A women's blog, Jezebel.com, referred to the list as "Academia's Shitty Men List." A number of entries on the list concerned GMU professors.

i.    In April 2018, the student newspaper published an article about a sexual misconduct case that "dragged on" for a year. The article criticized GMU for failing to respond to the female student's sexual harassment complaint. In the article, Dr. Hammat was quoted as saying "I'd love to tell you that I have ten hours a week to write nothing but investigation reports, but I am lucky if I get even a few hours a week to write those reports." The article received an aggressive response from Mr. Williams, who made clear that GMU was committed to eradicating sexual violence. His response was published in the student newspaper.

j.    In August 2018, The Washington Post published an article concerning the director of GMU's forensics team making a number of sexual advances towards students. GMU ensured to tell The Washington Post that it took "swift, decisive action" with respect to the professor. This was publicized again in March 2019, in a piece in The Atlantic, "A #MeToo Nightmare in the World of Competitive College Speech."

k.    Between March 2019 and June 2019, GMU faced a public outcry against its hiring of Brett Kavanaugh, including accusations that it did not care about sexual assault survivors.

485.    The decisionmakers in Plaintiff's case had backgrounds which suggest that gender bias was a motivating factor in the outcome in Plaintiff's case:

a.    Ms. Simmons had a lengthy background of advocacy on behalf of female victims of sexual violence and the prosecution of the male accused. Ms. Simmons left GMU after Dr. Hammat removed her from Plaintiff's case for bias and went to work at a non-profit that advocates for the prevention of violence against women. While at GMU Ms. Simmons gave guest lectures for the Women and Gender Studies Department. Ms. Simmons acted in a hostile manner towards Plaintiff, and operated under a presumption of guilt during the Title IX investigation. Upon information and belief, Ms. Simmons conducted all of the witness interviews relating to the allegations against Plaintiff, and her bias tainted the investigation.

b.    Dr. Hammat has been publicly vocal in women's advocacy publications about the fact that she is a survivor of sexual assault and that she put together a sorority pledge patrol that "kicked down doors" to get "girls out" of fraternity houses. She believed that male students should be angry and protective of female students.

c.  Dr. Hammat has been criticized by Title IX scholars as being an "ideologue" with "a preconceived worldview" who has "broadened" the definitions of sexual misconduct. Dr. Hammat drafted GMU's Sexual Misconduct Policies which, as discussed *supra*, decreased the rights of faculty with each iteration and expanded the definition of sexual harassment to include nearly any word or action imaginable.

d.  Dr. Hammat has participated in "DC Area Feminist Events" for the Clearinghouse on Women's Issues including a program in which she presented a "wish list" for how women's advocates could help her with meeting their "high expectations for Title IX Coordinators.

e.  In Plaintiff's case, Dr. Hammat acted in a manner that was biased against Plaintiff during his interview—including by raising false allegations that he was involved in a relationship with a student. She ignored contradictory evidence, including witness statements that *supported* Plaintiff's account of what occurred. Dr. Hammat failed to question the changing allegations of the complainants, to which she gave Plaintiff no opportunity to respond, the extensive delay in reporting, or their motives. Upon information and belief, Dr. Hammat provided the complainants with opportunities to respond to Plaintiff's account of what occurred, whereas she denied Plaintiff access to all of the evidence in the case, including the Complainant's written statements.

f.  Dr. Hammat's email notifications and Letters of Determination contained statements that reflected gender bias based on stereotypical views of relationships between men and women: i) in her December 2018 email to Plaintiff concerning Complainant 2's allegations, Dr. Hammat included the fact that Plaintiff allegedly told a story (five years earlier) about "skinny-dipping" with a woman who was not his wife, which suggested that Plaintiff was expected to comport with traditional notions of marriage, fidelity and monogamy or else be branded a sexual harasser; ii) the Spa World allegation referenced "human trafficking" with respect to the spa, even though there was no credible evidence that Plaintiff had knowledge of any such allegation against the spa during the relevant time period; and iii) with respect to Complainant 3, Dr. Hammat included the allegation that Plaintiff invited her to see a sexually explicit professional presentation "knowing she was a first year graduate student," suggesting that it was inappropriate or corrupt for a male professor to invite an adult, female graduate student to attend a public presentation about human sexuality that is grounded in peer-reviewed research.

g.  Mr. Williams made public statements in the past that campus administrators have a moral obligation to protect and care for female students and to make them feel safe when investigating and responding to allegations of sexual

assault and sexual harassment and that, regardless of the outcome, they are to be believed as telling the truth.

h. Mr. Williams' mischaracterization of the evidence in deciding Plaintiff's appeal was indicative of gender bias: i) Mr. Williams' seemed outraged by Plaintiff allowing students to swim, with bathing suits, in a hot tub; ii) Mr. Williams elected to ignore evidence concerning Complainant 4's organization of sex-related activities (and lie about Plaintiff taking students to a strip club when she organized the trip), use of "hyper-sexual" language, and unprompted, voluntary discussion of sex-related topics suggests that Mr. Williams assumed that an adult female in her mid-twenties was incapable of behaving in such a manner absent the coercion of a male authority figure; and iii) Mr. Williams categorized all discussions about sex as creating a hostile environment—ignoring that this was the subject of Plaintiff's research with his graduate students.

i. Mr. Williams upheld Dr. Hammat's erroneous findings despite the hundreds of pages of evidence that contradicted the allegations, including the absence of any impact on the Complainants' access to their education or activities. Like Dr. Hammat, Mr. Williams' failed to question the motives of the Complainants, all friends, one of whom had recently been fired by Plaintiff.

486.    GMU also engaged in selective enforcement. A "selective enforcement" claim asserts that, regardless of the respondent's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the respondent's gender. *See Yusuf*, 35 F.3d at 715.

487.    Upon information and belief, GMU has engaged in a pattern of unfair investigations and adjudications resulting in unduly severe sanctions being imposed on males accused of sexual or gender-based harassment.

488.    Upon information and belief, GMU engaged in selective enforcement because, unlike Plaintiff, female professors accused of sexual or gender-based harassment have not been formally investigated by Title IX administrators.

489.    Upon information and belief, to the extent that GMU has pursued the investigation of reports of sexual and gender-based harassment against female professors, and found them

responsible for violating University policy, GMU imposed far less severe sanctions than against male professors found responsible for similar violations.[74]

490.    GMU also engaged in selective enforcement with respect to Complainant 4. GMU assumed the "complete veracity" of Complainant 4's allegations, and pursued a formal investigation against Plaintiff. When Plaintiff filed a complaint against Complainant 4 for violating the Sexual Misconduct Policy by making a bad faith, false report against Plaintiff, GMU took no action.

491.    Plaintiff was subjected to a sex-biased, prejudiced and unfair process in violation of Title IX. This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

492.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

493.    Plaintiff is also entitled to an injunction directing GMU to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's

---

[74] A number of courts have allowed Title IX claims to proceed to discovery where information concerning sexual misconduct proceedings, including the gender of the respondents, is exclusively in the possession of a college or university. *See Doe v. The Trustees of the U. of Penn.*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017) (selective enforcement claim could proceed to discovery where complaint alleged that comparator information was in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

personnel records and all other locations in which they are kept; v) open an investigation into

Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in

violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi)

grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending

false Title IX allegations during the Spring 2019 semester.

## COUNT II
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process
### (Against Defendants Hammat, Williams, Renshaw, Ardis and Wu)

494.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint

as though fully set forth herein.

495.    The Fourteenth Amendment to the United States Constitution provides that no state

shall "deprive any person of life, liberty, or property, without due process of law."

496.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress. . . .

497.    Defendants Hammat, Williams, Renshaw, Ardis and Wu were acting under color

of state law when they deprived Plaintiff of his constitutional rights under the Fourteenth

Amendment.

498.    Fourteenth Amendment due process protections are required in higher education

disciplinary proceedings. Tenured faculty, such as Plaintiff, have significant property and liberty

interests such that the University must afford them heightened due process protections in any

University proceedings that threaten those interests. *Cleveland v. Bd. of Ed. v. Loudermill*, 470

U.S. 532, 546 (1985); *Abatena v. Norfolk State U*., 2014 WL 1819665, at \*\*10-11 (E.D. Va. 2014); *Dear v. the Rector and Visitors of George Mason U*., 1992 WL 884775 (Va. Cir. Ct. 1992).

499.     The OCR's 2001 Guidance also requires due process, "A public school's employees have certain due process rights under the United States Constitution… The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding." *Id.* at 22. "Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment." *Id.*

500. To satisfy due process in the context of any disciplinary proceeding against a faculty member, the University is required to provide notice of the charges against the faculty member, an explanation of the evidence against him or her, and an opportunity to present his side of the story. *Abatena*, 2014 WL 1819665, at \*11. Tenured faculty are entitled to a hearing before they can be terminated. *Dear*, 1992 WL 884775 at \*1.

501.     Recent cases involving public universities have held that individuals accused of sexual misconduct have a right to cross-examination in cases where credibility is at stake. For example, the United States Court of Appeals for the Sixth Circuit held:

> Due process requires cross-examination in circumstances like these because it is 'the greatest legal engine ever invented' for uncovering the truth…Not only does cross-examination allow the accused to identify inconsistencies in the other side's story, but it also gives the fact-finder an opportunity to assess a witness's demeanor and determine who can be trusted…So if a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process.

*Doe v. Baum*, 903 F.3d. 575, 581 (6th Cir. 2018).[75]

---

[75] While this case addressed student respondents in Title IX cases, faculty respondents, who also have significant interests at stake, should be afforded the same right of cross-examination in cases where credibility determinations must be made by the Title IX investigator.

502.   Plaintiff has a significant liberty interest in his good name and reputation and significant property interest in his tenured position as full professor. *Abatena*, 2014 WL 1819665, at \*\*10-11.

503.   Dr. Hammat placed a stigma on Plaintiff's reputation by publishing the false and erroneous Letters of Determination by sending them to Dean Ardis, who had not been involved in the Title IX proceedings. As detailed *supra* the Letters contained a number of false, unsupported and mischaracterized statements about Plaintiff.

504.   Upon information and belief, Mr. Williams placed a stigma on Plaintiff's reputation when he disclosed Dr. Hammat's notification emails and Letters of Determination to Professor 1, who shared the information with at least 9 professors in Plaintiff's program. Faculty also spread the false information to graduate students in Plaintiff's program and encouraged them not to work with Plaintiff.

505.   Mr. Williams further placed a stigma on Plaintiff's reputation when Plaintiff informed him that a member of the faculty had been disseminating information around the Department about the confidential Title IX proceedings and Mr. Williams made no effort to stop the dissemination of this information.

506.   Upon information and belief, Mr. Williams and/or Dr. Renshaw also placed a stigma on Plaintiff when they informed Complainants 1-4 of the various sanctions imposed on Plaintiff as a result of the false statements, mischaracterizations and errors made by Dr. Hammat and Mr. Williams. The applicable OCR Guidance required only the disclosure of sanctions directly relevant to the Complainants, such as a no contact order. Thus, disclosure of the restrictions placed on Plaintiff's employment was unwarranted and an egregious violation of his right to privacy in personnel matters.

142

507.     Dr. Renshaw made statements to members of the faculty—beyond those who "needed to know"—about the details of the erroneous determinations and restrictions placed on Plaintiff's employment which the faculty then shared with graduate students in Plaintiff's program.

508.     Dr. Renshaw also assisted Professor 1 with organizing a program faculty meeting at which, upon information and belief, the false and erroneous Title IX findings against Plaintiff were discussed outside Plaintiff's presence because Plaintiff was excluded from that meeting after he informed Dr. Renshaw and Professor 1 that he did not wish to speak about the case.

509.     Dr. Renshaw also assisted Professor 1 with organizing a second faculty meeting, which Dr. Renshaw attended, at which Plaintiff was attacked by members of the program faculty about the Title IX findings, and at which he was told that his reputation was already destroyed by the false information that had already been disseminated around the Department.

510.     Dr. Renshaw led a third meeting with the full faculty of Plaintiff's Department with a focused discussion on the details of Plaintiff's case.

511.     As a result of Dr. Hammat's, Mr. Williams' and Dr. Renshaw's actions in publishing this information, Plaintiff's colleagues attacked him and he was disaffiliated from his program.

512.     Plaintiff's constitutionally protected property interest in his tenured position at GMU and to be free from overburdensome, unwarranted sanctions tantamount to dismissal from his professional position arises from his appointment letter, the Faculty Handbook.

513.     Pursuant to Section 2.1.1 of the Faculty Handbook, "[t]enure is a major safeguard of academic freedom, of the quality of the education offered [at the University], and stability of the institution. For the faculty member on whom tenure is conferred, it is a privilege granted by

the University to those who have consistently demonstrated their value to the institution over an extended period of time."

514.    Pursuant to Section 2.9 of the Faculty Handbook, tenured faculty may not be terminated without cause and after the University follows "procedures…designed to ensure due process in termination of appointment proceedings." The procedures include a full hearing with a right of cross-examination and full examination of the evidence.

515.    Pursuant to Section 2.10.2, in cases where faculty members are accused of "unethical or unprofessional conduct" procedures must be employed which protect "*all parties*…right to procedural due process." (emphasis added).

516.    Plaintiff had obeyed all institutional rules when he was wrongly determined to have violated University Policy by Dr. Hammat and had sanctions imposed upon him by Dr. Renshaw.

517.    The procedures employed by Ms. Simmons and Dr. Hammat when investigating and determining the outcome of the Title IX allegations against Plaintiff deprived him of even the most minimal due process protections:

    a.      Plaintiff faced dismissal from the GMU as a potential outcome of the Title IX investigation.

    b.      GMU's 2017 Grievance Procedures required Ms. Simmons and Dr. Hammat to assume the "complete veracity" of the complainants' allegations prior to investigating them. *Id.* at III.

    c.      Dr. Hammat's December 2018 notification emails to Plaintiff contained no recitation of the specific charges against Plaintiff or the specific policy provisions that applied to the allegations in question. Plaintiff was not notified whether the investigator employed the Grievance Procedures relevant to each time period, or those in effect at the time that the reports were made.

    d.      Complainant 1 and Complainant 2's allegations concerned events that took place in Spring 2013 and Spring 2014 – over five years prior to when they reported them. These allegations were reported well beyond the 180-day time limit set forth in the applicable Grievance Procedures. These allegations should not have

been investigated. Upon information and belief, the significant delay in reporting was not questioned by the Title IX Office nor the investigators.

e.          Not only were Complainant 1's and Complainant 2's allegations timed out, both complainants had already left the University, their degrees having been conferred months prior to the making of their reports. There is no University policy provision which permits such post-hoc complaints.

f.          Complainant 3's allegations were also timed out under the 2015 and 2016 Grievance Procedures, which required reports to be made within 180 days, because they involved events that took place at least two years prior to when they were reported. There was no evidence of circumstances beyond Complainant 3's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

g.          With the exception of allegations concerning events that occurred in August 2018, the remainder of Complainant 4's allegations were also timed out under the applicable Grievance Procedures, which require reports to be made within 180 days. *2016 Grievance Procedures and 2017 Grievance Procedures*. There was no evidence of circumstances beyond Complainant 4's control that would have precluded her from reporting the allegations sooner, nor was there a "pattern of ongoing discriminatory behavior" alleged or supported by any evidence. Again, this was not questioned.

h.          Upon information and belief, the four complaints were investigated together, which tainted the information gathering process. The first investigator, Ms. Simmons, also conducted the investigation under the presumption that Plaintiff was guilty of the allegations. This was apparent to Plaintiff from the rude and hostile manner in which she acted towards Plaintiff during the investigation. Upon information and belief, Defendant Simmons' presumption of guilt influenced the manner in which she questioned the complainants and witnesses, and tainted the information gathering process. To the extent that Ms. Simmons' replacement, Dr. Hammat, relied upon the evidence gathered and conclusions drawn by Ms. Simmons, the investigation was irreparably tainted.

i.          Dr. Hammat, who took over the investigation for Ms. Simmons after Plaintiff complained that she was biased, was also demonstrably biased. Throughout the interview, Dr. Hammat alluded to allegations that were not part of the case and suggested incorrectly that Plaintiff was involved in a consensual relationship with an unnamed student. It was clear that she also presumed that Plaintiff was guilty, and that her decision making was impacted by false and unsubstantiated rumors.

j.          As the Title IX Coordinator, Dr. Hammat also had a conflict of interest, and should not have been tasked with determining responsibility.

k.          Plaintiff was denied access to all evidence collected concerning the four complaints including but not limited to: a) any and all written complaints filed with the Title IX office; b) witness statements; c) interview memoranda and/or audio recordings; d) text, email, photographic or other evidence gathered during the investigation; e) a copy of any investigation report or memorandum created by the investigators; and f) summaries of the interviews in which Plaintiff participated. Plaintiff's inability to review or respond to the evidence against him impeded his ability to fully defend himself against the allegations.

l.          There was no hearing.

m.          Plaintiff had no opportunity to cross-examine the complainants, nor to ask questions of any of the witnesses. Many of the allegations required Dr. Hammat to make credibility determinations and, thus, this deprivation was even more significant.

n.          Upon information and belief, the names of the complainants were withheld from the witnesses interviewed as part of the investigation, prejudicing the process because the witnesses could not accurately answer questions posed to them.

o.          The allegations stated in the Letters of Determination differed from the allegations set forth in Dr. Hammat's December 2018 emails to Plaintiff, as did the cited sexual misconduct policy in each case.

p.          The Letters of Determination added charges of gender-based harassment to the original charges of sexual harassment. Plaintiff had no awareness of, or opportunity to respond to these charges during the Title IX investigation.

q.          The Letters of Determination contained allegations that had not been disclosed to Plaintiff during the interview process and, therefore, Plaintiff had no opportunity to defend himself against them.

r.          The Letters of Determination did not state the specific policy provisions applied by Dr. Hammat to find that Plaintiff engaged in sexual or gender-based harassment.

s.          The evidence gathered, to the extent it was cited in each Letter of Determination, did not support a policy violation. In determining that a policy violation occurred in each case, Dr. Hammat found against the weight of the evidence, suggesting bias in the process.

t.          Dr. Hammat's statement in the Letters of Determination that "CDE did find enough factual information" to find a policy violation differs from the preponderance of the evidence standard. There was also a startling lack of factual

evidence to support the findings against Plaintiff as opposed to the subjective thoughts or reactions of the complainants posed as "facts."

u.          The Letters of Determination failed to provide any and all relevant definitions of Sexual or Gender Based Harassment and an explanation of how the evidence supported a finding of misconduct against Plaintiff under those definitions. The Determination Letters did not specify which policy definitions were at issue for each complaint, which alleged conduct and events during differing time periods, and instead cited only to "Policy 1202."

v.          The Letters of Determination stated that the determination of the appeal was final and "Deans, Directors or Department Chairs may not reject investigative findings and recommendations of corrective actions in complaints against employees." This was not stated in the Grievance Procedures. While Dr. Hammat stated that such a process avoids "biases in the adjudicatory process," the failure to provide for a level of faculty review, including a <u>hearing</u>, potentially reinforced any bias in the investigative process, which was instead left to a single investigator.

w.          Neither the Grievance Procedures nor the Letters of Determination referred to the specific process through which sanctions are determined for tenured faculty members found responsible for violations of the University's Sexual Misconduct Policies.

x.          Prior to the issuance of the Letters of Determination, and before Plaintiff was notified of the outcome of the investigation, CDE directed the Chair of Plaintiff's Department to prohibit Plaintiff from taking on graduate research assistants. There is no policy provision which gives CDE authorization to take such actions. Before Plaintiff's appeal was taken, and any sanctions imposed, Plaintiff was directed to reject the six students Plaintiff interviewed for a previously approved position to work in his lab in Fall 2019.

y.          Plaintiff's appeal was decided by Mr. Williams, Assistant Vice President of CDE, who had a conflict of interest due to his administrative responsibilities to enforce GMU's policies.

518.    Dr. Hammat, who participated in drafting GMU's Sexual Misconduct Policy and Grievance Procedures, was, as Title IX Coordinator, aware that Title IX procedures are required to provide due process at public universities. Rather than acting to protect the rights of the accused, she acted to erode those rights by designing a process through which due process was denied.

519.    Dr. Hammat chose to cherry-pick from the various policies provided to Plaintiff— as well as later versions that were not provided to him—provisions that benefited the

complainants' rights over Plaintiff's. She further ignored policy provisions that provided minimal protections to Plaintiff. For example, the 2016-2017 and 2017-2018 Sexual Misconduct Policies permitted all parties to review the evidence that would be used to determine whether a policy violation occurred. Dr. Hammat did not afford Plaintiff this right while, upon information and belief, this right was afforded to Complainants 1-4. These actions violated Plaintiff's clearly established right to due process.

520.    Mr. Williams, as Vice President of CDE knew, or should have known, that Title IX guidance required due process in Title IX proceedings at public universities. Mr. Williams also knew, or should have known, that the Faculty Handbook required due process in cases where faculty members faced dismissal from the University as a potential sanction. Though Mr. Williams had authority to grant Plaintiff's appeal based on procedural flaws in the Title IX process, and though Plaintiff's 38-page appeal laid out myriad flaws, Mr. Williams elected to affirm Dr. Hammat's biased, erroneous determinations.

521.    As a result of these deprivations, Plaintiff had no meaningful opportunity to be heard with respect to the evidence against him, or to test the credibility of the complainants or unnamed witnesses. As a result of the erroneous finding, and denial of Plaintiff's appeal, by Dr. Hammat and Mr. Williams—each of whom were biased—the matter was referred to Dr. Renshaw for sanctions.

522.    Dr. Renshaw was aware of the egregious violations of due process and the bias present in the Title IX proceedings. As a member of the faculty, Dr. Renshaw, knew that GMU faculty were entitled to due process in misconduct proceedings. Dr. Renshaw elected to ignore these issues (*e.g.*, despite receiving a copy of Plaintiff's appeal he explicitly said in an email that he did not read it), and place conditions on Plaintiff's employment that are so restrictive that they

are tantamount to dismissal. The conditions placed on Plaintiff may only be lifted in Dr. Renshaw's discretion and are, in effect, an indefinite suspension of Plaintiff's right to teach or conduct research, or to fulfill the duties and responsibilities of his tenured position of full professor.

523. In its memorandum dated May 15, 2019, GMU's Faculty Senate, of which Dr. Renshaw was a member, raised "grave concerns" to Provost Wu about the lack of due process in faculty misconduct proceedings, and pointed to a number of the violations referenced above.

524. Provost Wu, aware of these grave concerns, declined to investigate CDE's investigation and findings in Plaintiff's case specifically, choosing to reject the Faculty Senate Executive Committee's request for his office to investigate the lack of due process protections afforded to Plaintiff. Provost Wu was, due to his position, aware that GMU's faculty had a clearly established right to due process in all proceedings in which they faced dismissal from the University as an outcome.

525. Plaintiff was also denied due process with respect to the Program Grievance, as the Committee elected to hear a group grievance, in violation of the Faculty Handbook. Plaintiff was not afforded a hearing, right of cross-examination or to present witnesses, or right to examine the Faculty Grievance Committee's investigation documents and evidence in support of Professor 1's sham arguments about accreditation. Given that the outcome was Plaintiff's disaffiliation from his program he had a right to due process. This was also clearly stated in Section 2.10.2 of the Faculty Handbook.

526. Dean Ardis had no authority under University policies to effectuate the recommendations of the Faculty Grievance Committee. As the Dean of Plaintiff's College, she knew or should have known that faculty have a right to due process in proceedings concerning alleged ethics violations, as set forth in Section 2.10.2 of the Faculty Handbook. Dean Ardis

violated Plaintiff's clearly established rights when she issued a "concurring" decision that Dr. Renshaw should effectuate Plaintiff's disaffiliation from his program. Dean Ardis improperly stretched the plain language of the Faculty Handbook to grant her permission to effectuate a more severe punishment on Plaintiff through a concurrence in the Faculty Grievance Committee's decision with respect to Dr. Renshaw.

527.  Dr. Renshaw was aware that Dean Ardis was not authorized to effectuate the Faculty Grievance Committee's recommendations, as evidence by the sentence in his letter that the Faculty Handbook "indicates" that the Dean's decision was final with respect to a "grievance filed against an academic administrator." Dr. Renshaw ignored that the Dean did not have a level of review with respect to a grievance filed against a faculty member. Moreover, neither the Faculty Grievance Committee nor Dean Ardis proposed that Plaintiff be disaffiliated from the program for a period of "at least" 5-6 years. Upon information and belief, Dr. Renshaw elected to impose the most severe restriction on Plaintiff—which exceeded the vague, indefinite sanctions already imposed on him—at the urging of Plaintiff's detractors, including Professor 1. The disaffiliation restrictions served as a final blow to Plaintiff's research and teaching, and his obligations as a full professor at GMU. Like the Title IX sanctions, Plaintiff's re-affiliation with the program was discretionary.

528.  Based on the foregoing, Defendants Hammat, Williams, Renshaw, Ardis and Wu violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution with respect to the Title IX investigation, determination of responsibility, denial of Plaintiff's appeal, sanctions imposed on Plaintiff and his disaffiliation from his program. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4;

ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and v) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

529.    As a result of the actions of Defendants Simmons, Hammat, Williams, Renshaw, Ardis and Wu, acting in their individual capacities, in violating Plaintiff's constitutional right to due process, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

530.    As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III
**Violations of the Due Process Clause of the Virginia Constitution**
**(Against Defendants Hammat, Williams, Renshaw, Ardis and Wu)**

531.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

532.    The Virginia Constitution states that "no person shall be deprived of his life, liberty, or property without due process of law." Va. Const. art. I, § 11.

533.     For the reasons stated in Count II, the University deprived Plaintiff of his property interest without due process of law.

534.     Defendants Hammat, Williams, Renshaw, Ardis and Wu violated the rights and guarantees set forth in the due process clause of the Virginia Constitution in the investigation, determination of responsibility, denial of Plaintiff's appeal and sanctions imposed on Plaintiff. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

535.     As a result of the actions of Defendants Hammat, Williams, Renshaw, Ardis and Wu, acting in their individual capacities, in violating Plaintiff's constitutional right to due process, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

536.     As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### 42 U.S.C. §1983: Denial of First Amendment Free Speech
### (Against Defendants Hammat, Williams and Renshaw)

537.     Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

538.     The First Amendment to the United States Constitution bars Congress from passing any law "abridging the freedom of speech…"

539.     The protections of the First Amendment extend to the campuses of state colleges and universities. *Healy v. James*, 408 U.S. 169, 180 (1972). Free speech rights apply in all educational programs and activities of public schools (*e.g.,* classroom, public meetings and speakers on campus, campus debates, student publications, school presentations, and other events). *See* 2001 Guidance, at p. 22. *See e.g.,* George Mason University, OCR Case No. 03-94-2086 (law professor's use of a racially derogatory word, as part of an instructional hypothetical regarding verbal torts, did not constitute racial harassment); *see Iota XI Chapter of Sigma Chi Fraternity v. George Mason University* (4th Cir. 1993) 993 F.2d 386 (offensive fraternity skit constituted student expression).

540.     The protection of academic discourse is a "special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

541.     The United States Supreme Court has determined that the question of whether a public employee's speech is constitutionally protected turns upon the "public" or "private" nature of such speech. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The

distinction is based upon the principle that "speech on public issues occupies the highest rung of the heirarchy [sic] of First Amendment values, and is entitled to special protection." *Id.* at 145, 103 S.Ct. 1684. To determine whether an employee's speech addresses a matter of public concern, the court must look to the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. Speech that relates "to any matter of political, social, or other concern to the community" touches upon matters of public concern. *Id.* at 146, 103 S.Ct. 1684.

542.    Plaintiff engaged in constitutionally protected expression and was severely disciplined in response to his exercise of constitutional rights. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). Plaintiff's ability to engage in protected academic discourse is itself an issue of public concern protected by the First Amendment. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

543.    In drafting policies defining sexual harassment and regulating the conduct of students to prevent or redress discrimination prohibited by Title IX, schools must be cognizant of free speech rights. While Title IX is intended to protect students from sex discrimination, it is *not* meant to regulate the content of speech. The OCR recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a sexually hostile environment under Title IX. 2001 Guidance, at p. 22. In order to establish a violation of Title IX, the harassment must be sufficiently serious to deny or limit a student's ability to participate in or benefit from the education program. The age of the students involved and the location or forum may affect how the school can respond consistently with the First Amendment. 2001 Guidance, at iii.

544.    According to the 2001 Guidance, sexually explicit discourse in the classroom is protected by the First Amendment. The OCR's July 28, 2003 Dear Colleague Letter specified:

> Some colleges and universities have interpreted OCR's prohibitions of 'harassment' as encompassing all offensive speech regarding sex, disability, race or other classifications. Harassment, however, to be prohibited by the statutes within OCR's jurisdiction must include something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive. Under OCR's standard, the conduct must also be considered sufficiently serious to deny or limit a student's ability to participate in or benefit from the educational program. Thus, OCR's standards require that the conduct be evaluated from the perspective of a reasonable person in the alleged victim's position, considering all the circumstances, including the alleged victim's age.

545.    The University's Sexual Misconduct Policies, and/or the manner in which they are interpreted, have evolved away from this requirement even though this federal guidance has not been withdrawn, to infringe on the First Amendment rights of University faculty, including Plaintiff.

546.    As set forth *supra* Paragraphs 182, 185, 188, 200, 210, until it released its 2017-2018 Sexual Misconduct Policy, GMU's Sexual Misconduct Policies and Grievance Procedures took protected academic discourse into account when evaluating sexual harassment complaints against faculty.

547.    Upon information and belief, the removal of this protection from the 2017-2018 Sexual Misconduct Policy, and subsequent iterations, was at the urging of Dr. Hammat, who had recently joined GMU as its Title IX Coordinator and was responsible for revising GMU's Title IX policies and procedures, as well as determining the outcome of harassment cases against faculty.

548.    As explained *supra* Paragraphs 252-273, 288-289, 292, 304-205, 336-340, 342, and 353, Plaintiff's discussions, both inside and outside the classroom, with his graduate students concerned human sexuality, relationships and cultural taboos, topics directly related to the research Plaintiff and his graduate students were conducting at the time and were, accordingly, matters of

public concern. There was no concern present that the graduate students participating in these lectures and discussions would be exposed to material that was inappropriate for their level of maturity because such concerns are "not implicated in the graduate school context." *Scallet v. Rosenblum*, 911 F. Supp. 999, 1011 (W.D. Va. 1996).

549.    Nor were any concerns raised, or complaints made, at the time Plaintiff engaged in the protected speech—whether by students or faculty. Instead, Defendants Hammat, Williams and Renshaw elected to later view the protected speech as harassment, in some cases over five years after the statements were made. First Amendment principles cannot be cast aside simply by labeling speech as "harassment or discriminatory," as there is no categorical "harassment exception to the First Amendment's free speech clause." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).

550.    Plaintiff's interest as a public citizen educating his graduate students through the use of pedagogical tools, including real world examples relevant to their areas of research in human sexuality and related topics, outweighed the University's interest in forbidding the occasional use of sexual or profane language by its faculty. *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968); *Hardy v. Jefferson Cmty. Coll.*, 260 F. 3d 671 (2001). There was, further, no evidence that Plaintiff's discussions about sexuality and cultural taboos caused any disruption to GMU's pedagogical mission or within his department at the time. *Id. See also Scallet,* 911 F. Supp. at 1012-1013.

551.    The allegations made against Plaintiff by Complainants 1 and 2 predominantly concerned statements made by Plaintiff that constituted protected speech under the First Amendment. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Although the policies and procedures in place at the time the statements were made, and which were provided to Plaintiff, included protections for academic

discourse, Dr. Hammat ignored these protections in determining that Plaintiff was responsible for sexual harassment in the cases of Complainants 1 and 2. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

552.    With respect to Complainant 3, a number of allegations concerned speech protected by the First Amendment. Again, the policies and procedures in place at the time, and provided to Plaintiff, included protections for academic discourse. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Dr. Hammat ignored the First Amendment in determining that Plaintiff was responsible for sexual harassment in the case of Complainant 3. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment, which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

553.    With respect to Complainant 4, a number of allegations concerned speech protected by the First Amendment. The remaining allegations were unsubstantiated, contradicted by evidence, and did not constitute sexual harassment. Dr. Hammat ignored the First Amendment in determining that Plaintiff was responsible for sexual harassment in the case of Complainant 3. Mr. Williams affirmed this erroneous decision. Dr. Renshaw ignored these errors when placing severely restrictive conditions on Plaintiff's employment which were tantamount to dismissal because of their severe, negative impact on Plaintiff's ability to fulfill his obligations as full professor.

554.    Had Dr. Hammat not ignored the First Amendment in investigating and determining the outcome of Plaintiff's case and had Mr. Williams not done so in denying Plaintiff's appeal, then Plaintiff would not have received the severe and unwarranted discipline imposed by Dr. Renshaw, including Plaintiff's disaffiliation from his program, which was grounded in the erroneous Title IX findings which purportedly threatened the accreditation of Plaintiff's program.

555.    Dr. Hammat, as Title IX Coordinator and drafter of GMU policies, was or should have been aware of Plaintiff's clearly established right to free speech under the First Amendment as set forth in the OCR's 2001 Guidance. Mr. Williams, as an Assistant Vice President, should also have been aware of this right. As a member of the faculty, and individual responsible for imposing sanctions resulting from violations of GMU's Sexual Misconduct Policy, Dr. Renshaw should also have been aware of Plaintiff's right to free speech on matters of public concern, as discussed in the 2001 Guidance.

556.    Based on the foregoing, Defendants Hammat, Williams and Renshaw violated the rights and guarantees set forth in the First Amendment of the United States Constitution with respect to the Title IX investigation, determination of responsibility, denial of Plaintiff's appeal and sanctions imposed on Plaintiff. Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy,

in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

557.    As a result of the actions of Defendants Hammat, Williams and Renshaw, acting in their individual capacities, in violating Plaintiff's constitutional right of free speech pursuant to the First Amendment, Plaintiff suffered substantial injury, damage, and loss, including, but not limited to, physical illness, emotional distress, reputational damages, loss of career and research opportunities, economic injuries and other direct and consequential damages.

558.    As a result, Plaintiff is entitled to damages against these Defendants in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    As to Count I against Defendants George Mason University and Board of Visitors of George Mason University for violations of Title IX of the Education Amendments of 1972, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as an injunction directing Defendant George Mason University to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) open an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester;

(ii)    As to Count II against Defendants Hammat, Renshaw, Williams, Ardis and Wu for 42 U.S.C. §1983: Denial of Fourteenth Amendment Due Process, in their official capacities

an injunction: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester. Against Defendants Hammat, Renshaw, Williams, Ardis and Wu in their individual capacities, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)      As to Count III against Defendants Hammat, Williams, Renshaw, Ardis and Wu for violations of the Due Process Clause of the Virginia Constitution, an injunction Accordingly, Plaintiff is entitled to injunctive relief against these Defendants in their official capacities: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester; and damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)      As to Count IV against Defendants Hammat, Renshaw, and Williams for 42 U.S.C. §1983: Denial of First Amendment Freedom of Speech, in their official capacities an injunction: i) vacating the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) removing all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliating Plaintiff with his program; iv) removing all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) opening an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) granting Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester. Against Defendants Hammat, Renshaw and Williams, in their individual capacities, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)      An injunction directing Defendant George Mason University to: i) vacate the determinations made by Dr. Hammat with respect to Complainants 1-4; ii) remove all sanctions, conditions and restrictions placed on Plaintiff by Dr. Renshaw, including the directive that Plaintiff disaffiliate from his program; iii) re-affiliate Plaintiff with his program; iv) remove all documents and information concerning the Title IX investigation and resulting sanctions from Plaintiff's personnel records and all other locations in which they are kept; v) open an investigation into Plaintiff's allegations that Complainants 1-4 acted in bad faith, in their own interests, and in violation of University Policy, in bringing sexual harassment complaints against Plaintiff; and vi) grant Plaintiff a one-semester sabbatical as a replacement for the sabbatical that he spent defending false Title IX allegations during the Spring 2019 semester.

(vi)     Awarding punitive damages.

(vii)    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:

                                      Respectfully Submitted,

                                      FARMER LEGAL, PLLC

                                      By: ___ /s/ *Joshua T. Farmer* ___
                                           Joshua T. Farmer
                                      5030 Sadler Place, #205
                                      Glen Allen, VA 23060
                                      (804)325-1441
                                      josh@farmerlegalhelp.com

                                      NESENOFF & MILTENBERG, LLP

                                      By: ___ /s/ *Andrew T. Miltenberg* ___
                                      Andrew T. Miltenberg (*pro hac vice* admission pending)
                                      Kara L. Gorycki (*pro hac vice* admission pending)
                                      363 Seventh Avenue, Fifth Floor
                                      New York, New York 10001
                                      (212) 736-4500
                                      amiltenberg@nmllplaw.com
                                      kgorycki@nmllplaw.com