**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:19-cv-01249 |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT THE RECTOR AND VISITORS OF
<u>GEORGE MASON UNIVERSITY'S MOTION TO DISMISS COUNT I</u>**

Plaintiff was found responsible for sexual harassment after an investigation into complaints made by four graduate students about Plaintiff's numerous sexually explicit statements and actions.  Plaintiff's sole claim against The Rector and Visitors of George Mason University ("Mason")[1] is that it violated Title IX when it found him responsible.  Plaintiff's primary theory is an "erroneous outcome" theory, which requires Plaintiff to plead both facts sufficient to create doubt in the outcome of his case and facts demonstrating that the outcome of his case was motivated by gender bias.  While Plaintiff has made many allegations (558 paragraphs, to be exact), there are three glaring holes in Plaintiff's complaint.  *First,* Plaintiff was required to allege specific statements or actions by the decision makers that demonstrate a gender bias.  Despite scouring the internet for such statements, Plaintiff came up with nothing that indicates they have a gender bias.  Instead, he alleges statements that, at most, demonstrate a commitment by Mason and its employees to combatting sexual misconduct on campus, regardless of the gender of the accused or complainant.  Courts have repeatedly rejected attempts to conflate a commitment to addressing sexual misconduct with anti-male gender bias.  Even more problematic for Plaintiff is that his own allegations disprove his claim by demonstrating that the decision makers in this case and Mason as an institution do not harbor or make decisions based on gender stereotypes or biases.

*Second,* Plaintiff cannot show that the outcome was erroneous because he ***admits that most of the findings against him are correct.***  Throughout the Complaint, Plaintiff admits that he, *inter alia*, shared stories with graduate students about his personal sexual experiences, asked a graduate student about her pornography preferences, visited a strip club with students, and

---

[1]Pursuant to Virginia Code § 23.1-1500(A) George Mason University operates under the corporate name "The Rector & Visitors of George Mason University."  The Parties have agreed to dismiss George Mason University as a defendant.

spent time in a hot tub with students talking about his experience at a brothel.   The outcome of

the investigation cannot be "erroneous" when the Plaintiff admits that the key underlying factual

findings are correct.   Here too, Plaintiff's own allegations demonstrate that he has no claim.

*Third*, while Plaintiff tries to cast doubt on the outcome of his case by asserting that he

was denied due process during the investigation, he admits that he was given notice and four

opportunities to be heard—more than what due process requires.   For a third time, Plaintiff's

own allegations disprove his claim.

Plaintiff also asserts a "selective enforcement" theory under Title IX but devotes only

five out of 558 paragraphs to this claim.   For his selective enforcement claim, Plaintiff needed to

allege that Mason treated a similarly situated female faculty member differently.   Plaintiff does

not identify any such faculty member; indeed, he admits that he has no such factual allegations

and begs the Court to ignore federal pleading standards and allow him to go on a fishing

expedition.   Once again, Plaintiff's own complaint demonstrates that he has no claim.

In short, Plaintiff's 162 page complaint is a prime example of why "[m]ore is not

necessarily better under the Federal Rules."   *Northern Trust Co. v. Peters*, 69 F.3d 123, 129 (7th

Cir. 1995)  Not only has he failed to allege the necessary elements of his claim, but he has

"plead[ed] himself out of court by unnecessarily alleging facts which . . . demonstrate that he has

no legal claim."   *Id.*

## FACTUAL BACKGROUND

As this motion only addresses Plaintiff's Title IX claims, this section will be limited to

the events relevant to that claim, i.e., the Title IX investigation and adjudication.   A description

of subsequent events relevant to Plaintiff's other claims is included in the Individual Defendants'

Motion to Dismiss.   As required for a motion to dismiss, Mason assumes the truth of the factual

allegations in the Complaint unless contradicted by documents incorporated by reference into the Complaint.[2]  *See Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

While Plaintiff's voluminous complaint might give the false impression that this case has a long or complicated factual background, the relevant events are actually quite simple.  Plaintiff is currently a tenured full professor at Mason.  *See* Compl. ¶ 502.  On December 4, 2018, Mason's Office of Compliance, Diversity, and Ethics ("CDE") notified Plaintiff that "four former and current graduate students . . . had filed Title IX complaints against him for sexual harassment."  *Id.* ¶ 136.  These notices listed the allegations against Plaintiff and provided him with the applicable policies and procedures based on the school year when the alleged harassment occurred.  Exs. 1-4 (incorporated by reference, Compl. ¶ 136).   In summary, the allegations against Plaintiff were that over a five-year period he made sexually inappropriate comments, shared personal sexual experiences, and asked graduate students about their sexual preferences.  *Id.*  The complainants alleged that these comments made them feel uncomfortable and interfered with their educational experience.[3]

---

[2] On a Rule 12(b)(6) motion to dismiss a court may consider "documents incorporated into the complaint by reference."  *Tallabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

[3] To understand these allegations, it is important to recognize the power dynamic between a faculty member, such as Plaintiff, and graduate students, such as Complainants 1-4.  A faculty member has a great deal of power and authority over a graduate student in his department.  Unlike undergraduate students who take classes with many different faculty members during their time at a university, graduate students work closely with a few faculty member mentors in classes and on their research.  Faculty mentors have the ability to exert a strong influence over the graduate students' ability to conduct their research, obtain funding for that research, present at conferences and publish their research, complete their graduate work, and obtain future employment in academia or other fields.  Indeed, Plaintiff notes providing recommendations for and assistance obtaining jobs and research grants to graduate students.  *See* Compl. ¶ 5.

3

Per Mason's policies and procedures, CDE conducted an investigation of the allegations. As part of that investigation, Plaintiff was interviewed three times, *see* Compl. ¶ 145, twice by Dr. Hammat, Mason's then-Title IX Coordinator and "the sole individual tasked with deciding the outcome of the allegations against Plaintiff." *Id.* ¶¶ 149, 150, 158.  During those interviews Plaintiff, while represented by counsel, had the opportunity to respond to the evidence and present his side of the story.  *See, e.g.*, *id.* ¶252-53 (had the opportunity to explain the context of the story told during class about him performing oral sex on a woman in public); ¶ 269 (had the opportunity to deny statements attributed to him); ¶ 309-10 (had the opportunity to present evidence of communications with Complainant 3 and about incident alleged by her); ¶ 338 (had the opportunity to respond to allegation that while at a bar he asked a graduate student about what type of pornography she liked to watch); ¶ 341 (had the opportunity to explain why he believed there was nothing wrong with "hot tubbing" with graduate students).  He also had the opportunity to "provide a list of witnesses" and "over 150 pages" of documents to support his side of the story.  *Id.* ¶¶ 153-54.

During the course of the investigation, Plaintiff admitted to many of the alleged statements and conduct—as he does again in the Complaint.  For example, Plaintiff admitted to (1) spending time with his graduate students in his hot tub during which he discussed his visit to a brothel in Germany, *id.* ¶ 341-42; (2) asking a graduate student what type of pornography she liked, *id.* ¶ 337-38; (3) visiting a strip club with graduate students, taking a photograph of one of the students getting a lap dance, and making a statement about using the photograph for blackmail, *id.* ¶ 347; (4) discussing with graduate students, while at a conference, "sexual encounters that occurred on the trip," *id.* ¶ 344; (5) sharing with graduate students a story about an intimate sexual experience Plaintiff had in Vietnam, *id.* ¶ 353; (6) sharing the number of

sexual partners he had during one of his classes, *id.* ¶ 292; and (7) sharing a story during class about a time that Plaintiff performed oral sex on a woman in public at a party, *id.* ¶ 252.

Based on Plaintiff's own admissions and testimony from eleven other witnesses, *id.* ¶ 374, Dr. Hammat determined that Plaintiff had engaged in conduct that violated Mason's sexual misconduct policy, and on February 22, 2019 sent Letters of Determination to Plaintiff stating her findings.  *See* Exs. 5-8 (incorporated by reference, Compl. ¶ 160).  Notably, where Dr. Hammat did not find sufficient evidence to support a specific allegation against Plaintiff she either so noted in the Letters of Determination, *see, e.g.*, Ex. 7 (Complainant 3 Letter of Determination) (stating that "[d]ue to lack of corroborating witnesses, the investigator was unable to determine whether" allegation about Plaintiff hugging Complainant 3 and offering to buy her a beer was true), or omitted that allegation from the findings, *compare* Ex. 1 (Complainant 1 Notice) (containing allegations that Plaintiff told graduate students that "they needed to get naked together" and that Plaintiff made comments in class that suggested that men and women were not equal) *with* Ex. 5 (Complainant 1 Letter of Determination) (not including these allegations in findings of investigation).

Per Mason's procedures, Plaintiff had another opportunity to present his story through an appeal of Dr. Hammat's decision to the Vice-President of CDE, Julian Williams.  Plaintiff "submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits."  Compl. ¶ 165.  Mr. Williams denied Plaintiff's appeal finding that the "investigation into the reports uncovered numerous instances of non-pedagogical discussions of sex, sexual encounters, and a sexually-charged environment, in general" and that Plaintiff "confirmed most of this conduct during the investigation."  Ex. 9 (incorporated by reference, Compl. ¶ 373).

The determination in Plaintiff's case was provided to his supervisor, Dr. Renshaw, who determined the appropriate sanctions based on the findings. Dr. Renshaw required Plaintiff to undergo sexual harassment training and placed him on a four-semester probationary period during which he could not teach or mentor new graduate students, was only allowed to meet with students on campus or in public settings, and could only communicate with students through Mason approved methods (e.g., official Mason email). *See* Compl. ¶ 393. Plaintiff was not terminated and remains a tenured full professor at Mason. *Id.*

Plaintiff now claims that Mason violated Title IX. As demonstrated below, Plaintiff has not properly pled a Title IX claim.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must allege sufficient facts regarding each count to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 555 U.S. at 556.

Courts "must consider the complaint in its entirety, as well as . . . documents incorporated in the complaint by reference, and matters of which a court may take judicial notice." *Tallabs*, 551 U.S. at 322. A court "need not accept as true mere legal conclusions couched as factual allegations." *Assa'ad-Faltas v. Virginia.*, 738 F. Supp. 982, 985 (E.D. Va. 1989). A court also should not accept as true allegations that are contradicted by documents incorporated by reference into a complaint. *See Veney*, 293 F.3d at 730. Finally, a plaintiff can "plead himself

6

out of court" by alleging facts that "demonstrate that he has no legal claim." *Northern Trust*, 69 F.3d at 129.

## ARGUMENT

Plaintiff's only claim against Mason is for violation of Title IX related to the determination that he engaged in sexual harassment against four students. Plaintiff asserts an "erroneous outcome" theory and then tacks on as an afterthought a "selective enforcement" theory. Both claims must be dismissed as a matter of law.

## I.   PLAINTIFF'S TITLE IX ERRONEOUS OUTCOME CLAIM MUST BE DISMISSED.

A Title IX "erroneous outcome" claim was first recognized in *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). In *Yusuf*, the Second Circuit concluded that "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* at 715. Therefore, in order to state an erroneous outcome claim, a plaintiff must both "allege particular facts sufficient to cause some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

Notably, Plaintiff's erroneous outcome claim is limited to the determination that he engaged in sexual harassment; the decisions by his department chair as to what sanction to impose and by the faculty to disaffiliate him from an academic program are not at issue in this claim. Nor has Plaintiff made any allegations that Dr. Renshaw, Dean Ardis, or Provost Wu have a gender bias. Therefore the sole issues are whether Plaintiff has sufficiently alleged particular facts demonstrating (1) that gender bias was a motivating factor in the determination that Plaintiff violated Mason's sexual misconduct policy and (2) some articulable doubt as to whether Plaintiff did engage in conduct that violated the sexual misconduct policy.

**A. Plaintiff Has Not Made Particularized Allegations Showing a Causal Connection Between the Outcome of the Title IX Investigation and Gender Bias.**

Plaintiff's erroneous outcome claim fails because he has not pled facts sufficient to show that gender bias motivated the outcome of the Title IX investigation.  As *Yusuf* instructed "conclusory allegation[s] of gender discrimination [are] not sufficient to survive a motion to dismiss" and that "particularized allegations relating to a causal connection between the flawed outcome and gender bias" are required.  35 F.3d at 715.  Plaintiff must plead "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [ ] tend to show the influence of gender." *Id.*  Plaintiff's attempts to meet this requirement fall into two categories, (1) allegations about Mason officials involved in investigating and deciding his Title IX matter and (2) allegations about general "pressure" Mason (and every other university) face on issues related to addressing sexual misconduct.  But none of Plaintiff's allegations actually demonstrate gender bias; rather, they demonstrate that Mason officials are committed to the important goal of addressing sexual misconduct on campus.

      1.  <u>Plaintiff Has Failed to Allege Any Statements by University Officials Demonstrating Gender Bias.</u>

As the court in *Doe v. Marymount Univ.* recently explained, "a Title IX plaintiff successfully alleges gender bias if he or she points to statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias."  297 F. Supp. 3d 573, 585 (E.D. Va. 2018).  Here, Plaintiff has made no allegations of statistical evidence of gender bias or policies and procedures that are designed to reach gender-specific outcomes; he instead rests his claim on his allegations of statements made by Dr. Hammat and Mr. Williams.

In order to try to satisfy this element, Plaintiff appears to have engaged in an exhaustive internet search for statements made by Dr. Hammat and Mr. Williams, going so far as to include

8

statements made by them ***more than five years ago***.[4]  Despite this effort, Plaintiff came up with

nothing.  *Marymount* provides a helpful example of the kind of statement by a university official

that could evidence gender bias.  In that case, plaintiff alleged that the adjudicator had expressed

incredulousness that a male was not aroused by a female touching his genitals without consent.

The court concluded that this allegation sufficiently pled that the adjudicator's "decision-making

was infected with impermissible gender bias, namely [his] discriminatory view that males will

always enjoy sexual contact even when that contact is not consensual."  *Id.* at 585-86.

Here, on the other hand, Plaintiff has not alleged any statement by Dr. Hammat or Mr.

Williams that indicate gender bias.  At most (and even this is questionable), Plaintiff has alleged

facts suggesting that they may have a bias against perpetrators of sexual misconduct or in favor

of victims of sexual misconduct.  But, as Judge Williams of this Court recognized over twenty

years ago and Judge Trenga reconfirmed this year, "bias against people accused of sexual

harassment and in favor of victims . . . indicate[s] nothing about gender discrimination."  *Haley*

*v. VCU*, 948 F. Supp. 573, 579 (E.D. Va. 1996); *Doe v. Fairfax Cnty. Sch. Bd.*, __ F. Supp. 3d

___, 2019 U.S. Dist. LEXIS 170577, at \*19 (E.D. Va. 2019) ("Courts have widely held that

vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those

accused of misconduct, is not evidence of anti-male bias."); *see also Sahm v. Miami Univ.*, 110

F. Supp. 3d 774, 778 (S.D. Ohio 2015) (collecting cases).  Plaintiff's allegations, however, do

not even demonstrate that Dr. Hammat or Mr. Williams are biased against perpetrators of sexual

---

[4] In addition to the statements alleged by Plaintiff not demonstrating gender bias, the Court should not countenance Plaintiff's attempt to meet his pleading requirement by cherry-picking isolated statements made by Dr. Hammat and Mr. Williams years before Plaintiff's Title IX matter arose.  The large temporal gap between the alleged statements and the investigation at issue negates any "causal connection" between such statements and the outcome of the investigation.

misconduct.  Rather, his allegations demonstrate that they are committed to the laudable goals of

preventing sexual misconduct on campus and providing a fair process to all involved parties.

<u>Allegations about Statements by Dr. Hammat</u>

- Plaintiff selectively quotes and misrepresents[5] a 2013 interview of Dr. Hammat in which she disclosed that she is a survivor of sexual assault and explained that after she disclosed to her sorority that she had experienced sexual assault, her sorority (not her alone, as Plaintiff incorrectly alleges) formed a group where they agreed to not leave a party without all of the members of the group. *See* Ex. 10 at 8-9 (incorporated by reference, Compl. ¶ 150, n.55).  She also states that when she shared her experience with fraternities, they often became angry and wanted to know the name of her assailant.  *Id.*  Instead of disclosing the name, she instead would tell them that "I'm not saying that this has ever happened in this frat house, but I need you to be this angry and this protective of every female that walks in this house because you never know." *Id.*  Plaintiff cannot seriously be claiming that Dr. Hammat being a survivor of sexual assault or Dr. Hammat's sorority sisters deciding to take common-sense safety precautions when attending parties (notably not limited to fraternity parties) makes Dr. Hammat biased against men.  And her statement to the fraternities actually cuts against Plaintiff's claim by demonstrating that Dr. Hammat is not biased against men as she explicitly states that she is ***not*** assuming that sexual assaults occur in all fraternity houses and recognizes that many men will want to take actions to prevent sexual misconduct.

- Plaintiff also references an article in the UT-Austin school newspaper from 2013 in which Dr. Hammat cited national statistics about the percentage of women ***and men*** who are likely to be the victim of sexual assault before they leave college and explained that the number of reported sexual assaults at UT-Austin (where she worked at the time) was significantly less than what would be expected based on those statistics and the student population.  *See* Ex. 11 at 2 (incorporated by reference, Compl. ¶ 151, n.57).  This statement by Dr. Hammat does not indicate any gender-bias, to the contrary

---

[5] For example, Plaintiff incorrectly asserts with regard to this interview that "Dr. Hammat has been publicly vocal in women's advocacy publications . . . ." Compl. ¶ 485(b).  First, Plaintiff has only alleged one publication in which she made these statements, not multiple publications.  Second, the publication where Dr. Hammat made these statements is not a women's advocacy publication, it is a journal published by the Institute on Domestic Violence & Sexual Assault (IDVSA) at the University of Texas at Austin.  The mission of that organization is to "advance the knowledge of domestic violence and sexual assault in an effort to end interpersonal violence" regardless of the gender of the parties.  *See* Ex. 10 at 1 ("Our Mission").

it demonstrates that Dr. Hammat understands that both males and females can be the victim of sexual assault.  Perhaps realizing that Dr. Hammat's comments by themselves don't demonstrate any gender-bias, Plaintiff cites "criticism" of Dr. Hammat by a single ideological internet blogger.[6] Comments by someone else do not demonstrate that Dr. Hammat is gender-biased.  To the extent it has any relevance, the criticism of Dr. Hammat was that she couldn't interpret statistical information or has an overly broad understanding of what constitutes sexual assault, neither of which have any bearing on whether Dr. Hammat is biased against males (or made a misjudgment here since this case does not involve sexual assault).

- Plaintiff references Dr. Hammat's participation in an event titled "How Equity Advocates Can Support High Expectations for Title IX and Title IX Coordinators" in which Dr. Hammat and other DC-area Title IX coordinators were asked to share their "wish list for support from Equity Advocates." Compl ¶ 152.  Dr. Hammat's participation in such an event does not demonstrate any gender bias; it demonstrates an interest in engaging with parties interested in Title IX issues. Plaintiff fails to make any allegation that Dr. Hammat said anything or included anything on her "wish list" that demonstrated she was biased against men.  Plaintiff makes the conclusory and purely speculative allegation that this event "is yet another example of Dr. Hammat publicly taking a biased position on the side of women's rights," but Plaintiff has no idea (and therefore cannot allege) what Dr. Hammat said or what positions she took at that event.

- Plaintiff complains that during his interview Dr. Hammat asked him about an allegation that he was involved in a relationship with a student.  Compl. ¶ 485(e).  Plaintiff does not explain, nor could he, how Dr. Hammat asking him about this allegation demonstrates gender bias.  The purpose of the interview was to give Plaintiff an opportunity to respond to allegations made against him.  To the extent it demonstrates anything, this allegation shows that Dr. Hammat conducted a thorough investigation.  Had Dr. Hammat not asked him about the allegation and given him the opportunity to respond, Plaintiff would undoubtedly be claiming that was a due process violation.

- Finally, Plaintiff claims that Dr. Hammat exhibited gender bias by including certain details in her description of the allegations against Plaintiff.  Again, had Dr. Hammat not included these details in the notices, Plaintiff would surely be claiming that Mason did not provide him with adequate notice.  Plaintiff also does not provide any explanation for how Dr. Hammat

---

[6] The criticism was by KC Johnson, an internet blogger who frequently complains about Title IX issues on college campuses and is the author of "The Campus Rape Frenzy:  The Attack on Due Process at American Universities." *See* Ex. 12 (incorporated by reference, Compl. ¶ 151, n.56).

providing Plaintiff with the allegations ***made by other people*** demonstrates that Dr. Hammat has a gender bias.  Regardless, the details identified by Plaintiff do not demonstrate gender bias.  *First*, Dr. Hammat noting that the alleged story Plaintiff told about skinny-dipping involved a woman who was not Plaintiff's wife does not demonstrate that Dr. Hammat expected Plaintiff to comport with traditional notions of marriage; it is merely a detail in the alleged story.  Also, even if Plaintiff were correct that Dr. Hammat has a bias towards traditional notions of marriage that would have no relevance to whether she has an anti-male bias.  *Second*, Plaintiff complains that Dr. Hammat included a reference to human trafficking with respect to the allegation about Spa World.  Plaintiff once again provides no explanation, nor could he, for how Dr. Hammat including a reference to human trafficking demonstrates gender bias.  *Third*, Plaintiff complains that Dr. Hammat noted that Complainant 3 alleged that Plaintiff invited her to a sexually explicit conference presentation "knowing she was a first year graduate student."  Once again, this statement does not indicate gender bias; if anything it demonstrates a bias about the maturity of first-year graduate students.

<u>Allegations about Statements by Mr. Williams</u>

- The only allegation Plaintiff makes about statements by Mr. Williams are from a single 2014 or 2015 interview about Vassar's (where Mr. Williams worked at the time) Title IX process.  Plaintiff's allegations blatantly misrepresent Mr. Williams' statements by inserting the word "female" into a statement that was gender neutral.  Plaintiff alleges that Mr. Williams said that "campus administrators have a moral obligation to protect and care for female students" but what Mr. Williams actually said was "So at Vassar we want to meet not only our legal obligations under Title IX but, more importantly, our moral obligation to protect and care for our students and our community."  Ex. 13 at 2 (incorporated by reference, Compl. ¶ 166 n.61).  The statement Mr. Williams actually made is plainly gender neutral.

- Plaintiff also references and again misrepresents another statement in that interview.   In the interview Mr. Williams explained that "[j]ust because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying."  Ex. 13 at 4.  As an initial matter, nothing in this statement indicates gender bias, since both male and female students can be complainants in Title IX cases.  The statement Plaintiff quotes actually cuts against his argument that Mr. Williams is biased because it demonstrates that Mr. Williams understands that even if he believes that a victim of sexual misconduct is telling the truth, a policy violation can only be found if there is sufficient information to corroborate the allegations.  As Mr. Williams states in the next sentence, "We must operate within our

standard of proof and our policy definitions, but we care about all the students who go through this process." Ex. 13.

Plaintiff's allegations of specific statements by Mr. Williams and Dr. Hammat fall far short of demonstrating that either of them harbor impermissible gender biases. Plaintiff's other attempts to demonstrate gender bias, *see* Compl. ¶ 485 (c), (e), (h), and (i), similarly fail.[7] For example, Plaintiff's disagreement with how Mr. Williams and Dr. Hammat weighed the evidence does not indicate any gender bias, as this court already held in *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 734 (E.D. Va. 2015) ("*GMU*"). There, the plaintiff similarly alleged that the original decision maker "made a decision against the weight of the

---

[7] Plaintiff also makes allegations about the initial investigator, Megan Simmons, who was removed from the case after Plaintiff's initial interview based on complaints by him about her. Ms. Simmons, therefore, had limited involvement with the investigation and was not involved in deciding the outcome of Plaintiff's case or appeal. Regardless, Plaintiff has not alleged any facts that show Ms. Simmons had a gender bias. He asserts that she "had a lengthy background of advocacy on behalf of female victims of sexual violence and the prosecution of males accused." Compl. ¶ 485(a). But elsewhere in the Complaint, Plaintiff contradicts this conclusory allegation by pleading only that Ms. Simmons' background included "working as a federal agent" and "represent[ing] law enforcement on various committees tasked with finding holistic approaches to ending violence against women in the Navy." Compl. ¶ 147. Even if Ms. Simmons did previously work on issues related to violence against women, that does not mean she has an anti-male gender bias. *See Doe v. Loh*, PX-16-3314, 2018 U.S. Dist. LEXIS 53619, at *29 (D. Md. March 29, 2018) *aff'm* 767 Fed. Appx. 489 (4th Cir. 2019) ("[S]imply because [university official], in the past, had taken up the cause of female victims does not render her hopelessly biased against men."). Nor does Plaintiff's allegations that Ms. Simmons left Mason to work "for a non-profit that advocates for the prevention of violence against women" or that she "gave guest lectures for the Women and Gender Studies Department," in any way demonstrate that she is biased against men. At most, these allegations demonstrate that Ms. Simmons has an interest in combatting violence against women (regardless of who commits it). Finally, Plaintiff alleges that Ms. Simmons "was hostile and menacing towards Plaintiff," and that based on this "demeanor" Plaintiff believes she "operated under a presumption that Plaintiff was guilty." Compl. ¶ 146. Whether or not Ms. Simmons was nice to Plaintiff has no bearing on whether she harbors a gender bias. There are plenty of plausible reasons why Ms. Simmons might have been hostile to Plaintiff, including that he admits to engaging in inappropriate conversations and actions with his students. *See GMU*, 132 F. Supp. 3d at 733 (explaining that there may be any number of non-discriminatory reasons for how a school official treats an accused individual and that in "in the absence of any specific factual allegation pointing to such a bias," "it cannot be said that the discriminatory motive explanation is plausible rather than conceivable").

evidence," the appellate officer "summarily affirmed the erroneous decision," and "'the only possible explanation' is bias against the plaintiff because of his 'status as a male accused of sexual misconduct.'"  *Id.*  As the court in *GMU* explained in rejecting this argument, "this conclusion does not *necessarily* follow from the facts alleged.  Gender neutral concerns might well have easily—and more plausibly—motivated the challenged actions."  *Id.*

Some of Plaintiff's allegations are both hyperbolic and fail to demonstrate gender bias. For example, Plaintiff's allegation that "Dr. Hammat drafted GMU's Sexual Misconduct Policy which  . . . decreased the rights of faculty with each iteration and expanded the definition of sexual harassment to include nearly any word or action imaginable," Compl. ¶ 485(c), is unnecessary hyperbole because the policy clearly does not make "any word or action imaginable" sexual harassment. *See* Exs. 4A at 13-14, 4C at 12-13 (defining sexual harassment). Even if this allegation were true, it might indicate that Dr. Hammat has a broad understanding of sexual harassment or is biased against faculty members, but it provides no support for Plaintiff's assertion that Dr. Hammat is biased against men.  *See Loh*, 2018 U.S. Dist. LEXIS 53619, at *27 (policy which is written in a "facially neutral manner" and applies to all allegations of sexual misconduct "without regard to gender" does not demonstrate gender bias).  Plaintiff also asserts that in deciding his appeal Mr. William's "seemed outraged by Plaintiff allowing students to swim, with bathing suits, in a hot tub." Compl. ¶ 485(h).  The only statement Mr. Williams made in his appeal decision about the hot tub is that the investigation revealed "[o]ccasions where students under your supervision visited your home hot tub."  Ex. 9.  If Plaintiff or his counsel actually believe that statement demonstrates "outrage," they do not understand what that word means.  Regardless, even if true, Mr. Williams being concerned about a faculty member

14

being in a hot tub with his graduate students does not demonstrate gender bias, it demonstrates

he has the good judgment that Plaintiff apparently lacks.

Despite scouring the internet for statements by Mr. Williams and Dr. Hammat, Plaintiff

has failed to allege any statement or action by either that even hints at an anti-male or pro-female

bias, let alone constitute the required "particularized allegations relating to a causal connection

between the flawed outcome and gender bias." *Yusuf*, 35 F.3d at 715.  Instead Plaintiff's

complaint rests on the fallacy that support for sexual assault victims and a commitment to

eradicating sexual misconduct from college campuses is the same as anti-male bias.  As courts

regularly recognize, it is not the same, and allegations, such as those made by Plaintiff here, are

not sufficient to plead an erroneous outcome claim.  *See Haley*, 948 F. Supp. at 579; *Fairfax*

*Cnty. Sch. Bd.*, 2019 U.S. Dist. LEXIS 170577, at *19.  As such, Plaintiff's erroneous outcome

claim must be dismissed.

> 2.   Plaintiff's Allegations of "Pressure" Are Insufficient to Plead Gender Bias

As demonstrated above, Plaintiff has failed to plead "statements by members of the

disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making

that also tend to show the influence of gender," *Yusuf*, 35 F.3d at 715, and, therefore, his

erroneous outcome claim must be dismissed.  Recognizing that he has failed to meet this

requirement of his claim, Plaintiff wastes pages of his complaint with allegations about supposed

"pressure" Mason faces on the issue of sexual assault.  Even if those allegations demonstrated

pressure on Mason to act against men (they do not), they would still be insufficient to state a

claim absent the concrete allegations demonstrating gender bias required by *Yusuf*.  Plaintiff

concedes this point by stating in his complaint that his allegations of "pressure" at most provide a

"'backdrop' for gender bias."  Compl. ¶ 481 (quoting cases where courts found that allegations

of pressure *plus* biased statements by university officials were sufficient to state an erroneous outcome claim).

In addition to being insufficient to meet the pleading standard for an erroneous outcome claim, Plaintiff's allegations of "pressure" fail to demonstrate that Mason has an anti-male bias. Courts have regularly held that allegations, such as those made by Plaintiff, about "pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—say nothing about the University's alleged desire to find men responsible because they are men."  *Doe v. Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017); *Loh,* 2018 U.S. Dist. LEXIS 53619, at *26 ("Doe's allegation of general pressure that the Dear Colleague letter supposedly exerted on *all* universities does not allow the inference that UMCP succumbed to such pressure, and that the pressure rendered a biased outcome in Doe's case."); *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017) (rejecting argument that "OCR previously investigat[ing] CCC regarding Title IX complaints, and subsequent publicity from that investigation pressured CCC to investigate and punish males more harshly"); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) ("[I]t is not reasonable to infer that UC has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding."); *Messeri v. Univ. of Colo.*, 18-cv-2658, 2019 U.S. Dist. LEXIS 162010, *41 (D. Colo. Sept. 23, 2019) ("[S]crutiny and criticism from the student newspaper does not say anything about the University's desire to find men responsible because they are men.").  Courts also reject attempts to use a university "rais[ing] the awareness of its faculty and staff to sexual assault" as a basis to allege gender bias against men.  *Univ. of Cincinnati*, 173 F. Supp. 3d at 602; *see also*

*Columbia Coll. Chi.*, 299 F. Supp. 3d at 955 (rejecting argument that events "such as 'Take Back the Night' and other public awareness events[ ] are anti-male").

Plaintiff's other allegations about Mason similarly fail to even suggest the possibility of anti-male bias.  Plaintiff has not offered a single allegation about a time in which Mason favored a female complainant at the expense of an accused male.  To the contrary, Plaintiff's factual allegations all relate to addressing sexual misconduct regardless of the gender of the perpetrator and victim.  Some of Plaintiff's allegations are just silly.  For example, how could Mason's former president joining a task force to combat sexual assault; or the Secretary of Education giving a speech at Mason on sexual assault on campuses; or the Vice President of CDE making the true statement that OCR could limit federal funds if it found a Title IX violation; or Dr. Hammat expressing her opinion about how sexual assault survivors (of all genders) might feel about new Title IX regulations, in any way demonstrate gender bias against men?  All of these examples fail because, as noted above, they incorrectly equate addressing sexual assault with bias in favor of females.  Likewise, Plaintiff's allegations about the use of trauma-informed investigation methods do not demonstrate gender bias given that both males and females can be victims of sexual assault.[8]  *See Messeri*, 2019 U.S. Dist. LEXIS 162010, *44 ("[T]he investigator's training in trauma-informed investigations is not inherently pro-female or anti-male.").

_____

[8] One of Plaintiff's allegations is that "Dr. Hammat met with members of the Women and Gender Studies Department and agreed to implement their demands into GMU's Title IX process, including the use of a trauma informed approach" Compl. ¶ 484(c).  This allegation is based on an article in Mason's student newspaper which is cited in Plaintiff's complaint, *see* Compl. ¶ 110, and is attached as Ex. 14.  The article lists the demands being made which contain no references to the gender of the parties involved in sexual misconduct cases and have no anti-male or pro-female biases.  The demands are also concerned with a fair process for all.  For example, one of the demands is that "the hearing process be equitable, realistic in its needs, and trauma informed." *Id* at 2.

Plaintiff's allegations not only fail to demonstrate anti-male bias, they undercut Plaintiff's position.  Plaintiff notes a Washington Post article reporting on another Mason professor accused of making sexual advances towards students.  But the complaining student in that case was a man.  *See* Compl. ¶ 122.  To the extent that incident put any pressure on Mason, it was to address sexual misconduct by professors towards students regardless of the gender of the parties.  Even more problematic for Plaintiff are the allegations he makes about Mason's decision to hire Justice Kavanaugh as an adjunct law school professor.  The allegations about Mason's response to pressure to fire Justice Kavanaugh disprove Plaintiff's claim that Mason has a gender bias against male faculty members accused of sexual misconduct.  Even though Justice Kavanaugh was a male publicly accused of sexual assault on a female, Mason not only hired Justice Kavanaugh but "h[e]ld its ground on the Kavanaugh hiring decision," Compl. ¶ 133, in the face of pressure from faculty and students.  Plaintiff has pled himself out of a claim by including in his complaint allegations that demonstrates clearly that Mason is not biased against males and is not succumbing to public pressure to punish males accused of sexual misconduct.[9]

Plaintiff's own allegations also demonstrate that to the extent that Mason is under any pressure to protect sexual assault victims (which as explained above is not the same thing as being anti-male), it is under an equal if not greater pressure to ensure that individuals accused of sexual misconduct are provided with a fair, bias-free process—as Plaintiff was here, *see infra*.  As the Complaint alleges, under the current administration, the Department of Education has

---

[9] To the extent the allegations about Justice Kavanaugh could support Plaintiff's position, Plaintiff has a temporal problem.  Justice Kavanaugh hiring was publicly announced in "late March 2019," Compl. ¶ 128, more than a month after the letters of determination in Plaintiff's case were issued.  Therefore any "pressure" resulting from protests against his hiring could not have impacted the decision in Plaintiff's case.

made clear through its new proposed Title IX regulations that it is focused on ensuring that the accused receive a fair grievance process. *See* Compl. ¶ 79, 80.  Likewise, Plaintiff's complaint details how the AAUP, the leading union for university faculty, has advocated to ensure universities provide a fair process to faculty accused of misconduct, *see id.* ¶¶ 87-96, and how Mason's own faculty has pressured Mason on this issue, *id.* ¶¶ 385-92.  And Plaintiff's lawsuit itself is indicative of the primary Title IX related litigation universities face:  lawsuits by individuals found responsible for sexual misconduct claiming Title IX and due process violations. *See Marymount*, 297 F. Supp. 3d at 582 (noting the "spate of actions where a male student accused of sexual assault sues his university or college alleging gender discrimination in violation of Title IX").  Therefore, taken as a whole, the Complaint alleges that Mason was facing pressure to protect both sexual misconduct victims and the rights of those accused of sexual misconduct, like Plaintiff.  No reasonable inference of a bias against men can be made from any of these allegations.

*   *   *

Plaintiff has failed to allege any facts that demonstrate gender bias on the part of Mason.  To the contrary, his complaint contains allegations that explicitly contradict this necessary element of his claim.  As such, Plaintiff has both failed to plead facts sufficient to state an erroneous outcome claim and has "pled himself out" of such a claim.

### B. Plaintiff Has Not Alleged Particular Facts Casting Doubt on the Outcome of the Title IX Investigation; To the Contrary the Complaint Confirms that the Outcome Was Correct.

Even if Plaintiff had alleged sufficient facts to demonstrate that gender bias caused the outcome of his Title IX case, his claim would still fail because he has not pled facts casting doubt on the outcome.  Plaintiff tries to satisfy this prong by arguing (1) that the outcome of his case was incorrect and (2) that he "was deprived of due process in all respects."  Compl. ¶ 482-

19

83.   To the contrary, his complaint admits that most of the finding of the investigation are correct and that he received due process.

### 1.   The Complaint Admits That Most of the Factual Findings Are True.

An erroneous outcome claim is not a basis for a court to second guess the internal processes of universities to investigate and adjudicate violations of Title IX.   "We do not believe that Congress meant Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming.   If no doubt exists based on the record before the disciplinary tribunal, the claim must fail."   *Yusuf*, 35 F.3d at 715.   The Court need look no further than Plaintiff's own complaint to see that the "evidence of the offense . . . is overwhelming."   *Id.*   While the Complaint spends a great deal of ink trying to explain away Plaintiff's comments and actions, Plaintiff ultimately concedes that most of the factual findings of the Title IX investigation are true.[10]   Those admissions are fatal to his claim. *See Armstrong v. James Madison Univ.*, No. 16-cv-00053, 2017 U.S. Dist. LEXIS 25014, at *21 (W.D. Va. Feb 23, 2017) (dismissing erroneous outcome claim where plaintiff "readily admits that he made unsolicited advances on two student-employees"); *Marshall v. Ohio Univ.*, No. 15-cv-775, 2015 U.S. Dist. LEXIS 155291, at *16 (S.D. Ohio Nov. 17, 2015) (dismissing erroneous outcome claim where Plaintiff "affirmatively allege[d]" that he sent inappropriate text messages and as such "no doubt is cast about the determination that [plaintiff] violated the Policy").

---

[10] The Complaint also conflates *allegations* with the *actual findings* of the investigation. Plaintiff spends a great deal of time disputing the *allegations* that were made, *see e.g.*, Compl. ¶¶ 266-77, many of which were not included in the findings of the Title IX investigation because there was insufficient evidence to corroborate the allegation, *see, e.g.,* ¶ 307 (acknowledging that Mason indicated in the letter of determination when there was not corroborating evidence to support an allegation).   These allegations are irrelevant because allegations that were not included in the factual findings cannot be the basis of an erroneous outcome claim.

The Complaint admits that the following factual findings of the investigation regarding

Plaintiff's conduct are correct:

- The Letter of Determination for Complainant 4 found that Plaintiff "confirmed that you and your graduate students ended up in [Plaintiff's] hot tub, discussing life, wellness, research, and a recent sexual experience you personally had in Germany." Ex. 8. The Complaint concedes that Plaintiff spent time in his hot tub with his graduate students at his home and shared a story about his experience at a brothel in Germany. *See* Compl. ¶ 341-42.

- The Letter of Determination for Complainant 4 found that Plaintiff admitted that while at a bar he asked a graduate student what kind of pornography she liked to watch. Ex. 8. The Complaint concedes that this occurred. *See* Compl. ¶ 337-38.

- The Letter of Determination for Complainant 4 found that Plaintiff went to a strip club with his graduate students and took a photograph of Complainant 4 receiving a lap dance. Ex. 8. The Complaint concedes that this occurred (the Complaint also admits that Plaintiff "joked" about blackmailing Complainant 4 with the photograph). *See* Compl. ¶ 347.

- The Letter of Determination for Complainant 4 found that at a conference, Plaintiff had a conversation with graduate students about the prior evening's sexual activity. Ex. 8. The Complaint concedes that at the conference Plaintiff had a "discussion with his graduate students about sexual encounters that occurred on the trip." Compl. ¶ 344.

- The Letter of Determination for Complainant 4 found that while at a conference Plaintiff discussed with students an intimate sexual encounter he had with a woman in Hanoi. Ex. 8. The Complaint concedes that this conversation occurred. *See* Compl. ¶ 353.

- The Letter of Determination for Complainant 4 found that Plaintiff often discussed sex with his graduate students. Ex. 8. The Complaint concedes that Plaintiff spoke about sexuality with his graduate students. Compl. ¶ 326.

- The Letters of Determination for Complainants 1 and 2 found that Plaintiff shared a story with his class about performing oral sex in public. Exs. 5 & 6. The Complaint concedes that Plaintiff told a story during class about him performing oral sex on a woman at a party. Compl. ¶ 252.

- The Letter of Determination for Complainant 2 found that Plaintiff "shared a conversation with the class regarding the number of sexual partners" he

has had. Ex. 6.   The Complaint concedes that Plaintiff shared this information during class.  Compl. ¶ 292.

- The Letter of Determination for Complainant 2 found that Plaintiff shared a story about a trip to Kuwait that involved swimming in the ocean and was described by other students in the class as "erotic."[11]  Ex. 6.  The Complaint concedes that Plaintiff told a story about a trip to Kuwait that included erotic components.  Compl. ¶ 262 (describing story shared in class about trip to Middle East that involved a visit to an area "populated by illegal mistresses" and a road "known as 'love street'").

- The Letter of Determination for Complainant 3 found that at a conference Plaintiff made comments to Complainant 3's then-boyfriend about the two of them dating.  Ex. 7.  The Complaint concedes that Plaintiff and "Complainant 3's boyfriend often engaged in banter of a personal nature about their relationships and other topics."  Compl. ¶ 306.

In short, the Plaintiff has pleaded himself out of an erroneous outcome claim by admitting in his complaint to exactly the conduct for which he was found responsible—repeated instances of inappropriate sexual conversations and activities with graduate students.  *See Armstrong*, 2017 U.S. Dist. LEXIS 25014, at *21; *Marshall*, 2015 U.S. Dist. LEXIS 155291, at *16; *see also Northern Trust Co.*, 69 F.3d at 129 ("[A] party can plead himself out of court by unnecessarily alleging facts which . . . demonstrate that he has no legal claim.").

Unable to dispute the truth of the findings, the Complaint makes a number of irrelevant allegations in an attempt to distract from his admissions.  The Complaint attacks the credibility of the complainants, but as detailed above Plaintiff has admitted to most of the conduct for which he was found responsible.  The Complaint incredibly tries to claim that the sexual conversations were pedagogical or research related, but it is plain on the face of the Complaint that discussing personal sexual activity outside of the classroom, asking a student what type of pornography she enjoys while at a bar, visiting strip clubs with students, and spending time in a hot tub with

_____

[11] The original allegation was that the story involved "skinny-dipping."  Ex. 2.  This part of the allegation was not corroborated as noted in the Letter of Determination.  Ex. 6.

students have no pedagogical or research value.  Moreover, the reason Plaintiff engaged in this conduct is irrelevant; the question for an erroneous outcome claim is whether Mason erroneously concluded that the conduct occurred.  Here, Plaintiff's own complaint concedes that it did occur. As such, Plaintiff cannot successfully plead an erroneous outcome claim.

       2.   Plaintiff Received Due Process.

Plaintiff also tries to establish this element of his claim by alleging a list of supposed procedural flaws with Mason's investigation that deprived him of due process.  *See* Compl. ¶ 483.  The first problem for Plaintiff is that even if Mason ran a flawed process, **he has admitted in his complaint to most of the findings of the investigation.**  Therefore, regardless of the allegations about the process, there is no question that the outcome was correct.

Plaintiff is also incorrect that there were procedural irregularities or a deprivation of due process.  His list of supposed due process violations, *see* Compl. ¶ 483, consists of misrepresentations about the process and conclusory allegations.  It also demonstrates that Plaintiff has a gross misunderstanding of what is required under due process jurisprudence when an employment action is taken against a public employee.  The Supreme Court has made clear that in the case of **termination** the "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). As the Fourth Circuit has noted, *Loudermill*'s list of the due process required "was meant to be exhaustive." *Curtis v. Montgomery County Pub. Schs.*, 242 Fed. Appx. 109, 111 (4th Cir. 2007).

Here, however, Plaintiff was not terminated.  The only sanctions imposed on Plaintiff was a required sexual harassment training and a four-semester probationary period.[12]  *See* Compl. ¶ 393; Ex. 15.  Plaintiff continues to be a tenured member of Mason's faculty and has the ability to teach undergraduates, conduct research, and participate in University governance like all other members of the faculty. Therefore, since Plaintiff's sanctions fall far short of termination, it is questionable whether the due process described in *Loudermill* was constitutionally required.  *See Gilbert v. Homar*, 520 U.S. 924, 929 (1997) ("[W]e have not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination.").  Notwithstanding whether it was required, there is no question that Plaintiff was given the due process described in *Loudermill*.

Plaintiff was provided notices of the specific charges against him and provided with the applicable University policies and procedures.  *See* Exs. 1-4; *Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs*., 964 F.2d 1436, 1439 (4th Cir. 1992) (quoting *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir. 1986)) ("Notice is sufficient [ ] if it apprises the vulnerable party of the nature of the charges and general evidence against him.").  In *Loh*, 2018 U.S. Dist. LEXIS 53619, at *20, the court rejected an inadequate notice argument where the "Complaint and the incorporated attachments show that [plaintiff] presented to [the hearing officer] all of the arguments and defenses of which he now claims to have been deprived."  Plaintiff has identified no argument he was prevented from making because of inadequate notice.

---

[12] Plaintiff's conclusory allegations that the sanctions imposed here are "tantamount to dismissal," Compl. ¶ 394, need not be credited particularly when the Complaint pleads contrary facts and references a document showing that Plaintiff was not dismissed and continues to be able to engage in many of his duties as a professor.  *See* Compl. ¶ 393, *see also* Motion to Dismiss of Individual Defendants Part II.A; *Jeffery M. Brown Assocs. v. Rockville Ctr., Inc.*, 7 Fed. Appx. 197, 202 (4th Cir. 2001) (Court need not "accept as true . . . conclusory allegations in the complaint that are contradicted by the attachments.").

To the contrary Plaintiff alleges that he had the opportunity to present his arguments on several occasions.  The Complaint acknowledges that he was interviewed "on three occasions," Compl. ¶ 145, twice by Dr. Hammat, "the sole individual tasked with deciding the outcome of the allegations against Plaintiff." *Id.* ¶¶ 149, 150, 158.  The Complaint goes into great detail about how during these interviews, Plaintiff, while represented by counsel, had the opportunity to respond to the evidence and present his side of the story.  *See, e.g., id.* ¶253 (had the opportunity to explain the context of the story told during class about him performing oral sex on a woman in public); ¶ 269 (had the opportunity to deny statements attributed to him); ¶ 309-10 (had the opportunity to present evidence of communications with Complainant 3 and about incident alleged by her); ¶ 338 (had the opportunity to respond to allegation that while at a bar he asked a graduate student about what type of pornography she liked to watch); ¶ 341 (had the opportunity to explain why he believed there was nothing wrong with "hot tubbing" with graduate students).  He also had the opportunity to "provide a list or witnesses" and "over 150 pages" of documents to support his side of the story.  *Id.* ¶¶ 153-54.  After Plaintiff was provided with Mason's findings, Plaintiff had another opportunity to be heard when he "submitted a 38-page appeal to Mr. Williams with hundreds of pages of exhibits."  *Id.* ¶ 165.  All of this occurred *before* any sanctions were imposed.  After sanctions (which did not include termination) were imposed, Plaintiff had an opportunity to, and did, grieve the sanctions to a faculty grievance committee (which affirmed the sanctions).  *Id.* ¶¶ 400-10.  The Complaint clearly demonstrates that Plaintiff was given an opportunity to be heard.

Unable to deny that he received notice and several opportunities to be heard, Plaintiff tries to nit-pick the investigation in a futile attempt to distract from this inconvenient truth.  A similar strategy was rejected in *Loh* where the plaintiff also alleged "multiple procedural 'due

process' violations."  2018 U.S. Dist. LEXIS 53619, at *16.   The *Loh* court rejected the erroneous outcome claim because the complaint demonstrated that plaintiff "received adequate notice, a meaningful investigatory process, and sufficient opportunity to be heard by an independent decision making body" and therefore could "not plausibly allege[] a 'procedural or otherwise flawed proceeding."  2018 U.S. Dist. LEXIS 53619, at *20, 23, 25, *aff'm* 767 Fed. Appx. 489 (4th Cir. 2019).

Similarly here, nothing in Plaintiff's list, Compl. ¶ 483, demonstrate that he was denied due process or that Mason failed to follow its investigatory procedures.  Several of Plaintiff's complaints are just wrong.  For example, he was given notices that listed the specific alleged violations and the applicable policies (¶ 483(b)) and he had an opportunity to be heard (¶ 483(m)).  *See supra.*  Plaintiff is incorrect that Mason's procedures prohibited investigating conduct that occurred more than 180 days prior to the complaint (¶ 483(c)-(f)) or imposing interim measures while the investigation progressed (¶ 483(y)); both are allowed by the applicable policies.  *See, e.g.,* Exs. 1B, 3B, 4B, 4D (stating that complaints "should" be filed within 180 days, not that they *must* be filed in that time frame); Exs.4B & 4D (authorizing "interim emergency action until the conclusion of the investigation").

Plaintiff also misrepresents Mason's policy when he claims that it required the Title IX coordinator to "assume the 'complete veracity' of the complainants' allegations prior to investigating them."  (¶ 483(a)).  What the procedures actually say—which Plaintiff well knows because he quotes it in full in paragraph 239 of the Complaint—is "[a]ssuming the complete veracity of the allegations(s), CDE will make a threshold determination as to whether the allegations contained in the complaint constitute a violation of university policy . . . If the threshold determination indicates that an investigation is required, CDE will determine the

appropriate investigation process."  In other words, Mason does exactly what this Court does when evaluating a motion to dismiss.  Not only is this step not a due process violation, it actually protects accused parties from having to defend against facially meritless accusations.

Other "allegations" are nothing more than Plaintiff's *ipse dixit*, such as alleging without an iota of support that Mr. Williams and Dr. Hammat had a conflict of interest (¶ 483(k), (z)) or that the joint investigation of all the complaints somehow tainted the information gathering process (¶ 483(i)).  Some just rehash Plaintiff's claims that the individuals involved were biased (¶ 483(i), (j)) or Plaintiff's disagreement with the outcome (¶ 483(t)).  As demonstrated above, *see infra* Parts I.A, I.B.1, Plaintiff has failed to allege bias and has admitted to many of the findings.  Regardless, Plaintiff's disagreement with the outcome is not a basis to find a due process violation or a procedural irregularity.  Plaintiff also quibbles with the word choice in the Letters of Determination, complaining that Dr. Hammat used the phrase "CDE did find enough factual information" instead of "preponderance of the evidence" (¶ 483(u)), without explaining how the meaning of those two phrases differ or alleging that Dr. Hammat actually did not apply the preponderance of the evidence standard.

Finally, other assertions are based on a process that Plaintiff appears to have invented which bears no resemblance to Mason's procedures or what is required for due process in employment matters.  *See Armstrong*, 2017 U.S. Dist. LEXIS 25014, at *22 (finding plaintiff's claim of procedural irregularities "rings hollow" where claims were based on procedures that did not apply to plaintiff).  For example, Plaintiff complains that he was not allowed to cross examine witnesses (¶ 483(n)), but "[i]t is well settled that the accused is not entitled to 'trial-like' rights of confrontation or cross examination at disciplinary proceedings." *See Loh*, 2018 U.S. Dist. LEXIS 53619, at *22.  Similarly, Plaintiff complains that he was not given access to all

evidence collected during the investigation (¶ 483(l)), but "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive explanation be afforded as to permit [plaintiff] to identify the conduct giving rise to the dismissal and thereby enable him to make a response." *Linton*, 964 F.2d at 1440. Plaintiff's gripes about the contents of the determination letters are equally unavailing because there are no due process requirements for what must be in a decision (¶ 483(p)-(s), (u)-(x)). And some of the assertions simply make no sense, for example claiming that it was somehow a due process violation or a procedural irregularity for Mason to "use[ ] quoted statements" in the notice of investigation (¶ 483(g)).

In short, Plaintiff has not alleged a single way in which Mason deprived Plaintiff of due process or deviated from its established process for investigating allegations of sexual misconduct by employees. *See Marshall*, 2015 U.S. Dist. LEXIS 155291, at *16 (dismissing erroneous outcome claim where plaintiff failed to "allege[] that OU failed to follow its disciplinary proceeding procedures"). Plaintiff may wish that Mason had a different process, but absent some allegation of an actual deprivation of due process Plaintiff cannot state an erroneous outcome claim—especially when the outcome has been confirmed by Plaintiff's own admissions.

## II.   PLAINTIFF'S TITLE IX SELECTIVE ENFORCEMENT CLAIM MUST BE DISMISSED.

Plaintiff's entire selective enforcement claim consists of five paragraphs tacked on at the end of Count I. *See* Compl. ¶ 486-90. Plaintiff's selective enforcement claim is based on pure speculation that Mason has treated female professors accused of sexual misconduct differently than male professors accused of sexual misconduct. Plaintiff does not allege a single fact to support his claim. This failure is fatal to Plaintiff's claim because this Court has previously recognized that a comparator is required to sustain a selective enforcement claim. "[A] male

plaintiff' must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the school." *Fairfax Cnty.*, 2019 U.S. Dist. LEXIS 170577, at *10-11; *see also Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017) (dismissing selective enforcement claim where plaintiff did not allege similarly situated person "was treated more favorably by the University").

Plaintiff does not identify any female Mason professor accused of sexual harassment of students who was treated more favorably. Indeed, he admits that he has no such allegations and begs the Court to allow him to proceed to discovery because he does not have the information to properly plead his claim. *See* Compl. ¶ 489 n.74. "The Federal Rules of Civil Procedure do not permit such a fishing expedition." *Everett v. Redmon*, No. 16-CV-323-D, 2017 U.S. Dist. LEXIS 80876, at *17 (E.D.N.C. May 26, 2017) (rejecting argument that plaintiff should be allowed to proceed to discovery because "he cannot know whether the Housing Authority's termination of other employees was racially motivated" without discovery). "Allowing [plaintiff] to proceed to discovery . . . in the hope of finding a similarly situated [individual] on which to base his claim, would authorize the kind of fishing expedition *Iqbal* and *Twombly* meant to avoid." *Streno*, 278 F. Supp. 3d at 931 ("informational disadvantage does not excuse [plaintiff] from plausibly alleging causation").

The only comparator that Plaintiff does allege is Complainant 4, against whom Plaintiff filed a complaint for bad faith reporting. *See* Compl. ¶ 490. But Plaintiff's attempt to assert a selective enforcement claim based on Mason's treatment of Complainant 4 fails because he is a faculty member and she is a graduate student so they are not similarly situated. Additionally, the "two individuals must have engaged in the same conduct." *Fairfax County Sch. Bd.*, 2019 U.S. Dist. LEXIS 170577, at *11 (emphasis omitted). The only allegation about Complainant 4 is

Plaintiff's dubious (given his own admissions) and self-serving accusation that Complainant 4 made a bad faith report; Plaintiff, on the other hand, was found to have engaged in sexual harassment.  There are no similarities.  The selective enforcement claim must be dismissed.

### III.    Count I Should Be Dismissed With Prejudice.

As demonstrated above, despite filing a 162 page complaint, Plaintiff has failed to allege the necessary elements of a Title IX claim against Mason.  He has also affirmatively pled himself out of such a claim by alleging facts that demonstrate that (1) gender bias played no role in the outcome of his case, (2) the outcome in his case was not erroneous, (3) he received due process, and (4) he has no basis to assert selective enforcement.  Given Plaintiff's own allegations there is no way that he can replead to properly state a Title IX claim.  Therefore, Mason respectfully requests that the Court dismiss Count I with prejudice.

### CONCLUSION

For the foregoing reasons, Plaintiff's claim against Mason (Count I) should be dismissed with prejudice.

December 20, 2019                              RESPECTFULLY SUBMITTED,

_____/s/_____

Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu

*Attorney for The Rector and Visitors of George Mason University*

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record in this case.

_____/s/_____
Eli S. Schlam, Asst. Atty. Gen.
Virginia Bar Number 92987
George Mason University
4400 University Drive,
MS 2A3
Fairfax, VA 22030
Phone: (703) 993-2619
Fax: (703) 993-2340
eschlam@gmu.edu