**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 1:19-cv-01249-LO-MSN |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGE MASON UNIVERSITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE INDIVIDUAL**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S DUE PROCESS AND FIRST**
**AMENDMENT CLAIMS PURSUANT TO FEDERAL RULE 12(b)(6)**

---

**NESENOFF & MILTENBERG, LLP**

**363 Seventh Avenue, Fifth Floor**

**New York, New York 10001**

**(212) 736-4500**

**-and-**

**FARMER LEGAL, PLLC**

**5030 Sadler Place, #205**

**Glen Allen, VA 23060**

**(804) 325-1441**

**INTRODUCTION**

Plaintiff respectfully submits this memorandum of law in opposition to the Individual Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's due process (Counts II and III) and First Amendment (Count IV) claims (ECF Nos. 29-30). The motion should be denied.

Defendants assert that Plaintiff had no right to due process because he was not terminated. On this ground, they further argue that Plaintiff cannot allege deprivation of a constitutionally-protected property interest. Plaintiff need not have been terminated to plausibly allege the deprivation of a property interest in his tenured position as a full professor.

Defendants further argue that Plaintiff cannot allege that he was deprived of a constitutionally-protected liberty interest in his name and reputation because (i) he was not terminated and (ii) the charges were not made public. On the contrary, Plaintiff plausibly alleged that he suffered a significant demotion and was relegated to a "perilous detour" in, if not a "dead end" to, his career. Plaintiff also plausibly alleged publication, based on Defendants Williams and Renshaw disseminating information about the Title IX findings and sanctions to the Title IX complainants, faculty and students at George Mason University ("GMU").

Defendants concede that Plaintiff was entitled to notice and opportunity to be heard, and then argue that he received all the process he was due. Defendants ignore controlling case law to surmise that the due process rights articulated in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), do not apply to Plaintiff because he was not terminated. Plaintiff plausibly alleged that Defendants violated his right to due process because he could not review even a scintilla of evidence in the Title IX proceedings against him, he was not provided with notice of all of the allegations upon which the Title IX findings were based, and the administrator involved at

each stage of the process was biased. Defendants violated Plaintiff's clearly established rights and are not entitled to qualified immunity.

Defendants argue that Plaintiff's First Amendment claim should be dismissed because the statements at issue in the Title IX investigation (i) did not involve matters of public concern and, even if they did, (ii) they were made in Plaintiff's role as a public employee. As detailed below, both of these arguments fail under controlling free speech case law, both inside and outside the classroom of a university professor. This controlling case law further demonstrates that Defendants have no right to assert a qualified immunity defense with respect to Plaintiff' First Amendment claim.

## BACKGROUND

In Fall 2018, four (4) sexual harassment complaints were made against Plaintiff by graduate students in Plaintiff's Department, including: Complainant 4, whom Plaintiff had recently fired from his lab for poor performance; Complainants 1 and 2, who had already graduated from GMU; and Complainant 3, with whom Plaintiff had minimal contact over the course of her academic career. Compl. ¶¶ 3, 140, 142, 323, 369. Complainants 1-3 were all friends with Complainant 4 and Complainant 3 was also her roommate. *Id.* ¶ 5, 140.

With the exception of Complainant 3's allegations that Plaintiff gave her a hug on two occasions, two years apart (one of which was not substantiated), the allegations concerned no physical contact or romantic or sexual overtures. *Id.* ¶ 249, 287, 303, 335. Rather, they concerned an example that Plaintiff used in teaching Course A, in *Spring 2013*, and an example that Plaintiff used in Course B, in *Spring 2014*, as well as conversations Plaintiff had with his lab group—which conducted research on issues concerning human sexuality, including sexual pleasure and pornography—during social activities and at professional conferences. *Id.* No contemporaneous

complaints were made with respect to these statements. *Id.* There was, further, no evidence that the purportedly offensive statements denied the complainants access to, or interfered with, their educational opportunities in any way. *Id.* ¶¶ 247, 256, 259, 264, 285, 291, 297, 303, 309, 322-329, 342-343, 345-349, 365.

Defendant Jennifer Hammat ("Dr. Hammat"), GMU's Title IX Coordinator, commenced an investigation into the allegations even though GMU policy did not permit *post hoc* investigations on behalf of alumni and the majority of allegations were time-barred, dating back as early as 2013. *Id.* ¶¶ 142-143. Despite the lack of any evidence to support the allegation that Plaintiff engaged in any form of harassment with respect to any complainant, Dr. Hammat erroneously found Plaintiff responsible for violating GMU's Sexual Misconduct Policy with respect to all four complainants. *Id.* ¶¶ 247-359. Plaintiff, who worked at GMU for over 15 years and is a tenured, full professor, had no disciplinary record and stellar student and peer evaluations prior to the Title IX investigation. *Id.* ¶¶ 28, 31.

Dr. Hammat notified Plaintiff about the Title IX investigation by sending him four emails which stated only that potential violations of varying sexual misconduct policies had been alleged. Dr. Hammat did not specify the "charges" or the specific policy provisions applicable in the case of each complainant. Appended to each email were varying policies and grievance procedures. *Id.* ¶¶ 138, 249, 287, 301, 302, 333. Dr. Hammat emailed Plaintiff a total of five (5) different sexual misconduct policies and four (4) different grievance procedures. Exs. C-F. It is undisputed that Plaintiff had no opportunity to review any of the evidence supporting the charges against him. *Id.* ¶ 155. Dr. Hammat included findings in her determination letters which were based on allegations and information of which Plaintiff was never notified during the Title IX investigation. Exs. K-N. Dr. Hammat was also biased. *Id.* ¶ 66-78, 84, 112-127, 149-164, 197, 202, 207, 251-256, 260-265,

275, 278-284, 288-289, 304, 313-323, 331-332, 336, 339-340, 357-365. Defendant Julian Williams ("Mr. Williams"), Dr. Hammat's direct supervisor, who and denied Plaintiff's appeal was also biased. *Id.* ¶¶ 108-109, 116-120, 166, 259, 290, 302, 319, 323, 332, 336-341, 352, 359, 370-381, 401-403, 435, 483.z, 485 (h)-(i), 520-521; Ex. T.

After Plaintiff's appeal was denied, GMU faculty, including Plaintiff's supervisor, Defendant Keith Renshaw ("Dr. Renshaw") sent a memorandum to Defendant S. David Wu ("Provost Wu") outlining their grave concerns with the lack of due process in faculty disciplinary proceedings, including the failure to provide supporting evidence to faculty accused of misconduct, Mr. Williams' partiality as Dr. Hammat's supervisor, and the lack of proportionality between the severity of sanctions and the severity of allegations. *Id.* ¶¶ 385-392; Ex. O.

Dr. Renshaw was responsible for sanctioning Plaintiff. *Id.* ¶¶ 393-399. Plaintiff faced termination as a potential sanction. *Id.* ¶¶ 187(b), 190(b), 196, 206. The subsequent final Title IX sanctions imposed by Dr. Renshaw substantially impaired Plaintiff's ability to carry out his normal and required duties as a tenured professor because they imposed restrictions of an indefinite duration which could only be lifted at Dr. Renshaw's discretion, including banning Plaintiff from working with graduate students until at least Fall 2021. *Id.* ¶¶ 393-399; Ex. B. Plaintiff was also deprived of salary increases as a result of the sanctions. *Id.* ¶ 399. It is undisputed that Plaintiff had no notice regarding the sanctioning process or any opportunity to meet with Dr. Renshaw prior to his imposition of the sanctions. *Id.* ¶ 406.

As a result of Dr. Renshaw and Mr. Williams sharing information concerning Plaintiff's Title IX findings and sanctions, Professor 1 attempted to force Plaintiff to disaffiliate from his program. *Id.* ¶ 413-422. When Plaintiff refused, Professor 1 and a number of other professors filed an unauthorized grievance against Plaintiff with the Faculty Grievance Committee. Per GMU's

attorney, the Committee did not speak for the University. *Id.* ¶¶ 418-422, 442. The Committee "recommended" that Plaintiff either voluntarily disaffiliate from his program or that Dr. Renshaw disaffiliate Plaintiff from his program—a program which Plaintiff helped create and worked in for the entirety of his career. *Id.* ¶ 423; Ex. A. The only graduate students interested in working on Plaintiff's research are in his program. *Id.* ¶ 426. Regardless, Dr. Renshaw elected to disaffiliate Plaintiff from his program for at least **5-6 years** and with no clear path for reinstatement. *Id.* 455-457. Ex. G. He also forced three students who remained interested in working with Plaintiff— two of whom had defended Plaintiff in the Title IX investigation—to find new mentors. *Id.* ¶ 456. Like Dr. Hammat and Mr. Williams, Dr. Renshaw was biased. *Id.* ¶¶ 131, 427-429, 432-426, 444-445.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Doe v. Washington & Lee U.*, 2015 WL 4647996, at *1 (W.D. Va. 2015). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "'state a claim to relief that is plausible on its face.'" *Kirch v. Kowalski*, 2018 WL 3596028, at *1 (E.D. Va. 2018) (O'Grady, J.). Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* at *1.

## ARGUMENT

### I.  Plaintiff Plausibly Alleged A Procedural Due Process Claim[1]

---

[1] Plaintiff hereby withdraws his federal and state due process claims (Counts II and III) against Defendants Wu and Ardis, in their individual capacities, for money damages. Plaintiff believes that Defendants Wu and Ardis are indispensable parties in their official capacities because they have the authority to effectuate the injunctive relief sought in Counts II and III of the Complaint. *See Doe v. Rectors and Visitors of George Mason University ("GMU"),* 149 F. Supp. 3d 602, 624 & n. 22 (E.D. Va. 2016).

Defendants seek dismissal of Plaintiff's federal and state law[2] due process claims (Counts II and III) on the grounds that: a) he has not adequately alleged a deprivation of a property interest; b) he has not adequately alleged a deprivation of a liberty interest; and c) he received all of the due process protections to which he was entitled. For the reasons set forth below, these arguments are meritless and the Court should deny that portion of Defendants' motion seeking to dismiss Counts II and III of the Complaint.[3]

### A.    Plaintiff Plausibly Alleged Deprivation of a Protected Property Interest

Defendants do not dispute that Plaintiff has a property interest in his tenured position as a full professor at GMU. Moving Br. at 7. Rather, they dispute that Plaintiff has been deprived of that property interest because he was not terminated from his employment. *Id.* Defendants point to no bright line rule in this Circuit that *requires* that a public employee be terminated in order to plausibly allege a deprivation of his or her property interest in continuing employment. On the contrary, the "scope of a property interest in a fact-intensive inquiry that turns on the terms of the contract (or law) creating the property interest." *Garner v. Steger*, 69 F. Supp. 3d 581, 590-591 (W.D. Va. 2014) (holding that professor whose "monetary benefits and prestige"—not salary— were reduced by loss of laboratory subsidy and ability to control funding for additional researchers plausibly alleged deprivation of property interest). *See Willis v. City of Va. Beach*, 90 F. Supp. 3d 597, 604, 614 (E.D. Va. 2015) (20- and 40-hour suspensions constituted deprivation of property

---

[2] For the reasons stated in Points I.A., I.C. and I.D, Plaintiff's state law due process claim (Count III) should not be dismissed. Plaintiff is not asserting a state law claim with respect to his liberty interest. *See* Defs. Moving Br. at 19.

[3] Defendants assert that Plaintiff's claims for money damages against Defendants "in their official capacities" should be dismissed on Eleventh Amendment grounds. Moving Br. at 6. The Complaint clearly alleges claims for injunctive relief against the Defendants in their official capacities and claims for money damages against the Defendants in their individual capacities. Compl. ¶¶ 528-529, 534-535, 556-557. The Eleventh Amendment does not bar claims for money damages against Defendants acting in their individual or personal capacities. *See Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F. 3d 292, 306 & n. 13 (4th Cir. 2006).

interest); *Wilkinson v. School Bd. of Cnty. of Henrico*, 566 F. Supp. 766, 769 (E.D. Va. 1983) (plaintiff had property interest in not having employment interrupted by suspension).

Defendants also attack the propriety of Plaintiff's due process claim, raising the specter of Rule 11, because he alleged that the severe sanctions imposed on him were "tantamount to dismissal." Defs. Moving Br. at 10 & n. 8. Yet the facts set forth in the Complaint, including the impact of the sanctions, strongly support this claim. *See, e.g. Ridpath v. Board of Governors Marshall University*, 447 F. 3d 292, 310 (4th Cir. 2006) (reassignment of employee was neither voluntary nor innocuous transfer—despite salary increase—rendering it "tantamount to outright discharge"). Defendants ineffectively attempt to minimize the impact of the alleged sanctions by mischaracterizing them as a mere probationary period in which Plaintiff's job requirements barely changed. In fact, the sanctions imposed on Plaintiff have hobbled his career and his ability to carry out his required duties as a full professor at GMU.

Plaintiff alleged that, as result of the biased and flawed Title IX proceedings, Dr. Hammat's erroneous findings and Mr. Williams' denial of his Title IX appeal, Dr. Renshaw first issued sanctions which substantially impacted his ability to fulfill his role as a full professor and cost him at least two forms of salary increase. Compl. ¶¶ 393-399. Then, as a result of the Faculty Grievance Committee's recommendation,[4] which neither he nor Dr. Renshaw were obliged to follow, Dr. Renshaw disaffiliated Plaintiff from his program, rendering Plaintiff unable to effectively fulfill his role as professor. Compl. ¶¶ 412-459.

Contrary to Defendants' assertions, the sanctions imposed on Plaintiff are not temporary in nature and, even if they were, would not preclude his due process claim. Dr. Renshaw's first

---

[4] Defendants criticize Plaintiff for failing to include the members of the Faculty Grievance Committee as defendants. First, GMU never disclosed the identities of the Committee members to Plaintiff, other than the Chair. He received no information about their decision-making process. There was, further, no basis to do so because Committee did not have the authority to disaffiliate Plaintiff from his program, only to issue a decision that was akin to an advisory opinion. *See* Compl. ¶ 441 (noting that Committee "does not speak or act for the University").

sanction letter, (Ex. B), imposed restrictions on Plaintiff's continuing employment at GMU that were, in fact, of an ***indefinite duration***:

1) Plaintiff was ineligible to recruit new graduate students to work under his mentorship and supervision. While the sanction letter states that this restriction is in place for over two years (until August 15, 2021), it also says that Plaintiff's return to working with graduate students is subject to Dr. Renshaw's, and the Dean's, discretion as to whether Plaintiff has exhibited "sufficient behavioral change." Compl. ¶ 393. The reason why Plaintiff has alleged that this indefinite restriction was tantamount to dismissal is because, in effect, Plaintiff could be prevented from ever conducting research with graduate students, who comprised the necessary human capital needed to conduct his research, ***ever again***. *Id.* ¶ 395. Plaintiff further alleged that the restrictions will have a long lasting, chilling effect on his work. *Id.* ¶ 396.

2) The monitoring and reporting requirements imposed by Dr. Renshaw are vague enough that it would be easy for Dr. Renshaw to argue that Plaintiff violated the conditions of the sanction, preventing him from resuming his supervision and mentorship of graduate students ***at any point in time***—even if Dr. Renshaw and the Dean allow him to resume working with graduate students in 2021. *Id.* ¶ 397.

3) Per the sanction letter, if Plaintiff is allowed to resume supervising graduate students in his lab, Dr. Renshaw and the Dean "will make the determination if any continuing restrictions are necessary." *Id.* ¶ 398. Thus, by the plain language of Dr. Renshaw's letter, Plaintiff is not merely on probation for ***two years***—the potential timeframe in which he will be restricted from his core responsibility of working with graduate students is ***indefinite***.

Ex. B. Plaintiff further alleged that he was deprived of compensation as a result of Dr. Renshaw's sanction because he is ineligible for salary increases to which he would have been entitled, as well as any merit-based pay raises, for an indefinite period of time. Compl. ¶ 399.[5]

After the Title IX sanctions were imposed, and faculty began spreading rumors about Plaintiff around the Department. Professor 1 attempted to force Plaintiff to disaffiliate from the program within which he had worked for his entire career. Professor 1 offered the sham excuse that the program could lose its accreditation if Plaintiff remained part of it—which Plaintiff learned from the accrediting association was untrue. Compl. ¶¶ 413-416. Professor 1 had no

---

[5] Subsequent to the filing of the Complaint, Plaintiff also lost Department funding for his research.

authority to impose additional sanctions on Plaintiff or to amend the sanctions already imposed by Dr. Renshaw. *Id.* ¶ 417. When Plaintiff refused to voluntarily disaffiliate from the program, Professor 1, along with 7 other professors, filed a grievance with the Faculty Grievance Committee, pursuant to which the Committee took it upon itself to review the sanctions imposed on Plaintiff under GMU's Grievance Procedures for *Title IX* investigations. The Title IX Grievance Procedures provided for no such level of review. *Id.* ¶¶ 418-422; Exs. C-F (appended policies and procedures). The Grievance Committee recommended that Plaintiff either voluntarily disaffiliate from the program or that Dr. Renshaw disaffiliate Plaintiff. Ex. A. Because the Committee is an internal faculty body "that does not speak for the University," Dr. Renshaw was not obligated to follow this recommendation. *Id.* ¶ 442.

When Plaintiff elected not to acquiesce to the Committee's recommendation and disaffiliate from his program, Dr. Renshaw elected not only to disaffiliate Plaintiff, but to do so for **5-6 years**. Compl. ¶¶ 455-457. Ex. G. Plaintiff was banned from teaching any courses or seminars in the program, participating in program-related brown bag lunches, conducting program-related research with doctoral students, serving on committees and serving as a mentor. *Id.* ¶ 455. Though three of Plaintiff's graduate students in the program (male and female)—who decried the allegations that Plaintiff created a hostile environment—wanted to continue working with Plaintiff, Dr. Renshaw forced them to separate from his mentorship. Compl. ¶ 456.[6] Whether or not Plaintiff can ever re-affiliate with the program is an open question, left to the discretion of whomever heads the Department and the program in or around 2026, whether there are any procedures in place at

_____

[6] Defendants falsely assert that "Plaintiff was allowed to continue to work with existing graduate students under his mentorship, if those students chose to continue working with him." Defs. Moving Br. at n.7. *Compare* Ex. B *with* Ex. G.

that point to do so and Plaintiff "may be asked to provide evidence of behavioral change in support of [his] request." Ex. G.

Disaffiliation was a form of banishment from a program that Plaintiff heavily contributed to and helped establish. Compl. ¶ 423. Moreover, the only students who have shown interest in Plaintiff's research at GMU are students in the very program from which he was disaffiliated. *Id.* ¶ 426. As alleged in the Complaint, "the new severe sanctions imposed on Plaintiff were the final blow to Plaintiff's research and professorship" and "rendered his position untenable." *Id.* ¶ 457. Clearly, Defendants were asserting pressure on Plaintiff in order to force his resignation by stripping him of every meaningful aspect of his professorship. Plaintiff has not caved to this pressure.

Contrary to Defendants' assertion, the sanctions outlined above are a far cry from a mere "change in assignment," "reassignment of duties" or change in "physical location," as referenced in Plaintiff's appointment letter. *See* Defs. Ex. 5. Moreover, the *University* did not undertake the implementation of additional sanctions on Plaintiff—per University counsel the decision of the Faculty Grievance Committee to disaffiliate Plaintiff was not the University's decision. Compl. ¶ 442. Pursuant to his appointment letter, Plaintiff is required to make his "best efforts to successfully perform his duties." Defs. Ex. 5, Attachment A, page 3. The sanctions imposed by Dr. Renshaw have made it essentially impossible to comply with this provision.

Defendants do not address that the Faculty Handbook, and the very provisions upon which the Faculty Grievance Committee relied in recommending Plaintiff's disaffiliation, provides that "*[i]n all cases, the parties have a right to procedural due process*." Defs. Ex. H, Section 2.10.2 (emphasis added).

Defendants also fail to address that GMU's Sexual Misconduct Policies, which are incorporated by reference into the Faculty Handbook and were relied upon by Dr. Renshaw and the Faculty Grievance Committee, require due process for all individuals involved in the process. *See, e.g.* Ex. C-D, Policy 2006-14, Section IV; Ex. E-F, 2016-2017 Sexual Misconduct Policy, Section III (mandating thorough and impartial investigation, notice, opportunity to present witnesses and evidence and view evidence).

Defendants also attempt to minimize the impact of Dr. Renshaw's sanctions on Plaintiff's tenure, spanning over the next 6 years with no finality, by offering for the Court's review a few lines concerning faculty work assignments while conveniently omitting the Faculty Handbook provisions concerning faculty evaluations. Defs. Moving Br. at 9; Defs. Ex. 4. Defendants also set forth the type of work that faculty assignments include, but ignore that these assignments must be "equitably allocated" and ensure "fairness and equity throughout the University." Ex. H, 2.10.3 at 47-48.

With respect to evaluating tenured faculty, the Faculty Handbook sets forth criteria for annual evaluations, which are the "primary basis for determining salary increases." Ex. H, 2.6.1, at 28. The evaluations examine whether professors are effective teachers, including with respect to "the training and supervision of teaching assistants, mentoring graduate students, clinical and field supervision of students and student advising." *Id.* Section 2.4.1. Dr. Renshaw's sanctions bar Plaintiff from engaging in any of these activities for an unlimited period of time.

Tenured faculty are also evaluated for scholarly achievement, or original publications and peer-reviewed contributions which, as set forth *supra*, will be impacted in Plaintiff's case by his lack of graduate student staff (even though students wanted to continue working in his lab). *Id.* Section 2.4.2. A third component of faculty evaluations is University and professional service. *Id.*

Section 2.4.3. This requires participation in faculty meetings, governance and operational activities outside the classroom. *Id.* Plaintiff has been banned from participating in meetings, and sitting on committees, in his program. His lack of ability to participate will surely negatively impact his evaluations going forward. Tenured faculty who receive two "unsatisfactory" reviews in a four-year period may be terminated. *Id.* Section 2.6.2. Given these provisions, Defendants cannot reasonably argue that the sanctions imposed on Plaintiff are a mere probationary process with minimal impact on his tenure.

Defendants concede that the Court may not consider evidence outside the scope of the Complaint and then include this purported evidence in their brief anyway. Such tactics should not be countenanced by this Court. Defs. Moving Br. at n. 8.[7] Missing from Defendants' purported evidence are facts concerning the invaluable role that graduate students play in assisting faculty with their research, including by providing the human capital necessary to timely complete the projects funded by research grants. Indeed, graduate students comprise the majority of staff that Plaintiff worked with in his lab over the course of his career at GMU. Compl. ¶¶ 28, 394-396, 426. A professor's inability to utilize graduate students to conduct research can hobble a given project and result in a loss of funding. By way of example, the removal of graduate students from Plaintiff's lab is the equivalent of removing all middle management executives from a company, and leaving the Chief Executive Officer to work with the least skilled and experienced employees to try and keep the company functioning. Such a position is untenable.

Defendants' assertion that Plaintiff's submission and publication of articles in 2019 evidences a lack of harm is also misleading. Defs. Moving Br. at n. 8. For example, Complainant 4

---

[7] Plaintiff responds to Defendants' assertions in kind even though they are improper, outside the scope of the pleading, and raise questions of fact that cannot be resolved at this stage. Should the Court elect to consider evidence outside the scope of the pleadings, Plaintiff requests the opportunity to submit responsive evidence and/or testimony to the Court concerning these issues.

is listed as co-author of one of the articles, indicating that it was researched, and written, before Complainant 4 was fired from Plaintiff's lab in September 2018. Compl. ¶ 331. Certain of the co-authors of other articles listed were in Complainant 4's lab group and graduated from GMU in May 2019. Moreover, it is silly for Defendants to assert that articles *published* or *submitted for publication* in 2019 involve research conducted by Plaintiff in the few months after Dr. Renshaw imposed sanctions on Plaintiff (on May 31, 2019 and then again on September 17, 2019). Compl. ¶¶ 449.[8]

While Defendants point to a research grant that Plaintiff was recently awarded as evidence of how well they believe he is doing, they provide no context, such as whether Plaintiff has historically relied on research grants or if his Department cut off his research funding because he can no longer work with graduate students. Surely Plaintiff would need additional monies to close any gaps resulting from Dr. Renshaw's sanctions. Defendants' assertion that a job posting for post-doctoral students is the equivalent of having adequate staff to support Plaintiff's research is also baseless, particularly since Defendants do not assert that Plaintiff has been able to hire any replacement staff. The same can be said for the assertion that having more laboratory space signifies more than just that.

The cases relied upon by Defendants to argue that Plaintiff has not been deprived of a protected property interest are readily distinguishable from the facts at hand. In *Huang v. Board of Governors of the University of North Carolina*, 902 F.2d 1134 (4th Cir. 1990), addressing the district court's prior summary judgment ruling, the appellant was merely transferred to another department where his "expertise …would be effectively employed," and he remained employed at the same, or greater, compensation. *Id.* at *1142. The appellant also received a full, nine-day

---

[8] Plaintiff's participation in conferences is also neutral evidence—it could be that the conferences were scheduled well in advance of his disaffiliation from Dr. Renshaw's imposition of either round of sanctions.

hearing prior to any determination being made with respect to his employment. *Id.* at **1137, 1142. Here, Plaintiff alleged that he is ineligible for any salary increases, as well as merit-based pay raises, for an indefinite period of time and, as detailed *supra*, he is no longer "effectively employed" because of both the immediate and long-term effects of Dr. Renshaw's sanctions. Dr. Renshaw simply disaffiliated Plaintiff from his program. Unlike *Huang*, there was no effort to place Plaintiff in another program within his Department and, therefore, no reassignment. *See* Ex. G. It is unheard of that a professor would be completely isolated by not being affiliated with any program within a Department.

In *Royster v. Board of Trustees of Anderson County School District*, 774 F.2d 618 (4th Cir. 1985), the Fourth Circuit reversed a directed verdict in the plaintiff's favor because the plaintiff received all of the compensation and benefits that were due for the term of his employment contract. *Id.* at 621. Here, Plaintiff is a GMU employee "elected without term," or with tenure, that has been deprived of salary increases. Unlike the plaintiff in *Fields v. Durham*, 909 F.2d 94, 98 (4th Cir. 1990), Plaintiff has not alleged that he is entitled to perform a particular job or even work in a particular program of his Department. As detailed *supra*, the sanctions imposed on him have deprived him of the ability to perform the critical duties required of him in order to maintain his tenure, including working within the program that he was affiliated with for the entirety of his career. *See, e.g. Garner*, 69 F. Supp. 3d at 590-591. *See also Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 900-01 (8th Cir. 1994) ("An employee can have a protected property interest in a benefit, such as a particular assignment or duty station, if he legitimately expects to continue in that assignment or duty station."). Plaintiff's case is also readily distinguishable from *Cominelli v. The Rector and Visitors of the University of Virginia*, 589 F. Supp. 2d 706, 713-714

(W.D. Va. 2008), in which the plaintiff asserted that he had a property interest in an *at-will* position as director of his department.

**B.    Plaintiff Plausibly Alleged Deprivation of a Protected Liberty Interest**

Defendants do not dispute that Plaintiff has sufficiently alleged that the charges against him placed a stigma on his reputation and were false. Defs. Moving Br. at 12. Rather, Defendants assert that Plaintiff "has not, and cannot plead" that (1) the charges were made in conjunction with his termination or demotion and (2) that they were made public. *Id.* As set forth below, Defendants' arguments are meritless and the Court should deny defendant's motion to dismiss Plaintiff's due process claims.

**1.    Plaintiff Plausibly Alleged That the Sanctions Imposed Constitute A Significant Demotion**

A procedural due process claim grounded in the deprivation of a liberty interest is sufficiently alleged for purposes of a motion to dismiss where the plaintiff alleges "a significant demotion [which] may include the reassignment of an employee to a position outside his field of choice." *Ridpath*, 447 F.3d at 310. In evaluating the "gravity of a change in assignment, a court may consider surrounding circumstances; for example, a reassignment involving threats to the employer's career has a greater likelihood of being significant." *Miller v. Hamm*, 2011 WL 9185, at *9 (D. Md. Jan. 3, 2011) (citations omitted) (plaintiff sufficiently pleaded significant demotion where reassignment excluded him from flying helicopters for law enforcement and assigned him to foot patrol). *See Hall v. City of Newport News*, 469 Fed. Appx. 259, 262 (W.D. Va. 2012) (significant demotion pleaded where plaintiff, though still an employee, was stripped of his law enforcement duties, and reinstated position "excluded him from his calling"). In *Ridpath*, the Fourth Circuit found that this element was satisfied by the Plaintiff's allegations that, among other things, he was banished from the department in which he worked, and relegated to a position that

constituted a "perilous detour" or "dead end" to his career. *Id.* As fully detailed *supra* Point II.A, Plaintiff alleged that, while he is still employed, the sanctions that Dr. Renshaw imposed banished him from the program that he worked in for the entirety of his career, and which supported his research, for at least six years. Plaintiff further alleged that the prohibition on working with graduate students (including those who elected to continue working with him) has prevented him from fulfilling his duties as a professor. Being banished from his program is no different from the public employees in *Ridpath*, *Miller* and *Hall* who remained employed, but were relegated to jobs that were not reflective of their chosen careers. Per the allegations of the Complaint, Plaintiff's ability to continue on his chosen career path has been crippled by Dr. Renshaw's sanctions.[9]

## 2.  Plaintiff Sufficiently Pleaded Publication

Where, as here, a plaintiff alleges that stigmatizing statements were made to faculty, students, and staff, then "there is at least a question as to whether such disclosure constitutes 'public' disclosure." *Garner*, 69 F. Supp. 3d at 581. *See Cannon v. Village of Bald Head Island,* 891 F.3d 489, 503 (4th Cir. 2018) (under *Sciolino* standard publication occurred when employer sent email to employees stating that employees were terminated for sexual harassment). Plaintiff alleged that: a) he was approached by students asking whether the University punished him for engaging in sexual misconduct and whether he had been prohibited from taking on new students for the upcoming year—whether these students learned about the restriction from Complainants 1-4 or GMU faculty, there was no basis in any University policy (or under the applicable OCR 2017 Guidance) for informing Complainants 1-4, or faculty, about this restriction (or any

---

[9] *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 617 (E.D. Va. 2015), is distinguishable from the present facts because the *Willis* plaintiffs alleged nothing more than a conclusory assertion that they lost pay opportunities "and many other benefits of employment" without any explanation or other supporting allegations. In *Echtenkamp v. Loudon Cty.*, 263 F. Supp. 2d 1043 (E.D. Va. 2003), the restrictions imposed on the plaintiff concerned only 5% of her job responsibilities. *Id.* at 1051. In *Cominelli*, the plaintiff alleged that he was removed from administrative positions but that he remained, and was able to carry on his duties as, a member of the faculty. 589 F. Supp. 2d 715.

subsequent sanctions) (Compl. ¶¶ 382-384; Ex. I; Exs. C-F (appended policies and procedures));

b) Student 1 told Plaintiff that faculty in the Department were telling their students about the Title

IX proceedings and sanctions against Plaintiff (*Id.* ¶ 412); c) Professor 1 was informed about the

Title IX proceedings and sanctions, which caused her to file a sham grievance against Plaintiff (*Id.*

¶¶ 413-426); d) CDE, helmed by Mr. Williams, provided Professor 1 with copies of the Title IX

findings against Plaintiff (and potentially more documentation, as yet undetermined) without

Plaintiff's knowledge (*Id.* ¶ 427); e) Professor 1 disseminated Plaintiff's Title IX documents to at

least nine other professors (*Id.* ¶¶ 427, 432-436); f) Dr. Renshaw led a meeting with the full faculty

of Plaintiff's Department with a focused discussion of the details of Plaintiff's case (*Id.* ¶ 510);[10]

and g) the Title IX sanction letter was permanently placed in Plaintiff's personnel file (*Id.* ¶ 394).[11]

*See also* Compl. ¶¶ 503-511.[12] Defendants' general disclosure of Plaintiff's Title IX findings and

sanctions to University faculty and students is sufficient to preclude dismissal at this stage of the

proceedings.

      While Defendants argue that only "internal" disclosures were alleged, it cannot reasonably

be argued that disclosure to an entire Department, and students, was not a public disclosure. *See*

Defs. Moving Br. at 13. The cases cited by Defendants in support of this argument are inapposite.

In *Scott v. Va. Port Auth'y*, 2018 WL 3232825 at *17 (E.D. Va. Feb. 7, 2018), the plaintiff alleged

---

[10] After the Complaint was filed, the faculty who filed the grievance against Plaintiff held a "town hall" meeting about Plaintiff with the graduate students in the program. Plaintiff was not notified that this would occur. He found out about the meeting from graduate students that approached him about it. Professor 1, still not satisfied, also took it upon herself to meet with the heads of other programs in Plaintiff's Department to tell them that he had been disaffiliated from her program. Plaintiff was not notified that this would occur.

[11] Defendants' bald assertion that "several allegations are false," (Defs. Moving Br. at 13), need not be considered by the Court as this is an issue that will be ferreted out in discovery.

[12] Since the Complaint was filed, Plaintiff has learned about additional disclosures of which he was not informed and which indicate that the persons informed about Plaintiff's Title IX proceedings at GMU publicly disclosed the information beyond the walls of the University, including to government organizations through which Plaintiff has received grant funding. Should the Court find that dismissal of Plaintiff's stigma-plus claim is warranted based on a lack of publication, Plaintiff requests that it be dismissed without prejudice so that Plaintiff may have the opportunity to replead this element of his claim.

not only that the information in question was disclosed to his co-workers, but placed in his personnel file, which would likely be requested by prospective employers. Here, Plaintiff has alleged a number of disclosures, including to members of the public (*e.g.* students at GMU) and that the Title IX sanctions letter will permanently reside in his personnel file. In *Adler v. VCU*, 259 F. Supp. 3d 359, 409 (E.D. Va. 2017), the court found that the plaintiff's allegation that an audit report circulated to decisionmakers in an internal investigatory process did not meet the publication requirement. *Id.* at 403-404. Here, Plaintiff has not alleged publication via the transmission of the Title IX findings or related documentation amongst or between the decisionmakers involved in that process. Unlike *Willis*, 90 F. Supp. 3d at 617, and *Echtenkamp*, 263 F. Supp. 2d at 1056, the alleged disclosures in Plaintiff's case were not limited to "internal memoranda, private conversations, or meetings not attended by the general public." *Id.* Plaintiff alleged the general dissemination of information about his Title IX case to GMU students and faculty, not simply those who needed to know for administrative purposes.

Defendants' argument that Plaintiff has not alleged publication because GMU may not disclose information concerning his disciplinary record, absent his consent, is not dispositive. *See* Moving Br. at 13. As this court found in *GMU*, 149 F. Supp. 3d 602 (E.D. Va. 2016), the potential availability of Title IX disciplinary records to future employers, with the plaintiff's authorization, sufficiently alleged publication because the plaintiff (i) would have to forgo employment opportunities with institutions or organizations which require disclosure of disciplinary records or (ii) authorize the dissemination of defamatory records which would likely foreclose the plaintiff's ability to pursue such opportunities. *Id.* at 614 & n. 9. *See Sciolino v. Newport News*, 480 F. 3d 642, 649 (4th Cir. 2007) ("If prospective employers are likely to see the stigmatizing allegations, an employee must choose between finding future employment and protecting his reputation by not

applying for jobs and thus not risking the release of stigmatizing information."). In *GMU*, the Court also held that dissemination of the Title IX findings to the Title IX complainant Jane Roe, "a member of the general public," constituted publication. *Id.* at 614. Here, the Title IX sanctions were disclosed to Complainants 1-4, who were upset that Dr. Renshaw was too lenient. Compl. ¶¶ 445, 453.

Defendants' reliance on *Sciolino* is also misplaced. In *Sciolino*, the Fourth Circuit rejected the argument Defendants assert here, finding that the Government Data Collection and Dissemination Practices Act did not, in practice, completely protect the plaintiff's personnel file from dissemination. *Id.* at n. 3. Likewise, DRHM Policy 6.05, which Defendants are "required to follow," (Defs. Moving Br. at 13), permits the disclosure of Plaintiff's disciplinary records *without his consent* and at GMU's discretion in a number of circumstances. Ex. J (referencing disclosure without consent to supervisors, higher level managers, private service providers, and in response to subpoenas, court "requests" and court orders). The policy notes that "this list is not all inclusive." *Id.* Defendants have provided no insight into their actual practices, including in a case where Plaintiff may apply for employment at another public institution. *See Sciolino*, 480 F. 3d at n. 3 (employer, in practice, engaged in some dissemination of personnel file, including prospective employers, in some cases).

**C.**    **Plaintiff Plausibly Alleged That Defendants Deprived Him of Due Process**

Contrary to Defendants' assertions, Plaintiff's claim that he was deprived of due process is not based on a "fundamental misunderstanding of what the due process clause requires." Moving Br. at 17. Rather, it is Defendants' misunderstanding of what process was due Plaintiff—under the Due Process clause and as codified in GMU's own policies—that has left them in the position of having to defend against this claim. GMU cannot dispute that, subsequent to Plaintiff's Title IX

case, its very own faculty raised grave concerns about the lack of due process in disciplinary proceedings concerning faculty, triggering an audit by Provost Wu. Compl. ¶¶ 385-392.

Defendants and GMU question the applicability of *Loudermill* to cases other than those in which a public employee is *terminated*. Yet the Fourth Circuit, and at least one court in this District, have applied *Loudermill* in precisely such circumstances. *See Hibbits v. Buchanan County School Bd.*, 433 Fed. Appx. 203, 205 (4th Cir. 2011) (in case of probation, "[t]he only process guaranteed by the Constitution is notice and a hearing before termination of the protected property right");[13] *Willis*, 90 F. Supp. 3d at 613 (citing *Loudermill* and stating that "[i]f adequate process was not provided, the deprivation is illegal" in case concerning 20- and 40-hour suspensions). In accordance with *Loudermill*, a tenured public employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence against him, and an opportunity to present his side of the story." 470 U.S. at 544 (citing *Arnett v. Kennedy*, 416 U.S. 134, 170-171 (1974)). In *Loudermill*, the United State Supreme Court, discussing *Arnett*, and addressing pre-termination proceedings, noted "six Justices found constitutional minima satisfied where the employee *had access to the material upon which the charge was based* and could respond orally and in writing and present rebuttal affidavits." *Id.* at 542 (emphasis added). As set forth below, Plaintiff had no such rights here. *See* Compl. ¶ 517.

Apart from the process that was due Plaintiff under *Loudermill*, it is axiomatic that plaintiff was also entitle to a fair and impartial process. *Willis*, 90 F. Supp. 3d at 614 ("[a]n impartial decision maker is an essential element of due process"). While there is typically a presumption of honesty and integrity on the part of administrative decisionmakers, such presumption can be

---

[13] *Hibbits*, a summary judgment decision, is distinguishable from the present case because the plaintiffs in *Hibbits* were reassigned, with a salary reduction, in accordance with the express language of a State statute. The statute also provided for notice and "an informal meeting." 433 Fed. Appx. at 205.

rebutted where a plaintiff can show "bias stemming from an extrajudicial source." *Id.* Here Plaintiff alleged numerous sources of bias in his Title IX process, from the investigation through the sanctioning process, as well as in Dr. Renshaw's decision to disaffiliate Plaintiff from his program.

### 1. <u>Dr. Hammat Deprived Plaintiff of Due Process</u>

GMU codified the fundamental principles of due process in its sexual misconduct policies. The 2016-2017 and 2017-2018 Sexual Misconduct Policies that Dr. Hammat provided to Plaintiff with respect to Complainant 4 expressly provides for "thorough and impartial investigations that afford *all parties* notice and an opportunity to present witnesses and evidence and to view the information that will be used in determining whether a policy violation has occurred." Compl. ¶¶ 194, 204; Ex. F, at III. With respect to the Title IX investigation, and erroneous findings against Plaintiff, Dr. Hammat violated Plaintiff's right to due process:[14]

a. **<u>Bias:</u>** GMU conceded in its Moving Brief (albeit tentatively) that Plaintiff alleged that: Dr. Hammat may have had a bias "against perpetrators of sexual misconduct or in favor of victims of sexual misconduct" (GMU Moving Br. at 9); Dr. Hammat was biased "about the maturity of first-year graduate students." (*Id.* at 12); and certain of Plaintiff's allegations could be indicative of Dr. Hammat having a bias against faculty members (*Id.* at 14).

   Dr. Hammat had a conflict of interest because she served as both Title IX Coordinator *and* decided Plaintiff's case (which violated Office for Civil Rights' ("OCR") Guidance). Compl. ¶¶ 84, 197, 207, 473. In her role as Title IX Coordinator, Dr. Hammat was not only responsible for determining the outcome of Title IX complaints, she was also charged with monitoring the University's compliance with Title IX. *Id.* ¶¶ 197, 207.

   At around the time in which Dr. Hammat investigated the allegations against Plaintiff, GMU was under OCR investigation and facing criticism in the press for its purported mishandling of Title IX complaints. *Id.* ¶¶ 116, 113-127. Dr. Hammat publicly questioned Betsy DeVos' changes to Title IX enforcement, which were

---

[14] Plaintiff hereby incorporates by reference his opposition to GMU's motion to dismiss his Title IX claim (ECF No. 38) ("Title IX Opp.").

intended to provide more due process protections for the accused. Compl. ¶¶ 66-78, 112.

Dr. Hammat also exhibited bias in statements made to Plaintiff, in emails she authored concerning the investigation and findings, and in her decision-making process. *Id.* ¶¶ 149-164, 202, 251-256, 260-265, 275, 278-284, 288-299, 304, 313-323, 331-332, 336, 339-340, 357-365, 483. *See also* Title IX Opp., Pts. II.B, C.

Plaintiff also alleged that the statements he made, and evidence he submitted, contradicted the allegations of Complainants 1-4, as well as Dr. Hammat's findings (Compl. ¶¶ 157, 250, 255-277, 288, 296-298, 307, 308-312, 321, 323, 324-332, 340, 343, 345-349, 354-355, 359, 362, 365, 367-368, 372, 375-380).

b. **Lack of Adequate Notice:** Dr. Hammat's "notices" to Plaintiff stated only that potential violations of varying sexual misconduct policies had been alleged. Dr. Hammat did not specify the "charges" or the specific policy provisions applicable in the case of each complainant. Appended to each email were varying policies and grievance procedures. Compl. ¶¶ 138, 249, 287, 301, 302, 333. Exs. C-F. Dr. Hammat emailed Plaintiff a total of five (5) different sexual misconduct policies and four (4) different grievance procedures. Exs. C-F. The determination letters added charges of gender-based harassment and did not specify the policy provisions, or grievance procedures, Dr. Hammat applied in finding Plaintiff responsible. *Id.* ¶¶ 278-279, 294, 313, 356. Exs. K-N. Dr. Hammat also made factual findings based on allegations and information of which Plaintiff was not notified—*and to which Plaintiff could not respond*—during the Title IX investigation. Compl. ¶¶ 282, 297, 316-318, 320, 322, 359, 360-364. *Id.* ¶¶ 282, 297, 316-319, 320-323, 360-361, 362, 364-365. *Compare* C-F *with* K-N.

These allegations stand in stark contrast to *Doe v. Loh*, 2018 WL 1535495, at *6 & n. 4 (D. Md. Mar. 29, 2018), where the *hearing board* that evaluated the allegations against the plaintiff heard all of the plaintiff's arguments and defenses when he "presented testimony, answered questions, and submitted affidavits at his hearing," *after* he reviewed the evidence. In *Linton v. Frederick County Bd.*, 964 F.2d 1436, 1440-1441 (4th Cir. 1992), the court held that allegations of a general nature, or that serve as a "catch-all" do not provide sufficient notice. *See* Exs. C-F, K-N. Neither case addressed Dr. Hammat's failure to include allegations in her emails to Plaintiff that later appeared in her determination letters. *See GMU*, 149 F. Supp. 3d at 616-617 (failure to give notice of specific charges and events that later appeared in determination letter was constitutionally inadequate).

c. **Withholding of Evidence:** Plaintiff was denied access to any and all evidence gathered during the Title IX investigation. Compl. ¶ 155. *See also* Title IX Opp. at Point II.B. Both the 2016-2017 and the 2017-2018 Sexual Misconduct Policies expressly provided "all parties … an opportunity … to *view the information that will be used in determining whether a policy violation has occurred.*" Compl. ¶¶

194, 204, Ex. F. (emphasis added). *See Doe v. Salisbury U.*, 123 F. Supp. 3d 748 (D. Md. 2015) (withholding evidence from plaintiff was one of "numerous procedural defects"); *Norris*, 362 F. Supp. 3d at 1011 (denying plaintiff access to investigative file). Under *Loudermill*, 470 U.S. at 538, and *Linton*, 964 F. 2d at 1440, Plaintiff did not receive an adequate explanation of the evidence against him because he was not apprised of *any* evidence that would be used in assessing whether he violated GMU's sexual misconduct policies and, accordingly, could not fully respond to the complainants' allegations. *See, e.g.* Compl. ¶¶ 157, 158, 340, 425; Ex. O (GMU faculty criticized "lack of clarity in presenting evidence that supports decisions"). Complainants 1-4 were permitted to review, and respond to, Plaintiff's evidence and statements. Compl. ¶ 485.e. *See id.* ¶ 390(6).

    d. **Lack of Hearing**: Plaintiff did not have a fair or adequate Title IX hearing. On the contrary, Dr. Hammat's bias precluded it. *See supra* point a; Title IX Opp., Pts. II.B., C. That Plaintiff was interviewed three times and that he submitted evidence to the best of his ability, does not equate to a fair or adequate hearing process. *See* Defs. Moving Br. at 18; *supra* point c. *Loh* is inapposite in this regard because the plaintiff was able to review the evidence against him prior to personally appearing before a review committee, questioning the Title IX investigator, presenting witnesses and submitting additional evidence. 2018 WL 1535495, at ** 3 & n. 4. *See Arnett*, 416 U.S. at 170-171. Plaintiff was also deprived of a fair and adequate hearing because he had no right of cross-examination. GMU does not dispute that its Title IX process provided no method through which Plaintiff could confront his accusers. Compl. ¶ 156. *See Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018); *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 583 (E.D. Va. 2018). *See* Title IX Opp., Pt. II.B.f.

Despite Defendants' assertion to the contrary (Moving Br. at 18), the Court may consider Dr. Hammat's deviations from GMU policies and procedures as part of its analysis as to whether, as alleged, the disciplinary process in Plaintiff's case fell short of due process. *GMU*, 149 F. Supp. 3d at 620-621. Apart from the due process violations outlined above, Dr. Hammat also elected to investigate time-barred complaints and failed to apply the preponderance of the evidence standard when making her determinations. *See* Title IX Opp., Pt.II.B.c, h.

### 2. **Mr. Williams Violated Plaintiff's Right to Due Process**

    Mr. Williams violated Plaintiff's right to due process because he failed to conduct a fair and impartial review of Plaintiff's appeal. *See, e.g. GMU*, 149 F. Supp. 3d 620 (appellate officer's

bias denied plaintiff a meaningful opportunity to be heard). Plaintiff's right was further impeded because he did not have access to any of the evidence including the statements of Student 1, his colleague, and potentially two other students who provided exculpatory information. Compl. ¶¶ 157-158, 340, 425.

GMU conceded (albeit tentatively) that Plaintiff alleged that Mr. Williams may have had a bias "against perpetrators of sexual misconduct or in favor of victims of sexual misconduct" (Moving Br. at 9). Mr. Williams also had a conflict of interest because, as the head of CDE, he is responsible for enforcing GMU's administrative policies and the direct supervisor of the Title IX office. Compl. ¶ 483.z. GMU's faculty noted this bias in their submission to Provost Wu decrying the lack of due process in faculty proceedings. *Id.* ¶ 390; Ex. O. Mr. Williams also made public statements concerning the OCR's investigation of GMU, including that the University could lose federal funding, and he vehemently opposed the student newspaper's criticism of GMU's failure to timely and adequately address a sexual harassment complaint made by a female student. *Id.* ¶¶ 108-109, 116-120; Exs. P-R. Mr. Williams also made statements to the effect that universities have a moral obligation to protect female students from sexual misconduct, and that he believes that accusers always tell the truth. *Id.* ¶ 166; Ex. S. *See also* Title IX Opp. at Point II.C. Mr. Williams also exhibited bias in his decision-making process. *Id.* ¶¶ 259, 302, 319, 323, 332, 336-341, 352, 359, 370-381, 401-403, 435, 485(h)-(i), 520-521; Ex. T.

### 3.  Dr. Renshaw Deprived Plaintiff of Due Process

Dr. Renshaw improperly restricted Plaintiff from hiring graduate students to work in his lab in Fall 2019 *before* any findings and *before* Plaintiff's appeal. Compl. ¶¶ 159, 405. Dr. Renshaw also directed Plaintiff to reject the students he had already interviewed. *Id.* ¶ 405. It cannot be disputed that this restriction was imposed without notice and that Plaintiff had no right

to object to, or appeal, this restriction. It further became public knowledge even though there was no reason why the University would need to disseminate such information to persons other than Plaintiff. *Id.* ¶¶ 383-384.

Dr. Renshaw was responsible for devising the sanctions imposed on Plaintiff. *Id.* ¶¶ 393-399. Plaintiff faced termination as a potential sanction. *Id.* ¶¶ 187(b), 190(b), 196, 206. It cannot be disputed that Plaintiff was provided no information about the sanctioning process, or any opportunity to meet with Dr. Renshaw, prior to the sanctioning. *Id.* ¶ 406.

With respect to the Program Grievance filed by Professor 1 and eight other professors, the Faculty Grievance Committee had no authority to review the grievance because the Faculty Handbook did not authorize grievances "on behalf of a third party or group." Compl. ¶ 419; Ex, H, Section 2.11.2.1.a. Moreover, there was no provision in the Title IX Grievance Procedures that permitted third parties, such as Professor 1, to seek review of Dr. Renshaw's Title IX sanctions for their appropriateness. Compl. ¶¶ 420-422. *See* C-F. Regardless, the Committee took it upon itself, without any authority, to recommend that the extreme sanction of disaffiliation be imposed. *Id.* ¶ 439. Given that the Committee only issued a recommendation to Dr. Renshaw, which stated that "[c]orrective actions *should* require, if they do not already, the disaffiliation of" Plaintiff, (Ex. A, 9/10/19 Letter, at 2), and given that the University's counsel stated that the Faculty Grievance Committee did not speak or act for the University, Dr. Renshaw was not required to disaffiliate Plaintiff. Compl. ¶ 441.[15] Moreover, Dr. Renshaw again imposed extreme measures that were not recommended by the Committee but instead were crafted by Professor 1, disaffiliating Plaintiff from his program for a period of at least 5-6 years and barring Plaintiff from working with the

_____

[15] Defendants incorrectly assert that Plaintiff violated the Faculty Handbook by declining the "recommendation" that he "should" disaffiliate from the program. Defs. Moving Br. at 16. Ironically, GMU argues in its moving brief that the word "should" is not mandatory. GMU Moving Brief, at 26. Plaintiff understood the Committee's decision to be what it stated, a recommendation. Compl. ¶¶ 415-417, 424-425; Ex. A.

three graduate students who wanted to continue working with him. *Id.* ¶ 457. Plaintiff had no right to appeal this second round of sanctions, which went beyond what was even contemplated by the Committee.

Dr. Renshaw was also biased: i) prior to issuing the Title IX sanctions, he was a member of the Faculty Senate, which called for an investigation into Justice Kavanaugh, who had been hired to teach a course at GMU (Compl. ¶ 131); ii) he was a member of the very program from which Plaintiff was disaffiliated, and participated in meetings at which faculty attacked Plaintiff's character (prior to the Program Grievance being decided) (*Id.* ¶¶ 429, 432-436); iii) he incredibly denied that program faculty learned about Plaintiff's Title IX findings from Professor 1 (*Id.*¶ 427); iv) he expected *Plaintiff* to quell the hostile environment created by the faculty against Plaintiff (*Id.* ¶ 428); v) he told Plaintiff that Complainants 1-4 were upset that the Title IX sanctions were too light (*Id.* ¶ 445); and vi) he acknowledged to Plaintiff that the #metoo movement may have impacted Plaintiff's case.

### D. Defendants Are Not Entitled to Qualified Immunity

"A qualified immunity defense can be presented in a Rule 12(b)(6) motion, but … when asserted at this early stage of the proceedings, the defense faces a formidable hurdle and is usually not successful." *Owens v. Baltimore City State's Attorney's Office*, 767 F. 3d 379, 396 (4th Cir. 2014). *See also McVey v. Stacy*, 157 F.3d 271, 278-279 (4th Cir. 1998) Plaintiff has satisfied the first prong of the two-part test for determining whether Defendants have qualified immunity: he alleged that Defendants deprived him of his constitutionally protected property and liberty interests by violating his right to due process. *Ridpath*, 447 F. 3d at 306. At issue is whether Plaintiff's rights were clearly established. *Cannon*, 891 F.3d at 497 (a constitutional right is clearly established when its contours are sufficiently clear that a reasonable official would understand

what he is doing violates that right). Defendants concede that "[c]learly established law is that, at most, Plaintiff was entitled to notice and a hearing." Defs. Moving Br. at 25. As detailed *supra* Point C, Plaintiff did not receive adequate notice or an opportunity to be heard. ¶¶ 522-523.

Plaintiff had a clearly established right to the due process rights set forth in *Loudermill. See Hibbits*, 433 Fed. Appx. at 205 (citing *Loudermill*); *Willis*, 90 F. Supp. 3d at 613 (same). Plaintiff had a clearly established right not to be deprived of his property and liberty interests without due process of law, including notice, a right to view the evidence supporting the charges against him and to be heard, even though he was not terminated. *See Willis*, 90 F. Supp. 3d at 614 (20- and 40- hour suspensions constituted deprivation of property interest); *Wilkinson*, 566 F. Supp. at 769 (plaintiff had property interest in not having employment interrupted by suspension). *See also Ridpath*, 447 F.3d at 310 (liberty interest due to reassignment constituting significant demotion); *Hall*, 469 Fed. Appx. at 262 (same). Plaintiff also had a clearly established right not to have the stigmatizing Title IX findings and/or sanctions disseminated to faculty and students without adequate due process. *Cannon*, 891 F.3d at 503. Plaintiff also had a clearly established right to an impartial process. *Willis*, 90 F. Supp. 3d at 614 (citing *Bowens v. N.C. Dep't of Human Resources*, 710 F.2d 1015, 1020 (4th Cir. 1983)). As set forth *infra* Point C, the process employed in disciplining Plaintiff was rife with bias at every stage. Compl. ¶ 520, 522-523. Dr. Hammat, Mr. Williams and Dr. Renshaw knew, or reasonably would have known, about Plaintiff's clearly established rights. Compl. ¶¶ 518-522, 527.

## II.   Plaintiff Plausibly Alleged A First Amendment Claim

Defendants argue that Plaintiff's First Amendment claims should be dismissed because Plaintiff's statements concerning human sexuality (i) did not involve matters of public concern and

(ii) were made in his role as a public employee. Defs. Moving Br. at 20-22.[16] Of note is the fact that Defendants predominantly rely on summary judgment opinions in asserting their arguments because these issues are not typically decided at the motion to dismiss stage. *See, e.g.*, *Boring v. Buncombe County Bd. of Education*, 136 F. 3d 364, 374 (4th Cir. 1998) (dissenting op. Hamilton, J. and Murnaghan, J.). Defendants further resort to general assertions, without context, that Plaintiff's statements were not related to matters of public concern, pointing to only a few of the statements at issue in the Complaint. Moving Br. at 20-21.

Plaintiff's statements related to matters of public concern. The United States Supreme Court found that: "'[s]ex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; *it is one of the vital problems of human interest and public concern*.'" *Urofsky v. Gilmore*, 216 F. 3d 401, 438 (4th Cir. 2000) (dissenting op., Murnaghan, J.) (citing *Roth v. United States*, 354 U.S. 476, 487 (1957)) (emphasis in original). The Fourth Circuit has also held that speech concerning "campus culture, sex, feminism, abortion, homosexuality, religion, and morality…plainly touch on issues of public, rather than private concern." *Adams*, 640 F.3d at 565. In order to determine whether speech involves matters of public concern, courts evaluate (typically at the summary judgment stage) the "content, form, and context of the speech at issue in light of the entire record." *Id.* at 565.

---

[16] Defendants do not—because they cannot—dispute that the allegations of the Complaint satisfy the third prong of the "*McVey* Test"—that Plaintiff's speech was a substantial factor in Plaintiff's adverse employment decision. *Adams v. Trustees of the University of North Carolina—Wilmington*, 640 F.3d 550, 560-561 (4th Cir. 2011). Because they have discounted all of Plaintiff's statements as not subject to First Amendment protection, Defendants do not address the second prong—whether Plaintiff's interest in speaking about matters of public concern outweighed the government's interest in providing effective and efficient services to the public. *Id.* Plaintiff submits that, if the Court finds that any or all of his statements related to matters of public concern, that Defendants cannot satisfy the second prong because, at the time that Plaintiff made the statements in question, there was no disruption or threat to GMU's educational mandate. *See, e.g.*, *Scallet v. Rosenblum*, 911 F. Sup. 999, 1017 (W.D. Va. 1996) *aff'd* 106 F.3d 391 (4th Cir. 1997). Unlike the plaintiff in *Scallet*, Plaintiff, here, had a clean disciplinary record prior to the Title IX investigation and his courses received stellar reviews from peers and students alike. In addition, Defendants cannot convert protected speech into unprotected speech based on factors that came into play only after the protected speech was made. *Adams*, 640 F. 3d at 561.

Defendants' assertion that Plaintiff's speech in the classroom is merely "curricular speech" that "fails *per se* to be a matter of public concern" is dead wrong. *See* Defs. Moving Br. at 21 & n. 15. "To suggest that the First Amendment, as a matter of law, is never implicated when a professor speaks in class, is fantastic" as "the First Amendment is routinely implicated in the classroom, both at the university level and below." *Scallet*, 911 F. Supp. at 1014. Indeed, at the level of higher education—and graduate school in particular—there is little justification for restricting professors' in-class speech, because the "interest in assuring that readers or listeners are not exposed to material that may be inappropriate for their level of maturity is not implicated in the graduate school context." *Id.* at 1011 (citation omitted).

Here, Plaintiff's in-class statements (made in 2013 and 2014 with no complaints at the time) related to human sexuality and sexual disorders, as well as the emergence of counterculture and cultural taboos that were, accordingly, related to matters of public concern.[17] Compl. ¶¶ 252-284, 287-289, 292, 296. Plaintiff's statements outside of the classroom (also made months to years prior with no contemporaneous complaints) also related to matters of public concern, again, to topics of human sexuality which Plaintiff's graduate students were researching. Compl. ¶¶ 304-305, 326, 335-344, 353, 359, 362, 363, 367, 375-377, 379-380 & n. 72, 548-550.[18]

Defendants' argument that the statements at issue were made "in his role as an employee" also fails. Defs. Moving Br. at 22. *See Adams*, 640 F.3d at 564 (statements made outside classroom were not in official capacity); *Scallet*, 911 F. Supp. at 1012-1014 (court did not find in-classroom

---

[17] That Plaintiff discussed events in which he was a participant does not, in the context in which the events were discussed, render those examples obscene. *See, e.g. Roth*, 354 U.S. at 488-490.

[18] *Kirby*, *Grutzmacher* and *Lee*, cited by Defendants in support of dismissal, are all summary judgment decisions. None of them involved university professors. *Urofsky*, also a summary judgment decision, concerned the right of university professors to access sexually explicit materials on computers leased by state universities. 216 F.3d 401 (4th Cir. 2000). *Boring*, though an opinion addressing the defendants' motion to dismiss, concerned a high school teacher's selection and production of a play as part of the school curriculum. 136 F.3d at 364. *German v. Fox*, 2007 WL 1228481, at * 1 (W.D. Va. Apr. 26, 2007), involved an employee who worked for a private organization—not a professor—and emails he sent with the organization's signature block.

statements were made in official capacity and, therefore, unprotected). In *Adams*, the Fourth Circuit rejected the argument that simply because a faculty member's speech concerned scholarship, research and service that he was required to undertake as part of his duties as professor, that such speech constituted statements made pursuant to his official duties. 640 F.3d at 564. The Fourth Circuit held that the professor's speech was not "tied to any more specific or direct employee duty than the general concept that professors will engage in writing, public appearances, and service within their respective fields." *Id.*[19]

For the above-stated reasons, that portion of Defendants' motion seeking to dismiss Plaintiff's First Amendment claim should be denied.

## CONCLUSION

For the above stated reasons, the Court should deny the Individual Defendants' motion to dismiss Counts II-IV of the Complaint in its entirety, along with such other and further relief that the Court deems just and proper.

Dated: January 22, 2020

Respectfully Submitted,

**NESENOFF & MILTENBERG, LLP**

By:        /s/ *Andrew T. Miltenberg*
Andrew T. Miltenberg (*pro hac vice*)
Kara L. Gorycki (*pro hac vice*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
kgorycki@nmllplaw.com

---

[19] Under *Adams* and *Scallet*, Plaintiff had a clearly established right to First Amendment protection with respect to the statements later used as grounds for sanctioning him. Therefore, Defendants are not entitled to qualified immunity with respect to Plaintiff's First Amendment Claim. *See* Defs. Moving Br. at 24.

**FARMER LEGAL PLLC**

By:        /s/ *Joshua T. Farmer*
Joshua T. Farmer, VSB #87508
5030 Sadler Place, #205
Glen Allen, VA 23060
(804) 325-1441
josh@farmerlegalhelp.com

***Attorneys for Plaintiff John Doe***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 22nd day of January, 2020, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send a notification of such

filing to all parties of record. I also served a copy of the foregoing on counsel for Defendants at

the following address:

>Eli S. Schlam
>Assistant Attorney General
>Virginia Bar Number 92987
>George Mason University
>4400 University Drive,
>MS 2A3
>Fairfax, VA 22030
>Phone: (703) 993-2619
>Fax: (703) 993-2340
>eschlam@gmu.edu

>By:        /s/ *Joshua T. Farmer*
>Joshua T. Farmer, VSB #87508
>5030 Sadler Place, #205
>Glen Allen, VA 23060
>(804) 325-1441
>josh@farmerlegalhelp.com