## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:19-cv-1249 |
| | ) | Hon. Liam O'Grady |
| GEORGE MASON UNIVERSITY, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM OPINION & ORDER

This matter is before the Court on a motion *in limine* to proceed by pseudonym and two motions to dismiss. Dkt. 2, Dkt. 26, Dkt. 29. The motions were fully briefed, and the Court dispensed with oral argument because it would not aid in the decisional process.

### I. BACKGROUND

Plaintiff John Doe ("Doe") is a tenured, full professor at George Mason University ("GMU"). Compl. ¶¶ 3, 28, 502. He has worked there for more than fifteen years, obtained tenure in 2008 and became a full professor in 2014. Compl. ¶ 28. He teaches courses involving human sexuality, abnormal behavior, and cultural norms, and he conducts related research. Compl. ¶ 30. He is an accomplished author, has been published on many occasions, and has received grants and awards during his career. Compl. ¶ 29.

Doe teaches and works within a particular GMU department (the "Department"). Dr. Keith Renshaw is another GMU professor, Doe's supervisor, and Chair of the Department. Compl. ¶¶ 22, 169. The Department falls within a College led by Dean Ann Ardis. Compl. ¶¶ 23, 178. Dr. S. David Wu is Provost of GMU. Compl. ¶ 24.

GMU has policies in place regarding the investigation and processing of sexual and gender-based harassment complaints. *See, e.g.*, Compl. ¶¶ 9-10. GMU staff involved in those proceedings include a Title IX investigator and a Title IX Coordinator. Compl. ¶¶ 9, 20. At all times relevant to this action, Ms. Megan Simmons held the investigator position and Dr. Jennifer Hammat held the Coordinator position. Compl. ¶¶ 20, 104, 146-49. The Coordinator, Dr. Hammat, was ultimately responsible for determining whether a policy violation occurred after an investigation. Compl. ¶¶ 50, 555. Any appeal of her findings would be decided by Mr. Julian Williams, the Vice President of GMU's Compliance, Diversity, and Ethics ("CDE") office. Compl. ¶¶ 21, 162.

## A. Title IX Allegations and Investigation

On December 4, 2018, Dr. Hammat notified Doe by email that four Title IX complaints had been filed against him. Compl. ¶ 136. Dr. Hammat sent one email notification per complaint. Compl. ¶ 136. Each email: 1) advised Doe "of a complaint of Sexual Harassment received in the Office of Compliance, Diversity and Ethics," 2) specifically identified a complainant's allegations, including descriptions of the allegedly harassing conduct and the time frames within which that conduct occurred, and 3) included (as attachments) copies of the GMU harassment policy and grievance procedure which were in effect at the time of the alleged conduct. Pl.'s Opp'n to Mot. to Dismiss Count I, Exs. 4, 5, 6, 7 (Dkt. 38-4, 38-5, 38-6, 38-7) ("Exs. 4, 5, 6, 7").

All four complainants were current or former graduate students, knew each other, and were friends. Compl. ¶¶ 137, 140. Though the conduct they complained of occurred while they were students, Complainant 1 and Complainant 2 had graduated from GMU's graduate program at the time they filed their complaints. Compl. ¶ 142.

2

The complaints alleged that over a five-year period, the sexual nature of some of Doe's conduct made the complainants uncomfortable and interfered with their educations. *See generally* Compl. ¶¶ 247-365. The complained-of conduct occurred in a variety of contexts, from in-class discussions to conversations at bars, and from sharing a hot tub to a social outing "to a strip club" where Doe "received a lap dance." Compl. ¶ 345. Generally, the complainants identified Doe's statements and inquiries as the allegedly harassing behavior. *See* Exs. 4, 5, 6, 7.

GMU initiated an investigation into the complaints, during which Doe was interviewed three times. Compl. ¶¶ 141, 145, 146 (incorrectly pleading the year 2018), 149. Doe's first interview was conducted by Ms. Simmons, GMU's Title IX investigator at the time. Compl. ¶ 146. Doe complained about Ms. Simmons after this first interview, alleging she was biased. Compl. ¶ 148. Dr. Hammat, her supervisor, removed Ms. Simmons from Doe's investigation in response to his bias allegation, and she left GMU for another position at some time during the investigation into Doe. Compl. ¶¶ 147, 148. Thereafter, Dr. Hammat conducted the second and third Doe interviews herself. Compl. ¶ 149. In addition to his three interviews, Doe provided Dr. Hammat with a list of witnesses and over 150 pages of communications between him and the complainants, course evaluations, and photographs. Compl. ¶¶ 153, 154.

Both in the course of the investigation, and in his Complaint, Doe acknowledged that much of the complained-of behavior, the allegedly harassing conduct, did in fact occur:

- Complainant 1 alleged, and Doe acknowledges, that during class he told a detailed personal story about performing oral sex at a party. Compl. ¶ 252.
- Complainant 2 alleged, and Doe acknowledges, that he shared the number of sexual partners he has had with one of his classes. Compl. ¶ 292.
- Complainant 4 alleged, and Doe acknowledges, that he attended an academic conference with a group of graduate students and that he shared details of a personal, sexual

3

experience he had with them.  The particular sexual experience he related occurred while he was married and while he was attending a professional workshop.  Compl. ¶¶ 335, 353.

- Complainant 4 alleged, and Doe acknowledges,[1] that while he was at a bar with students, he repeatedly asked a female student about her personal pornography preferences. Compl. ¶ 337.

- Complainant 4 alleged, and Doe acknowledges, that he invited his graduate students to his home, entered his hot tub with them, and discussed his experience at a brothel. Compl. ¶ 341-42.

- Complainant 4 alleged, and Doe acknowledges, that he attended an academic conference with a group of graduate students and engaged them in a discussion regarding sexual encounters that occurred during that trip.  Compl. ¶ 344.

- Complainant 4 alleged, and Doe acknowledges, that he attended a "bar, which had a strip club component" with four graduate students during an academic conference.  Compl. ¶¶ 344, 347.  While there, Doe accepted a lap dance paid for by Complainant 4 after another student had declined to accept.  Compl. ¶ 347.  Doe also took a photo of Complainant 4 receiving a lap dance, and "joke[d] about [] using the photo for blackmail."  Compl. ¶ 347.

Dr. Hammat was the initial decisionmaker regarding whether Doe had violated GMU policy.  Compl. ¶¶ 150, 158.  She found that he had: on February 22, 2019, Doe received four "Letters of Determination," notifying him of Dr. Hammat's findings in regard to each complaint. Compl. ¶ 160.  The Letters of Determination stated that CDE had concluded its investigation into

---

[1] This, he alleges, "was a typical conversation about the research conducted in [his] laboratory." Compl. ¶ 338.

each complaint, that the investigation involved interviews and document review, and that the investigation "considered the factual information" which Doe had provided. Pl.'s Opp'n to Mot. to Dismiss Count I, Exs. 8, 9, 10, 11 (Dkt. 38-8, 38-9, 38-10, 38-11) ("Exs. 8, 9, 10, 11").

The Letters of Determination explain that "CDE did find enough factual information to sustain the allegation that [Doe] engaged in conduct that qualifies as Sexual or Gender-based Harassment in violation of George Mason University's *Policy 1202: Sexual or Gender-Based Harassment and Other Interpersonal Violence*." Exs. 8, 9, 10, 11. Each letter then restates the corroborated allegations, the investigative findings which support them, and ultimately finds that "these repeated instances of sexual conversations with students you supervise and teach . . . combine to create a hostile environment for students in the classroom." Exs. 8, 9, 10, 11. Where a complainant's allegation was unsupported, the factual findings either explicitly noted that or omitted the allegation altogether. *See, e.g.*, Ex. 10 at 2 (Letter of Determination stating that "[d]ue to lack of corroborating witnesses, the investigator was unable to determine whether" an allegation occurred); *compare* Ex. 4 at 3 (Complainant 1 alleged Doe told a class they "needed to get naked together to really get to know each other") *with* Ex. 8 (Letter of Determination regarding Complainant 1 which omits those allegations); *see also* Compl. ¶ 308.

The letters were communicated to Employee Relations and Doe's supervisor, Dr. Renshaw, and they conclude by noting Doe will be contacted regarding disciplinary sanctions. Exs. 8, 9, 10, 11. Doe appealed the findings to Mr. Williams, again submitted hundreds of pages of what he deemed to be supporting documentation, and his appeal was denied approximately two weeks later. Compl. ¶¶ 165, 167.

**B. Sanctions Imposed on Doe**

As the Letters of Determination forecasted, Dr. Renshaw contacted Doe regarding his disciplinary sanctions by letter dated May 31, 2019. Compl. ¶ 169. The sanctions letter

explained that Dr. Renshaw, as Chair of the Department, was "responsible for determining and implementing the appropriate disciplinary sanctions to address the behavior" which violated GMU policy. Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 16 (Dkt. 38-16) ("Ex. 16"). Thus, because CDE had sustained various allegations of sexual or gender-based harassment which violated GMU policy, Dr. Renshaw implemented four sanctions. Ex. 16; Compl. ¶ 393. The four sanctions are: 1) sexual harassment training, 2) teaching, interactions, and communications restrictions, 3) a performance review, and 4) reevaluation of the need for restrictions.

First, Doe was required to participate in sexual harassment training. Second, Doe's student interactions were limited in a finite number of ways "through the end of Summer 2021 Semester, August 15, 2021." Ex. 16; *see also* Compl. ¶ 393. Specifically, Doe was restricted from teaching graduate-level classes, he became ineligible to recruit new graduate student mentees, and his current graduate student mentees were to be offered an opportunity to choose another mentor. Those restrictions did not apply to undergraduate or post-graduate level students. Regarding all students, however, Doe was required to communicate through official GMU-authorized channels, his communications would be subject to GMU's review, and his in-person interactions with students were limited to meetings and professional events and were required to occur in an open setting. The third sanction Dr. Renshaw implemented was a regular review of Doe's conduct throughout the above-mentioned probationary period. The review would incorporate student feedback, and based on that feedback Dr. Renshaw (as the Department Chair) and the Dean would reevaluate Doe's sanctions midway through the probationary period. Fourth and finally, Dr. Renshaw's sanctions letter noted that if Doe's ability to teach, mentor, or

6

supervise graduate students were reinstated, he and the Dean might implement further or continuing restrictions if those became necessary.[2]

Doe filed a faculty grievance on June 10, 2019, grieving the sanctions which were imposed upon him based on the CDE findings. Compl. ¶ 171. In effect, this was an appeal of his sanctions. The grievance was filed with the Faculty Grievance Committee which reviewed his grievance and the sanctions before upholding them. Compl. ¶ 172.

Other faculty members from Doe's Department subsequently filed a grievance which also revolved around the sanctions imposed on Doe.[3] Compl. ¶ 173. This grievance was filed against Doe and Dr. Renshaw, as the Department Chair, because Doe remained affiliated with a Program within the Department (the "Program"). Compl. ¶ 419. The question presented in the faculty's grievance was whether Dr. Renshaw's sanctions were sufficient or whether university policy required Doe's disaffiliation from the Program because he had potentially placed the program at risk. Compl. ¶ 420. The Committee ultimately agreed with the faculty that the Faculty Handbook requires a faculty member who CDE has determined violated University Policy 1202 to disaffiliate from any Program, and if that faculty member does not do so voluntarily, the Faculty Handbook requires their supervisor to force disaffiliation. Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 30 (Dkt. 38-30) at 2-3 ("Ex. 30"); Compl. ¶ 437.

Doe informed Dr. Renshaw he would not voluntarily disaffiliate from the Program. Compl. ¶ 442. Dean Ardis, Dr. Renshaw's supervisor, concurred with the Committee, and Dr. Renshaw subsequently disaffiliated Doe from the Program. Compl. ¶¶ 447, 449.

---

[2] Though these sanctions were set to expire on August 15, 2021, Doe remained susceptible to new or further sanctions pursuant to the Faculty Handbook and his appointment letter which govern his employment.
[3] This grievance followed an unnamed professor's informal request that Doe voluntarily disaffiliate based on potential consequences to the Program—the loss of accreditation—if he did not. *See* Compl. ¶¶ 413-419.

Doe's disaffiliation caused his name to be removed from the "core faculty members" in Program materials, such as on GMU's website, caused him to be ineligible for Program leadership or committee positions, and caused him to be ineligible to participate in the Program's teaching or mentoring activities. Compl. ¶ 455. His disaffiliation is effective "at least until all students who are currently enrolled in the program as of the 2019-2020 academic year are no longer enrolled." Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 31 (Dkt. 38-31) at 2-3 ("Ex. 31").

Throughout the period in which the Faculty Grievance Committee was dealing with Doe's and the other faculty members' grievances, Doe discovered that aspects of his Title IX investigation were known to non-participants. *See* Compl. ¶ 168 (Doe "was advised that GMU could not impose 'gag orders' on parties to prevent them from sharing information,"); *see also, e.g.*, Compl. ¶¶ 412 (Student aware of Title IX proceedings), 458 (faculty in the Department discussed Doe's Title IX case).

Doe subsequently brought this lawsuit, alleging he was discriminated against based on his gender, and that his rights to due process and free speech have been violated.

## II. LEGAL STANDARDS

### A. Motion to Proceed by Pseudonym

Whether a litigant may proceed by pseudonym falls within the district court's discretion. *Doe v. Pub. Citizen*, 749 F.3d 246, 273 (4th Cir. 2014) (citing *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993)). The Fourth Circuit has identified five factors, the *Jacobson* factors, which guide a district court's discretion when deciding whether to permit a party to proceed anonymously. *See Jacobson*, 6 F.3d at 238. Accordingly, courts consider:

> whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature; whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; the ages of the persons whose privacy interests

8

are sought to be protected; whether the action is against a governmental or private party; and, relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

*Id.* Because these factors are nonexclusive, others may be considered. *Pub. Citizen*, 749 F.3d at 289.

## B. Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). A complaint containing mere labels, conclusions, or a formulaic recitation of elements is insufficient and will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678.

While a motion to dismiss tests the sufficiency of a complaint, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd*, 822 F.3d 159, 165–66 (4th Cir. 2016) (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails." *Id.* at 166 (alteration in original) (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)).

### III. DISCUSSION

#### A. Motion to Proceed by Pseudonym

"The Federal Rules of Civil Procedure require that the identities of the parties to a case be disclosed." *Pub. Citizen*, 749 F.3d at 273 (citing Fed. R. Civ. P. 10(a)). While courts may permit a party litigate pseudonymously, it "is a 'rare dispensation.'" *Id.* (quoting *Jacobson*, 6 F.3d at 238). John Doe, proceeding thus far by pseudonym, moved this Court to conceal his identity. Each *Jacobson* factor will be addressed in turn.

The first *Jacobson* factor is whether use of a pseudonym "is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature." *Jacobson*, 6 F.3d at 238. Relying on *Doe v. Rector and Visitors of George Mason Univ.* ("*Rector*"), 179 F. Supp. 3d 583, 593 (E.D. Va. 2016), Doe argues that this factor weighs in his favor because the lawsuit concerns sexual misconduct allegations. The *Rector* court found in that case that "what justifie[d] the use of pseudonyms . . . [was] the plaintiff's status as an accused perpetrator of sexual misconduct—a rapist," and the "significant social stigma" which accompanies that designation. *Rector*, 179 F. Supp. 3d at 593-94. But this case is not like *Rector*. Here, first of all, Doe is not accused of rape. Second, Doe's conduct which gave rise to the Title IX complaints occurred in public, not in private. Accordingly, the Court finds this factor weighs against use of a pseudonym.

The second factor is whether Doe's identification poses a risk of retaliatory harm to him, or to innocent non-parties. *Jacobson*, 6 F.3d at 238. Doe has not identified any non-parties who are at risk of harm, and instead only claims that identifying him in these proceedings will harm his reputation. While some courts have considered reputational harm to be a sixth factor in the analysis, the Court declines to do so. *See, e.g.*, *Doe v. Alger*, 317 F.R.D. 37, 40 (W.D. Va. 2016). Reputational harm is distinct from the "privacy or confidentiality concerns" which were

at the root of the Fourth Circuit's *Jacobson* analysis, and is more akin to mere "annoyance and criticism." *Jacobson*, 6 F.3d at 238. It is, therefore, not the type of harm which weighs in favor of anonymity under the second factor. *See Pub. Citizen*, 749 F.3d at 274 ("courts consistently have rejected anonymity requests to prevent speculative and unsubstantiated claims of harm to a company's reputational or economic interests.") (citing *Nat'l Commodity & Barter Ass'n v. Gibbs,* 886 F.2d 1240, 1245 (10th Cir. 1989) (per curiam) for the proposition that pseudonymity "has not been permitted when only the plaintiff's economic or professional concerns are involved" and collecting cases). Furthermore, Doe's claim of reputational harm rings hollow because his name was previously associated with the underlying complaints and he maintains that the conduct at issue was not misconduct. Accordingly, the second factor does not favor Doe.

Third, *Jacobson* instructs courts to consider the age of the people whose privacy interests are at issue. *Jacobson*, 6 F.3d at 238. Doe does not argue this factor favors him. The Court affords this factor substantial weight, and it weighs heavily against psuedonymity.

In assessing the fourth *Jacobson* factor, whether the action is against a government entity or private party, courts weigh a plaintiff's privacy interest against the public interest in open judicial proceedings. *See Pub. Citizen*, 749 F.3d at 274 ("when a party seeks to litigate under a pseudonym, a district court has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party."). "The public has an interest in knowing the names of the litigants and disclosing the parties' identities furthers openness of judicial proceedings." *Id.* at 273 (internal citations omitted). Doe has not shown any extraordinary circumstances which overcome the

11

public interest here, especially considering the heightened public interest in disclosure he caused

by suing an arm of the state and its officers.

He attempts to liken this situation, again, to *Rector*. The court in that case found the

fourth *Jacobson* factor weighed in favor of proceeding by pseudonym because,

> to the extent the public has a heightened interest in litigation against the
> government, the public's strong interest in monitoring the position that
> government agencies take in litigation is vindicated [] because the public has full
> access to everything the government has filed with the exception of plaintiff's and
> Roe's identities. Thus, the use of pseudonyms strikes an appropriate balance
> between ensuring that the public has access to the record in this case while also
> protecting plaintiff and Roe from any harm—including retaliatory physical
> harm—that might ensue from association with the accusations at issue here.

*Rector*, 179 F. Supp. 3d at 594 (internal citations, quotation marks, and alterations omitted).  But

again, the facts of this case are dissimilar, and for three reasons.  First, the *Rector* court struck a

balance to protect the litigants from physical harm.  As noted above, there is no risk of harm

here.  Second, the *Rector* plaintiff asserted a privacy interest in keeping his identity separate

from allegations of conduct which occurred in private—rape, stemming from what he alleged

was a consensual relationship.  In contrast, here, Doe asserts a privacy interest in keeping his

identity separate from allegations of public conduct.  Third and finally Doe seeks to keep his

identity separate from allegations of conduct—some of which he admits to—which he contends

was not improper.  Because the facts here are distinct from those in *Rector*, and because Doe has

failed to show the extraordinary circumstances which might overcome the heightened public

interest in disclosure, this factor weighs against permitting a pseudonym.

The fifth and final factor is the risk of unfairness to the opposing party which would

result from allowing the action to proceed anonymously.  *Jacobson*, 6 F.3d at 238.  Doe argues

that this factor weighs in his favor because the defendants know his identity already.  The Court

agrees the risk of unfairness to the defendants is minimal.

The *Jacobson* factors clearly weigh against permitting Doe to proceed by pseudonym. While any unfairness which may occur to the defendants would be minimal, all the other factors weigh against pseudonymity. Moreover, the Court finds the movant's age, the lack of retaliatory harm, and the heightened public interest to be especially compelling here. Accordingly, Doe's motion will be denied, and he will not continue under a pseudonym.

## B. Motions to Dismiss for Failure to State a Claim

John Doe originally sued Defendants George Mason University, the Rector & Visitors of George Mason University, and five Mason officers, Dr. Hammat, Mr. Williams, Dr. Renshaw, Dean Ardis, and Provost Wu, each in both their individual and official capacities. In his 162-page, four count Complaint, Doe alleges that the university violated Title IX, 20 U.S.C. § 1681(a) (Count I); that all five individual defendants violated 42 U.S.C. § 1983 by denying Doe due process in violation of the Fourteenth Amendment of the United States Constitution (Count II); that all five individual defendants violated the due process clause of the Virginia Constitution (Count III), and; that three individual defendants—Dr. Hammat, Mr. Williams, and Dr. Renshaw—violated § 1983 by denying Doe his right to free speech, guaranteed by the First Amendment of the United States Constitution (Count IV).[4]

At the outset, the Court recognizes that Doe originally named "George Mason University," as a defendant. The university operates under the corporate name "The Rector & Visitors of George Mason University" pursuant to Va. Code § 23.1-1500(A), and George Mason University is therefore an improperly named defendant which the parties agreed to dismiss.

---

[4] To the extent that Doe asserts in paragraph 384 of his Complaint that GMU violated his privacy by notifying Complainants 1-4 of sanctions, that claim fails. As he pleads, and as the document he incorporated into his Complaint by reference makes clear, GMU was required to inform Complainants 1-4 of not only sanctions which related directly to them, but also "any other steps . . . taken to eliminate the hostile environment, if the school found one to exist." Compl. ¶ 384 (quoting U.S. Dep't of Educ., Office of Civil Rights, Q&A on Campus Sexual Misconduct (2017), available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf).

The remaining defendants are therefore the Rector & Visitors of George Mason University ("Mason")[5] and the five individual defendants. Doe withdrew his claims against Provost Wu and Dean Ardis in their individual capacities but not in their official capacities, maintaining they "are indispensable . . . because they have the authority to effectuate the injunctive relief sought in Counts II and III." Dkt. 43 at 5 n.1. Accordingly, Dr. Hammat, Mr. Williams, and Dr. Renshaw, are being sued in both their individual and official capacities, and Dean Ardis and Provost Wu are being sued only in their official capacities.

### 1. Claim Against Mason (Count I)

In Count I, Doe claims that Mason is liable for GMU's gender-based discrimination against him in violation of Title IX. Specifically, he alleges GMU unlawfully subjected him to investigative and disciplinary proceedings because of his gender, and that the university's ultimate findings were also erroneous.

Title IX prohibits federally-funded education institutions from engaging in gender discrimination. 20 U.S.C. § 1681(a). It is enforceable through an implied private right of action. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999). "Plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Plaintiffs in the first category proceed by an "erroneous outcome" theory, and plaintiffs in the second category proceed by a "selective enforcement" theory. *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 515 (E.D. Va. 2019). "[U]nder the 'erroneous outcome' theory, a plaintiff can claim that he or she is innocent and was 'wrongly found to have committed an offense.'" *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 606

---

[5] As noted on page 1, throughout this opinion "GMU" refers to the university as an entity, not to the improperly named defendant "George Mason University." "Mason" refers to the properly named Rector & Visitors of George Mason University.

(E.D. Va. 2019) (quoting *Yusuf*, 35 F.3d at 715). In contrast, under the "selective enforcement" theory, a plaintiff can claim that "the severity of the penalty and/or the decision to initiate the proceeding was affected by the [plaintiff's] gender," regardless of their guilt or innocence. *Yusuf*, 35 F.3d at 715; *accord id.* at 606-07. Here, Doe attempts to proceed under both theories.

### (i) Erroneous Outcome

To survive a motion to dismiss, an erroneous outcome claim must claim an erroneous outcome—that is, the plaintiff must claim innocence. *Yusuf*, 35 F.3d at 715; *accord Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 583 (E.D. Va. 2018); *see also Doe 2*, 384 F. Supp. 3d at 607. In addition, an erroneous outcome claimant must cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding, and allege particularized facts indicating a causal connection between gender bias and the flawed outcome. *See Marymount Univ.*, 297 F. Supp. 3d at 583 (quoting *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018)). A plaintiff can satisfy the articulable doubt element "by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence." *Doe 2*, 384 F. Supp. 3d at 607. The pleading burden to articulate doubt "is not heavy." *Yusuf*, 35 F.3d at 715. The facts showing the final element, a causal connection, must both be "particularized," and suggest "gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

Here, Doe admits to much of the underlying conduct which the complainants alleged was, and which GMU later found to be, harassment. He disputes the ultimate findings that this was misconduct, arguing that his actions did not limit students' educations. The Court will assume without deciding that Doe's claims—which amount to ultimate legal conclusions—satisfy the requirement that he claim innocence. The Court will also assume without deciding that Doe satisfied the low bar for the element of articulable doubt. Even so, he has failed to state

a claim because he has not pleaded particularized facts suggesting gender bias was a motivating factor in GMU's findings.

### (a) Particularized Facts Must Show Gender Bias Caused the Outcome

Mere "allegations of a procedurally or otherwise flawed proceeding that [] led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." *Id.* "When reviewing whether a Title IX plaintiff has pled the requisite gender bias, [] courts have considered the following types of factual allegations: 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that [] tend to show the influence of gender.'" *Marymount Univ.*, 297 F. Supp. 3d at 585 (quoting *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). But Courts reject statistical evidence which merely indicates men disproportionately comprise those accused of misconduct or those who appeal from adverse rulings as insufficient to establish gender-based discrimination. *Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 518 (compiling cases). Further, "vigilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias." *Id.* at 519 (compiling cases).

Doe has not pled sufficiently particularized facts showing gender bias in his case. He relies heavily upon *Marymount*, wherein the plaintiff pled facts showing that (1) the adjudicator in his case, (2) exhibited "disbelief" of males in a subsequent investigation, and (3) believed that "males [] always enjoy sexual contact even when that contact is not consensual." *Marymount Univ.*, 297 F. Supp. 3d at 587. The conversation evidencing those well-pleaded facts allowed a reasonable inference that the adjudicator had earlier applied an anti-male bias in the plaintiff's Title IX investigation. Thus, in *Marymount*, the allegations were sufficient to defeat a motion to

16

dismiss because well-pleaded facts "create[d] a plausible inference that the University's decision was infected with gender bias." *Id.* at 585.

The crucial allegation in that case was "that in a subsequent sexual assault investigation at Marymount," an "unpleasant exchange" between the male complainant and the investigator revealed the investigator's "decision-making was infected with impermissible gender bias, namely [a] discriminatory view that males will always enjoy sexual contact even when that contact is not consensual." *Id.* at 585–86. Bias was directly supported by well-pleaded facts showing the investigator "asked the male student 'were you aroused' by this unwanted touching? When the student responded, 'no,' [the investigator], in apparent disbelief, allegedly asked the male student again, 'not at all?'" *Id.* at 586.

*Marymount* is inapposite because Doe has not alleged similar facts about his adjudicator. The adjudicator in Doe's case was Dr. Hammat, and no well-pleaded facts directly support the inference that she, or even Mr. Williams, do not believe males, or—analogously to *Marymount*—believe males always enjoy engaging in harassing behavior. Here, Doe has failed to identify a conversation that is similar to what occurred in *Marymount* showing his adjudicator held specific, discriminatory and biased views against—or a preference for—one sex over the other. Neither has he shown that she applied such views in prior or subsequent investigations or adjudications. Having failed to allege facts showing the adjudicator was biased, Doe fails to create a plausible inference that the university's decision was infected with gender bias.

### (1) The Facts Do Not Show that Dr. Hammat Was Biased

Perhaps in recognition of the absence of well pleaded facts directly showing Dr. Hammat to be biased, Doe asks the Court to infer her bias so that it can then infer that it infected university's decision. He claims the inference flows from her findings and her public statements. Each basis is addressed in turn.

The findings in the Letters of Determination do not demonstrate Dr. Hammat's bias. *See* Dkt. 38 at 21-23 (identifying ten bases, a.-j., and citing the Complaint and exhibits). Doe has identified ten grounds, but each is woefully insufficient.[6] First, for example, he points to Dr. Hammat's word choice. *See* Dkt. 38 at 21 (subsection a., citing, *inter alia*, Compl. ¶¶ 249, 287, 296, 485). Specifically, he contends that use of the words "erotic" and "wife" indicate bias. But Dr. Hammat's descriptions—of a discussion as erotic and of a woman as not Doe's wife— merely convey information about the discussion and the woman, respectively. The words do not suggest she was seeking to punish Doe, or that she held a prejudice against males. Doe suggests that, but it is not a plausible inference.

The nine other specific grounds Doe identifies similarly fail to demonstrate bias. He presents them in an attempt to show that "a decision against the weight of the evidence is indicative of bias," but without an anti-male or pro-female leaning, this amounts to an assertion that bias is the only possible explanation for Dr. Hammat's findings. Dkt. 38 at 27. But where a plaintiff alleges gender bias is the only possible explanation for the outcome, claims fail if the "conclusion does not *necessarily* follow from the facts alleged." *Doe v. Rector & Visitors of George Mason Univ. ("GMU")*, 132 F. Supp. 3d 712, 734 (E.D. Va. 2015). That is the case here, because "[g]ender neutral concerns might well have easily—and more plausibly—motivated the challenged actions." *Id.*

Neither do Dr. Hammat's public statements show bias. Doe argues a published story, in which Dr. Hammat related her personal life experience, reveals gendered assumptions and

---

[6] In addition to arguing for these grounds, the Complaint pleads that "Dr. Hammat was [] demonstrably biased" because in the course of interviewing Doe based on the complaints against him, she "alluded to false, unrelated allegations against [him] and suggested that he was involved in a consensual, romantic relationship with an unnamed student." Compl. ¶ 149. Yet, the purpose of the interview could reasonably include determining the truth or falsity of such allegations. And Doe has pled that Dr. Hammat learned of these allegations from one of the complainants whose complaints she was tasked with investigating. Thus, raising these issues during an interview does not demonstrate bias.

further argues that her participation in a Title IX-related event "raises questions about [her] impartiality." Dkt. 38 at 25.  Both these arguments fail.

Doe's initial point is that, in a published article, Dr. Hammat (1) referred to victims as "she," and (2) revealed gendered assumptions when she used the phrase "kicked down doors," and expressed protectiveness of her sorority sisters.  While the complained-of word, "she," is obviously a gendered pronoun, Dr. Hammat's use was merely conversational and the conversational context shows that use does not reflect any bias.  The word arose within a discussion between Dr. Hammat—a woman—and two other women.  Dr. Hammat was describing a hypothetical situation, and in the example, she identified a hypothetical "roommate."  Given the exclusively female participants in the conversation, it is unsurprising that Dr. Hammat's hypothetical roommate would be a female.  Dr. Hammat's use of the word "she" therefore does not demonstrate anti-male bias or a gendered assumption of victimhood.

Similarly, Dr. Hammat's use of "kicked down doors," and hypervigilance or protectiveness regarding her sorority do not show bias.  Doe argues they reflect "gendered assumptions about males as sexual predators, females being in need of protection and the aggressive manner in which males need to be handled in order to prevent them from raping females."  Dkt. 38 at 24.  But Dr. Hammat was describing her own past behavior, and the actions of her sorority sisters.  These factual and descriptive statements do not reflect her gendered assumptions or bias, they relate a story of what Dr. Hammat and members of her sorority did when leaving parties.

Finally, Doe's argument that Dr. Hammat's impartiality must be questioned based on her Title IX advocacy event attendance falls flat.  Doe pleaded that:

> In April 2016, while employed at GMU as Title IX Coordinator, Dr. Hammat participated in an event that the Clearinghouse on Women's Issues listed as a "DC Area Feminist Event," "How Equity Advocates Can Support High Expectations

for Title IX and Title IX Coordinators." As part of the event, Hammat was to provide her "wish list" of how women's advocates could assist her with Title IX enforcement. This is yet another example of Dr. Hammat publicly taking a biased position on the side of women's rights when she was required to make *impartial* determinations of responsibility in GMU's sexual misconduct cases.

Compl. ¶ 152 (emphasis in original). While this is a well-pleaded fact, it does not support a plausible inference of bias because it is reasonable to expect a Title IX Coordinator to participate in Title IX-related events. This is especially the case for events such as the one described above, which will improve the community's ability to support university personnel. Doe has merely pleaded that Dr. Hammat, a Title IX Coordinator, attended and participated in an event which was directly related to her work.

In essence, Doe asks the Court to infer bias because the Complaint includes the words "Women's Issues" and "Feminist." That does not show bias. *See, e.g., Miami Univ.*, 882 F.3d at 593 n.6 (noting that "being a feminist, being affiliated with a gender-studies program, or researching sexual assault does not support a reasonable inference than [sic] an individual is biased against men."). Indeed, for Dr. Hammat to have avoided the event based on its association with those words would likely demonstrate a gender bias against females. The well-pleaded facts indicate the event was relevant to her Title IX Coordinator job, and no facts show she participated in, or failed to participate in, any events because of a particular sex or gender. Accordingly, Doe has again failed to plead facts allowing a plausible inference of bias.

In sum, this case is unlike *Marymount* because no facts directly show the adjudicator's bias. Doe has also failed to plead facts which allow the Court to infer Dr. Hammat's bias. While Dr. Hammat's findings and public statements may make an inference of gender bias conceivable, the question that the Court must answer "is whether the [] factual allegations make that inference cross the line from conceivable to *plausible.*" *GMU*, 132 F. Supp. 3d at 733 (emphasis in original). Here, they do not. And, indeed, to the extent Doe has pled a conceivable inference of

20

bias, he has also undermined that inference by pleading that Dr. Hammat removed an investigator from his case based on his allegation that the investigator was biased. Compl. ¶¶ 9, 146 n.53, 148. Therefore, the Complaint does not plead facts which support an inference that Dr. Hammat was biased based on gender, or that bias infected the university's decision-making in Doe's proceeding.

### (2) The Facts Do Not Show that Mr. Williams Was Biased

Doe has pled that Dr. Hammat was "the sole individual tasked with deciding the outcome of the allegations against" him. Compl. ¶ 150. Nonetheless, he argues that he has successfully stated a claim because his Complaint shows Mr. Williams' bias. It does not.

First, Doe identifies—as he did with Dr. Hammat—a number of Mr. Williams' ultimate findings, statements, and evidentiary analyses, with which he takes issue. For example, Doe appears to claim Mr. Williams improperly found him responsible for taking "a trip to a strip club with students during a professional conference," even while he "acknowledge[s] that he should have left upon realizing that the outing involved [a] strip club," but did not. Compl. ¶ 380. Regardless, as noted above, whether Doe would weigh the evidence differently himself is not indicative that the actual decisionmaker was affected by a gender bias. "And, in the absence of any specific factual allegations pointing to such a bias on the part of the defendants, it cannot be said that the discriminatory motive explanation is plausible rather than just conceivable." *GMU*, 132 F. Supp. 3d at 733.

Doe claims the "tone of Mr. Williams' response" to his appeal "insinuated" a gendered view. Dkt. 38 at 26. But Doe must allege facts to support such a view, and the only potentially relevant factual allegations pertain to the following statements. Doe has plead that:

> Mr. Williams made public statements in the past that campus administrators have
> a moral obligation to protect and care for female students and to make them feel
> safe when investigating and responding to allegations of sexual assault and sexual

harassment and that, regardless of the outcome, they are to be believed as telling the truth.

Compl ¶ 485.g. Thus, two statements are at issue: that campus administrators must protect and care for female students, and that they are to be believed.

The first issue relates to campus administrators' obligations to female students. Mr. Williams has stated "If you don't have an environment that is investigating and responding to issues of sexual assault and sexual harassment, female students on your campus may not feel safe, and they may not feel like they belong." Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 19 (Dkt. 38-19) at 2.[7] This statement's use of a gendered pronoun does not suggest a bias because it does not suggest an obligation to females that is exclusive of or that detracts from any obligation to males. Instead, it merely expresses a true proposition which is, since male students may also be susceptible to those same feelings, incomplete. There is no gender bias in recognizing and articulating that females may feel unsafe if a university does not address sexual assault and harassment issues. That is what Mr. Williams did in his statement.

The second issue relates to believing victim statements. Doe pleads that, regarding Title IX complainants, Mr. Williams has said: "[r]egardless of the results of the hearing, we still hear you . . . . Just because a panel may not have had enough information to determine that there has been a probable policy violation doesn't mean that we don't believe you, doesn't mean that we think you are lying." Compl. ¶ 166. This statement does not suggest an anti-male bias. First, it demonstrates that Mr. Williams understands that not every Title IX complaint will support a violation. Second, and more importantly, it suggests—at worst—a tendency to believe complainants. Complainants and victims are and may be of any gender. Thus, a "bias in favor

---

[7] As an initial matter, Doe was factually incorrect when he represented to the Court that Mr. Williams made public statements about a moral obligation to females. The statement actually mentioned both "legal" and "moral obligations" and referred not to females but to "our students and our community." Pl.'s Opp'n to Mot. to Dismiss Count I, Ex. 19 (Dkt. 38-19) at 2.

of victims and against those accused of misconduct, is not evidence of anti-male bias." *Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 519.

Doe has failed to allege that Mr. Williams exhibited bias.  Neither the contention that Doe would weigh the evidence differently, nor the statements Mr. Williams previously made show a gender-based bias infected his or the university's decision-making in Doe's proceeding.

*(3) Doe's Allegations of "Pressure" Do Not Show Gender Bias*

Lastly, Doe argues that GMU was subjected to pressures coming "from the federal government, the State of Virginia, constant negative publicity, and campus activism to aggressively protect female students from the sexual misconduct at the expense of the rights of the accused." Dkt. 38 at 28 (quoting Compl. ¶ 101).  Specific examples of the cited pressures include, for example, two Department of Education investigations into GMU, a campus community outcry regarding GMU's hiring of Justice Kavanaugh, and media reports concerning allegations against GMU professors. *See, e.g.*, Compl. ¶¶ 98-135.

Accepting these allegations as true, and viewing them in the light most favorable to Doe, the well pleaded facts give rise to the inference that the "public attention and the ongoing investigation put pressure on the university to prove that it took complaints of sexual misconduct seriously." *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).  Even so, such "pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding," may give rise to a plausible claim.  *Id.*

Doe argues that four events show Mr. Williams and Dr. Hammat succumbed to the cited pressures and that, as a result, he has pled bias.  First, as to Mr. Williams, Doe claims bias is evident because Mr. Williams stated that GMU must comply with Title IX to avoid losing federal funding in response to a federal investigation.  Compl. ¶ 109.  But compliance with Title

IX is a legal requirement and applies to protect both genders.  Compliance with it, even for the exclusive purpose of receiving federal funding, therefore does not show bias.  Second, Doe claims Mr. Williams revealed bias when he stated his office "would never want a message conveyed to [the GMU] community that suggests a student would not be listened to" when issuing a Title IX complaint.  Compl. ¶ 119.  Like the other statement, this does not show bias because both males and females may be "listened to" in relation to a Title IX complaint, and indeed Mr. Williams did not differentiate between male and female students.  Third, Doe argues Dr. Hammat showed bias by meeting with the Women and Gender Studies Department to address their demands in Title IX proceedings.  Compl. ¶ 110.  This argument fails because meeting with interested stakeholders and addressing concerns is within the Title IX Coordinator's scope and no fact indicates she excluded any other individuals or groups.  Finally, Doe argues Dr. Hammat showed bias when she said the Secretary of Education's remarks could be construed as devaluing sexual assault survivors.  Compl. ¶ 112.  Because survivors can be male or female, these statements apply to both genders and this argument also fails.

Thus, Doe has provided no basis from which to infer the existence of bias in his specific proceeding.  While social, societal, or governmental pressures may provide a backdrop to a given case, a plaintiff must nonetheless plead particularized facts, such as decision-maker statements or patterns of decision-making, which "show the influence of gender." *Yusuf*, 35 F.3d at 715. Without more, the pressures which Doe cites to are insufficient to state a claim. *See, e.g., Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) (explaining "it is not reasonable to infer . . . a practice of railroading [those] accused of misconduct" based on the Department of Education's control over university's federal funding); *accord Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017) (finding pressure of Department of Education's investigations into university Title IX proceedings and resultant publicity did not create bias).

As discussed above, Doe has not shown that Dr. Hammat or Mr. Williams were biased.

Each of Doe's numerous attempts to show an anti-male bias have failed. At most, Doe's factual allegations may allow for an inference of bias in favor of victims and against the accused—but that bias is not actionable. He has not shown that Dr. Hammat or Mr. Williams made statements demonstrating a gender-based bias, or that such a bias existed in his specific proceeding. Accordingly, Doe has failed to state an erroneous outcome claim.

### (ii) Selective Enforcement

To state a claim under a theory of selective enforcement, a plaintiff must allege (1) that the university treated him less favorably than a similarly situated person of the opposite gender,[8] and (2) that the plaintiff's gender was a motivating factor for the less favorable treatment. *See Yusuf*, 35 F.3d at 715.

In his Complaint, Doe alleges "[u]pon information and belief," that: GMU engaged in a pattern of unfair investigations and adjudications to the disadvantage of males, that female professors have not been formally investigated by Title IX administrators, and that female professors found responsible for violating university policies have received less severe sanctions than males. Compl. ¶¶ 487-89. Under the federal pleading standards, "[a] plaintiff is generally permitted to plead facts based on 'information and belief.'" *Ridenour v. Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015). That pleading device is appropriate in at least two situations. First, information and belief pleading may be appropriate where allegations "rely on second-hand information." *Raub v. Bowen*, 960 F. Supp. 2d 602, 615 (E.D. Va. 2013). Second,

---

[8] The Fourth Circuit has not addressed whether a comparator is required to state a selective enforcement claim, but in the absence of binding precedent, courts within this district have. *See Doe 2*, 384 F. Supp. 3d at 608–09 (Brinkema, J.) (noting that "both the Eastern and Western Districts of Virginia" have required a comparator to state a claim) (citing *Sheppard v. Visitors of Virginia State Univ.*, 2019 WL 1869856, at *4 (E.D. Va. Apr. 25, 2019) (Hudson, J.); *Streno v. Shenandoah Univ.*, 278 F. Supp. 3d 924, 932 (W.D. Va. 2017) (Dillon, J.)); *accord Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d at 515 (Trenga, J.); *see also Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 931 (S.D. Iowa 2018); *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016).

it may be appropriate where the underlying "facts are peculiarly within the possession and control of the defendant." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010); *accord Ridenour,* 147 F. Supp. 3d at 456. Plaintiff has alleged neither second hand information nor the existence of particular facts which may support either element of this claim.

In *Ridenour,* the plaintiff alleged upon information and belief that "*either*" one or the other "or both" of the two defendants—MCC and Sterling—used an inaccurate background check report to reject his employment application. *Ridenour,* 147 F. Supp. 3d at 456-57 (emphasis in original). These "information and belief" allegations were "not prohibited" based upon the confluence of two factors. *Id.* at 457. First, the court found that "other allegations in the complaint plainly suggest that MCC" did in fact use the inaccurate background check report, and second, the court found the record before it "suggests that the details of the relationship between Sterling and MCC [were] known only to defendants." *Id.* Thus, the Complaint contained well-pleaded facts which supported the allegations pled upon information and belief.

But while the plausibility standard does not prevent a plaintiff from pleading facts upon information and belief, he "may not rely exclusively on conclusory allegations of unlawful conduct, even where alleged 'upon information and belief.'" *Doe v. Salisbury Univ.,* 123 F. Supp. 3d 748, 768 (D. Md. 2015). In *Salisbury University,* Judge Bredar explained the permissibility and impermissibility of pleading upon information and belief in the erroneous outcome context. The plaintiffs there pleaded, upon information and belief, "*specific factual allegations*" which supported their claims both (1) existed and (2) were "peculiarly within the possession" of the defendant. *Id.* (emphasis in original). Specifically, the plaintiffs alleged that the university was in possession of certain communications which would show an intentional gender bias motivated a particular erroneous finding. In finding these specific factual allegations sufficient, the *Salisbury* court noted that the plaintiff's "allegations would be insufficient if they

26

had simply stated something akin to: 'Upon information and belief, procedural defects were motivated by gender bias.'" *Id.* Those defective, conclusory allegations are like the allegations in this Complaint.

Unlike *Salisbury* and *Ridenour*, the Complaint here is devoid of facts supporting the allegations that were pleaded upon information and belief. In *Salisbury*, the existence of particular communications in the control of the adverse party allowed the court to reasonably infer animus. In *Ridenour*, the existence of the inaccurate report, other facts indicating one defendant relied upon it, and the existence of a relationship between the two defendants allowed the court to reasonably infer the second defendant may have acted on the report. Here, Doe's allegations of selective enforcement are not supported by any well-pled facts that exist independent of his legal conclusions.

While he argues that "the statistical evidence necessary to prove this claim is within [GMU's] exclusive possession or control," Dkt. 38 at 29, the Complaint does not allege any such evidence exists. Unlike the communications in *Salisbury*, Doe has not pleaded facts to indicate what that evidence would be, the form it would be in, the time frame it may occupy, or the personnel involved. He has not pleaded any dates or instances of female professors engaging in conduct similar to his own. Indeed, the closest he has come to providing a well-pleaded fact which could support a selective enforcement claim is footnote 71, in which he notes that "members of the faculty, including a female professor, regularly invite students to their homes for pool parties." Compl. ¶ 379 n.71. But, even so, Doe was not accused of hosting a pool party and a pool party was not the basis for any of his Title IX proceedings. And regardless, beyond failing to allege that female professors engaged in similar conduct, he has not pleaded the critically important fact of whether students lodged similar complaints against female professors, or that any females were subjected to any investigative, adjudicative, or disciplinary measures or

27

proceedings. Instead, he has pled in a conclusory fashion and without factual support, a wholly speculative conclusion that the university engaged in selective enforcement.

No facts support the inference that Doe was treated less favorably than a female. Even if he was, no facts support the inference that any disparity was motivated in part by his gender. Because Doe has not alleged the existence of a female comparator or gender-based bias, he has failed to state a claim for selective enforcement.

### 2. Claims Against GMU Employees

In Counts II, III, and IV, Doe claims that GMU officers denied him due process and his right to free speech, in violation of 42 U.S.C. § 1983 in violation of Virginia's constitution in its own right. Doe seeks monetary relief from the individual defendants only in their individual capacities.[9] *See* Compl. ¶ 530 (Count II damages); ¶ 536 (Count III damages); ¶ 558 (Count IV damages); Compl. at 159-160 Prayer for Relief (limiting monetary damages against the individual defendants to their individual capacities). Because his individual-capacity claims against Provost Wu and Dean Ardis were withdrawn, the individual defendants from whom Doe seeks money damages are only Dr. Hammat, Mr. Williams, and Dr. Renshaw. He also seeks injunctive relief from all five individual defendants.

#### (i) Due Process Claims

Doe has asserted that the individual defendants deprived him of due process in violation of the federal and state Constitutions.

##### (a) § 1983 Violations Predicated on Denial of Fourteenth Amendment Due Process (Count II)

---

[9] The individual defendants correctly point out, and Doe does not contest, that claims against them in their official capacities for money damages are barred. *See* Dkt. 30 at 6-7 (noting that 42 U.S.C. § 1983 actions for monetary damages against these individual defendants in their official capacities are barred by the Eleventh Amendment); *see also* Dkt. 43 at 6 n.3 (conceding that point).

Count II alleges that all five individual defendants deprived Doe of procedural due process in the Title IX investigation, proceedings, and outcome. "To succeed on a procedural due process claim, a plaintiff must satisfy three elements." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013). They are: "(1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." *Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988)).

Doe has attempted to assert both a liberty interest and a property interest. In both cases, however, he has failed to state a due process claim. First, he has failed to plead a liberty interest is implicated in his case, and therefore has not satisfied the first element. Second, although he pled a cognizable property interest, he has failed to satisfy the second element because he did not plead a deprivation of that interest.

### (1) Doe Failed to Plead a Cognizable Liberty Interest

Doe purports to assert a reputational liberty interest. Compl. ¶ 502. Public employees have a constitutionally protected liberty interest in their "good name, reputation, honor, or integrity." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)); *accord Echtenkamp v. Loudon Cty. Pub. Sch.*, 263 F. Supp. 2d 1043, 1056 (E.D. Va. 2003). But there is "no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 702 (1976). Accordingly, an employee's liberty interest in "reputation alone, apart from some more tangible interests such as employment," is insufficient "to invoke the procedural protection of the Due Process Clause." *Id.* at 701.

29

But "a public employer cannot deprive an employee of her 'freedom to take advantage of other employment opportunities.'" *Willis v. City of Virginia Beach*, 90 F. Supp. 3d 597, 616 (E.D. Va. 2015) (quoting *Roth*, 408 U.S. at 573). Therefore, to state a reputation liberty interest claim, "a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino v. City of Newport News, Va.*, 480 F.3d 642, 646 (4th Cir. 2007) (citing*Stone*, 855 F.2d at 172 n.5). Here, Doe has failed to plead the facts which support a reasonable inference that he has suffered the necessary employment-related harm. The Court will therefore focus the discussion below on the third element and expresses no opinion as to the others.

A liberty interest in one's reputation is cognizable where a public employer has made stigmatizing remarks in the course of a discharge or significant demotion. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006) (quoting *Stone*, 855 F.2d at 172 n.5). Here, Doe does not allege that he was discharged. Compl. ¶ 502. Neither does he plead an actual demotion. Instead, he argues, that the sanctions imposed upon him effectively constitute a "significant demotion" and therefore implicate his liberty interest. Dkt. 43 at 15. In short, the sanctions imposed on Doe required sexual harassment training and performance review with student input, restricted his communications with students to official channels and settings, and restricted him from teaching graduate-level courses through August of 2021. He was also disaffiliated from the Program, a subgroup within the Department, for approximately six years, which had the effect of limiting his participation in committees, activities, and research, associated with that Program.

Doe's argument relies primarily upon *Ridpath*. There, the Fourth Circuit held that a "'significant demotion' may include the reassignment of an employee to a position outside his

field of choice." *Ridpath*, 447 F.3d at 309.  Doe has failed to plead facts similar to those in *Ridpath*, and accordingly, that case is inapposite.

In *Ridpath*, the Fourth Circuit found a reassignment to be "a significant demotion . . . tantamount to an outright discharge," where the plaintiff's new "position [was] outside his chosen field." *Id.* at 310.  In that case, Mr. Ridpath's "chosen career [was] in intercollegiate athletics administration, particularly in the area of overseeing compliance with NCAA rules." *Id.* at 300.  His position was within the Department of Athletics, where he was the Compliance Director. *Id.* at 310.  Mr. Ridpath was not merely reassigned from that position, but was "relegated to a position for which he lacked the necessary education and training." *Id.*  He "was banished from the Department of Athletics" entirely, to an entirely dissimilar position: Director of Judicial Programs. *Id.*  The Director of Judicial Programs position, outside the plaintiff's chosen field of athletics administration, "constituted, at best, a perilous detour on his career path and, at worst, a dead end." *Id.*

Doe's case is crucially different in three respects.  First, Doe remains within his chosen career field.  He argues that his disaffiliation from the Program is akin to Mr. Ridpath's disaffiliation from the Athletics Department, but it is not.  The Program is a single, narrow component of Doe's field of choice, which is the Department.  Doe was not banished from the Department; he has not been stripped of his ability to either teach courses or conduct research. Doe is therefore different from Mr. Ridpath, who was relegated from intercollegiate athletics administration to judicial programs, because Doe was originally in the Department, and is still in the Department.

Second, Doe has not lost his position.  He argues that "the prohibition on working with graduate students . . . has prevented him from fulfilling his duties as a professor," but he does not plead facts which support this argument.  Dkt. 43 at 17.  Working with graduate students is

31

merely a single aspect of the comprehensive and varied professorial duties he has pleaded, which include teaching and researching, attending conferences and presenting at workshops. While Mr. Ridpath lost his job, his duties changed, and his title changed from Compliance Director to Director of Judicial Program, Doe is still a tenured, full professor with teaching and research duties.

Third, Doe has not lost ability to perform his calling. He is authorized to teach courses within his chosen field and to conduct research—he has merely been restricted. But the sanctions do not prohibit doctoral students, even within the Program, from working with Doe, and he retains the ability to conduct research with undergraduates, post-doctoral students, and faculty members. He has not pled facts giving rise to the inference that the sanctions imposed and disaffiliation from the Program may be, even, a perilous detour on his career path. Accordingly, Doe's sanctions are exceedingly dissimilar from the significant demotion of *Ridpath*.

Doe also points to *Miller* and *Hall* as support for the proposition that his sanctions are a significant demotion. Neither case supports his argument.

In *Hall*, a police officer—Mr. Hall—was terminated, then his position was reinstated. *Hall v. City of Newport News*, 469 F. App'x 259, 261 (4th Cir. 2012). Upon his reinstatement, however, the police department "assigned him to a civilian position in the Records Bureau and stripped him of his law enforcement powers and status as a police officer." *Id.* The Fourth Circuit found that Mr. Hall's allegations were sufficient, under *Ridpath*, "to qualify as a significant demotion" because despite his reinstatement to the police force, he was relegated to a "civilian position," lost "the police power to make stops, issue summons and warrants, and make arrests," and accordingly was put in a position which "effectively excludes him from his trade or calling as a police officer." *Id.* at 262–63. Unlike Mr. Hall, here, Doe's position remains

32

unchanged, and he has not lost his ability to perform core professorial duties of teaching and research.

Similarly, the *Miller* plaintiff was a Flight Officer in the Aviation Unit of the Baltimore Police Department. *Miller v. Hamm*, 2011 WL 9185, at *1 (D. Md. Jan. 3, 2011). He lost that position, and was "transferred to the Marine Unit, which provides uniformed foot patrol in the Inner Harbor area. He had not previously held this position or received recent training as a uniform[ed] foot patrol officer. Moreover, he was advised that this reassignment would result in a decrease in pay." *Id.* at *2. The court concluded that Mr. Miller "sufficiently alleged a significant demotion" because "reassignment to the Marine Unit excluded him from his chosen career—flying helicopters for law enforcement." *Id.* at *9. Mr. Miller's reassignment out of the field of flight, in combination with his pay decrease, were critical to the court's conclusion. But where Mr. Miller suffered (1) a reassignment, which (2) altered his career path, and (3) reduced his income, Doe suffered no such changes. He was not reassigned to a new position, remained in both the teaching and research field and the field of study of the Department, and his pay was unchanged. Doe, unlike Mr. Miller, has not pled a drastic detour in his career.

In sum, Doe's case is significantly different from *Ridpath*, *Hall*, and *Miller*, and the Court concludes he has failed to plead a significant demotion. To invoke a liberty interest, "there must have been 'some damage to [the plaintiff's] employment status.'" *Willis*, 90 F. Supp. 3d at 617 (quoting *Johnson*, 903 F.2d at 999). Although Doe has pled that the sanctions instituted changes within the nature of employment, "to change" is not synonymous with "to damage." A plaintiff "falls well short of a 'significant demotion,'" where they show a mere "minor restriction of [] freedom and authority as a result of [] placement on probation" in conjunction with "increased supervision." *Echtenkamp*, 263 F. Supp. 2d at 1057 (quoting *Stone*, 855 F.2d at 172 n.5). That is what happened here: Doe has not been reassigned to a new or different position which

excludes him from his field, and indeed he has not even been suspended. *See Johnson*, 903 F.2d at 999 (where a public employee "is suspended but not discharged he 'cannot complain that he has been made unemployable; he remains employed.'") (quoting *Hershinow v. Bonamarte*, 735 F.2d 264, 266 (7th Cir. 1984)). Before the sanctions took effect, he was a tenured, full professor, teaching in the Department, with a certain salary, and that all remained true after the sanctions became effective. The well pleaded facts do not support the inference that the sanctions are tantamount to discharge, nor do they show a significant demotion occurred. Therefore, Doe has failed to implicate a liberty interest.

### (2) Doe Failed to Plead Deprivation of a Property Interest

Doe's "position as a tenured professor is indisputably a property right entitled to procedural due process protection." *Huang v. Bd. of Governors of Univ. of N. Carolina*, 902 F.2d 1134, 1141 (4th Cir. 1990). Doe has therefore satisfied the first element of his due process claim implicating a property interest by asserting his tenured professorship as a property interest. Compl. ¶¶ 502, 512.

The Supreme Court has not "decided whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997). The Fourth Circuit, however, has articulated the relevant legal principles which apply to a property interest in a tenured full professorship in *Huang*. In that case, Dr. Huang was a tenured full professor at North Carolina State University ("NCSU"). *Huang*, 902 F.2d at 1136. He alleged a due process violation occurred when NCSU forced him to transfer from the Department of Biological and Agricultural Engineering ("BAE") to the Division of University Studies ("DUS"). *Id.* at 1138. His interdepartmental transfer was accompanied by a reduced contractual obligation and corresponding pay reduction. *Id.* The Fourth Circuit found that Dr. Huang had not been deprived of his property interest where it was "beyond dispute" that

34

he "remain[ed] a tenured full professor . . . at the same or effectively greater salary." *Id.* at 1141. Indeed, citing the Eleventh, Sixth, and Fifth Circuits, the *Huang* Court went even further to hold that even "the transfer of tenured professors from one department to another, without loss of rank or pay, does not implicate any property interest protected by the Due Process Clause." *Id.* at 1142 (citing *Maples v. Martin,* 858 F.2d 1546, 1550–51 (11th Cir. 1988); *Garvie v. Jackson,* 845 F.2d 647, 651 (6th Cir. 1988) (demotion from department chairman to professor not a denial of a protected property interest); *Kelleher v. Flawn,* 761 F.2d 1079, 1087 (5th Cir. 1985) (reduction of graduate student's teaching duties is not denial of a protected property interest)).

Here, Doe has not pled that he was terminated, lost his tenured position, or had his salary reduced.[10]  To the contrary, he continues to hold his position. Compl. ¶ 502; *see also* Compl. ¶¶ 28 (Doe "has worked at GMU for over fifteen (15) years,"), 30 (Doe's "research focuses on sex, human sexuality and cultural norms,"), 31 (Doe "has received continuing support" regarding his Title IX matter). As such, Doe has not been deprived of his property right in his tenured full professorship.

Further, he has not pled that he was transferred and lost pay or rank.  His probation and disaffiliation from the Program do not affect his professorial status or position within the Department.  Thus, the sanctions here are less severe than those in *Garvie*, where a demotion from department chair to professor did not implicate a property interest. *See Garvie,* 845 F.2d at 651 (cited favorably in *Huang,* 902 F.2d at 1142). And the precise sanctions he complains of, a reduction in teaching duties, occurred in *Kelleher,* and was found not to be a denial of a protected property interest. *See Kelleher,* 761 F.2d at 1087 (cited favorably in *Huang,* 902 F.2d at 1142). Accordingly, Doe has not pled a deprivation of a protected property interest.

---

[10] Doe has pled that he is ineligible for salary *increases* and merit-based *raises*, but these losses are contractual and speculative, respectively, and do not constitute cognizable injuries. *See* Compl. ¶ 399.

He argues there is "no bright line rule in this Circuit that *requires* [] a public employee be terminated in order to plausibly allege a deprivation of his or her property interest in continuing employment." Dkt. 43 at 7 (emphasis in original). The Fourth Circuit rejected this argument when it rejected Dr. Huang's contention "that he had a property right in his BAE position." *Id.* at 1141. The Circuit Court quoted its previous opinion, explaining that:

> to hold that [an employee] had a constitutionally protected property interest in continuing to perform his services would make it impossible for a public employer, dissatisfied with an employee's performance, but without specific contractual cause to discharge him, to relieve the employee from his duties although willing to compensate the employee in full....
> We are convinced that any constitutionally protected property interest [an employee has] as a result of his employment contract [is] satisfied by payment of the full compensation due under the contract.

*Id.* (alterations in original) (quoting *Royster v. Board of Trustees*, 774 F.2d 618, 621 (4th Cir. 1985), *cert. denied*, 475 U.S. 1121 (1985)). Thus, the fact that Doe has not pled loss of his position or salary is fatal.

The three cases Doe cited do not support his proposition. In both *Willis* and *Wilkinson*, the property interests asserted included a right to not be suspended. *Willis*, 90 F. Supp. 3d at 613; *Wilkinson v. School Bd. Of Cnty. Of Henrico*, 566 F. Supp. 766, 769 (E.D. Va. 1983). Here, the metes and bounds of the asserted property right were proclaimed in *Huang*, and while they extend to not being terminated, this interest does not include a right not to be disciplined. The third case Doe cites is *Garner*, but in that case, the plaintiff was both demoted to a new position and lost a monetary subsidy provided for in a contract. *Garner v. Steger*, 69 F. Supp. 3d 581 (W.D. Va. 2014). Thus, the *Garner* plaintiff asserted a property interest in the original position which was lost, and—in accord with *Huang* and *Royster*—was denied a contractual monetary benefit. None of these cases involve a property interest that was like Doe's.

36

To the extent Doe asserts a property interest in the right "to be free from overburdensome, unwarranted sanctions tantamount to dismissal from his professional position arises from his appointment letter," his claim also fails. Compl. ¶ 512. First, Doe's vague reference to his appointment letter fails to plead the existence of any property interest because he has not identified a source from which that right would flow.[11] Second, and resultantly, the scope of Doe's asserted property interest is limited to his tenured professorship, and he cannot claim it is tantamount to a property interest in the ability to provide his teaching services as he sees fit, or to graduate students in particular. "[T]he Fourteenth Amendment's due process right to property does not guarantee a right to a particular job, or the right to 'perform particular services.'" *Hibbitts v. Buchanan Cty. Sch. Bd.*, 433 F. App'x 203, 206 (4th Cir. 2011) (quoting *Fields v. Durham,* 909 F.2d 94, 98 (4th Cir. 1990)). Constitutionally protected property interests arising from employment contracts such as a tenured professorship are "satisfied by payment of the full compensation due under the contract." *Huang*, 902 F.2d at 1141 (quoting *Royster,* 774 F.2d at 621). Accordingly, the sanctions imposed here are not an actionable deprivation. *See id.*

The "critical point" in due process claims is that a plaintiff is entitled to constitutional protections only after he has shown that he was deprived of a cognizable interest. *Stone,* 855 F.2d at 172 ( *Roth,* 408 U.S. 564 (1972), *Daniels v. Williams,* 474 U.S. 327 (1986)). "Unless there has been a 'deprivation' . . . the constitutional right to 'due process' is simply not implicated." *Id.*; *accord Iota Xi,* 566 F.3d at 146. Here, Doe has failed to meet this threshold. Because no deprivation occurred, "the question of what process is required and whether any

---

[11] *Compare* Defs.' Mot. to Dismiss Counts II-IV, Ex. 5 (Dkt. 30-5) (appointment letter providing that Doe "may be reassigned duties as determined by the University" and incorporating terms and conditions of the Faculty Handbook) *and* Defs.' Mot. to Dismiss Counts II-IV, Ex. 4 (Dkt. 30-4) ("Faculty Handbook") (providing, in Section 2.10.3, that "work assignments include **some combination** of teaching, research and scholarship, and/or service.") (emphasis added) *with* Pl.'s Opp'n to Mot. to Dismiss Counts I-IV (Dkt. 43) at 10 (noting that the Faculty Handbook, in Section 2.10.3 guarantees "a right to procedural due process" but pointing to no guarantee of an ability to teach graduate courses, or to do so without restrictions).

provided could be adequate . . . is irrelevant." *Id.* Accordingly, the Court's analysis will not reach the third element, the adequacy of procedures here.

### (b) Violations of the Due Process Clause of the Virginia Constitution (Count III)

In Count III, Doe alleges all five individual defendants violated the Virginia Constitution by depriving him, through the Title IX investigation, its proceedings, and its outcome, of a property interest without due process of law.

The Virginia Constitution provides that "no person shall be deprived of his life, liberty, or property without due process of law." Va. Const. Art. I, § 11. "In order to enforce a private right of action under the Virginia Constitution, the provision in question must be self-executing." *GMU*, 132 F. Supp. 3d at 728 (citing *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681, 324 S.E.2d 674, 676 (1985)). The due process clause of the Virginia Constitution is self-executing, but only "with regard to *property* deprivation." *Id.* (emphasis in original) (citing *Gray v. Rhoads*, 55 Va. Cir. 362, 368 2001 WL 34037320, at *5 (City of Charlottesville, 2001); *Graham v. Mitchell*, 529 F. Supp. 622, 625 (E.D. Va. 1982)). Doe asserts he suffered a property deprivation in regard to his tenured position. *See* Compl. ¶ 502; Dkt. 43 at 7 n.2 (Doe "is not asserting a . . . claim with respect to his liberty interest.").

"Virginia state courts have 'consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution.'" *Doe 2*, 384 F. Supp. 3d at 612 (quoting *Lilly v. Commonwealth*, 50 Va. App. 173, 184, 647 S.E.2d 517 (2007)). As noted above, there is no question that Doe's "position as a tenured professor is [] a property right entitled to procedural due process protection." *Huang*, 902 F.2d at 1141. But he has not alleged that he was deprived of that tenured position. Accordingly, as discussed in more

detail above, Doe has not pleaded that he was deprived of a property interest. Count III therefore fails to state a claim.

### *(ii) First Amendment Claim (Count IV)*

Finally, Doe alleges in Count IV that individual defendants Dr. Hammat, Mr. Williams, and Dr. Renshaw violated § 1983 when they sanctioned him based on his speech, because to do so violated his First Amendment rights. He argues that the various statements GMU found to be sexual and gender-based harassment were about matters of public concern, were made in his capacity as a private citizen, and were therefore protected speech. Dkt. 43 at 27-30. Notably, he does not point the Court toward specific statements, but instead breaks the speech into two groups: in-class statements related to human sexuality and sexual disorders, and statements made outside the classroom. Dkt. 43 at 29. The question is therefore whether Doe has pleaded that regulating those statements violates the First Amendment.

While public employees retain First Amendment rights, "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000). The "determination of whether a restriction imposed on a public employee's speech violates the First Amendment requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id.* (alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). Thus, there is a threshold inquiry: "If a public employee's speech made in his capacity as a private citizen does not touch upon a matter of public concern, the state, as employer, may regulate it without infringing any First Amendment protection." *Id.* (citing *Connick,* 461 U.S. at 146; *Holland v. Rimmer,* 25 F.3d 1251, 1254–55 & n.11 (4th Cir. 1994)). Accordingly, Doe's claim may survive

only if he has pled facts which support that his speech both was on matters of public concern and was made by him as a private citizen, not as an employee. His claim fails because he has affirmatively pled that the speech at issue does not satisfy either element.

The essence of Doe's claim is that he is entitled to discuss any sex-related matters by virtue of his position as professor of "human sexuality, relationships and cultural taboos." Compl. ¶ 548. This argument fails at inception because, in attempting to plead his speech was of public concern, Doe has pled that his speech was not made in his capacity as a private citizen. Indeed, Doe pleads that his statements, "both inside and outside the classroom," were matters of public concern specifically *because* they occurred "with his graduate students" and "concerned . . . topics directly related to the research [Doe] and his graduate students were conducting at the time." Compl. ¶ 548; *see also, e.g.*, Compl. ¶¶ 288 ("Plaintiff's discussion about oral sex within the context of exhibitionism and paraphilias was protected academic discourse,"), 253-55 (pleading that Doe recounted a story of his performing oral sex in public at a party to a class, as "an appropriate pedagogical tool."). In so pleading, Doe has asserted that the statements at issue were made either during and in relation to a class he taught in his capacity as a GMU professor, or in relation to and in conjunction with such a class or related research that he conducts in the same capacity. He has therefore pled that his speech is unprotected because it occurred in his capacity as a state employee.

Furthermore, Doe has pled that his speech is curricular and is therefore not a matter of public concern. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir. 2004) (citing *Connick*, 461 U.S. at 146). "For purposes of this inquiry, it does not matter 'how interesting or important the subject of an employee's speech is,' and 'the place where the speech occurs is [also] irrelevant.'" *Adams v. Trustees of the Univ. of N.C.-*

40

*Wilmington*, 640 F.3d 550, 565 (4th Cir. 2011) (alteration in original) (quoting *Urofsky*, 216 F.3d at 407). The Fourth Circuit has made clear that sexual topics may be a matter of public concern when they are made in one's capacity as a private citizen. *See, e.g.*, *id.* (tenured associate professor, who also was a columnist and commentator, authored columns addressing sex which "plainly touched on issues of public, rather than private, concern."). Yet, one's position as a professor of sexual taboos does not confer carte blanche and render all speech protected. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (holding that a teacher's selection of a play to be presented at a public school constituted a matter of private concern). Indeed, the Fourth Circuit has held that where the speech of a public employee is "part of [a] school's curriculum," it is "not protected speech under the First Amendment." *Id.* at 367. More specifically, because the nuances and manifestations of an institution's curriculum are to be decided between the employee/teacher and the employer/institution, curricular speech "does not present a matter of public concern and is nothing more than an ordinary employment dispute." *Id.* at 368. Here, Doe has repeatedly pled and argued that the speech at issue was curricular. *See* Dkt. 43 at 30 (arguing Doe's speech was curricular because it related to his work and citing Compl. ¶¶ 252-84, 287-89, 292, 296, 304-05, 326, 335-44, 353, 359, 362, 363, 367, 375-77, 379-80, 548-50). It is, therefore, not a matter of public concern.

Because Doe has pled that his statements were made in his capacity as an employee, and were not matters of public concern, he has failed to state a claim.

### 3. Amendment is Futile

In footnotes, Doe has requested—if his claims are to be dismissed—that two portions of those claims be dismissed without prejudice. Specifically, he has requested to replead his liberty interest claim based on the publication element, and he has requested to replead his selective

41

enforcement claim if his erroneous outcome claim survived. Dkt. 38 at 29 n.20; Dkt. 43 at 17 n.12. Those claims, like the others, will be denied with prejudice because amendment futile.

A party may amend its pleading once as a matter of course within certain time limits. Fed. R. Civ. P. 15(a)(1). In all other cases, "leave to amend shall be given freely, absent bad faith, undue prejudice to the opposing party, or futility of amendment." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000) (compiling cases); *see also* Fed. R. Civ. P. 15(a)(2). Amendment is futile when it "'is clearly insufficient or frivolous on its face.'" *Wilkins v. Wells Fargo Bank, N.A.*, 320 F.R.D. 125, 127 (E.D. Va. 2017) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986)). Clearly insufficient amendments "fail[] to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). Thus, where an amended complaint "could not withstand a motion to dismiss," amendment is futile. *Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995) (citing *Glick v. Koenig*, 766 F.2d 265, 268-269 (7th Cir. 1985)); *see also Katyle*, 637 F.3d at 471 (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (leave to amend may be denied if the "amended complaint fails to satisfy the requirements of the federal rules.") .

First, as an initial matter, the Court finds that Doe's footnoted requests fail to qualify as a motion for leave to amend. *See* Fed. R. Civ. P. 7(b), 15(a); *see also Cozzarelli v. Inspire Pharms., Inc.,* 549 F.3d 618, 630–31 (4th Cir. 2008) ("[W]e cannot say that the district court abused its discretion by declining to grant a motion that was never properly made,"); *United States ex rel. Williams v. Martin–Baker Aircraft Co.,* 389 F.3d 1251, 1259 (D.C. Cir. 2004) ("While Federal Rule 15(a) provides that leave to amend shall be freely given when justice so requires, a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion with the

contemplation of Rule 15(a)."). The Court will proceed with its analysis nonetheless, assuming Doe would make such a motion. Second, Doe's requests are futile. On the one hand, his liberty interest claim fails regardless of the publication element. On the other, he premised his selective enforcement claim repleading request upon the continued existence of his erroneous outcome claim, but that claim has also failed.

Furthermore, any other amendment to Doe's original 162-page Complaint is futile. Doe has exhaustively pled each count, and this lawsuit was filed only after he had painstakingly responded with the detailed extensive rebuttal to GMU's investigation, which he provided repeatedly during the administrative review. The Court cannot envision any amendments possible under Rule 11 which would cure the defects herein because Doe has extensively pled facts which preclude his claims.

"Courts recognize that a plaintiff can plead himself out of court by pleading facts that show that he has no legal claim." *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 594 (E.D. Va. 2013) (Lee, J.) (quoting *Whitlock v. St.*, 2012 WL 3686434, at *4 (E.D. Va. Aug. 24, 2012) (Hudson, J.) (compiling cases)). Doe has done so here. First, regarding his Title IX claims, Doe failed to plead a gender bias but alleged the existence a bias in favor of victims or complainants and against the accused. Since that bias is not gender-based, it is lawful. Second, regarding his due process claims, Doe has failed to show any deprivation which may invoke due process protections. Any subsequent deprivation will necessarily result from a separate transaction or occurrence. Third and finally, Doe has affirmatively pled that his speech at issue is unprotected by the First Amendment because it occurred in his capacity as a state employee, and was not of public concern.

Accordingly, amendment would be futile.

43

## IV. CONCLUSION

For the reasons stated above, Plaintiff's motion to proceed by pseudonym, Dkt. 2, is hereby **DENIED**.

Further, the improperly named Defendant "George Mason University" is hereby **DISMISSED**.

Further still, Defendants' motions to dismiss, Dkt. 26 and Dkt. 29 are hereby **GRANTED**, and the Complaint is hereby **DISMISSED WITH PREJUDICE**.

It is **SO ORDERED**.


April 23 2020
Alexandria, Virginia

_____
Liam O'Grady
United States District Judge